UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SUSAN E. WOOD,<br><br>     Plaintiff,<br><br>v.<br><br>SEMPRA ENERGY TRADING CORPORATION,<br><br>     Defendant. | CIVIL ACTION NO.<br>3:03-CV-986 (JCH)<br><br><br>May 14, 2004 |

FILED 2004 MAY 14 P 3: 25 U.S. DISTRICT COURT BRIDGEPORT, CONN.

**DEFENDANT'S LOCAL RULE 56(a)(1) STATEMENT OF UNDISPUTED MATERIAL FACTS SUPPORTING ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to D. Conn. L. R. Civ. P. 56(a)(1), Defendant, Sempra Energy Trading Corp. ("Sempra") respectfully submits that the following undisputed material facts warrant summary judgment in its favor on all claims in the Complaint, dated May 14, 2003 [doc. #1] (the "Complaint"), with the sole exception of Plaintiff's claim for breach of an implied contract to reimburse business expenses (Count Eleven). All exhibits referenced herein are compiled in Defendant's Appendix of Exhibits, submitted herewith.

   1.  In September 2000, Susan Wood ("Plaintiff") commenced her employment at Sempra. At that time, she held the position of Assistant Vice President. See Pl.'s Dep. at 51:12-52:15;[1] Employ. Agree. (Exhibit D).

---

[1] Relevant excerpts from Plaintiff's deposition are attached as Exhibit A.

2. In September 2000, Plaintiff received, read and signed an Application for Employment at Sempra. See Pl.'s Dep. at 105:4-22; Employ. Appl. (Exhibit N). The Application states, in pertinent part, as follows:

> I understand that nothing contained in this application *or in any policies, procedures or handbooks I might receive*, and nothing said to me in my interview, is intended to create an employment contract between Sempra Energy and me. No promises regarding employment have been made to me, and I understand that no such promise or guarantee is binding upon the Company unless it is in writing *and signed by an authorized Sempra Energy representative*. I understand and agree that if I am employed by Sempra Energy, my employment, including compensation and benefits, can be terminated, with or without cause, with or without notice, at any time, at the option of either Sempra Energy or me.

See Exhibit N at 8 (emphasis added).

3. Plaintiff was employed by Sempra pursuant to a written Employment Agreement that was signed by Plaintiff and Jacqueline Mitchell, a Managing Director at Sempra. See Pl.'s Dep. at 51:12-52:15; Exhibit D. Plaintiff signed the Employment Agreement on September 6, 2000. See Pl.'s Dep. at 51:12-52:15.

4. The Employment Agreement states that Sempra "may terminate [Plaintiff's] employment at will and whether or not for cause." See Exhibit D, ¶ 3. The Employment Agreement further provides that Plaintiff "may [] be eligible for a bonus, based on [her] performance and that of Sempra Trading and its subsidiaries, in an amount to be determined by Sempra Trading's management solely in their discretion." Id. at ¶ 2.

5. The Employment Agreement makes no mention of bonus payments being made to Plaintiff based on a percentage (10% or otherwise) of her booked profits, nor does it state that Plaintiff would remain employed by Sempra as long as she remained profitable for the

company. See Exhibit D.

      6.     The Employment Agreement incorporates by reference the terms of Sempra's Policy Manual. Id. at ¶ 3. The Policy Manual, in turn, states in pertinent part:

> Except as provided by the laws of any state or country where the Company has offices, or by a *written* contract between a particular employee and the Company, *each employee of the Company is an employee 'at-will.' The Company reserves the right to discipline or terminate its employees, with or without warning, for any reason.*
>
> . . . . . . . . . . . .
>
> The Company *may, but is not required to*, pay employees a bonus based on their performance and that of the Company. However, the determination as to whether and in what amounts to pay such bonus shall be made by the Company *in its sole discretion* and, *absent a written contract* to the contrary, *no employee has any entitlement to a bonus until it is actually received.*

See Policy Manual (Exhibit J) at 31 (emphasis added).

      7.     Plaintiff received a copy of Sempra's Employee Handbook on March 16, 2001. See Pl.'s Dep. at 108:13-109:7; Hand. Acknowl. (Exhibit O). The "Introduction" to the Handbook, which appears on the first page, states: "This Handbook sets forth the general policies and guidelines which govern everyone's employment in our Company. These policies and guidelines are subject to change from time to time . . . . [E]xcept for those provisions which expressly state otherwise, the handbook is not intended to be an express or implied contract of employment for a specified period of time, a guarantee of employment, or a promise to provide benefits." See Employ. Hand. (Exhibit I at 1). The Handbook section that addresses termination of employment states: "Certain conduct which is detrimental to other employees and/or the Company warrants involuntary termination on the first occurrence. These are guidelines only, and do not change the at will nature of your employment relationship. The Company reserves

the right to change these guidelines in its discretion." Id. at 19.

