UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SUSAN E. WOOD, | CIVIL ACTION NO. |
| Plaintiff, | 3:03-CV-986 (JCH) |
| v. | |
| SEMPRA ENERGY TRADING CORPORATION, | May 14, 2004 |
| Defendant. | |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S COMPLAINT**

Submitted By,

*Peter M. Schultz*

Mary C. Dollarhide (ct12291)
Peter M. Schultz (ct19425)
Paul, Hastings, Janofsky & Walker, LLP
1055 Washington Boulevard
Stamford, CT 06901
Telephone: (203) 961-7400
Facsimile: (203) 359-3031
peterschultz@paulhastings.com

ATTORNEYS FOR DEFENDANT

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................1

PROCEDURAL HISTORY AND FACTUAL BACKGROUND ....................................3

LEGAL ARGUMENT..............................................................................................5

**POINT I**

PLAINTIFF FAILS TO STATE A HOSTILE WORK ENVIRONMENT CLAIM.......................5

    A.    Plaintiff Has Failed To Allege An Actionable Hostile Work
        Environment……………………………………………………….………….…5

        1.    The Discrete Conduct Identified By Plaintiff Is Neither
            Severe Nor Pervasive………………………………………….……..…………7

    B.    Sempra Meets The Ellerth-Faragher Affirmative Defense To
        Liability For Harassment………………………………………….……..….…10

        1.    Sempra Had An Effective Anti-Harassment Policy…….…………….………11

        2.    Plaintiff Never Complained About The Alleged Harassment……………13

**POINT II**

PLAINTIFF CANNOT PROVE DISCRIMINATION IN CONNECTION WITH
HER TERMINATION..............................................................................................14

    A.    Plaintiff Cannot Establish A Prima Facie Case Of Discrimination……….……..15

    B.    The Decision To Terminate Plaintiff Was Based Upon Legitimate,
        Non-Discriminatory Business Reasons……………………………….……..……16

    C.    Plaintiff Cannot Demonstrate That Sempra's Articulated Reasons
        For Her Termination Are A Pretext For Discrimination………..……….……18

**POINT III**

THERE IS NO EVIDENCE THAT PLAINTIFF WAS DISCHARGED IN RETALIATION
FOR COMPLAINING ABOUT THE HOWLEY INCIDENT ...............................................19


**POINT IV**

PLAINTIFF'S CLAIMS FOR PUNITIVE DAMAGES WILL NOT LIE… ...............................24


**POINT V**

PLAINTIFF'S CLAIMS FOR BREACH OF AN EXPRESS CONTRACT
AND NEGLIGENT INVESTIGATION CANNOT WITHSTAND SCRUTINY ........................26


**POINT VI**

PLAINTIFF'S CLAIMS FOR BREACH OF AN IMPLIED CONTRACT,
PROMISSORY ESTOPPEL AND UNJUST ENRICHMENT ARE FLATLY
INCONSISTENT WITH THE TERMS OF PLAINTIFF'S EXPRESS
EMPLOYMENT AGREEMENT ...............................................................................31


**POINT VII**

PLAINTIFF HAS NO VIABLE CLAIM FOR BREACH OF AN IMPLIED
COVENANT OF GOOD FAITH AND FAIR DEALING.................................................37


**POINT VIII**

PLAINTIFF HAS NO TENABLE CLAIM UNDER THE CONNECTICUT
WAGE ACT......................................................................................................40


CONCLUSION...................................................................................................45

## INTRODUCTION

The best defense is a good offense, or so Susan Wood ("Plaintiff") would have the Court believe. Having talked herself into a position at Sempra Energy Trading Corp. ("Sempra") that required a greater degree of sophistication and business knowledge than she could bring to bear, she now attempts to turn the shortcomings that ultimately lead to her termination into a case about something it most definitely is not - - invidious discrimination. Spinning the protected class wheel and landing on "gender" and "sexual orientation," Plaintiff now claims that her supervisor, Sarathi Roy, subjected her to a hostile work environment and, ultimately, terminated her employment. She makes this claim despite the fact that Mr. Roy is a man with whom Plaintiff felt comfortable enough to: (i) invite to her vacation home out West (Pl.'s Dep. at 157:18-158:1);[1] (ii) go out for drinks on several occasions, including shortly before her termination (Id. at 158:10-159:7); (iii) proudly display pictures of the family dog (i.e., her "baby") (Id. at 177:5-178:13); and (iv) most notably, forward an e-mail containing an image of a half-naked woman (appropriately bearing the caption "Intimate Images"). Id. at 171:11-172:14; see 1/10/02 E-Mail from S. Wood to S. Roy (Exhibit B).

Tellingly, Plaintiff never alerted Sempra to *any* of Mr. Roy's alleged conduct about which she now complains, notwithstanding the company's comprehensive anti-harassment policy. See Pl.'s Dep at 104:11-25. She did, however, complain about a June 2001 incident with a Sempra Managing Director, Joseph Howley (the "Howley Incident"). A business deal gone bad because of her own mistake, Plaintiff now attempts to transform that incident into another example of discrimination. In a fit of overreaching, she also alleges that she was terminated in retaliation for complaining about the incident, despite the *nine month* gap between those two

---

[1] Relevant excerpts from Plaintiff's deposition are attached as Exhibit A.

events and the fact that Mr. Howley, by all accounts, had no involvement in the termination decision.

Refusing to turn the spotlight on herself, Plaintiff fails to recognize that her short tenure at Sempra was marred by incidents, described _infra_, reflecting her lack of professionalism and underdeveloped knowledge of Sempra's business. That is not to say that Plaintiff was a wholly unsatisfactory employee or that her March 2002 termination was "for cause." Context, however, is critical in this case. In February 2002, Sarathi Roy was appointed to head up the marketing function of the Petroleum Derivatives department in which he and Plaintiff worked. Hoping to reinvigorate a business that had _lost_ money in 2001, see Roy Dep. at 239:8-13,[2] Mr. Roy decided to focus his efforts on developing a new (and, hopefully, lucrative) customer base. Turning a critical eye on the skill sets of the team that would support those efforts, it was Mr. Roy's business judgment that Plaintiff was the weakest performer in the group. This decision was in no way influenced by Plaintiff's gender, as evidenced by the fact that Mr. Roy did not terminate Mary Rose Malchow, another female member of the department. Id. at 21:16-22:1.

Ultimately, Mr. Roy's efforts did not result in a profitable year for Sempra's Petroleum Derivatives department, which was subsequently shut down in December 2002. Id. at 20:5-15. This fact, however, only underscores the soundness of Mr. Roy's assessment that a change needed to be made - - and quickly. Plaintiff may, of course, question the wisdom of the decisions Mr. Roy made to jumpstart the Petroleum Derivatives department in 2002, but as the undisputed facts of this case reveal, she cannot question their lawfulness.

---

[2] Relevant excerpts from Sarathi Roy's deposition are attached as Exhibit C.

## PROCEDURAL HISTORY AND FACTUAL BACKGROUND

Sempra is a wholesale energy trading company, engaged in the marketing and trading of physical and financial energy products, including natural gas, power, crude oil and associated commodities. In September 2000, Plaintiff was employed by Sempra as an Assistant Vice President pursuant to a written, at-will Employment Agreement ("Employment Agreement"). See Pl.'s Dep. at 51:12-52:15; Employment Agreement (Exhibit D). From September 2000 through January 2001, Plaintiff worked as a trader in the West Coast Gas department under the supervision of Jackie Mitchell, Managing Director. See Complaint, ¶¶ 12-13. In or about February 2001, Plaintiff transferred to the Petroleum Derivatives department. See Pl.'s Dep. at 109:8-11. That department services customers who have risk management needs related to the market pricing of petroleum-based products. The department structures transactions for these customers to limit, manage or remove the price-fluctuation risk from their hands and place it into Sempra's at market prices. See Affidavit of Sarathi Roy, ¶ 3 ("Roy Affidavit") (Exhibit E).

