UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SUSAN E. WOOD, | CIVIL ACTION NO. |
| Plaintiff, | 3:03-CV-986 (JCH) |
| v. | |
| SEMPRA ENERGY TRADING CORPORATION, | July 13, 2004 |
| Defendant. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S COMPLAINT**

## <u>INTRODUCTION</u>

Plaintiff Susan E. Wood ("Plaintiff" or "Wood") has pending before the Court a fourteen-count Complaint against the Defendant, Sempra Energy Trading Corporation ("Defendant" or "Sempra"), which counts are as follows:

1.  Discrimination on the basis of Gender and Sexual Orientation in violation of 42 U.S.C. §. 2000e, <u>et</u> <u>seq</u>. ("Title VII") and the Connecticut Fair Employment Practices Act ("CFEPA") (Counts One, Two and Three).

2.  Retaliatory discharge in violation of Title VII and CFEPA (Counts Four and Five).

3.  Breach of Sempra's employment handbook in regard to the handling of Plaintiff's employment complaint (Count Six).

4.  Breach of implied contract regarding the improper termination of Plaintiff's employment, as well as failure to pay her bonuses which she had earned (Count Seven).

5.      Claims regarding her employment and consideration due to her by reason of her improper termination and failure to pay bonuses couched in promissory estoppel, unjust enrichment, and breach of the implied covenant of good faith and fair dealing (Counts Eight, Nine and Ten).

6.      Damages arising from failure to reimburse business expenses (Count Eleven).

7.      Violation of the Connecticut Wage Act, C.G.S. § 31-71, et seq. (Count Twelve).

8.      Negligent failure to investigate harassment claims (Counts Thirteen and Fourteen).

Sempra has moved for summary judgment as to all counts except Count Eleven by its motion, accompanying memorandum of law, and related documents, all dated May 14, 2004 ("Defendant's Summary Judgment Motion").

In moving for summary judgment, at first blush it is patently obvious that Sempra's submission reads like a summation to a jury or other trier of fact.  While disparaging Wood's right to pursue relief under various federal and state statutes, as well as common law claims, Sempra, acting with the benefit of limitless resources, has brazenly chosen to burden the Court, as well as Plaintiff, in having to respond to a motion for summary judgment when it is without question that material issues of fact exist in each of Plaintiff's challenged claims.  Such stratagem, no doubt, arises from Sempra's cynical tactic to make this litigation as expensive and burdensome as possible to Plaintiff, as well as to provide a deterrent to any other individual who would seek to hold Sempra accountable for its actionable conduct.[1]

---

[1] Indeed, at the Scheduling Conference held before the Court on or about November 19, 2003, the Court, aware of the factual issues asserted in the Complaint informally questioned the propriety of filing a motion for summary judgment, given the facts put at issue in this litigation.  Quite apparently, Sempra chose the path of creating a burden to Plaintiff and the Court rather than accede to the Court's informal directive.

## FACTUAL BACKGROUND

The following facts are undisputed, and when examined against the prevailing law regarding the discrimination claims and breach of contract and related claims filed by Plaintiff, easily defeat Defendant's pending Summary Judgment Motion. Plaintiff has filed an affidavit concurrent herewith, supplying a factual basis to her claims ("Wood Affidavit"). The basic facts, which controvert Sempra's submission, and defeat Sempra's Summary Judgment Motion, are as follows:

1.      Plaintiff, a woman and lesbian, was hired in September of 2000 by Sempra at the Assistant Vice President level with responsibilities dealing with Sempra's Gas Department. Sometime in February of 2001, Sempra asked Plaintiff to take a position in the Petroleum Derivatives Department. In June of 2001, Plaintiff was physically assaulted in Sempra's workplace by a trader named Joe Howley ("Howley"). The assault (referred to in this litigation as the "Howley incident") was witnessed by a Mr. Sarathi Roy and certain other individuals at Sempra. Plaintiff made an immediate protest to management about the assault, and in particular spoke to Sempra's General Counsel, Michael Goldstein, as well as the Chairman, Steven Prince, the President, David Messer, her former supervisor, Jackie Mitchell, and her then supervisor, Brian Cumming.

2.      In discussing the incident with General Counsel Michael Goldstein, Wood had stated that, based upon her interactions with certain personnel at Sempra, she was fearful that she would be retaliated against and ultimately terminated based upon the altercation with Howley. The environment at Sempra while Wood was employed had a "cowboy" aura, and

3

many of the traders and salespeople evidenced a machismo attitude.

3.      After the Howley incident, Plaintiff felt ostracized in dealing with her peers at Sempra.  Further, her complaint about the assault resulted in a tepid response from Sempra management and Mr. Goldstein, and ultimately, Wood was never made aware of any formal reprimand having been given to Howley.

4.      After the 2001 financial year was completed, Susan Wood, in 2002, was given a $50,000 bonus based on her performance, as well as a $10,000.00 raise in her base salary.  Other assistant vice presidents in the Petroleum Derivatives Department were given no bonus based upon their performance.  Plaintiff was also paid a bonus in 2001 for her work in 2000 which covered approximately 3 and one half months.  Further, the written job evaluations of Wood's performance were uniformly positive in assessing her work from the time of the commencement of her employment through her ultimate termination.

5.      Ultimately, Sempra informed Plaintiff that she was terminated in the early part of 2002.  Plaintiff had been given no advance notice of any deficiency in her work.  As stated above, to the contrary, Plaintiff had been given bonuses in each of the years 2000 and 2001 (while other similarly situated officers were given no bonus), and had received positive job evaluations.  The person who articulated the termination was Sarathi Roy, but Mr. Roy had counseled with General Counsel Michael Goldstein in effectuating the termination, as well as Ms. Wood's previous supervisors.  The President, David Messer, was also made aware of the termination.  Thus, each of the individuals who participated in the decision to terminate Plaintiff

4

were aware and conscious of the Howley incident.  More alarmingly, Mr. Goldstein, who purportedly served as an objective fact finder regarding Plaintiff's complaint about the Howley incident and her communicated fear of retaliation, jettisoned his objective role in handling his role of investigator of Ms. Wood's complaint and expressed fear of retaliation, and provided legal advice to Sempra, under the cloak of attorney client privilege, regarding Plaintiff's termination.

6.      Still further, the person who communicated the termination to Wood, Mr. Roy, has made a number of admissions about how he felt about Wood, essentially corroborating Plaintiff's assertions.  More particularly, Mr. Roy has stated that he felt uncomfortable with Plaintiff, and felt awkward about her working at Sempra.  These statements by Mr. Roy, coupled with his statements to Plaintiff evidencing a prejudice and chauvinism about women and lesbians, provide corroborating evidence that his motivation to terminate Wood emanated from discriminatory animus.  Still further, a fellow Sempra employee stated to Plaintiff that Mr. Roy was in fact uncomfortable with her lesbian status.

7.      Before Ms. Wood was terminated by Sempra, none of Mr. Roy, Mr. Messer,  Mr. Goldstein, Ms. Mitchell, or Mr. Cummings reviewed Wood's written job evaluations, or any objective criteria including financial reports as to Plaintiff's productivity or profitability.

8.       Further, Steve Soule, a male, was approached to replace Wood in her position at Sempra before she was terminated, and he ultimately did replace her.  In contrast to Plaintiff, Mr. Soule had very little experience in the Petroleum Derivatives Department.  Still

5

further, after Wood was terminated, Sempra gave Mr. Soule the customer leads developed by Wood before she was terminated.

