UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SUSAN E. WOOD,<br><br>                    Plaintiff,<br><br>     v.<br><br>SEMPRA ENERGY TRADING CORPORATION,<br><br>                    Defendant. | CIVIL ACTION NO.<br>3:03-CV-986 (JCH)<br><br><br><br>July 13, 2004 |

**AFFIDAVIT OF PLAINTIFF SUSAN E. WOOD**

1. The undersigned, Susan E. Wood, is the Plaintiff in the above litigation and offers this Affidavit in support of Plaintiff's Local Rule 56(a)(2) Response and Statement of Disputed Issues of Material Fact ("Rule 56(a)(2) Statement") and Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, dated July 13, 2004 ("Plaintiff's Memorandum in Opposition"), which are being filed concurrently herewith in response to Plaintiff's Motion for Summary Judgment, dated May 14, 2004 ("Defendant's Summary Judgment Motion"), and Defendant's Local Rule 56(a)(1) Statement ("Defendant's 56(a) Statement").

2. I am over the age of 18 and believe in the obligations of an oath.

3. I offer this affidavit to assert facts in support of my claims and to rebut certain of the assertions made in Defendant's Summary Judgment Motion and Defendant's 56(a) Statement.

4. I signed the Employment Application referenced in Paragraph 2 of Defendant's 56(a) Statement after my employment at Sempra commenced.

5. I was given representations by Audrey Cullen, who was a principal at First Call Associates, who advised she was fully authorized to make such representations on behalf of Sempra, as well as David Messer at a recruitment meeting, that I would be paid a minimum bonus of 10% of the profits I booked at Sempra and I would not be terminated so long as I remained profitable, negating the assertion that I was terminable at will. After my employment commenced, Mr. Messer, on numerous occasions, reiterated these representations to me.

6. I do not have any recollection of having the Policy Manual presented to me at any time before my employment commenced (although I signed an acknowledgement form regarding the Policy Manual) and, therefore, the terms of the Policy Manual did not, nor could not, modify the terms of my employment regarding the representations given to me regarding my bonus and employment security referenced above.

7. Acting through its duly authorized agent, Audrey Cullen, and the statements of David Messer, Sempra made representations to me as to promised job security, bonus compensation and other terms of employment.

8. The purported change of business focus set forth in Paragraph 16 of Defendant's 56(a) Statement, as articulated by Mr. Roy, does not correspond to the communications that were given to me regarding the Petroleum Derivatives Department or any material changes in the Department prior to or after Mr. Roy took over as supervisor.

9. The purported and unsubstantiated statements of Mr. Vogel and Mr. Evans in Paragraph 19 of Defendant's 56(a) Statement were never communicated to me at any time during my tenure at Sempra or during any of my performance reviews, casting significant doubt as to their credibility. Further, these statements are clearly hearsay and in order to be admitted in Court, I would request the direct testimony of Mr. Vogel and Mr. Evans.

10. The transaction referenced in Paragraph 22 of Defendant's 56(a) Statement was in fact a transaction that yielded Sempra a substantial profit and which other employees at Sempra reviewed and ratified (i) at the time the transaction was consummated, and (ii) later when communications between Sempra and the customer occurred concerning the transaction.

11. My job history at Sempra reflected an effective, professional and profitable employee and the asserted reasons of Mr. Roy for my termination are false and otherwise pretextual. I admit that Mr. Roy felt misgivings about me, but those misgivings arose from my sex and sexual orientation.

12. As admitted by Messrs, Goldstein, Prince, Messer, Cummings, as well as Ms. Mitchell, all officers at Sempra, (admissions which were made while I was employed at Sempra as well as at the depositions of these individuals), there were a number of Sempra employees who participated in the decision to terminate me, including without limitation the General Counsel, Mr. Goldstein, the President, Mr. Messer, and that those individuals, as well as Mr. Roy, were well aware that I had complained about the Howley incident as reflective of unlawful and improper action by Mr. Howley motivated, at least in part, because I was a woman and a lesbian, and also that I feared that I would be retaliated against based upon pursuing such complaint against Mr. Howley.

13. I talked to other employees at Sempra about my concerns about a hostile work environment, including my first supervisor, Jackie Mitchell, David Zeitz and Billy Lasher, and when I was informed of my termination, I stated to the Sempra employees, Mr. Cookingham and Ms. Freda, that I was being terminated because I was a woman, all of which was connected to the Howley Incident and the hostile work environment.

14. I had certain experience in working with commodities at Enron in Houston, Texas, where I handled marketing of oil and natural gas, and Audrey Cullen expressed an interest in my background as it related to employment prospects at Sempra in 2000.