8. Prior to the commencement of her employment at Sempra, the only person who allegedly made representations to Plaintiff regarding the availability of profit-based bonuses at Sempra was an executive recruiter by the name of Audrey Cullen. See Pl.'s Dep. at 28:18-29:15; 44:11-47:13; 53:23-55:17. Ms. Cullen was not a Sempra employee at the time of her alleged discussions with Plaintiff. Id. at 29:1-15.

9. Plaintiff claims that, in early 2001, several months after executing the Employment Agreement, she was told for the first time that she would have a job at Sempra so long as she "remained profitable" for the Company. See Pl.'s Response to Def.'s Interrogatory No. 10 (Exhibit R).

10. Plaintiff admits that the amount of the bonus to which she claims entitlement in this lawsuit would be based not only on her performance but on the performance of Sempra as a company and other factors unrelated to her performance. See Pl.'s Dep. at 52:24-53:22.

11. In or about February 2001, Plaintiff transferred to the Petroleum Derivatives department. Id. at 109:8-11. That department serviced customers who had risk management needs related to the market pricing of petroleum-based products. The department's goal was to structure transactions for these customers to limit, manage or remove the price-fluctuation risk from their hands and place it into Sempra's at market prices. See Affidavit of Sarathi Roy ("Roy Affidavit"), ¶ 3 (Exhibit E).

12. In June 2001, Plaintiff was involved in a dispute with Joseph Howley, a Sempra Managing Director, in connection with a business transaction (the "Howley Incident"). The following facts regarding the Howley Incident are undisputed:

- On the afternoon of June 20, 2001, Plaintiff agreed to a natural gas transaction with a Sempra customer.

- Plaintiff obtained from Mr. Howley the price at which the deal with the customer was completed.

- At the completion of the deal, Plaintiff did not add a mark-up to the price quote she obtained from Mr. Howley. Consequently, the transaction included no profit for Plaintiff.

- Plaintiff thereafter approached Mr. Howley at his trading desk and, in a raised voice, accused him of "ripp[ing] her off." Plaintiff further indicated that Mr. Howley "owe[d] [her] some profit."

- No agreement was reached on the profit sharing issue at that time.

- A short time later Plaintiff returned to Mr. Howley's work station and, leaning with both of her hands into Mr. Howley's work area, again asked Mr. Howley to discuss the price sharing issue.

- At that time, it was near 2:30 p.m., approximately 40 minutes before the end of the trading day. Mr. Howley had approximately an 800 lot NYMEX position open on the trading desk. This position represented a substantial profit or loss to Sempra depending on how the market price changed before the end of the trading day.

- Mr. Howley told Plaintiff to "get away."

- When Plaintiff did not move, Mr. Howley used his hands to move Plaintiff away from his work space.

- Later that day, Mr. Howley apologized to Plaintiff for having touched her during the incident.

- Mr. Howley was twice reprimanded for his conduct, and advised that making physical contact with Plaintiff was inappropriate.

See Pl.'s Dep. at 60:5-66:8; 69:2-72:17; 73:24-75:13; Howley Dep. at 27:19-28:19; 56:5-57:22; 60:2-61:13;[2] Notated Incident Reps. (Exhibit L).

13. Within days after the Howley Incident, and immediately after his return from travel abroad, Sempra's General Counsel interviewed: (1) the Plaintiff, (2) Joseph Howley, and (3) at least two other employees who witnessed the dispute, either in whole or in part. See Goldstein Dep. at 27:20-28:10; 29:7-32:6;[3] Goldstein Notes (Exhibit Q). From those interviews, Attorney Goldstein generated an Incident Report describing the facts of the incident. See Goldstein Dep. at 62:13-63:13. Plaintiff thereafter made proposed written changes to the Incident Report, which she then signed as revised. Mr. Howley signed the original version of the Incident Report. Id. at 67:21-71:2.

14. One of Plaintiff's colleagues in the Petroleum Derivatives department was Sarathi Roy. See Pl.'s Dep. at 109:8-18. Mr. Roy worked in the Petroleum Derivatives department from approximately February 2000 until December 2002. See Roy Affidavit, ¶ 3.