One of Plaintiff's colleagues in the Petroleum Derivatives department was Sarathi Roy. See Pl.'s Dep. at 109:8-18. In February 2002, Mr. Roy became Plaintiff's direct supervisor when he was appointed to head up the department's marketing function. Id. at 109:25-110:2. Shortly after his appointment, Mr. Roy decided to focus the department on growing the business by targeting a specific customer base - - i.e. the hedge fund industry. See Roy Dep. at 131:12-21; Roy Affidavit, ¶ 6. Mr. Roy perceived that industry as being extremely sophisticated, keenly desirous of maintaining confidentiality with respect to its investment strategy, demanding excellent customer service, and with a low tolerance for mistakes. Roy Affidavit, ¶ 6. In assessing who best could service this new target group, Mr. Roy was primarily concerned with

organizing a team of individuals who had the greatest revenue generation potential, and who could establish long-term client relationships through their professionalism and discretion. Id. at ¶ 7. He considered established revenue history by individuals as well as knowledge of client dealings, experience in and depth of knowledge of the energy markets, behavioral issues and particular deals worked on. Id.

Using these guidelines, it was Mr. Roy's opinion that Plaintiff did not have the skills, judgment or discretion necessary to market herself to the customers he was hoping to service. Id. at ¶ 8. As a result, he made the decision not to retain her in the Petroleum Derivatives department. See Roy Affidavit, ¶ 14; Roy Dep. at 33:5-25; 34:23-35:10. He attempted to find a position for her in other departments, without success. See Roy Affidavit, ¶ 14; Roy Dep. at 65:5-19; 72:9-24; 75:8-14; 76:15-25. Consequently, he decided to terminate her employment. See Roy Dep. at 130:22-131:11.

Following her termination, in May 2003, Plaintiff filed a *fourteen*-count Complaint in the Superior Court for the State of Connecticut, purporting to assert the following causes of action against Sempra: (1) discrimination on the basis of gender and sexual orientation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII") and the Connecticut Fair Employment Practices Act ("CFEPA") (Counts One, Two, Three); (2) retaliatory discharge in violation of Title VII and the CFEPA (Counts Four, Five); (3) breach of the terms of Sempra's Employee Handbook (Count Six); (4) breach of an "implied" contract to pay Plaintiff a bonus and to continue her employment as long as she "remained profitable" (Count Seven); (5) promissory estoppel (Count Eight); (6) unjust enrichment (Count Nine); (7) breach of an implied covenant of good faith and fair dealing (Count Ten); (8) breach of an implied contract to reimburse business expenses (Count Eleven); (9) violation of the Connecticut

Wage Act, C.G.S. § 31-71a, et seq. (Count Twelve); and (10) negligent failure to investigate harassment claims (Counts Thirteen, Fourteen).

On June 4, 2003, Sempra removed the Complaint to this Court based on federal question jurisdiction. On June 11, 2003, Sempra filed its Answer to the Complaint, denying its substantive allegations. The parties thereafter commenced discovery, which closed on May 3, 2004. Pursuant to Federal Civil Rule 56, Sempra now moves for summary judgment on thirteen of the Complaint's fourteen counts.[3]

## LEGAL ARGUMENT

I. **PLAINTIFF FAILS TO STATE A HOSTILE WORK ENVIRONMENT CLAIM**

    A. **Plaintiff Has Failed To Allege An Actionable Hostile Work Environment**

The standards governing hostile work environment claims under Title VII and the CFEPA are well-established. See, e.g., Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270-72 (2001) (per curiam) (citing cases).[4] To survive summary judgment on her hostile work environment claim, Plaintiff must produce sufficient evidence to permit a reasonable jury to find (1) that the harassment she experienced was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment," and (2) that there

---

[3] Sempra is not moving on Plaintiff's claim for breach of an implied contract to reimburse business expenses (Count Eleven).

[4] The Supreme Court of Connecticut has held that the CFEPA is intended to be coextensive with federal employment anti-discrimination statutes, and that in interpreting the CFEPA, the courts are "properly guided by the case law surrounding the federal fair employment legislation." Wroblewski v. Lexington Gardens, Inc., 188 Conn. 44, 448 A.2d 801, 805 (1982). See Perodeau v. City of Hartford, 259 Conn. 729, 738 (2002) ("This court previously has recognized that in construing the Fair Employment Practices Act we are properly guided by the case law surrounding federal fair employment legislation.") (citation and internal quotation marks omitted); Brittell v. Department of Correction, 247 Conn. 148, 164 (1998) (citing federal case law in affirming dismissal of hostile environment claim under CFEPA).

is "a specific basis . . . for imputing the objectionable conduct to [Sempra]." Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002) (citation omitted).[5]

"The Supreme Court has emphasized that the standard for judging whether a work environment is objectively hostile must be sufficiently demanding so as to prevent Title VII from becoming a 'general civility code.'" O'Dell v. Trans World Entm't Corp., 153 F. Supp.2d 378, 385 (S.D.N.Y. 2001) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)). To be actionable, therefore, the harassment must be more than "merely offensive or boorish." O'Dell, 153 F. Supp.2d at 386. Rather, it must be "so objectively offensive as to alter the 'conditions' of the victim's employment." Id. at 385 (quoting Oncale, 523 U.S. at 81). In making this determination, the court should examine "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 103 (2002) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). The Supreme Court has repeatedly emphasized, however, that "simple teasing, offhand comments, and isolated incidents

---

[5] As this Court well knows, summary judgment should be granted where the evidence, taken as a whole, shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(b); see also Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). While a court considering such a motion must view the evidence in the light most favorable to the non-moving party, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Weinstock, 224 F.3d at 41, to defeat a motion for summary judgment, the non-moving party "may not rest upon . . . mere allegations or denials," but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "[U]nsupported allegations do not create a material issue of fact." Weinstock, 224 F.3d at 41. If the non-moving party's evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted); see id. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat summary judgment). The test is "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." Id.

(unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Breeden, 532 U.S. at 271 (quoting Faragher v. Boca Raton, 524 U.S. 775, 788 (1998)).  Thus, a plaintiff alleging a hostile work environment "must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment." Alfano, 294 F.3d at 374 (quoting Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (additional citation omitted)).

In this case, even crediting Plaintiff's version of events, as a matter of law, the statements and conduct identified by Plaintiff in support of her hostile environment claim simply do not rise to the level of severity or pervasiveness that would allow a reasonable jury to conclude that they altered the conditions of Plaintiff's employment and created an actionable hostile work environment.