9.      Beyond the foregoing factual record substantiating Plaintiff's discrimination claims, certain clear representations were made to Plaintiff at the time she was recruited to take employment at Sempra regarding her bonus and job security. More particularly, Plaintiff was promised that beyond her base salary, she would be a paid a bonus of 10-15% of the profit that she booked (revenue less the "cost" of her desk), and was promised employment security if she met certain objective profit criteria. These were material representations made to and relied upon by Plaintiff in deciding to relocate from Texas and accept employment with Sempra. As such, Sempra has clear contractual and other legal obligations to Ms. Wood which it cannot disavow.

Based upon the foregoing facts, under the prevailing law supporting Plaintiff's claims, the Court should summarily deny Defendant's Summary Judgment Motion.

## **LEGAL ARGUMENT**

## I.    **DEFENDANT FAILS TO MEET ITS BURDEN OF PROOF FOR SUMMARY JUDGMENT BECAUSE ISSUES OF MATERIAL FACT EXIST.**

A.    The Standards of Summary Judgment Require a Denial of Defendant's Motion.

Fed. R. Civ. P. 56(c) states that summary judgment is rendered " … if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Further, it is the

burden of the party moving for summary judgment to prove the absence of any genuine issues of material fact.  <u>Edwards v. State of Connecticut Department of Transportation</u>, 18 F.Supp2d 168, 170 (D. Conn. 1998) (citation omitted); <u>Sava v. General Electric Company</u>, 877 F.Supp. 81, 83 (D. Conn. 1995) (citation omitted).

In deciding whether the movant has met its burden of proof, " … the Court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  <u>Edwards</u>, 18 F.Supp.2d. at 170 (citation omitted); <u>Feingold v. State of New York</u>, 366 F.3d 138, 148 (2d Cir. 2004) (citation omitted).  Accordingly, summary judgment is appropriate only where " … it appears beyond doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle [him] to relief."  <u>Id</u>. at 148 (citation omitted; internal quotation marks omitted).

In the context of discrimination cases,

> …where state of mind is at issue, [the courts] <u>affirm a grant of summary judgment in favor of an employer sparingly</u> because careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination.

<u>Id</u>. at 149 (emphasis supplied) (citations omitted; internal quotation marks omitted); <u>See</u> <u>also</u> <u>Edwards</u>, 18 F.Supp.2d at 171 (" … [T]he Second Circuit has held that a district court should exercise particular caution when deciding whether summary judgment should issue in an employment discrimination case."); <u>Sank v. City University of New York</u>, 219 F.Supp.2d 497, 500 (S.D.N.Y. 2002) ("Greater caution must be exercised, however, in granting summary judgment in employment discrimination cases where the employer's intent is genuinely in issue).

As demonstrated below, Plaintiff has met its burden of proof as to each of the thirteen counts of the Complaint upon which Defendant seeks summary judgment, and therefore,

Defendant's Summary Judgment Motion should be denied as to each such count.


**II.    ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFF'S CLAIMS OF SEXUAL DISCRIMINATION AND SEXUAL ORIENTATION DISCRIMINATION**.

  A.    Plaintiff Has Established A Prima Facie Case of  DisparateTreatment.

Without citing a single case in Connecticut, Defendant asserts that Plaintiff cannot establish that Defendant's termination of her employment was based on gender and/or sexual orientation in violation of Title VII and CFEPA.[2]  (Defendant's Memorandum of Law in Support of its Motion for Partial Summary Judgment on Plaintiff's Complaint, pp. 14 – 19) (hereinafter "Def.'s Memo." _____ ).  However, Defendant does not cite one Connecticut case in support of its argument.  Further, as indicated by the cases cited by Defendant, its argument rests upon an application of the enhanced pretext plus standard (Def.'s Memo. pp. 14-15), which as shown below stands in direct contradiction of existing Connecticut case law and recent authority from the United States Supreme Court.  As demonstrated below, Plaintiff has established her claims of discrimination under Title VII and CFEPA in accordance with the precedents set by Connecticut law and the United States Supreme Court.

In Connecticut, a plaintiff may establish a *prima facie* case of discrimination under Title VII,

> … through inference by presenting facts [that are] sufficient to remove the most likely bona fide reasons for an employment action. … From a showing

---

[2] Connecticut courts " … look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both."  Board of Education, 266 Conn. 492, 505, FN. 18 (citation omitted; internal quotation marks omitted).

> that an employment decision was not made for legitimate reasons, a fact-
> finder may infer that the decision was made for illegitimate reasons.

United Technologies v. CHRO, 72 Conn.App. 212, 221 (2002) (citation omitted; internal quotation marks omitted); see generally McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Board of Education of the City of Norwalk v. CHRO, 266 Conn. 492, 510 (2003).

Although a debate exists among the federal circuit courts regarding the ultimate burden of proof borne by the complainant in an employment discrimination action (see Board of Education of Norwalk, 266 Conn. at 504, FN. 17), the United States Supreme Court recently applied the more relaxed standard of proof adopted in Connecticut. See Desert Palace v. Costa, 123 S.Ct. 2148, 2155, FN. 3 (2003) (holding that direct evidence of discrimination is not required in a mixed motive case).[3] Significantly, the Connecticut Supreme Court has recently reaffirmed that " … in appropriate circumstances, the trier of fact can reasonably infer the ultimate fact of intentional discrimination." Board of Education of Norwalk, 266 Conn. at 510.

In order to establish a *prima facie* case of discrimination, a plaintiff must produce evidence of the following four elements:

(1)  she was a member of a protected class;

(2)  she was qualified for her position;

(3)  she was discharged; and

(4)  the termination occurred under circumstances giving rise to an inference of

---

[3] In the event the Court were to adopt the pretext plus standard advocated in Defendant's Summary Judgment Motion, Plaintiff asserts that she has adduced evidence in support of her discrimination claims which satisfies even the most demanding burden of proof.

discrimination.[4]

United Technologies, 72 Conn.App. at 225-26.

Once a plaintiff has made out a *prima facie* case, the defendant has the burden to rebut the presumption of discrimination which arises from such *prima facie* case by offering evidence of a legitimate, nondiscriminatory business rationale for its actions.   Id. at 231; see also McDonnell Douglas Corp., 411 U.S. at 802; Board of Education of Norwalk, 266 Conn. at 506. Further, summary judgment is still improper where a defendant rebuts a plaintiff's *prima facie* case with a legitimate, non-discriminatory reason for termination when the plaintiff has offered evidence from which a reasonable fact finder could conclude that such stated reason was pretextual.   Feingold v. State of New York, 366 F.3d 138, 155-156 (2d Cir. 2004).   More particularly, " … once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision –  [complainant] must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination."   Board of Education of Norwalk, 266 Conn. at 507 (citing Reeves v. Sanderson, 530 U.S. 133, 143 (2000)) (internal quotation marks omitted).   A jury is free to disbelieve an employer's preferred reason for an alleged discriminatory act, and such disbelief "… may, together with the elements of the prima facie case, suffice to show intentional discrimination."   Id. at 508.   In short, it is from this disbelief that the trier of fact may infer discrimination by concluding that the proffered reason is an attempt at covering up illegal discrimination.   Id.   Significantly, an employer's failure to abide by

---

[4] The fourth element is proven by a showing evidence that a plaintiff received less favorable treatment than a similarly situated employee in circumstances from which it can be inferred that such treatment was based upon unlawful discrimination.   United Technologies, 72 Conn.App. at 226 (citation omitted).

internal personnel policies are properly subject to scrutiny in Title VII cases, and departures from such internal policies may be probative on the issue of discrimination.  Id. at 512-13.[5]  Further, the Connecticut District Court has held that:

> To raise a triable issue of pretext, a plaintiff need not show that sex was the only reason for termination, nor that the defendant's proffered reason was false … . Rather, the plaintiff must show that the offered reasons for discharge were not defendant's only reasons and that sex was a determinative factor.