15. I had extensive communications with Audrey Cullen about the job prospects at Sempra and ultimately Audrey Cullen represented to me that she was authorized to make an offer to hire me as an employee at Sempra and that the terms of the offer included: (i) a base

salary of $115,000 plus an annual bonus to be paid based upon the profits booked by me at Sempra equating to no less than 10%, but up to 15% of such profits and, (ii) that I would have secure employment as long as I worked in a profitable manner for Sempra.

16.    In reliance on the representations made by Sempra through Audrey Cullen, and by Mr. Messer I agreed to accept the terms of the offer of employment as provided by Sempra and in such doing, decided to leave my existing employment opportunities and relocate to Stamford, Connecticut, which was significant given the employment opportunities that were available to me in Texas as well as elsewhere.

17.    On or about September 6, 2000, I signed a letter of agreement from Sempra, dated August 31, 2000, which reflected certain of the terms of employment as communicated by Audrey Cullen and Mr. Messer, but which implicitly incorporated the promise of job security at Sempra so long as I worked profitably for Sempra as well as the bonus compensation in the minimum amount of 10%, and up to 15%, of booked profits.

18.    I was aware of Sempra's policy prohibiting harassment at the time I took employment with Sempra.

19.    The President of Sempra, Mr. David Messer, during a recruitment interview with me, reiterated the representations that had been provided to me - in particular, that I would (i) be paid at least a 10% bonus in addition to my base salary and (ii) have job security at Sempra as long as my work yielded profits at Sempra.

20. In reliance on the representations made by Ms. Cullen and Mr. Messer, I continued to work at Sempra in 2000, 2001 and the early part of 2002, just prior to my termination.

21. During my employment at Sempra, I generated profits for Sempra through my work in the Gas Department and subsequently in the Petroleum Derivatives Department.

22. Based upon my profitability for Sempra for the year 2001, I was paid a bonus in 2002 in the amount of $50,000.00, reflecting the fact that I had generated approximately $400,000.00 in profit, which corresponded to $1,100,000.00 in revenue, less $700,000.00 in "cost" associated with my desk. The actual bonus approximated 12.5% of such profitability, consistent with the promises made to me to induce me to take employment with Sempra.

23. Reflecting the fact that bonuses were paid based on a percentage of booked profits, Sempra did not pay bonuses to certain other individuals at the Assistant Vice President level in the Departments in which I worked for the years 2000 and 2001.

24. Sempra, in recognition of my contributions to the company in 2001 also awarded me a $10,000.00 increase in annual salary. The 2001 bonus and salary increase were reported to me by Brian Cumming, my supervisor.

25. During my tenure of employment at Sempra, I brought in 16 new revenue-

generating clients to Sempra, which was consistent with, and exceeded, one aspect of the criteria at Sempra for evaluating my work performance.

26.     Right up through my termination, I was given favorable employment reviews by my supervisor Jackie Mitchell when I worked in the Gas Department, and Brian Cumming, my supervisor in the Petroleum Derivative Department, and my peers.  I never received a negative employment review from anyone.

27.     In June of 2001, I was physically attacked and verbally assaulted by a senior male employee and Managing Director of Sempra, Joseph Howley.

28.     Howley grabbed and physically shoved me on the trading floor, and verbally assaulted me ("Howley incident"), in front of approximately 150 of Sempra's employees including Jackie Mitchell, my initial supervisor, and Mr. Roy, my colleague and then subsequently my supervisor, who ultimately participated in the termination of my employment.

29.     After the Howley incident, I was greatly distressed and complained about the incident to my immediate supervisor at the time, Brian Cumming, as well as to my previous supervisor, Jackie Mitchell.

30.     After the Howley incident, I also made a formal complaint directly to the General Counsel of Defendant, Michael Goldstein.  At a meeting with Mr. Goldstein, I

communicated that I believed that the conduct by Mr. Howley was discriminatory and otherwise unlawful behavior, which constituted a clear violation of Sempra's prohibition against harassment.

31.   I informed Mr. Goldstein in particular that I believed that the physical and verbal assault of Howley was directed against me, at least in part, because I was a woman.

32.   At the time that I communicated to Mr. Goldstein that I wished to pursue a complaint against Mr. Howley, I advised Mr. Goldstein that I felt significant risk of being terminated in retaliation for pursuing a complaint against Mr. Howley, who was a powerful Managing Director.  I thought management would show great deference to Howley's position in contrast to my status as an Assistant Vice President and because I was a woman.  After having filed the Howley Complaint, I was forced to repeatedly demand that Mr. Goldstein and Sempra pursue the investigation that was promised under the Prohibition Against Harassment Policy.  In particular, Sempra did not promptly or properly investigate the actions and no communication was given to me that Howley was in any way reprimanded for his volative conduct, inconsistent with the terms of Sempra's Policy.

33.   Sarathi Roy, who ultimately was made my supervisor in or about March of 2002 had developed a close working relationship with Howley.