15. In February 2002, Mr. Roy became Plaintiff's direct supervisor when he was appointed to head up the marketing function of the Petroleum Derivatives department. See Pl.'s Dep. at 109:25-110:2; Roy Affidavit, ¶ 5.

16. Following his appointment, Mr. Roy decided to focus the Petroleum

---

[2] Relevant excerpts from the deposition of Joseph Howley are attached as Exhibit K.

[3] Relevant excerpts from the deposition of Michael Goldstein are attached as Exhibit P.

Derivatives department on growing the business by targeting a specific customer base in the market - - i.e., the hedge fund industry. See Roy Affidavit, ¶ 6.

17. In assessing who best could service this new target group, Mr. Roy was primarily concerned with organizing a team of individuals who had the greatest revenue generation potential, and who could establish long-term client relationships through their professionalism and discretion. Id. at ¶ 7.

18. It was Mr. Roy's opinion that Susan Wood was not well-suited to market herself to the customers he was hoping to service. Id. at ¶ 8.

19. Two of the marketers in the Petroleum Derivatives department, Alberto Vogel and James Evans, advised Mr. Roy that, in their estimation, Plaintiff did not understand the limitations of the risk management services that the Petroleum Derivatives department offered its customers and was not able to communicate those limitations to the customers. Id. at ¶ 12. Citing these concerns, Mr. Vogel and Mr. Evans both expressed to Mr. Roy their desire that Plaintiff not cover their customers' telephone calls when they were out of the office. Id.

20. Colleagues at Sempra had advised Mr. Roy that Plaintiff had made certain "off-color" comments. On one occasion, a colleague advised Mr. Roy that, in the presence of several other Sempra employees, Plaintiff had commented on the breast size of Christine Cantor, a Managing Director. Id. at ¶ 9. On another occasion, a Jewish colleague told Mr. Roy that Plaintiff had questioned him about the wisdom of keeping kosher. Id. Mr. Roy believed that comments of this type showed a lack of discretion and maturity, and made Mr. Roy uncertain as to how such indiscretion might affect his department's ability to secure the customers he was hoping to focus on. Id. at ¶ 10.

21. On January 10, 2002, less than two months before Plaintiff's employment

was terminated and during the time when she claims that Mr. Roy harassed her on the basis of her gender and sexual orientation, Plaintiff forwarded to Mr. Roy an e-mail message that she had received from a friend. Attached to the e-mail was a picture, bearing the legend "Intimate Images." The picture was of a woman, apparently wearing nothing other than a pair of tight-fitting shorts, reclining on a beach with her legs spread. See Pl.'s Dep. at 171:11-172:14; 1/10/02 E-Mail to S. Roy (Exhibit B).

22. In or about February 2002, Mr. Roy became aware that Plaintiff had been involved in a deal with a client in which an error had been made that resulted in Sempra losing the client's business. It was explained to Mr. Roy by another Sempra employee involved in the deal (Stuart Sokel) that Plaintiff had, through miscalculation, quoted the client information which resulted in the client paying more on the deal than it should have paid. It is Mr. Roy's understanding that, as a result of this transaction, the client no longer deals with Sempra as a provider of risk management and other services. See Roy Affidavit, ¶ 13.

23. In March 2002, Mr. Roy decided that Plaintiff was not someone who had the skills, knowledge or judgment to contribute significantly to expanding the client base in the area in which he wanted to concentrate. To the contrary, Mr. Roy felt that keeping Plaintiff on the team would present the risk that, at some point, she might do or say something that would cause the department to lose business. Id. at ¶ 14. Mr. Roy therefore made the decision not to retain her in the Petroleum Derivatives department. H attempted to find a position for her elsewhere in the company, without success. Consequently, he decided to terminate her employment. Id.

24. The decision to terminate Plaintiff was Mr. Roy's alone. No one suggested to Mr. Roy that he should terminate her employment. Id. at ¶ 17.

25. At the time he made the termination decision, Mr. Roy was not aware that Plaintiff purportedly had earlier complained that, during the Howley Incident, Joseph Howley had engaged in conduct that Plaintiff believed was motivated by her gender or sexual orientation. Id. at ¶ 18.