### 1.      The Discrete Conduct Identified By Plaintiff Is Neither Severe Nor Pervasive

During her deposition, Plaintiff testified that her supervisor, Sarathi Roy, engaged in the following conduct which Plaintiff believed was motivated by her sexual orientation: (1) he asked Plaintiff "who wears the pants" in her family; (2) he asked Plaintiff how she and her partner (a woman) divided traditional male/female household chores (e.g., cooking, cleaning); and (3) he commented that his (i.e., Mr. Roy's) wife "would cook for him and take care of him the way that he should be taken care of." See Pl.'s Dep. at 110:17-112:13.[6]  Taken as true, these

---

[6] Plaintiff also contends that a co-worker in Sempra's Information Technology department advised her that Sarathi Roy was "not comfortable" with her homosexuality. Id. at 111:1-4. This alleged statement is pure hearsay, and therefore inadmissible in opposition to Defendants' motion for summary judgment. See Fed. R. Civ. P. 56(e) (stating that affidavits in opposition to summary judgment motion "shall set forth such facts as would be admissible in evidence"); Sarno v. Douglas Elliman- Gibbons & Ives, Inc., 183 F.3d 155, 160 (2d Cir. 1999) (holding that
(continued...)

discrete comments fall far short of demonstrating "[a] workplace . . . *permeated with discriminatory intimidation, ridicule and insult*, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ." Harris, 510 U.S. at 21 (emphasis added) (internal citation and quotation marks omitted). At worst, these statements constitute the type of "simple teasing" and "offhand comments" that the Supreme Court has declared are not actionable harassment. Faragher, supra. See, e.g., Smith v. New York State Ins. Fund, No. 98 Civ. 9146 (VM), 2001 WL 88211, at *4 (S.D.N.Y. Jan. 31, 2001) (no adverse employment action under Faragher standard where plaintiff's supervisor "glared at her, commented about her to a coworker, and, on two occasions, seemed to make jokes at her expense").[7]  Thus, Plaintiff cannot demonstrate that she was subjected to a hostile work environment on the basis of her sexual orientation.

With respect to her claim that she was subjected to a hostile work environment on the basis of her gender, Plaintiff testified that Mr. Roy: (1) referred to her as "the lady on the desk"; (2) claimed that he was in an "arranged" marriage; (3) opined that "a woman's place is in the home"; (4) said that he would not allow his wife on Sempra's trading floor; (5) commented that a masseuse he had visited was a "real woman who really knows how to take care of a man"; and (6) used a "falling hearts" background when exchanging e-mail messages with Plaintiff on Yahoo! instant messenger. See Pl.'s Dep. at 112:14-115:25. These alleged comments and conduct simply do not rise to the level of severity or pervasiveness necessary to create a hostile work environment. For example, in Quinn v. Green Tree Credit Corp., 159 F.3d 759 (2d Cir.

---

(...continued)

hearsay statement "did not constitute competent evidence" and thus could not be considered in opposition to motion for summary judgment).

[7] Unreported decisions cited herein are compiled in alphabetical order and attached jointly as Exhibit F.

1998), the plaintiff alleged, <u>inter alia</u>, that her supervisor had told her that "she had been voted the 'sleekest ass' in the office" and, on another occasion, had "deliberately touched [her] breasts with some papers that he was holding in his hand." <u>Id.</u> at 768. The Second Circuit acknowledged that the supervisor's conduct was "offensive and inappropriate," but held that, as a matter of law, the allegations were not sufficient "to support a finding that [the plaintiff] was subjected to abuse of sufficient severity or pervasiveness as to 'alter the conditions of [her] employment.'" <u>Id.</u> (quoting <u>Harris</u>, 510 U.S. at 21). In this case, the alleged gender-based comments identified by Plaintiff, assuming they occurred, surely are no more opprobrious than the conduct that the Second Circuit found insufficient to make out a claim for sexual harassment in <u>Quinn</u>.

Notably, there is no allegation that Mr. Roy did or "[said] anything to [Plaintiff] that could not be repeated on primetime television."[8] <u>Baskerville v. Culligan Int'l Co.</u>, 50 F.3d 428, 431 (7th Cir. 1995) (no actionable hostile work environment where, <u>inter alia</u>, plaintiff's supervisor regularly called her "pretty girl"; once made "grunting sound" when she was wearing leather skirt; and made several suggestive jokes and comments). To the contrary, Plaintiff characterized Mr. Roy as being "overly courteous and polite." <u>See</u> Pl.s Dep. at 148:14-22. And significantly, there is no evidence that Mr. Roy's alleged behavior interfered with Plaintiff's work performance. <u>See</u> <u>Harris</u>, 510 U.S. at 25 (Ginsberg, J., concurring) ("the adjudicator's

---

[8]By contrast, Plaintiff engaged in conduct that would likely have the network censors screaming. Approximately two months before her employment was terminated, Plaintiff admits that *she forwarded to Mr. Roy* an e-mail message with an attached picture of a woman, apparently wearing nothing other than a pair of tight-fitting shorts, reclining on a beach with her legs widespread. <u>See</u> Pl.'s Dep. at 171:11-172:14; Exhibit B). Plaintiff made this admission only after being confronted with the e-mail, having testified immediately beforehand that: (i) she did not recall ever having received e-mails at work that contained pictures of "naked or scantily clad women"; and (ii) receiving such e-mails at work would make her "uncomfortable." <u>See</u> Pl.'s Dep. at 165:4-10.

inquiry should center, *dominantly*, on whether the discriminatory conduct has unreasonably interfered with the plaintiff's work performance") (emphasis added). Indeed, Plaintiff alleges that "[her] job performance throughout her employment with [Sempra] was very good," that she booked "[a] high volume of profits" in the two months preceding her termination, and that she managed to maintain "significant profitability and revenue generating during her tenure at the company." See Complaint, ¶¶ 64, 75.

In sum, under the legal standards governing hostile work environment claims under Title VII and the CFEPA, Plaintiff has failed to allege incidents of harassment sufficiently severe or pervasive to permit a reasonable jury to conclude that they altered the conditions of her employment and created an actionable hostile work environment.

**B.    Sempra Meets the Ellerth-Faragher Affirmative Defense to Liability for Harassment**

Under the standards established by the Supreme Court in Faragher and Ellerth, "an employer can avoid liability [for hostile environment harassment by a supervisor] if it demonstrates that (a) it exercised reasonable care in preventing and correcting any sexually harassing behavior and (b) the plaintiff-employee unreasonably failed to take advantage of any preventive or corrective opportunities." Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 295 (2d Cir. 1999); see also Faragher, 524 U.S. at 807, and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998) (establishing employer's affirmative defense).[9] Sempra has established both aspects of this defense in this case.

---

[9] This affirmative defense also applies to Plaintiff's hostile environment claim under the CFEPA. See Taylor v. State, No. CV980578141S, 2001 WL 104350, at *11 (Conn. Super. Jan. 10, 2001) (dismissing CFEPA hostile environment claim based, in part, on conclusion that defendant "provided a ready and easily accessed avenue for complaints").

### 1.    Sempra Had An Effective Anti-Harassment Policy

With respect to the first prong of the employer's affirmative defense, "[a]n employer need not prove success in preventing harassing behavior in order to demonstrate that it exercised reasonable care in preventing and correcting sexually harassing conduct." Caridad, 191 F.3d at 295.  An anti-harassment policy and complaint procedure that is communicated to employees, followed by the company, and that does not require the victim to report the harassment to the offending supervisor, is sufficient to satisfy the first prong of the employer's affirmative defense.  See Leopold v. Baccarat, Inc., 239 F.3d 243, 245 (2d Cir. 2001); Caridad, 191 F.3d at 295; O'Dell, 153 F. Supp.2d at 388-389.