Sava v. General Electric Company, 877 F.Supp. 81, 84 (D. Conn. 1995) (citations omitted).

In United Technologies, *supra*, a case presenting a factual scenario similar to the matter before this Court, the employer, Pratt and Whitney Aircraft Division, appealed from the judgment of the trial court, which dismissed Pratt & Whitney's administrative appeal from an order and award by the Connecticut Commission on Human Rights and Opportunities ("CCHRO").  United Technologies, 72 Conn.App. at 214.  The CCHRO had sustained a claim of gender discrimination brought against Pratt & Whitney by an employee, Gale Nestor ("Nestor").  Id.  The crux of Nestor's complaint was that the defendant employer had discriminated against her when it terminated her employment following a physical altercation between Nestor and a male co-worker, Elmore.  Id. at 226-27.  In affirming the decision of the CCHRO for gender discrimination against the defendant employer, the Connecticut Appellate Court unanimously held,

> The facts illustrate that in the July 27, 1992 time clock incident, both Nestor and Elmore pushed against each other and that when Elmore

---

[5] Without citation to one Connecticut District Court case or Connecticut State Court case, Defendant incorrectly asserts, "[o]nce the employer articulates a legitimate reason, the presumption created by the prima facie case drops out of the picture… ."  Def.'s Memo. p. 15.  Rather, the Connecticut Appellate Court has held that " … once a minimal prima facie case is proved and the employer's nondiscriminatory explanation has been given … the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred."  United Technologies, 72 Conn.App. at 232.

> pushed harder, Nestor tried harder to get him away from her. Nestor and Elmore were disciplined quite differently for that similar conduct, with the former being terminated from her employment while the latter was issued only a one day suspension.

Id. at 227.

In Sava v. General Electric Company, 877 F.Supp. 81 (D. Conn. 1995), the Connecticut District Court denied the defendant's motion for summary judgment on plaintiff's claim of discrimination. Id. at 84. In Sava, (i) the plaintiff was the only female manager in her division, (ii) plaintiff had received two salary increases during her tenure, (iii) plaintiff's performance appraisals were excellent, (iv) plaintiff was highly rated by her previous managers, (v) during plaintiff's tenure, sales dropped between seventeen and eighteen percent each year, (vi) plaintiff did not receive incentive compensation when other division employees did, and (vii) plaintiff was the only person discharged from her division. Id. at 82-83. The defendant rebutted plaintiff's prima facie case by alleging that the plaintiff had been terminated due to lack of production. In reaching its holding, the District Court held that the circumstances surrounding plaintiff's termination " ... create a genuine factual issue as to whether [the employer's] stated reason for terminating plaintiff was pretextual and whether sex was a factor in [the employer's] decision to terminate plaintiff." Id. at 84.

In the instant case, Wood has satisfied all four prongs of the *prima facie* discrimination case.

- First, it is undisputed that Plaintiff is a woman and a lesbian, and as such, is a member of a protected class. (Complaint, ¶ 5, ¶ 58);

- Second, Plaintiff was qualified for her position with Defendant. (Complaint, ¶ 6-8);

- Third, she was terminated from her position with Defendant.  (Complaint, ¶ 38); and

- Fourth, the termination occurred under circumstances giving rise to an inference of discrimination.  (See generally Complaint, ¶¶ 6-51).  For example:

  (a)  Plaintiff was only one of two openly homosexual employees employed by Defendant out of approximately 300 employees. (Complaint, ¶ 62);

  (b)  Defendant was aware of Plaintiff's homosexuality.  (Complaint, ¶ 59);

  (c)  Sarathi Roy, who ultimately became Plaintiff's supervisor, made sexual innuendoes to Plaintiff and made numerous chauvinistic remarks about women in the workplace and lesbians.  (Complaint, ¶ 37);

  (d)  Plaintiff received a performance bonus in 2001 of $50,000.00 for her work in 2001. (Complaint, ¶ 17);

  (e)  Plaintiff was awarded an annual salary increase of $10,000.00 in 2001.  (Complaint, ¶ 18).

  (f)  Plaintiff received good reviews.

  (g)  In June 2001, Howley, a senior male employee and Managing Director of Defendant, grabbed Plaintiff and shoved her on the trading floor in front of approximately 150 of Defendant's employees ("Howley Incident").  (Complaint, ¶ 22);

  (h)  The Howley Incident was witnessed by Sarathi Roy, who

13

ultimately became Plaintiff's supervisor and was involved in the

decision to terminate Plaintiff.

(Complaint, ¶ 23);

(i)     Plaintiff reported the Howley Incident to Mitchell and her

immediate supervisor at the time, Brian Cumming. (Complaint, ¶

24);

(j)     Plaintiff also lodged a complaint with the General Counsel of

Defendant, Michael Goldstein, and made it clear to him that she

thought the Howley Incident was discriminatory and in violation of

Defendnat's Professional Conduct Policy and Prohibition Against

Harassment, and therefore, an investigation was necessary.

(Complaint, ¶¶ 26-28);

(k)     After the Howley Incident, Sempra treated Plaintiff vastly different

from its treatment of Howley.   In particular, (i) Plaintiff was

reprimanded, but there was no indication that Howley was

similarly censured for the incident (Complaint, ¶ 35), (ii) after the

Howley Incident, Plaintiff experienced an increasingly hostile

work environment (Complaint, ¶¶ 31-32), and (iii) Plaintiff was

terminated while Howley remained in his position with Defendant

(Complaint, ¶¶ 35, 38).

(l)     Defendant failed to investigate the Howley Incident in accordance

with its internal protocol, and, ultimately, the General Counsel who

was charged with an objective investigator role concerning the

14

Howley incident and Plaintiff's concerns about retaliation, assumed an adverse role and counseled Sempra and Mr. Roy about the termination of Plaintiff. (Complaint, ¶¶ 33-34);

(m)    Defendant's termination was tainted because Mr. Roy, who terminated Plaintiff, had a very close relationship with Howley, and was fully aware of the Howley Incident since he was on the trading floor at the time it occurred. (Complaint, ¶ 40);

(n)    In addition, before terminating Plaintiff, none of the persons involved in the termination reviewed Plaintiff's favorable job evaluations or objective data such as financial reports which showed Plaintiff to be a productive employee (Wood Affidavit); and

(o)    Ultimately, Steven Soule, a male with less experience than Ms. Wood was picked to replace Ms. Wood before she was fired. (Wood Affidavit).