34.   Mr. Roy, who had witnessed the Howley incident, in interacting with me, made a number of inappropriate boasts to me about his conquests with women and his opinions

as to the appropriate place of women in the workplace. For example, Mr. Roy, knowing that I have a female partner in my life as part of my lesbian status, asked me, "Who wears the pants in the family?" He also asked how we divided traditional female and male household chores in our home and commented to me that his wife would cook for him and take care of him in the way that he "should be taken care of."

35. Mr. Roy also made comments referring to me as the "lady on the desk," and referenced his marriage as having been "arranged." Mr. Roy also commented that a "woman's place is in the home" and that he would not even allow his wife on the Sempra trading floor. He also referenced how a masseuse that he visited was "a real woman," and "knew how to take care of him."

36. The communications and manner of Mr. Roy had the effect of making me feel particularly unwelcome and uneasy about my professional status at Sempra, which made the situation more troublesome, given Mr. Roy's relationship with Mr. Howley and the fact that I feared retaliation from the Howley incident.

37. Ultimately, in accordance with the statements of Mr. Goldstein and Mr. Howley, the Howley incident was concluded with different incident reports, and no formal reprimand of Mr. Howley having been made.

38. Ultimately, Mr. Roy communicated to me in March of 2002 that Sempra was terminating my employment. As per the statements made by the following individuals at their

depositions, before my termination, Mr. Roy had discussions with Brian Cumming, and Jackie Mitchell about me.  Further, before the date on which Mr. Roy communicated Sempra's termination of me, the President, David Messer, as well as the General Counsel, Michael Goldstein also participated in communications regarding my termination.  In fact, Mr. Goldstein acted as the investigator on the Howley incident, and participated in that role as an objective fact finder, not as an attorney.  In that role, Mr. Goldstein, under Sempra's Policy prohibiting discrimination, was charged with conferring with me about my complaint as well as my expressed concern that I feared retaliation in making the complaint; however, as Mr. Goldstein admitted in his deposition, Mr. Goldstein improperly and unlawfully jettisoned his objective role, and assumed an adverse role to me and my status as a complainant, by improperly providing legal advice to Mr. Roy and Sempra concerning the decision to fire me.

39.     In ultimately deciding to terminate me, none of the above individuals at Sempra who participated in discussions regarding my termination (Mr. Messer, Mr. Cumming, Mr. Roy, Mr. Goldstein, and Ms. Mitchell) took steps to review my favorable written employment evaluations or other objective criteria such as financial reports, which demonstrated my profitability at Sempra.

40.     Although Mr. Roy has stated that he had sought to find employment for me at Sempra before terminating me, Mr. Roy made no inquiry of me about potential prospects for me at Sempra and gave me not one scintilla of advance notice of any deficiencies in my work.

41.     I vigorously assert that the proffered reasons given by Sempra for my

termination - that I was unprofessional and lacked judgment - are wholly pretextual and a rationale that is defied by the fact that I had been a productive, profit-generating employee, had received favorable job reviews from each of my supervisors, Jackie Mitchell and Brian Cumming, and my peers, and had not received one negative employment evaluation since the time I commenced my employment at Sempra.

42.    Further, a Mr. Steven Soule, with little experience, was hired to join the Petroleum Derivatives Department at Sempra from another department at Sempra prior to my termination.  In essence, Mr. Soule replaced me in my position in the Petroleum Derivatives Department and in fact was given my leads and clients to call on that I had been working on before my termination.

43.    In sum, I am a woman and a lesbian, who was a demonstrated productive employee with favorable job reviews, was fired and replaced by a male with less experience.

44.    After I was terminated, I was informed by Billy Lasher, an employee at Sempra, that Mr. Roy had said he was not "comfortable" with me as a work colleague because I am a lesbian.

45.    Mr. Roy has admitted that he was "uncomfortable" with me.  That discomfort with me derived from the fact that I was a female and a lesbian.

                                                                            _____
                                                                            SUSAN E. WOOD

Sworn and subscribed to before me this
___ day of July, 2004.

_____
Commissioner of Superior Court

**CERTIFICATE OF SERVICE**

The undersigned, a member of the bar of this Court, hereby certifies that on this 13th day of July, 2004, a copy of the foregoing was served on the following counsel of record via first class mail, postage pre-paid:

>Mary C. Dollarhide (ct12251)
>Peter M. Schultz (ct19425)
>Neil B. Stekloff (ct19778)
>PAUL, HASTINGS, JANOFSKY & WALKER LLP
>1055 Washington Blvd.
>Stamford, CT  06901-2217
>Telephone: (203) 961-7400
>Facsimile:  (203) 359-3031
>Email: peterschultz@paulhastings.com

_____
Jeffrey M. McCormick