26. In support of her claim that she was subjected to a hostile work environment and subsequently terminated from Sempra on the basis of her sexual orientation (i.e., homosexual), Plaintiff testified that Sarathi Roy engaged in the following conduct during her employment: (1) he asked Plaintiff "who wears the pants" in her family; (2) he asked Plaintiff how she and her partner (a woman) divided traditional male/female household chores (e.g., cooking, cleaning); and (3) he commented that his (i.e., Mr. Roy's) wife "would cook for him and take care of him the way that he should be taken care of." See Pl.'s Dep. at 110:3-112:13.

27. In support of her claim that she was subjected to a hostile work environment and subsequently terminated on the basis of her gender (i.e., female), Plaintiff testified that, during her employment, Mr. Roy: (1) referred to Plaintiff as "the lady on the desk"; (2) claimed that he was in an "arranged" marriage; (3) opined that "a woman's place is in the home"; (4) said that he would not allow his wife on Sempra's trading floor; (5) commented that a masseuse he had visited was a "real woman who really knows how to take care of a man"; and (6) used a "falling hearts" background when exchanging e-mail messages with Plaintiff on Yahoo! instant messenger. Id. at 112:14-115:25.

28. Sempra maintains a written anti-harassment policy, which has been in place since at least 1998. See Affidavit of Denise Freda ("Freda Affidavit") (Exhibit G), ¶ 3.

29. Sempra's anti-harassment policy prohibits, among other things,

discrimination or harassment on the basis of gender or sexual orientation, including, but not limited to, unwelcome remarks, slurs or jokes. The policy also sets forth a procedure for reporting, investigating, and resolving allegations of harassment. Id. at ¶ 4; Pl.'s Dep. at 105:24-106-14; Anti-Harassment Policy (Exhibit H). Specifically, any Sempra employee who experiences such behaviors is advised to report the problem to Sempra's Chairman and CEO (Steve Prince), its President (David Messer), its General Counsel (Michael Goldstein), or to its Human Resources Manager (Denise Freda). In response to any such complaint, the policy states that Sempra "will take prompt investigatory actions, and corrective actions where necessary." See Freda Affidavit, ¶ 4; Exhibit H; Exhibit I at 18.

30.  Copies of Sempra's anti-harassment policy are distributed to new Sempra employees during new-hire orientation. The policy is also available to Sempra employees upon request from the Human Resources Department. See Freda Affidavit, ¶ 5.

31.  Plaintiff admits that she received and read a copy of Sempra's anti-harassment policy several days before she commenced her employment at Sempra. See Pl.'s Dep. at 106:1-14.

32.  Sempra regularly conducts anti-harassment training. Sempra conducted anti-harassment training on at least six dates from 1999 through 2002. See Freda Affidavit, ¶ 6. Plaintiff, Sarathi Roy and Joseph Howley attended anti-harassment training on December 6, 2000. Id.

33.  Plaintiff admits that, with the sole exception of the Howley Incident, she never complained about any alleged incidents of harassment, and thus never reported any of the comments that Plaintiff now alleges were made by Sarathi Roy. See Pl.'s Dep. at 104:11-25.

34.  Steve Soule became a Sempra employee before Plaintiff. See Pl.'s Dep. at

126:16-25. In January 2002, approximately two months before a decision was made to terminate Plaintiff's employment, the business unit in which Mr. Soule had been working was shut down. As a consequence, Sempra's President, David Messer, attempted to secure another position for Mr. Soule within the company. In February 2002, Mr. Messer made the decision to transfer Mr. Soule into the Petroleum Derivatives department, where he had prior work experience. See Roy Affidavit, ¶ 14; Roy Dep. at 157:4-24 (Exhibit C).

35. At the time of his transfer into the Petroleum Derivatives department, Mr. Soule was a Vice President at Sempra. See Pl.'s Dep. at 127:7-10. Ms. Wood was an Assistant Vice President. Id.

Dated: Stamford, Connecticut
May 14, 2004

Respectfully Submitted,

By: *Peter M. Schultz*
Mary C. Dollarhide (ct12251)
Peter M. Schultz (ct19425)
Paul, Hastings, Janofsky & Walker LLP
1055 Washington Boulevard
Stamford, CT 06901-2217
Telephone: (203) 961-7400
Fax: (203) 359-3031
Counsel for Defendant

CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing Defendant's Local Rule 56(a)(1) Statement of Undisputed Material Facts Supporting Its Motion for Partial Summary Judgment was served on the following counsel of record via courier on this 14th day of May 2004:

>Brendan J. O'Rourke
>O'Rourke & Associates, LLC
>27 Pine Street
>New Canaan, CT 06840

*Peter M. Schultz*
Peter M. Schultz

STM/273963.2