It is undisputed that Sempra has such a policy.  See Pl.'s Dep. at 105:24-106:14; Affidavit of Denise Freda, ¶ 3. ("Freda Affidavit") (Exhibit G).  Sempra's Professional Conduct Policy and Prohibition Against Harassment specifically prohibits harassment based on gender and sexual orientation, identifies objectionable behavior, and establishes clear procedures for reporting, investigating, and resolving allegations of harassment.  See Freda Affidavit, ¶ 4.  Plaintiff admits that she received a copy of the Policy several days before she commenced her employment at Sempra, that she read the Policy, and that she understood the Policy.  See Pl.'s Dep. at 106:1-14; Exhibit H.[10]  Copies of the Policy are distributed to new Sempra employees at new-hire orientation, and are available to Sempra employees upon request from the Human Resources Department.  See Freda Affidavit, ¶ 5.  Any Sempra employee who experiences harassment is advised to report the problem to Sempra's Chairman and CEO (Steve Prince), its

---

[10] Although it is available as a stand-alone document and was issued to Plaintiff in that form, see Exhibit H, at all times relevant to this lawsuit, the Policy could also be found in Sempra's Employee Handbook and its Policy Manual, both of which were distributed to Plaintiff during her employment. See Pl.'s Dep. at 106:17-107:22; 108:12-109:7; Exhibit I at 17-18; Exhibit J at 23-24.

President (David Messer), its General Counsel (Michael Goldstein), or to its Human Resources Manager (Denise Freda). Id. at ¶ 4; Exhibit H; Exhibit I at 18.

Moreover, the record is clear that Sempra trained its employees with respect to the Policy. Plaintiff admits that she attended one such training seminar in December 2000, as did Messrs. Roy and Howley. See Pl.'s Dep. at 107:23-108:11; Freda Affidavit, ¶ 6. Indeed, the company held at least one such seminar each year from 1999 through 2002. See Freda Affidavit, ¶ 6. Such training routinely has been recognized as an important part of an employer's obligation to establish effective workplace policies prohibiting sexual and other forms of harassment. See, e.g., Nichols v. Azteca Rest. Enters., Inc., 256 F.3d 864, 877 (9th Cir. 2001) (holding that company's "policy and company-wide training program were sufficient to show that it exercised reasonable care to prevent sexual harassment in its restaurants"); Walton v. Johnson & Johnson Servs., Inc., 203 F. Supp 2d 1312, 1322 (M.D. Fla. 2002); Carl v. Parmely, 188 F. Supp.2d 991, 1005 (S.D. Ill. 2001); Fiscus v. Triumph Group Operations, Inc., 24 F. Supp.2d 1229, 1240-41 (D. Kan. 1998).

Significantly, Plaintiff in this case has not supplied any evidence that would allow a jury to question the effectiveness of Sempra's policies. Plaintiff has retained no expert to claim that Sempra's policies are ineffective, compare, e.g., Blakey v. Continental Airlines, Inc., No. 93-2194, 1997 WL 1524797, at *4 (D.N.J. Sept. 9, 1997), and there simply is no basis on the record that would allow a jury to conclude that Sempra has not fully met its obligation to create and enforce appropriate policies prohibiting sexual harassment in the workplace.[11]

---

[11] Plaintiff's failure to report Mr. Roy's alleged harassment, discussed immediately below, precludes her from arguing, under the first prong of the Ellerth-Faragher defense, that Sempra's sexual harassment policy and procedures were ineffective. O'Dell, 153 F. Supp.2d at 389-90; see id. at 389 ("Before an employer can reasonably respond to sexual harassment, it must have adequate notice of the harassment").

## 2.    Plaintiff Never Complained About The Alleged Harassment

The second prong of the employer's affirmative defense "requires the employer to show that the employee unreasonably failed to take advantage of its sexual harassment complaint procedures." O'Dell, 153 F. Supp.2d at 390. "Evidence of '*any* unreasonable failure [by the employee] to use *any* complaint procedure provided by the employer . . . will normally suffice to satisfy the employer's burden under the second element of the defense.'" Id. (quoting Ellerth, 524 U.S. at 765) (emphasis in original). "Employees must be required to accept responsibility for alerting their employers to the possibility of harassment. Otherwise, Title VII's remedial and deterrent purposes would not be served." Id. (internal quotation marks and citations omitted).

It is beyond dispute that Plaintiff failed to use Sempra's anti-harassment policy in response to the acts of harassment about which she complains in this lawsuit. Plaintiff admits that she learned about the policy in September 2000, *before* she commenced her employment at Sempra, and attended an anti-harassment training session in December 2000. See Pl.'s Dep. at 106:1-14; 107:23-108:11. Nevertheless, Plaintiff admits that, with the sole exception of the Howley Incident, she *never* complained about *any* alleged incidents of harassment. Id. at 104:11-25 (Q. Ms. Wood, with the exception of the Howley incident, as we've been calling it, at any time during your employment at Sempra, did you ever report to anyone that you believed you were being harassed . . . on the basis of your gender or sexual orientation? A. Did I ever report to anyone? Q. Correct. A. No, I did not.).

Plaintiff's complete failure to report any alleged instances of harassment other than the Howley Incident is unreasonable as a matter of law.[12] See Ellerth, 524 U.S. at 765 ("a

---

[12] Plaintiff may claim that her complaint about the Howley Incident constituted a claim of harassment. However, as discussed under Point III, infra, there is simply no record evidence suggesting that Mr. Howley's conduct was motivated by Plaintiff's gender or sexual orientation.

(continued...)

demonstration of [the plaintiff's] failure [to use any complaint procedure provided by the employer] will normally suffice to satisfy the employer's burden under the second element of the defense"); O'Dell, 153 F. Supp.2d at 391 (plaintiff's "lengthy delay" in reporting harassment "alone" demonstrates unreasonable failure to utilize complaint procedure).

Accordingly, Sempra is entitled to summary judgment on Plaintiff's hostile work environment claim.

## II.   PLAINTIFF CANNOT PROVE DISCRIMINATION IN CONNECTION WITH HER TERMINATION

Plaintiff contends that Sempra's decision to terminate her employment in March 2002 was motivated by her gender and/or sexual orientation, in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), and the Connecticut Fair Employment Practices Act ("CFEPA").  See 42 U.S.C. § 2000e-2(a) (prohibiting sex discrimination); C.G.S. § 46a-81c (prohibiting sexual orientation discrimination).  To establish a discrimination claim without direct evidence of discrimination, a plaintiff must first satisfy each element of a prima facie case of discrimination.  Reeves v. Sanderson Plumbing Prods. Inc., 120 S.Ct. 2097, 2106 (2000) (citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993)).  The plaintiff bears the ultimate burden of proving that she has been the victim of intentional discrimination.  See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-12 (1993).

To establish a prima facie claim of gender or sexual orientation discrimination, a plaintiff must show that: (1) she is a member of a protected group; (2) she was qualified for the

---

(...continued)

Moreover, this single incident, standing alone, is legally insufficient to state a hostile work environment claim.  See Alfano, 294 F.3d at 374 (stating that a plaintiff alleging a hostile work environment "must demonstrate either that a single incident was *extraordinarily severe*, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.") (emphasis added) (citation and internal quotation marks omitted).

position she held; (3) she was subjected to an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). See also note 4, supra (noting that the CFEPA follows Title VII analytical framework set forth in McDonnell Douglas).

If a prima facie case is established, the burden then shifts to the employer to articulate a valid reason for its actions. The employer's burden is one of production only, and does not operate to relieve discrimination plaintiffs of their ultimate burden of proof. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981). Once the employer articulates a legitimate reason, "the presumption created by the prima facie case 'drops out of the picture,' and the plaintiff bears the ultimate burden of proving that she has been the victim of intentional discrimination." Ennis v. National Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995) (quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-12 (1993)). See also Rhodes v. Guiberson Oil Tools, 39 F.3d 537, 542 (5th Cir. 1994) (noting that the ultimate issue in Title VII discrimination case is whether plaintiff's gender was a factor in adverse employment decision).