In response to this litigation, Defendant now offers various alleged reasons for its termination of Plaintiff. However, the circumstances in this case, as set forth with particularity above, create a genuine issue of fact as to whether Defendant's stated reasons for terminating Plaintiff were pretextual. Accordingly, summary judgment as to Plaintiff's claims of gender-based discrimination and sexual orientation-based discrimination should be denied.

B.    Plaintiff Has Alleged An Actionable Hostile Work Environment Claim.

15

A disparate treatment claim under Title VII may alternatively be established by demonstrating that the harassment resulted in a hostile work environment. Feingold v. State of New York, 366 F.3d 138, 149 (2d Cir. 2004). Significantly, because a hostile work environment claim

> … encompasses an objective component … [w]hether a reasonable person would objectively perceive this conduct to create a hostile work environment is a matter frequently left to the sound discretion of reasonable jurors. Evaluating the severity and pervasiveness of a harasser's conduct on summary judgment is often difficult and, in many cases, inappropriate.

Edwards v. State of Connecticut Department of Transportation, 18 F.Supp.2d 168, 175 (citations omitted). As set forth more fully below, the evidence adduced by Plaintiff establishes the elements of a hostile work environment, and therefore, summary judgment must be denied as to Plaintiff's claims of gender-based discrimination and sexual orientation discrimination.

Defendant properly sets forth the two elements which Plaintiff must establish in order to set forth a claim for hostile work environment: first, she must prove that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and second, she must show that a specific basis exists for imputing the conduct that created the hostile environment to Sempra (See Def.'s Memo. pp. 5-6). However, Defendant offers an overly narrow and restrictive application of such standards. For instance, in what can only be described as misleading, Defendant attempts to depict the facts in this case as coming within those cases where the alleged discriminatory acts are merely acts of uncivil or offensive conduct or words which constitute "simple teasing, offhand comments and isolated incidents … ." (Def.'s Memo. p. 6). In furtherance of such efforts, Defendant disingenuously avoids mention of the pivotal Howley Incident. However, as stated by the

Second Circuit Court of Appeals,

> … a single act can create a hostile work environment if it in fact work[s] a transformation of the plaintiff's workplace … While the standard for establishing a hostile work environment is high, we have repeatedly cautioned against setting the bar too high, noting that [w]hile a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.

Feingold, 366 F.3d at 150 (emphasis supplied) (citations omitted; internal quotation marks omitted).

Further, in determining whether a plaintiff has stated an actionable claim for a hostile work environment, it is axiomatic that the court must consider " … all the circumstances … ." National Railroad Passenger Corporation v. Morgan, 122 S.Ct. 2061, 2074 (2002); see also Feingold, 366 F.3d at 150. Circumstances which are considered significant are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance." Feingold at 150.[6] To that end, "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice." National Railroad Passenger Corporation, 122 S.Ct. at 2074 (citation omitted; internal quotation marks omitted); see also Edwards, 18 F.Supp.2d 168 (summary judgment inappropriate where there was evidence of, among other things, intimidation through vandalism of plaintiff's belongings and plaintiff had contacted the affirmative action office of defendant regarding such

---

[6] In reaching its holding, the Second Circuit stated: "And, while Feingold has not alleged sufficient facts to make out a hostile work environment claim based solely on race, his allegations of racial animosity can nevertheless be considered by a trier-of-fact when evaluating Feingold's religion-based claim. Id. at 151.

17

incidents); Raniola v. Bratton, 243 F.3d 610, 621 (2d Cir. 2001) (plaintiff presented sufficient evidence for a reasonable jury to find a hostile work environment where over a two and a half year period plaintiff was subjected to "offensive sex-based remarks, disproportionately burdensome work assignments, workplace sabotage, and one serious public threat of physical harm); Howley v. Town of Stratford, 217 F.3d 141, 154 (2d Cir. 2000) (rational jurors could find that verbal abuse of a female firefighter witnessed by her subordinates created an intolerable alteration of plaintiff's working conditions).

As set forth in detail above, all of the circumstances in this case create issues of material fact, making summary judgment inappropriate on Plaintiff's hostile work environment claim.

C.     Defendant Is Not Entitled to Assert Faragher/Ellerth Defense.

Defendant misstates the Faragher/Ellerth defense. "Under Faragher and Ellerth, an employer is presumed liable for the sexual harassment of an employee by her supervisor." Wilburn v. Fleet Financial Group, Inc., 170 F.Supp.2d 219, 227 (D. Conn. 2001) (citations omitted)[7]; see also Edwards, 18 F.Supp.2d at 177.  However,

> in a claim of a hostile work environment that does not culminate in a tangible employment action, the employer may escape vicarious liability by showing: a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Generally, a tangible employment action occurs where a supervisor acts with the employer's authority and makes a decision that inflicts direct economic harm on the employee and constitutes a significant change in employment status, such as hiring, firing, [or] failing to promote … .

---

[7] Liability for the actions of co-workers attaches where the "…employer has either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." Edwards, 18 F.Supp.2d at 177 (citations omitted, internal quotation marks omitted).

Wilburn, 170 F.Supp.2d at 227 (citation omitted, internal quotation marks omitted).

In the instant case, there was a tangible employment action - the termination of Plaintiff, and therefore, the presumption applies. Further, even assuming, *arguendo*, that there was no tangible employment action, Defendant fails to meet the two-pronged test to establish the Faragher/Ellerth affirmative defense. First, Defendant did not exercise reasonable care in preventing and correcting the sexual discrimination of Plaintiff.[8] Second, Plaintiff did not unreasonably fail to take advantage of preventative or corrective opportunities provided by Defendant to avoid harm.

While it is true that evidence that the employer has an anti-harassment policy which it has " … effectively published and disseminated among the employees is an important consideration in determining whether the employer has met its burden of proof under the first prong," it is not dispositive. Id. at 228 (citation omitted, internal quotation marks omitted). More particularly, whether the policy is enforced is a factor relevant to determining whether the employer has met its burden on this defense. Id. Further, " … if the evidence creates an issue of fact as to whether an employer's actions [are] effectively remedial and prompt, summary judgment is inappropriate." Edwards, 18 F.Supp.2d at 178.

The cases cited by Defendant further lend support to the proposition that evidence of a policy alone does not insulate an employer from liability. See Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 295 (2d Cir. 1999) (undisputed that employer had a policy and

---

[8] Where an employer fails to show by " … undisputed evidence that it exercised reasonable care to prevent sexual harassment … [t]he question of whether an employer has provided a reasonable avenue of complaint is a question for the jury." Wilburn, 170 F.Supp.2d at 230 (citations omitted, internal quotation marks omitted).

investigated and remediated reported problems and plaintiff did not report incident); Leopold v. Baccarat, Inc., 239 F.3d 243, 245-46 (2d Cir. 2001) (employer had a policy and complaint procedure and plaintiff failed to utilize it); Nichols v. Azteca Restaurant Enterprises, Inc., 256 F.3d 864 (9th Cir. 2001) (defendant liable for the hostile environment created by its supervisor where court found that defendant "did not exercise reasonable care to promptly correct the sexually harassing behavior directed at plaintiff").

It is undisputed that Defendant in the instant matter had an anti-discrimination policy in place; however, Plaintiff has produced ample evidence that Defendant did not pursue the policy in accordance with its protocol. Still further, Plaintiff has produced evidence that she attempted on numerous occasions to utilize the complaint mechanisms provided in the very policies with which Defendant attempts to shield itself.[9] Further, when, after dragging its feet, Defendant finally did address Plaintiff's complaints, Defendant conducted an investigation in name only, and produced different versions of an incident report. Ultimately, and shockingly, the "neutral investigator", General Counsel Michael Goldstein, jettisoned his neutral role, and participated in the termination of Plaintiff. In contrast, Mr. Howley remained employed and unaffected.