### A.    Plaintiff Cannot Establish A Prima Facie Case Of Discrimination

Applying the foregoing legal standards to the facts of this case, it is apparent that Plaintiff cannot establish a prima facie case of discriminatory discharge because she cannot show that she was terminated under circumstances giving rise to an inference of discrimination. The only allegation of differential treatment asserted by Plaintiff is that, following her termination, she was "replaced" in her position by a man, Steve Soule. See Complaint, ¶ 48. This claim, however, is demonstrably false.

Steve Soule became a Sempra employee before Plaintiff.  See Pl.'s Dep. at
126:16-25.  In January 2002, the business unit in which Mr. Soule had been working was shut
down.  See Roy Affidavit, ¶ 14.  As a consequence, Sempra's President, David Messer,
attempted to secure another position for Mr. Soule within the company.  In February 2002 - -
approximately one month before a decision was made to terminate Plaintiff's employment - -
Mr. Messer made the decision to transfer Mr. Soule into the Petroleum Derivatives department,
where he had prior work experience.  See Roy Dep. at 157:4-24.  At the time of his transfer, Mr.
Soule was a Vice President at Sempra, whereas Ms. Wood was an Assistant Vice President.  See
Pl.'s Dep. at 127:7-10.  Thus, because: (i) it was David Messer, not Sarathi Roy, who made the
decision to move Mr. Soule into the Petroleum Derivatives department; (ii) the transfer decision
was announced *before* Mr. Roy made the decision to terminate Plaintiff's employment; (iii) the
transfer was precipitated by the shutdown of the business unit in which Mr. Soule had previously
worked; and (iv) Mr. Soule held a different position than Plaintiff, he cannot be considered her
"replacement."  Since Plaintiff has not articulated any other evidence of alleged disparate
treatment based on her gender or sexual orientation, she cannot establish a prima facie case of
discrimination.[13]

### B.    The Decision To Terminate Plaintiff Was Based Upon Legitimate, Non-Discriminatory Business Reasons

Assuming that Plaintiff can make out a prima facie case of discrimination,
Sempra has articulated legitimate, nondiscriminatory business reasons for terminating her
employment. Specifically, Sarathi Roy, Plaintiff's supervisor and the individual who made the
termination decision, has attested that, shortly after he was appointed to head up the marketing

---

[13] The fact that another female employee in the department, Mary Rose Malchow, was retained,
further belies any claim of gender discrimination.  See Roy Dep. at 21:16-22:1.

function of the Petroleum Derivatives department in February 2002, he decided to focus the

department on growing the business by targeting a specific customer base - - i.e. the hedge fund

industry.  See Roy Dep. at 131:12-21; Roy Affidavit, ¶ 6.  In assessing who best could service

this new target group, Mr. Roy was primarily concerned with organizing a team of individuals

who had the greatest revenue generation potential, and who could establish long-term client

relationships through their professionalism and discretion.  Id. at ¶ 7.  He considered established

revenue history by individuals as well as knowledge of client dealings, experience in and depth

of knowledge of the energy markets, behavioral issues and particular deals worked on.  Id.

Using these guidelines, it was Mr. Roy's opinion that Plaintiff did not have the

skills, knowledge or judgment to market herself to the customers he was hoping to service.  Id. at

¶ 8.  This assessment was influenced by, among other things, comments about Plaintiff made to

him by other traders.  For example, two of the traders in the Petroleum Derivatives department,

Alberto Vogel and James Evans, advised Mr. Roy that, in their estimation, Plaintiff did not

understand the limitations of the risk management services that the department offered it

customers and was not able to communicate those limitations to the customers.  See Roy Dep. at

175:22-179:13; Roy Affidavit, ¶ 12.  These limitations included, for example, the department's

lack of liquidity in certain markets, its lack of expertise in certain markets, and, more simply, the

overarching desire to avoid business transactions that would not easily allow the department to

hedge its price risk.  See Roy Dep. at 178:23-179:9; Roy Affidavit, ¶ 12.

Compounding the concerns regarding Plaintiff's business acumen raised by

Messrs. Vogel and Evans, in or about February 2002, another Sempra employee, Stewart Sokel,

explained to Mr. Roy that he (i.e., Mr. Sokel) and Plaintiff had been involved in a deal with a

significant customer and that Plaintiff had, through miscalculation, quoted the customer

information which resulted in the customer paying significantly more on the deal than it should have paid. See Roy Affidavit, ¶ 13; Roy Dep. at 189:6-23; 199:11-16. It is Mr. Roy's understanding that, as a result of that mistake, the customer no longer transacts business with Sempra. See Roy Dep. at 199:23-200:1.

Mr. Roy also had known Plaintiff to make certain "off-color" comments that, although not personally offensive to him, he believed might well offend others and adversely affect his department's ability to secure the customers he was hoping to focus on.. For example, on one occasion, a colleague told Mr. Roy with some surprise that, during an out-of-office gathering in the presence of several other Sempra employees, Plaintiff had commented on the breast size of Christine Cantor, a Sempra Managing Director. See Roy Affidavit, ¶ 9. On another occasion, a Jewish colleague told Mr. Roy that Susan had questioned him about the wisdom of keeping kosher. Id.

In light of the foregoing background, in March 2002, Mr. Roy decided that Plaintiff did not have the skills, knowledge or judgment necessary to expand the client base in the area in which he wanted to concentrate. As a result, he made the decision not to retain her in the Petroleum Derivatives department. See Roy Affidavit, ¶ 14; Roy Dep. at 33:5-25; 34:23-35:10. He attempted to find a position for her in other departments, without success. See Roy Affidavit, ¶ 14; Roy Dep. at 65:5-19; 72:9-24; 75:8-14; 76:15-25. Consequently, he decided to terminate her employment. See Roy Dep. at 130:22-131:11.

### C.    Plaintiff Cannot Demonstrate That Sempra's Articulated Reasons For Her Termination Are A Pretext For Discrimination

Plaintiff has failed to articulate facts demonstrating that Mr. Roy's reasons for her termination are a pretext for discrimination on the basis of her gender or sexual orientation.

With respect to her sexual orientation, during her deposition, Plaintiff identified a handful of discrete comments allegedly made by Mr. Roy during her employment which she contends supports her claim that she was terminated because of her sexual orientation. Specifically, Plaintiff claims that Mr. Roy: (1) asked Plaintiff "who wears the pants" in her family; (2) asked Plaintiff how she and her partner (a woman) divided traditional male/female household chores (e.g., cooking, cleaning); and (3) commented that his wife "would cook for him and take care of him the way that he should be taken care of." See Pl.'s Dep. at 110:17-112:13.

With respect to her gender discrimination claim, Plaintiff testified that Mr. Roy: (1) referred to her as "the lady on the desk"; (2) claimed that he was in an "arranged" marriage; (3) opined that "a woman's place is in the home"; (4) said that he would not allow his wife on Sempra's trading floor; (5) commented that a masseuse he had visited was a "real woman who really knows how to take care of a man"; and (6) used a "falling hearts" background when exchanging e-mail messages with Plaintiff on Yahoo! instant messenger. See Pl. Dep. at 112:14-115:25.

Taken as true, none of the above comments establishes that the reasons articulated by Mr. Roy in support of his decision to terminate Plaintiff were false and that Mr. Roy's termination decision was actually motivated by her gender or sexual orientation. Her discrimination claims must therefore be dismissed.