In sum, there exist disputed issues of fact as to whether Defendant has met the first prong of the defense. Accordingly, Defendant is not entitled to summary judgment on its affirmative defense.

---

[9] Defendant admits that Plaintiff complained of the Howley Incident. (Def.'s Memo. p. 13). However, Defendant takes the absurd position that Plaintiff's utilization of the procedures provided by Defendant's policies is somehow inadequate, because she allegedly did so with regard to only the Howley Incident (which, as set forth above, involved physical touching of Plaintiff). Significantly, Defendant provides no case law supporting the position that a plaintiff complaining of only one incident of discrimination is of any significance in analyzing whether a defendant has adequately met the two prongs of the Faragher/Ellerth affirmative defense, nor could it.

### III.    ISSUES OF MATERIAL FACT EXIST THAT DEFENDANT DISCHARGED PLAINTIFF IN RETALIATION FOR THE COMPLAINTS WHICH SHE MADE ABOUT THE SEXUAL DISCRIMINATION AND SEXUAL ORIENTATION DISCRIMINATION WHICH SHE SUFFERED

    A.    <u>Plaintiff Was Engaged In A Protected Activity When She Lodged Her Multiple Complaints</u>.

Defendant properly sets forth the test for a retaliation claim. (Def.'s Memo. p. 20). However, Defendant engrafts a requirement that Plaintiff establish objectively that the complained of employment practice was unlawful without citation to any Connecticut authority in support of such additional proof. (Def's Memo. p. 20). As the Connecticut District Court has made clear, no such requirement exists under Connecticut law. See <u>Harper v. Metropolitan District Commission</u>, 134 F.Supp.2d 470, 487 (D. Conn. 2001). Indeed, " … a plaintiff need not prove that her underlying discrimination claim was valid in the first instance." <u>Id</u>. (citation omitted).

Assuming that this Court were to apply the additional requirement that Plaintiff have reasonably believed that the conduct forming the basis of her claims constituted harassment, Plaintiff asserts that she would still prevail on the first prong of the test for retaliatory discrimination.[10] In fact, Defendant's position that Plaintiff fails to satisfy the first prong of the test because "no reasonable person could conclude that Mr. Howley's conduct constituted harassment or discrimination on the basis of Plaintiff's gender or sexual orientation" (Def.'s

---

[10] Plaintiff has presented proof that when she made the complaints, she (i) informed Mr. Goldstein that she thought the Howley Incident was discriminatory and otherwise unlawful behavior (Complaint, ¶ 26), (ii) Plaintiff informed Mr. Goldstein that she felt that Howley's conduct towards her was directed at her because she was a woman (Complaint, ¶ 26) and a lesbian (Complaint, ¶ 65), (iii) Plaintiff indicated to Howley that she feared retaliation for filing the complaints (Complaint, ¶ 28), and (iv) Plaintiff conveyed her fears about her increasingly hostile work environment to Ms. Mitchell and her belief that it was due to her gender (Complaint, ¶ 32).

Memo. pp. 20-21) stands in direct contradiction of Defendant's own employment policy manuals which prohibit sexual discrimination along with physical and verbal abuse.  More particularly, the Employee Handbook of Sempra states that "[c]ertain conduct which is detrimental to other employees … warrants involuntary termination on the first instance … [which conduct includes] … sexual or other harassment of another employee … [t]hreatening or committing physical violence against another person."  (Complaint, ¶ 91).  Although Defendant acknowledges in its policy manuals that physical contact is so severe as to warrant immediate dismissal, it now seeks to convince the Court that only an unreasonable person would view such contact as unlawful under Title VII.  Further, the fact that Defendant attempts to present the Howley Incident as the only act of discrimination at issue is, at best, misleading.  While the Howley Incident is evidence of a very serious act of discrimination which, Plaintiff would assert, amply demonstrates unlawful discrimination absent further evidence, Plaintiff has offered substantial other indicia of unlawful discrimination by Defendant, as set forth in detail above.  It is the totality of these circumstances which are before this Court.

The cases cited by Defendant are readily distinguished on their facts from the instant case.  Spadola v. New York City Transit Auth., 242 F.Supp.2d 284, 292 (S.D.N.Y. 2003) (in essence the court held that (i) the plaintiffs sexual harassment allegation was used as his own form of intimidation and retaliation, (ii) plaintiff's complaints were not made in accordance with applicable protocol, and (iii) the alleged words constituted one isolated incident); Schnoffstall v. Henderson, 223 F.3d 818, 826 (8th Cir. 2000) (the plaintiff was not terminated, but her assignment was changes, and she failed to prove that she suffered an adverse employment action, and that similarly situated male employees were treated differently than she was).

B.    Plaintiff Has Established a Causal Connection Between The Complaints To Defendant And Her Termination.

Defendant again continues to isolate the Howley Incident in an effort to avoid liability by asserting that the length of time between the Howley Incident and Plaintiff's termination causes Plaintiff's retaliation claim to fail. (Def.'s Memo. pp. 22-23). As discussed in Section III(A) above, the Howley Incident was a major part of an increasing pattern of unlawful discrimination which was ongoing up to and until it culminated in Plaintiff's termination. Hence, the timeline does not end with the Howley Incident.

Further, a gap between the incidents of discrimination and the retaliatory action is not dispositive for purposes of determining whether a plaintiff has met its burden on causation. Marx v. Schnuck Markets, Inc., 76 F.3d 324, 329 (10th Cir. 1996). The court in Marx was analyzing whether or not the plaintiff had made out a case for retaliation under the Fair Labor Standards Act. Id. With respect to causation, the Circuit Court stated that protected conduct closely followed by an adverse employment action might justify an inference of retaliatory motive; however, the court cautioned that "'closely followed' must not be read too restrictively where the pattern of retaliatory conduct begins soon after the filing of the FLSA complaint and only culminates later in actual discharge." Id.; see also Kull v. Davidoff of Geneva, 2004 WL 1418088, *10 (S.D.N.Y.).

As made clear by the cases cited by Defendant, the length of time between the actual complaint is not conclusive, but merely an indication of causation.[11] In the instant case, the

---

[11] It is well established that courts look to the totality of the factual circumstances giving rise to the discrimination claim in evaluating whether Plaintiff has made a sufficient case for such claim. National Railroad, 122 S.Ct. 2061, 2074 (2002).

unlawful discrimination was ongoing.  Plaintiff experienced gender-based discrimination and sexual orientation-based discrimination before and after the Howley Incident.  Still further, following the Howley Incident, such discrimination steadily worsened until it culminated in the unlawful termination of Plaintiff.

C.    There Is Evidence That The People Responsible For The Decision To Terminate Plaintiff Were Aware of the Howley Incident, As Well As The Ongoing Unlawful Discrimination.