### III.    THERE IS NO EVIDENCE THAT PLAINTIFF WAS DISCHARGED IN RETALIATION FOR COMPLAINING ABOUT THE HOWLEY INCIDENT

In Counts Four and Five, Plaintiff alleges that she was terminated in March 2002 in retaliation for complaining about the Howley Incident in June 2001, approximately *nine months* earlier. Notwithstanding this allegation, Plaintiff has not produced a shred of evidence

demonstrating that Sarathi Roy's decision to terminate Plaintiff was motivated in any way by her earlier complaint about Joe Howley.

A plaintiff asserting a retaliation claim under Title VII must show: "(1) that she was engaged in protected activity by opposing a practice made unlawful by Title VII; (2) that the employer was aware of that activity; (3) that she suffered adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action." Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998).[14] Notably, in order to satisfy the first element, the plaintiff must establish that when she voiced her opposition, she had a "good faith, *reasonable belief* that the underlying employment practice was unlawful [under the anti-discrimination statutes]." Id. (emphasis added). Spadola v. New York City Transit Auth., 242 F. Supp. 2d 284, 291 (S.D.N.Y. 2003)("The employee's belief that he was opposing an employment practice made unlawful by Title VII must also be *objectively* reasonable, in the sense that the asserted opposition must be grounded on sufficient evidence that the employee was the subject of discrimination and harassment at the time the protest to the offending conduct is registered.") (emphasis added).

In this case, Plaintiff's retaliation claim fails because she cannot meet the first and fourth prima facie elements. With respect to the first element, no reasonable person could conclude that Mr. Howley's conduct during the Howley Incident constituted harassment or

---

[14] The same elements must be satisfied in order to state a retaliation claim under the CFEPA. See Conte v. New Haven Bd. of Educ., No. CV020466475, 2003 WL 21219371, at *5 (Conn. Super. May 15, 2003) ("In order to establish a prima facie case of retaliation, [the plaintiff] must show that: (1) he engaged in an activity protected by the [the statute]; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity .") (internal quotation marks and citation omitted).

discrimination on the basis of Plaintiff's gender or sexual orientation, as the following undisputed facts plainly reveal:

- On the afternoon of June 20, 2001, Plaintiff agreed to a natural gas transaction with a Sempra customer.

- Plaintiff obtained from Mr. Howley the price at which the deal with the customer was completed.

- At the completion of the deal, Plaintiff did not add a mark-up to the price quote she obtained from Mr. Howley. Consequently, the transaction included no profit for Plaintiff.

- Plaintiff thereafter approached Mr. Howley at his trading desk and, in a raised voice, accused him of "ripp[ing] her off." Plaintiff further indicated that Mr. Howley "owe[d] [her] some profit."

- No agreement was reached on the profit sharing issue at that time.

- A short time later, Plaintiff returned to Mr. Howley's work station and, leaning with both of her hands into Mr. Howley's work area, again asked Mr. Howley to discuss the price sharing issue.

- At that time, it was some time near 2:30 p.m., approximately 40 minutes before the end of the trading day. Mr. Howley had approximately an 800 lot NYMEX position open on the trading desk. This position represented a substantial profit or loss to Sempra depending on how the market price changed before the end of the trading day.

- Mr. Howley told Plaintiff to "get away."

- When Plaintiff did not move, Mr. Howley used his hands to move Plaintiff away from his work space.

- Later that day, Mr. Howley apologized to Plaintiff for having touched her during the incident.

  See Pl.'s Dep. at 60:5-66:8; 69:2-72:17; 73:24-75:13; Howley Dep. at 56:5-57:22; 60:2-61:13;[15] Notated Incident Reports (Exhibit L).

---

[15] Relevant excerpts from the deposition of Joseph Howley are attached as Exhibit K.

It is clear from the foregoing chronology that the Howley Incident was nothing more than a business dispute between Plaintiff and Mr. Howley regarding the question of how the profit from a particular business transaction would be shared.[16]  Viewed objectively, there is absolutely no reason to believe that Mr. Howley's conduct was motivated by Plaintiff's gender or sexual orientation.  Thus, although Sempra must accept as true for purposes of this motion Plaintiff's claim that she *believed* Mr. Howley's conduct was "discriminatory" and that she advised Michael Goldstein of this belief, see Complaint, ¶ 26, Plaintiff nevertheless cannot satisfy the first element of a retaliation claim because her purported belief was not *objectively* reasonable.  See Spadola, 242 F. Supp. 3d at 291.  See also Schnoffstall v. Henderson, 223 F.3d 818, 826 (8th Cir. 2000) (affirming summary judgment for employer on hostile environment claim based on allegations that Plaintiff's supervisor lost his temper, swore at her, intimidated her, pounded on desks, and on one occasion, lunged across his desk at her; the court found that, "although this conduct [was] abusive and harassing, there is absolutely no evidence it was based on [Plaintiff's] sex.").

Even if the Court were to conclude that Plaintiff engaged in protected activity when she complained about the altercation with Mr. Howley, she still cannot satisfy the fourth prima facie element of a retaliation claim, since there is no causal connection between her complaint about Mr. Howley in June 2001 and her termination by her supervisor, Sarathi Roy, approximately nine months later.  As an initial matter, the substantial gap in time between the

---

[16] Indeed, on the day of the Howley Incident, Plaintiff described the altercation to a co-worker as a "small fighting match between Joe and I, *that's all.*"  See Pl.'s Dep. at 88:1-19 (emphasis added).  In response to another co-worker's inquiry, Plaintiff stated that the incident "was about Joe [Howley] moving a 2 year market 2.5 cents in 2 seconds" and she "[didn't] want to deal with that bullshit."  Id. at 93:20-94:23; 6/20/01 DeStefano E-Mail (Exhibit M).  In neither case did Plaintiff make any mention of discrimination or harassment.

Howley Incident and the date of Plaintiff's termination belies any claim of a causal connection. See Clark Co. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (holding that temporal proximity must be "very close" in order to constitute evidence of causality; citing cases holding that time periods of three or four months are too attenuated to support causal link); Hollander v. American Cyanamid Co., 895 F.2d 80, 84-85 (2d Cir. 1990) (indicating that three and one-half month interval, without other evidence, is insufficient to demonstrate causation and survive defendant's motion for summary judgment).[17]

In addition to the substantial gap in time between the Howley Incident and the date on which Plaintiff's employment was terminated, there is absolutely no evidence that Mr. Howley participated in the termination decision. Indeed, Mr. Howley and Sarathi Roy have unambiguously attested to the contrary. Moreover, although Mr. Roy was on the Sempra trading floor at the time the Howley Incident occurred, he has testified that, prior to making the decision to terminate Plaintiff's employment, he was unaware that Plaintiff purportedly had lodged a complaint of discrimination or harassment regarding the incident. In other words, Mr. Roy had no knowledge that Plaintiff had purportedly "opposed" conduct made unlawful by Title VII or the CFEPA. This fact further negates any claim that Plaintiff was terminated in retaliation for such alleged opposition. See Gordon v. New York City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000) ("The lack of knowledge on the part of particular individual agents is admissible as some

_____

[17] See also Conner v. Schnuck Mkts., Inc., 121 F.3d 1390, 1395 (10th Cir. 1997) (stating that "the four month time lag between [plaintiff's] participation in protected activity and his termination by itself would not be sufficient to justify an inference of causation") (cited with approval in Morris v. Lindau, 196 F.3d 102, 113 (2d Cir. 1999)); Cruse v. G & J USA Publ'g, 96 F. Supp.2d 320, 327 (S.D.N.Y. 2000) ("[T]he passage of more than six months from the date [plaintiff] complained . . . to the date of the [alleged adverse action] refutes any causal link."); Cobian v. New York City, No. 99 Civ. 10533, 2000 WL 1782744, at *18 (S.D.N.Y. Dec.6, 2000) (dismissing retaliation claim where there was four-month lapse between protected activity and adverse action).

evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of proximity or disparate treatment."); Kennedy v. St. Francis Hosp., 225 F. Supp.2d 128, 142-44 (D. Conn. 2002) (granting summary judgment on retaliation claim; holding that plaintiff could not establish a prima facie case of retaliation in the absence of evidence from which a jury could conclude that the employer's agent had any knowledge of the plaintiff's previous discrimination complaint) (quoting Gordon) (internal quotation marks omitted).[18]

For these reasons, Plaintiff's retaliatory discharge claims must fail.