Again, as made clear in Defendant's cases, whether the person who ultimately made the decision to terminate the plaintiff had knowledge of the plaintiff's complaints is merely suggestive as to the causal connection prong of a plaintiff's case.  Gordon v. New York City Bd. Of Educ., 232 F.3d 111, 117 (2d Cir. 2000).  In fact, the court in Gordon stated that a jury could find retaliation even if the agent denied direct knowledge of a plaintiff's activities.  Id.  Further, summary judgment is only appropriate where plaintiff has failed to produce any evidence from which a jury could conclude that the employer's agent had any knowledge of the Plaintiff's complaints.  Kennedy v. St. Francis Hosp., 225 F.Supp.2d 128, 143 (D. Conn. 2002); Walker v. New York City Transit Auth., No. 99 CIV. 3337 (DC), 2001 WL 1098022 at *10 (S.D.N.Y.) ( "… [P]laintiff has offered no evidence tending to suggest that the Human Resources Department was aware of his complaints of discrimination.  On this record, a reasonable jury could not infer that plaintiff's unsuccessful attempts to transfer to other units were caused by retaliatory animus).

Plaintiff has adduced ample evidence that the people involved in her termination were well aware of the Howley Incident, as well as the ongoing unlawful discrimination.  Defendant conveniently attempts to shelter itself from liability by foisting all responsibility on Mr. Roy.

24

Even assuming Mr. Roy was the only person who decided to terminate Plaintiff, it is undisputed that Mr. Roy and Howley had a uniquely close relationship, and it defies credulity to assert that Howley would not discuss such incident with Mr. Roy.

IV.    **THERE EXIST ISSUES OF MATERIAL FACT REGARDING PLAINTIFF'S CLAIMS FOR PUNITIVE DAMAGES**

Defendant seeks shelter from its actions in <u>Kolstad v. Am. Dental Ass'n.</u>, 527 U.S. 526 (1999).  In <u>Kolstad</u>, the United States Supreme Court enunciated the rule that "…an employer may not be held vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good faith efforts to comply with Title VII."  <u>Id</u>. at 545.  "An employer can be held responsible for the reckless indifference of discriminatory actions taken by those serving in a managerial capacity."  <u>MacGregor v. Mallinckrodt, Inc.</u>, 2004 WL 1459399, *6 (8th Cir.) ("Company's lax anti-discrimination policies were insufficient to keep the issue of punitive damages from the jury").  However, Defendant cannot shield itself from liability for punitive damages.  First, Plaintiff has demonstrated in Points I through III, supra, that Defendant, while admittedly having a written anti-discrimination policy, did not enforce such policies.  Second, while Defendant claims to have conducted a "thorough investigation" of the Howley Incident (Def.'s Memo. p. 25), Defendant cannot point the Court in the direction of one scintilla of evidence supporting such assertion.

V.    **ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFF'S BREACH OF EXPRESS CONTRACT AND NEGLIGENT INVESTIGATION CLAIMS**

Representations which are made in employee handbooks may create enforceable, obligations even where the handbook contains disclaimers of contractual intent.  <u>Holt v. Home</u>

25

<u>Depot, U.S.A., Inc.</u>, 2004 WL 178604, * 1 (D. Conn.) (the defendant argued that it made no definite promise on which plaintiff could reasonably rely. While conceding that its employee handbook contained an explicit promise that no employee would be penalized for using the open-door procedure, it contended that plaintiff could not reasonably rely on the promise because of disclaimers of contractual intent contained in the handbook and his employment application. The Court, however, disagreed, stating that the jury could reasonably find that the defendant's promise not to retaliate against employees for using the open-door procedure was so clear, emphatic, highly touted, and widely proclaimed that the plaintiff could reasonably believe it was inviolable, and thus not covered by general disclaimers in the handbook and application). More particularly, when an employer publishes an employee handbook outlining termination procedures, and such employer then fails to follow such procedures, the employer may be held liable in negligence. <u>Rood v. Canteen Corp.</u>, 1996 WL 548174 (Conn. Super.).

As such, genuine issues of material fact exist as to Defendant's breach of its policies under its employee handbook.

## VI.    PLAINTIFF CLAIMS SUPPORT BREACH OF AN IMPLIED CONTRACT, PROMISSORY ESTOPPEL AND UNJUST ENRICHMENT

Count Seven of the Complaint alleges that the parties entered into an implied contract (i) for long-term employment, and (ii) to pay Plaintiff a bonus in an amount no less than 10% of Plaintiff's booked profits in any year.  (<u>See</u> Wood Affidavit).  Counts Eight and Nine reassert the same claims under the legal theories of promissory estoppel and unjust enrichment.  In Defendant's Summary Judgment Motion, Defendant first attempts to knock out all three counts on the basis that Plaintiff's claims are "flatly inconsistent with the terms of Plaintiff's

26

Employment Agreement … ."  (Def.'s Memo. pp. 31-35).  Defendant, however, has misstated the law.

      A.    <u>There Are Genuine Issues Of Material Fact As To Plaintiff's Implied Contract Claims</u>.

Defendant first strings several case cites together that purport to hold that implied contracts cannot exist where an express contract is present.  (Def.'s Memo. pp. 31-32).  However, "[t]he existence of an implied contract, and the terms of that contract, are questions of fact to be determined by the trier of fact on the basis of all the evidence."  <u>Christensen v. Bic Corp.</u>, 18 Conn.App. 451, 454 (1989).  "[T]o survive a motion for summary judgment, a plaintiff has the burden of presenting evidence that the defendant had agreed to some form of contractual commitment, either by words or action or conduct.  <u>Schermerhorn v. Mobil Chem. Co.</u>, 2001 WL 50534, *4 (D. Conn.).  "In determining whether any words, actions or conduct of any employer have created an implied contract, the intentions of the parties, including inferences of fact, must be considered.  <u>Brockman v. Windsor Board of Education</u>, 2001 WL 1875790, *6 (D. Conn.) (citing <u>Coelho v. Posi-Seal International, Inc.</u>, 208 Conn. 106 (1988)).  While Defendant is correct in stating that contracts of permanent employment or for an indefinite term, as a general rule, are terminable at will, "[a]n employment at will relationship can, however, be modified by agreement of the parties."  <u>Id</u>.

Further, the Connecticut Supreme Court has held that, an exception to the "at-will" employee status is created, and an implied contract exists, where an employer's representative makes representations during the recruitment of a prospective employee, that the prospective employee will have long-term employment and/or will only be terminated for cause, and the prospective employee relies upon such representations when accepting such position.  <u>See</u>

<u>Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.</u>, 234 Conn. 1 (1995); <u>Gaudio v. Griffin Health Services Corp.</u>, 249 Conn. 523 (1999). In <u>Torosyan</u>, the plaintiff testified that certain statements were made to him in the context of an employment interview in direct response to his inquiries about job security, one such statement being that if the plaintiff did a good job, he could expect long-term employment. <u>Id</u>. at 16. Further, the plaintiff testified that the defendant employer's oral representations were material to the plaintiff's decision to move to Connecticut from California and accept employment. <u>Id</u>. at 16-17. As such, the court in <u>Torosyan</u> refused to overturn the trial court where the plaintiff testified as to each of the alleged oral statements concerning future job security, and the trial court found such testimony credible, thereby opining that there was sufficient evidence to find that the statements were in fact made, even in the face of the defendant's witnesses having denied ever making the statements. <u>Id</u>. at 12. The court went on to say, "… the determination of what the parties intended to encompass in their contractual commitments is a question of the intention of the parties, and an inference of fact." <u>Id</u>. at 15.