## IV.    **PLAINTIFF'S CLAIMS FOR PUNITIVE DAMAGES WILL NOT LIE**

Even assuming that Plaintiff could prevail on any of her Title VII claims, which she cannot, she cannot recover punitive damages from Sempra because it made good faith efforts to comply with anti-discrimination laws. Therefore, as a matter of law, Plaintiff cannot prove that Sempra acted with reckless indifference to her protected rights -- an essential element for recovery of punitive damages.

To establish a claim of punitive damages against a corporate employer, Plaintiff must establish that a "managerial employee" engaged in intentional discrimination, within the course and scope of his or her employment, with malice or reckless indifference to Plaintiff's protected rights. See Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 529-46 (1999). For the reasons set forth in Points I through III, supra, Plaintiff as a matter of law cannot make that showing. Even if Plaintiff could make that requisite showing, Sempra still is entitled to

---

[18] See also Walker v. New York City Transit Auth., No. 99 CIV. 3337(DC), 2001 WL 1098022, at * 10 (S.D.N.Y. Sept. 19, 2001) (granting summary judgment on retaliation claim for failure to state prima facie case; "[T]the record demonstrates that the Human Resources Department . . . made decisions with regard to the transfer of employees. . . . [P]laintiff has offered no evidence tending to suggest that the Human Resources Department was aware of his complaints of discrimination. On this record, a reasonable jury could not infer that plaintiff's unsuccessful attempts to transfer to other units were caused by retaliatory animus.").

summary dismissal of punitive damages under Title VII if the challenged decisions of

managerial agents are contrary to its good-faith efforts to comply with anti-discrimination laws.

Id. at 545.  This affirmative defense to punitive damages liability applies even if the prohibited

activity engaged in by the managerial employees involves a tangible employment action.  Id.[19]

      The undisputed facts in this case establish that Sempra did, in fact, engage in

good-faith efforts to comply with Title VII.  Sempra has a policy prohibiting discrimination,

regular anti-discrimination training for its employees, and an internal complaint procedure

available to Plaintiff that she used only on one occasion, following the Howley Incident.  As a

result of Plaintiff's complaint, a thorough investigation was conducted by Sempra's General

Counsel and appropriate disciplinary action taken.  As a matter of law Plaintiff's claim for

punitive damages therefore fails.[20]

---

[19] See Williams v. Trader Publ. Co., 218 F.3d 481 (5th Cir. 2000) (overturning $100,000 punitive
damages award based on Kolstad, despite upholding compensatory damages based on jury
finding that supervisor had sexually harassed employee, where defendant company had a good
faith anti-discrimination policy and where plaintiff failed to complain about the harassing
supervisor's conduct pursuant to that policy until after the tangible employment action had
occurred).  See also Farias v. Instructional Systems, Inc., 259 F.3d 91, 101-02 (2d Cir. 2001)
(affirming trial court's dismissal of claim for punitive damages; evidence supporting jury's
finding that plaintiff was victim of retaliation in violation of Title VII held insufficient to state
claim for punitive damages); Weissman v. Dawn Joy Fashions, Inc., 214 F.3d 224, 235-36 (2d
Cir. 2000) (evidence that employer fired employee and canceled his health insurance two weeks
after employee suffered heart attack supported claim of disability discrimination but was
insufficient to warrant award of punitive damages).

[20] Summary judgment should also be granted as to Plaintiff's claim for punitive damages under
the CFEPA to the extent that Plaintiff is seeking to recover anything more than "reasonable
attorneys' fees and costs."  See Shaw v. Greenwich Anesthesiology Assocs., P.C., 200 F.
Supp.2d 110, 117 (D. Conn. 2002) (stating that punitive damages under the CFEPA "are
measured by reasonable attorneys' fees and costs"; rejecting plaintiff's request for punitive
damages "above and beyond an award of attorneys' fees"); Oliver v. Cole Gift Centers, Inc., 85
F. Supp.2d 109, 112 n.1 (D. Conn. 2000) ("[P]unitive damages in Connecticut are measured by
reasonable attorney's fees and costs.")

**V.    PLAINTIFF'S CLAIMS FOR BREACH OF AN EXPRESS CONTRACT AND NEGLIGENT INVESTIGATION CANNOT WITHSTAND SCRUTINY**

In Count Six, Plaintiff alleges that Sempra breached an express contract when it purportedly failed to investigate the Howley Incident in accordance with the terms of Sempra's Employee Handbook, which states, in pertinent part, that "[c]harges of harassment or discrimination will be thoroughly investigated." See Complaint, ¶¶ 88-93.  In Counts Thirteen and Fourteen, Plaintiff claims that Sempra was negligent in the performance of its investigation of the "Howley Incident," in violation of the terms of the Company's Employee Handbook and Professional Conduct Policy.  Summary judgment must be granted as to each of these claims for several reasons.

*First*, Sempra's Employee Handbook cannot support Plaintiff's express contract claim because it contains appropriate language disclaiming the creation of any contract.[21]  The "Introduction" to the Handbook, which appears on the first page, states: "This Handbook sets forth the *general policies and guidelines* which govern everyone's employment in our Company. These policies and guidelines are *subject to change* from time to time . . . . [E]xcept for those provisions which *expressly* state otherwise, the handbook is *not intended to be an express or implied contract of employment* for a specified period of time, a guarantee of employment, or a promise to provide benefits." See Exhibit I at 1 (emphasis added).  Similar language appears in the Handbook section that addresses termination of employment: "Certain conduct which is

---

[21] In some circumstances, statements in an employer's handbook or personnel manual may create a contract between the employee and the employer.  See Finley v. Aetna Life & Cas. Co., 202 Conn. 190, 198 (1987).  However, the Connecticut Supreme Court has explained that "[b]y eschewing language that could reasonably be construed as a basis for contractual promise, *or* by including appropriate disclaimers of the intention to contract, employers can protect themselves against employee contract claims based on statements made in personnel manuals." Id. at 199 n.5 (emphasis added).

detrimental to other employees and/or the Company warrants involuntary termination on the first

occurrence. *These are guidelines only*, and do not change the at will nature of your employment

relationship. *The Company reserves the right to change these guidelines in its discretion*." Id. at

19 (emphasis added).

In addition to the disclaimers in the Employee Handbook, express disclaimer

language also appears in an Application for Employment that Plaintiff signed *six months before*

she received a copy of the Employee Handbook.[22]  The Application states, in pertinent part, as

follows:

> I understand that nothing contained in this application *or in any*
> *policies, procedures or handbooks I might receive*, and nothing said
> to me in my interview, is intended to create an employment contract
> between Sempra Energy and me.  No promises regarding employment
> have been made to me, and I understand that no such promise or
> guarantee is binding upon the Company unless it is in writing *and signed*
> *by an authorized Sempra Energy representative*.  I understand and agree
> that if I am employed by Sempra Energy, my employment, including
> compensation and benefits, can be terminated, with or without cause,
> with or without notice, at any time, at the option of either Sempra Energy
> or me.
>
> See Exhibit N at 8 (emphasis added).