Similarly, in <u>Gaudio</u>, the plaintiff testified that he was promised that as long as he was doing his job, and continued to do a good job, he would have a job for as long as he wished. <u>Gaudio</u>, 249 Conn. at 538. By citing to its decision in the <u>Torosyan</u> case, the court stated that, because the plaintiff's testimony as to alleged oral promises concerning his future job security was found to be credible by the trial of fact, the jury reasonably could have concluded that (1) an implied contract existed, and (2) that the terms of this implied contract precluded the defendant from terminating him absent just casue, even in the face of the defendant's witnesses having expressly denied having made such statements. <u>Id</u>.

In this case, Plaintiff has made several allegations that (i) in response to her concerns of

28

job security in moving from Texas to Connecticut to take the job with Defendants, she was told that she would have a job with Sempra as long as she remained profitable, and (2) she relied upon such fact when she accepted such position.  The same can be said regarding the promise made regarding bonus payments, in that it was an oral representation that was made by Sempra during the interview process upon which she relied upon in accepting the position.  Further, Section 45 of the Restatement (Second) of Contracts provides that "(1) [w]here an offer invites an offeree to accept by rendering a performance and does not invite a promissory acceptance, an option contract is created when the offeree tenders or begins the invited performance or tenders the beginning of it."  <u>Torosyan</u>, 234 Conn. at 14, FN 5.  As such, Sempra's offer to provide Wood with an annual bonus payment based on an amount no less than 10% of Plaintiff's booked profits was an offer that invited acceptance by performance, and as such, a valid option and/or implied contract was created.

As clearly demonstrated above, Plaintiff's allegations, as well as her supporting testimony in her deposition and Affidavit have more than created (i) issues of fact as to whether the parties had entered into an implied contract, and (2) inferences of fact as to what the parties intended to encompass in their contractual commitments, which are properly in the province of a fact finder.  Therefore, summary judgment on these issues must be denied.

B.    <u>There Are Genuine Issues Of Material Fact As To Plaintiff's Promissory Estoppel Claims</u>.

Again, Defendant presents a narrow view of the relevant law by representing that it is well-established that an action for promissory estoppel is barred where the parties have entered into an enforceable contract regarding same.  (Def.'s Memo, p. 32).

The Connecticut Supreme Court has stated that, under the doctrine of promissory

estoppel, "a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promise or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." D'Ullisse-Cupo v. Board of Directors of Notre Dame High School, 202 Conn. 206, 213 (1987) (citing Section 90 of the Restatement Second). Thus, the doctrine of promissory estoppel, under Connecticut law, is a separate or alternative claim from that of breach of contract and serves as a surrogate claim where a contract claim would fail. See e.g. Suffield Dev. Assoc. v. Society for Savings, 243 Conn. 832, 846 (1998) (although contract claim failed for lack of definiteness, plaintiff still permitted to pursue claim of promissory estoppel). Moreover, "[u]nder Rule 8(e)(2) of the Federal Rules of Civil Procedure, a plaintiff may plead two or more statements of a claim, even within the same count, regardless of consistency … The inconsistency may lie either in the statement of the facts or in the legal theories adopted … ." Henry v. Daylop Villages, Inc., 42 F.3d 89, 95 (2d Cir. 1994) (internal citations omitted).

Further, [i]n Connecticut, a claim for promissory estoppel has three prongs: (1) a clear and definite promise; (2) a change in position in reliance; and (3) resulting injury." Kull v. Davidoff of Geneva, Inc., 2004 WL 1418088, *13 (S.D.N.Y) (citing Hood v. Aerotek, Inc., 2002 WL 294762, *5 (D. Conn.)). As stated above with respect to Wood's implied contract claims, Plaintiff has more than adequately demonstrated evidence that (i) Sempra made oral promises to her during her recruitment period regarding long-term employment and annual bonus payments based on her profits, (ii) Wood changed her position in reliance of such promises by moving to Connecticut from Texas and accepting the position at Sempra, and (iii) Wood was later injured by Sempra having terminated her without cause and refusing to pay her an earned bonus for her work in 2002.

As such, despite the language that Defendant refers to in the Employment Agreement (Def.'s Memo., pp. 33-34), genuine issues of material fact exist as to Plaintiff's promissory estoppel claim.

    C.    <u>There Are Genuine Issues Of Material Fact As To Plaintiff's Unjust Enrichment Claims</u>.

"A right to recover under the doctrine of unjust enrichment is essentially equitable … ." <u>Gagne v. Vaccaro</u>, 255 Conn. 390, 408 (2001).  The elements of the claim are that (1) the defendant benefited; (2) the defendant unjustly failed to pay the plaintiff for the benefits; and (3) the failure of payment was to the plaintiff's detriment.  <u>Id</u>. at 409 (citations omitted).  Defendant has stated that Plaintiff's unjust enrichment count fails because "proof of a contract ordinarily precludes the remedy of unjust enrichment."  (Def.'s Memo. p. 32 (citing <u>Pleines v. Franklin Const. Co., Inc.</u>, 30 Conn.App. 612 (1993)).  However, as stated above, inconsistent and/or alternative legal theory pleading is expressly permitted under Fed. R. Civ. P. 8(e)(2).  Further, the Connecticut Supreme Court has held that:

> [w]here incidental issues of fact are presented in an action essentially equitable, the court may determine them without a jury in the exercise of its equitable powers … Where, however, the essential basis of the action is such that the issues presented would be properly cognizable in an action of law, either party has the right to have the legal issues tried to the jury, <u>even though equitable relief is asked in order to give full effect to the legal rights claimed</u>.

<u>Motor Vehicle Manufacturers Assn. of the United States, Inc. v. O'Neil</u>, 203 Conn. 63, 76 (1987) (citations omitted, internal quotation marks omitted).  Further, "[a]pplication of these principles to a particular controversy requires an analysis of the pleadings as a whole.  In that analysis, the form of the relief demanded is not dispositive."  <u>Id</u>. at 76-77.  "[O]ur law is that where separate and distinct causes of action are joined one at law and one in equity, either party has the right to

31

have a jury trial of the issues involved in the cause of action at law." <u>Connecticut Housing Finance Authority v. John Fitch Court Associates Limited Partnership</u>, 44 Conn.Sup. 411, 415 (1996) (citing <u>Berry v. Hartford National Bank & Trust Co.</u>, 125 Conn. 615, 618 (1939)). Therefore, a case with issues in both equity and law may be pursued before the ultimate fact finder.  <u>See</u> <u>Klar Crest Realty, Inc. v. Rajon Realty Corp.</u>, 190 Conn. 163, 170, FN 4 (1983).

Here, as shown above, Plaintiff has demonstrated substantial evidence as to the elements of a sufficient unjust enrichment claim.  As such, Plaintiff has the right to plead unjust enrichment as an alternative theory of recovery, and to have such equitable theory determined by a trier of fact in order to give full effect to the legal rights claimed.  Therefore, summary judgment must be denied.

D.    <u>Defendant Is Bound By The Oral Representations Of Its Authorized Agents</u>.

In an attempt to avoid liability under Plaintiff's implied contract theory regarding the promise made to Wood regarding her being paid an annual bonus based upon no less than 10% of her profits, Defendant has stated that the "*only* person who allegedly made representations to her regarding the availability of profit-based bonuses at [Sempra] was an executive recruiter by the name of Audrey Cullen, …" and that "it is undisputed that Ms. Cullen was *not* a Sempra employee at the time of her alleged discussions with Plaintiff."  (Def.'s Memo. p. 37).  Such statements, however, are both factually inaccurate and contrary to applicable agency law in Connecticut.