Given these clear disclaimers, Plaintiff's claim for breach of an express contract

fails. See Davis v. Liberty Mutual Ins. Co., 218 F.Supp.2d 256, 260-62 (D. Conn. 2002)

(disclaimer stating that employee handbook "is not and should not be considered an employment

contract" required dismissal of contract claim); Cowen v. Federal Express Corp., 25 F.Supp.2d

33, 37 (D. Conn. 1998) (granting summary judgment on breach of contract claim; "Federal

---

[22] Plaintiff testified that she read and signed the Employment Application at the commencement
of her employment in September 2000.  See Pl.'s Dep. at 105:4-22; Employ. Appl. (Exhibit N).
By contrast, Plaintiff did not receive a copy of Sempra's Employee Handbook until March 16,
*2001*.  See Pl.'s Dep. at 108:3-109:7; Handbook Acknowl. (Exhibit O).

Express repeatedly disclaims any intention to contract, stating throughout the [Employee] Manual, in no uncertain terms, *that its provisions are mere guidelines* which do not give rise to an express or implied employment contract.") (emphasis added).[23]

   *Second,* summary judgment is required as to Plaintiff's claims for negligent investigation because "Connecticut law does not permit recovery for an employer's negligent conduct of an investigation into charges of sexual harassment that is required by federal law." Malik v. Carrier Corp., 202 F.3d 97, 100 (2d Cir. 2000). In Malik, an employee sued his former employer for negligent infliction of emotional distress, alleging that the employer negligently conducted an investigation into allegations of sexual harassment made against him. The jury found in plaintiff's favor on the negligence claim. The Second Circuit reversed on appeal, reasoning that "an employer's investigation of a sexual harassment complaint is not a gratuitous or optional undertaking . . . [because] under federal law, an employer's failure to investigate may allow a jury to impose liability on the employer." Id. at 105. Consequently, in order to "ensure that federal policies are not undermined by imposing on employers legal duties enforceable by damages that reduce their incentives to take reasonable corrective action as required by federal law," the Second Circuit held that "corrective actions that a risk-averse employer might take to

_____

[23] See also Smith v. Shoreline Care LTD Partnership, No. 360206, 1996 WL 365015, at *5 (Conn. Super. May 17, 1996) (granting summary judgment based on language stating that "[t]his Handbook is a living changing document. It is neither a comprehensive treatment of personnel issues, nor is it an employment contract."); Markgraf v. Hospitality Equity Investors, No. 30 85 01, 1993 WL 53604, *3 (Conn. Super. Feb. 18, 1993) (language in employee handbook stating that "the contents of the handbook are presented as a matter of information only, and are not meant to be a contract" held to be sufficient disclaimer); Grich v. Textron Lycoming, 822 F. Supp. 66, 71 (D. Conn.1993) ("[P]laintiff must prove that the alleged employment manual contains mandatory directives enforceable as contractual obligations, *and not mere guidelines for employees*.") (emphasis added); Manning v. Cigna Corp., 807 F. Supp. 889, 895 (D. Conn. 1991) (disclaimer stating that employee manual was "not an employment contract" bars plaintiff's breach of contract claims).

comply with federal law *may not give rise to a negligence action*, whether the rationale is couched in terms of breach, legal duty, or privilege." Id. at 106 (emphasis added).

In this case, Plaintiff alleges that she advised Sempra's General Counsel, Michael Goldstein, that: (1) she believed Mr. Howley's conduct during the Howley Incident "was directed against her as a woman"; (2) Mr. Howley's behavior was a violation of Sempra's "Prohibition Against Harassment"; and (3) the Howley Incident "needed to be investigated." See Complaint, ¶¶ 26-27. Plaintiff further alleges that, thereafter, Sempra negligently investigated her complaint. See Counts Thirteen, Fourteen. Plaintiff's negligent investigation claims therefore fall squarely within the Second Circuit's holding in Malik, and must be dismissed.[24]

*Third,* Plaintiff's claims for breach of contract and negligent investigation are barred because the record evidence clearly demonstrates that Sempra did, in fact, investigate the Howley Incident. Specifically, it is undisputed that, within days after the Howley Incident, and immediately after his return from travel abroad, Sempra's General Counsel interviewed: (1) the Plaintiff, (2) Joseph Howley, and (3) at least two other employees who witnessed the dispute, either in whole or in part. See Goldstein Dep. at 27:20-28:10; 29:7-32:6;[25] Goldstein Notes (Exhibit Q). From those interviews, Attorney Goldstein generated an Incident Report describing

---

[24] To the extent Plaintiff claims that she was ultimately terminated in March 2002 because Sempra negligently failed to investigate her complaint regarding Mr. Howley, this claim is further barred. See Menard v. People's Bank, No. CV 970544627S, 1998 WL 177536, at *4 (Conn. Super. Apr. 6, 1998) (granting motion to strike negligent investigation claim filed by at-will employee; "[A]bsent an allegation of facts that indicate an employment relationship other than an at will employment relationship, an employer does not have an obligation to investigate alleged misconduct."); Daley v. Aetna Life & Cas., No. CV 94 0533693 S, 1994 WL 422642, at *5 (Conn. Super. Aug. 3, 1994) ("[P]rior to discharging an employee-at-will, an employer does not owe the employee a duty to investigate. Since the facts alleged do not indicate an employment relationship that would take Daley out of the at-will category, Aetna did not owe Daley a duty to investigate prior to discharging her. Therefore it cannot be held liable for negligent investigation.").

[25] Relevant excerpts from the deposition of Michael Goldstein are attached as Exhibit P.

the facts of the incident. See Goldstein Dep. at 62:13-63:13. Plaintiff thereafter made proposed written changes to the Incident Report, which she then signed as revised. Mr. Howley signed the original version of the Incident Report, without revisions. Id. at 67:21-71:2.

Plaintiff conceded during her deposition that, with limited exceptions, the Incident Report completely and accurately recounted the facts of the Howley Incident. See discussion under Point III, supra. Indeed, Plaintiff takes exception to the facts of the Howley Incident, as recounted in Attorney Goldstein's report, in only two respects. First, Plaintiff claims that Mr. Howley swore at her during the incident and denies that she swore at him. See Pl.'s Dep. at 64:25-65:16.[26] Second, Plaintiff does not believe that that her physical positioning during the incident (i.e., leaning with her hands into Mr. Howley's work area) actually prevented Mr. Howley from performing his job. Id. at 65:17-20; 71:9-12.

Given the wholly conclusory allegations in the Complaint, see Complaint, ¶¶ 93, Sempra can only assume that the Handbook "breach" about which Plaintiff complains relates to the Company's decision not to exhaustively interview each of the employees on the trading floor at the time of the Howley Incident regarding these two points of dispute. But the resolution of those two issues (assuming one could be reached) could not reasonably lead the Company to any conclusion other than the one it did reach - - i.e., that Plaintiff and Mr. Howley were involved in a business dispute regarding the division of profit on a customer deal and that both Plaintiff and Mr. Howley had acted inappropriately. Who said "fuck" to whom would not change this conclusion, nor would taking a poll among the employees on the trading floor to determine whether they believed that Plaintiff's act of leaning with both of her hands into Mr. Howley's

---

[26] Plaintiff claims that Mr. Howley told her to "fuck off" and "get the fuck away from me." Id. at 72:18-73:19.