First, the President of Sempra, David Messer, made representations to Wood during her recruitment interview promising a bonus of a minimum of 10% of her generated profits, as well as job security based upon continued profitability.  (<u>See</u> Wood Affidavit).  Such communication

from the President of the company to a prospective employee would certainly qualify as a representation by Defendant made to induce Plaintiff to leave her job in Texas and join Sempra in Connecticut.

Further, the statements made by Ms. Cullen are not inadmissible hearsay, as Ms. Cullen, an executive recruiter, was acting as Sempra's authorized agent when making such representations to Wood on Sempra's behalf to recruit Wood to join Sempra.

> Agency is defined as the fiduciary relationship which results from manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act … Restatement (Second), 1 Agency § 1 [1958] … Thus, the three elements required to show the existence of an agency relationship include: (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking.

Gordon v. Tobias, 262 Conn. 844, 849 (2003) (citations omitted, internal quotation marks omitted). Significantly, "it is the general rule of agency law that the principal in an agency relationship is bound by, and liable for, the acts in which his agent engages with authority from the principal, and within the scope of the [agency relationship]." Maharishi School of Vedic Sciences, Inc. (Connecticut) v. Connecticut Constitution Association Ltd. Partnership, 260 Conn. 598, 606 (2002) (emphasis supplied). Finally, "[a]n agent's authority may be actual or apparent … [while] [a]ctual authority may be express or implied … [and] [i]mplied authority is a fact to be proven by deductions or inferences from the manifestations of consent of the principal and from the acts of the principal and the agent." Gordon, 262 Conn. at 850 (citations omitted, internal quotations omitted).

In this case, Plaintiff has presented enough evidence to present to a fact finder that Ms. Cullen was acting as the authorized agent of Sempra when making oral representations to Wood

while attempting to recruit her to join Sempra, and that Sempra is then bound by, and liable for, the acts in which Ms. Cullen engaged on its behalf.  Further, as implied authority is a fact to be proven by deductions or inferences from the manifestations of consent of the principal and from the acts of the principal and the agent, such issues are wholly inappropriate to be determined at the summary judgment stage.  Therefore, summary judgment on Plaintiff's implied contract claim for bonus pay must be denied.


**VII.    PLAINTIFF'S CLAIMS SUPPORT A CLAIM FOR BREACH OF AN IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

First, a claim under the implied covenant of good faith and fair dealing "… is separate from and can be maintained in addition to a breach of contract claim."  <u>Kull v. Davidoff of Geneva</u>, 2004 WL 1418088, *14 (S.D.N.Y.).  In addition, in a termination case such as this, the plaintiff employee "must establish that his dismissal was for a demonstrably improper reason, the impropriety of which is derived from a violation of some important public policy."  <u>Id</u>. (citations omitted).  Here, despite Defendant's statements to the contrary, Plaintiff has shown enough evidence that (1) she and Sempra entered into an implied contract for long-term employment that could only be terminated for cause, and for a profit-based annual bonus, which benefits Wood had a reasonable expectation to receive, (2) Sempra undertook actions that undermined Wood's right to collect or maintain those benefits, and (3) Sempta acted in bad faith by terminating Wood without cause and refusing to pay her an earned bonus for 2002.  <u>See</u> <u>Id</u>.

Further, Defendant again attempts to argue that there are no implied contracts at play in this matter, and as such, there has been no breach of the express Employment Contract in this case, as Plaintiff was an "at will" employee, and therefore, there has been no breach of the

implied covenant of good faith and fair dealing. As demonstrated above, however, Plaintiff has demonstrated more than enough evidence to bring genuine issues of material fact as to the existence of implied contracts between herself and Sempra in this case, and as such, Plaintiff's claim for a breach under the implied covenant of good faith and fair dealing must stand.

Therefore, summary judgment as to this claim must be denied.


## VIII.    PLAINTIFF'S CLAIMS SUPPORT A CLAIM UNDER THE CONNECTICUT WAGE ACT

Again, Defendant's arguments fail in their attempt to knock out yet another of Plaintiff's counts on summary judgment, as such arguments are pinned solely upon its brief-long theory that only the express Employment Agreement is applicable in this case, and that there exists no implied contracts between the parties. However, as aptly briefed above, Plaintiff has more than established rampant questions of fact as to the issue of implied contracts being present between the parties here. As such, the language of the Employment Agreement is not determinative of whether Plaintiff's annual bonus payment was based – even in part – on Sempra's overall profitability. Instead, as Plaintiff was promised by both David Messer and Sempra's authorized agent, Ms. Cullen, that she would be paid an annual bonus based upon Plaintiff's profitability, and Plaintiff's profitability alone, such bonus payment meets the statutory definition of "wages" recoverable under the Wage Act. Despite its best efforts, quoting Plaintiff's responses to intentionally confusing questions as to how bonuses in general were determined at Sempra (see Def.'s Memo. p. 42), fails to carry the day for Defendant. Nothing can change the fact that Plaintiff has established genuine issues of material fact that she was orally promised bonus payments based on her profits alone, and that Sempra was attempting to induce Plaintiff to leave

her job Texas and join Sempra when such statements were made.  As such, genuine issues of material fact have been established for this issue as well, and cannot be determined on summary judgment.

Defendant then argues that Plaintiff is not entitled to an award of double damages under the Wage Act because Sempra did not act in bad faith, arbitrariness or unreasonableness with respect to the non-payment of Wood's bonus for 2002.  (Def.'s Memo., p.43-45).  To the contrary, however, as explained in greater detail above, Plaintiff has established claims of (i) discriminatory and retaliatory termination (which lead to Wood not receiving her bonus), (ii) breach of an implied contract to terminate her only for cause, and to pay her a bonus based on her sole profits, (iii) that Sempra has been unjustly enriched as a result, and (iv) that such conduct of Defendant was done in bad faith.  All of these issues are wrought with genuine issues of material fact for a fact finder to determine, and therefore, so is the issue of whether Defendant's non-payment of Plaintiff's promised bonus was done in bad faith, arbitrariness or unreasonableness.

As such, Plaintiff's claims under the Wage Act cannot be dismissed by summary judgment.

## **CONCLUSION**

For all of the foregoing reasons, Defendant's Summary Judgment Motion should be summarily denied.

PLAINTIFF,
SUSAN E. WOOD


By:_____
        Brendan J. O'Rourke (ct00522)
        Jeffrey M.  McCormick  (ct21185)
        O'ROURKE & ASSOCIATES LLC
        27 Pine Street
        New Canaan, CT  06840
        Telephone: (203) 966-6664
        Facsimile:  (203) 966-5710

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned, a member of the bar of this Court, hereby certifies that on this 13th day

of July, 2004, a true and correct copy of the foregoing was served on the following counsel of

record via United States Postal Service:

Mary C. Dollarhide (ct12251)
Peter M. Schultz (ct19425)
Neil B. Stekloff (ct19778)
PAUL, HASTINGS, JANOFSKY & WALKER LLP
1055 Washington Blvd.
Stamford, CT  06901-2217

_____

Brendan J. O'Rourke