### III. PLAINTIFF CANNOT PROVE DISCRIMINATION IN CONNECTION WITH HER TERMINATION

#### A. The Supreme Court's Desert Palace Decision Has No Bearing On This Case.

Although her brief is not a model of clarity on this point, Plaintiff apparently contends that the Supreme Court's decision in Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), somehow altered the traditional McDonnell Douglas burdenshifting framework for analyzing disparate treatment claims. See Pl.'s Opp. Br. at 8-9. This argument is meritless. Desert Palace held only that direct evidence of discrimination was not required to obtain a Title VII mixed-motive *jury instruction*. Desert Palace, 539 U.S. at 92, 101-02. On its face, the case does not address the standard of review on a discrimination claim at the summary judgment stage. Moreover, courts in this circuit have not extended the Supreme Court's holding in the manner Plaintiff suggests. See Hoyt v. Dep't of Children & Families, 309 F. Supp.2d 299, 306 (D. Conn. 2004) (Hall, J.) (applying McDonnell Douglas burdenshifting framework to Title VII claim after Desert Palace); Kull v. Davidoff of Geneva (N.Y.), Inc., No. 01 Civ. 4831 (LMM), 2004 WL 1418088, at *12 n.7 (S.D.N.Y. June 23, 2004) ("[Plaintiff] also brought to the Court's attention the Supreme Court case Desert Palace . . . regarding a mixed-motive instruction to a jury in a Title VII case. Although the issue of mixed motives may come up during the course of trial, the issue is not relevant to the current motions [for summary judgment].") (attached hereto as Exhibit K).[18]

In short, Plaintiff's claim of discriminatory discharge is properly analyzed under the familiar tri-partite McDonnell-Douglas burdenshifting formulation discussed in Sempra's moving brief.[19]

---

[18] Courts in other circuits similarly have found no tension between Desert Palace and McDonnell Douglas. See Herawi v. Alabama Dep't of Forensic Sciences, 311 F.Supp.2d 1335, 1346 (M.D. Ala. 2004) (stating that "there is nothing in Desert Palace that undermines the continued usefulness of McDonnell Douglas to trial courts, in either single- or mixed-motive cases based on circumstantial evidence, for assessing Title VII liability."); Winter v. Bank of America, N.A., No. Civ. A.3:02-CV-1591-L, 2003 WL 23200278, at *3 (N.D. Tex. Dec. 12, 2003) ("[T]he court declines to accept [plaintiff's] suggestion that the McDonnell Douglas burden-shifting paradigm no longer exists after Desert Palace . . . . If the Supreme Court were going to make a draconian departure from 30 years of well-established employment discrimination precedent, it would have done so with unmistakable clarity. In Desert Palace, the Supreme Court does not even intimate that it is overruling, restricting or clarifying McDonnell Douglas.") (attached hereto as Exhibit L).

[19] Plaintiff places great emphasis on the fact that Sempra does not cite cases from the Connecticut State Court or the United States District Court for the District of Connecticut in its discussion of the burdens of proof under the state and federal anti-discrimination statutes. See Pl.'s Opp. Br. at 8, 11 n.5. True as stated, Plaintiff neglects to mention Sempra's citation to binding *United States Supreme Court* precedent. See Def.'s Moving Br. at 14-15. Moreover, Plaintiff admits that "Connecticut courts look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both." See Pl.'s Opp. Br. at 8 n.2 (internal quotation marks and citation omitted). Thus, the absence of citations to Connecticut State Court cases is of no moment. Finally, Plaintiff's claim that Sempra "advocate[s]" for a "pretext plus" standard of review, see Pl.'s Opp. Br. at 8, 9 n.3, is simply wrong.

B. **Plaintiff's Termination Did Not Occur Under Circumstances Giving Rise To An Inference Of Discrimination.**

Plaintiff's claim that she was terminated because of her gender and/or sexual orientation rests upon nothing more than a handful of innocuous remarks that she now attributes to Sarathi Roy, see Def.'s Moving Br. at 19, but which she never complained about during her employment at Sempra and did not raise in her agency complaint before the Connecticut Commission on Human Rights and Opportunities. Taken as true, none of those stray comments establishes that the considered reasons articulated by Mr. Roy in support of his decision to terminate Plaintiff were false and that Mr. Roy's termination decision was actually motivated by her gender or sexual orientation.[20]

Plaintiff claims that she was terminated under circumstances giving rise to an inference of discrimination. See Pl.'s Opp. Br. at 13. In support of this naked claim, however, Plaintiff offers not a shred of admissible evidence. Instead, employing a "kitchen sink" strategy, she cites a series of allegations that are lifted directly from the complaint. Id. at 13-15. As previously noted, allegations in a complaint are not admissible evidence and cannot be relied upon in opposing Sempra's motion. Moreover, the majority of these alleged "facts" concern the Howley Incident and Sempra's response thereto. Id. (subparagraphs (g) through (m)). As previously discussed, there is no basis for concluding that the Howley Incident was anything other than a business dispute and no basis for Plaintiff's claim that the incident played any role in Sarathi Roy's decision to terminate Plaintiff. Plaintiff's remaining claims are likewise baseless. For example:

- Plaintiff's assertion that she was "only one of two openly homosexual employees" is supported by nothing other than her conclusory proclamation that it is so. (Id. at 13);

- There is no admissible evidence that Sarathi Roy ever made remarks about lesbians or homosexuals or that he made "sexual innuendoes" to Plaintiff. (Id.);

- The amount of the "bonus" that Plaintiff received for 2001, id., was not determined by Sarathi Roy but by Plaintiff's previous supervisor, Brian Cumming. Mr.

---

[20] It is well-settled that stray remarks, without more, cannot prove discrimination. See Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) ("[S]tatements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [do not] satisfy the plaintiff's burden [to demonstrate that the employer relied on illegitimate criteria]."); Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001) ("[T]he stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination.") (citing Woroski v. Nashua Corp., 31 F.3d 105, 109-110 (2d. Cir. 1994)); Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 92 n.2 (2d Cir. 2001) (declining to even consider stray remarks of decisionmaker as evidence of discrimination where they were unrelated to plaintiff's discharge); Ashton v. Pall Corp., 32 F. Supp. 2d 82, 90 (E.D.N.Y. 1999) (stating that "isolated comments cannot in and of themselves make out a case of employment discrimination.") (citations omitted).

Cumming made the decision to pay Plaintiff an amount equal to her "replacement cost" (i.e., Mr. Cumming's estimation of the amount of money it would cost Sempra to replace Plaintiff), which he projected to be approximately $50,000.00. See Sempra's Response to Pl.'s Interrog. No. 9 (attached hereto as Exhibit M). Far from a testament to Plaintiff's performance, Mr. Cumming testified that "[t]here were problems" with Plaintiff's performance in 2001. (See Cumming Dep. at 44:24-45:19) (attached hereto as Exhibit N); and

- Plaintiff has not provided the Court with a single "good review" or "favorable job evaluation[]." See Pl.'s Opp. Br. at 13, 15.[21]

Plaintiff also claims that Steven Soule, "a male with less experience" was "picked to replace [her] before she was fired." See Pl.'s Opp. Br. at 15. Again, however, this conclusion is bereft of any supporting facts, and contradicts Plaintiff's own deposition testimony, during which she admitted that Mr. Soule's employment at Sempra preceded hers by several years. See Pl.'s Dep. at 126:16-25 ("Q. Do you know if Mr. Soule was a Sempra employee since back in 1995 when the company was known as AIG? A. Yes. Q. He was? A. I -- I don't know if it goes that far back, but he was a previous employee. He was with their Energy America Group. Q. Which preceded your employment at Sempra? A. Yes.").

As discussed in Sempra's moving papers, in January 2002, the business unit in which Mr. Soule had been working was shut down. See Messer Dep. at 103:15-105:21 (attached hereto as Exhibit P); Roy Dep. at 157:4-159:22. As a consequence, Sempra's President, David Messer, attempted to secure another position for Mr. Soule within the company. In February 2002 -- approximately one month before a decision was made to terminate Plaintiff's employment -- Mr. Messer made the decision to transfer Mr. Soule into the Petroleum Derivatives department, where he had prior work experience. Id. At the time of his transfer, Mr. Soule was a Vice President at Sempra, whereas Ms. Wood was an Assistant Vice President. See Pl.'s Dep. at 127:7-10. Thus, because: (i) it

---

[21] Prior to Sarathi Roy becoming her supervisor in February 2002, Plaintiff reported to two managers -- Jackie Mitchell and Brian Cumming. Ms. Mitchell testified that Plaintiff reported to her only for a total of five months (i.e., from the commencement of Plaintiff's employment in September 2000 until early 2001), which Ms. Mitchell did not consider a sufficient amount of time to accurately evaluate her performance. See Mitchell Dep. at 86:16-22 ("Q. Ultimately, how many months did Susan Wood work in your department? A. I think five months. Q. So following your own testimony, she didn't work for you long enough to enable you to provide an accurate performance review; is that correct? A. Correct.") (attached hereto as Exhibit O). In early 2001, Plaintiff began reporting to Brian Cumming. Mr. Cumming testified that he had "problems" and "concerns" with Plaintiff's performance. See Cumming Dep. at 45:15-46:1 ("Q. Was Susan Wood doing a good job in 2001? A. There were problems in 2001. Several things had come to my attention. Because of her junior status, I did not feel comfortable with Susan traveling alone to meet with customers by herself. And so whenever she wanted to go see a client, I asked one of the other more senior marketers to travel with her. So, for instance, Jamie Evans made a trip with her and -- at least one trip with her, perhaps more, and Alberto Vogel traveled through Europe traveling airlines with her. After each of those visits I was taken aside by the senior marketers, and they expressed some concerns in several different areas.").

was David Messer, not Sarathi Roy, who made the decision to move Mr. Soule into the Petroleum Derivatives department; (ii) the transfer decision was announced *before* Mr. Roy made the decision to terminate Plaintiff's employment; (iii) the transfer was precipitated by the shutdown of the business unit in which Mr. Soule had previously worked; and (iv) Mr. Soule held a different position than Plaintiff, he cannot be considered her "replacement."[22]

In addition to her failure to adduce evidence showing that she was terminated under circumstances giving rise to an inference of discrimination, as required to state a prima facie claim of discrimination, Plaintiff has not and cannot rebut Sempra's legitimate, non-discriminatory business reasons for the termination decision. See Def.'s Moving Br. at 2-4; 16-18. In particular, it is undisputed that: (i) when Sarathi Roy was appointed to head up the marketing function of the Petroleum Derivatives department in February 2002, the business had just concluded a year in which it had lost money (see Roy Dep. at 239:8-13)[23]; (ii) Mr. Roy decided to focus his efforts on developing a new (and, hopefully, lucrative) customer base in the hedge fund industry (Id. at 131:12-21; Roy Affidavit, ¶ 6); (iii) it was Mr. Roy's business judgment that Plaintiff was the weakest performer in the derivatives group (Roy Affidavit, ¶ 8)[24]; (iv) although Mr. Roy elected to terminate Plaintiff's employment, another female member of the department, Mary Rose Malchow, was retained (See Roy Dep. at 21:16-22:1); and (v) the Petroleum Derivatives department was shut down in December 2002 based on lack of profitability. Id. at 20:5-15.[25]

---

[22] In any event, Mr. Soule's employment was terminated at the end of 2002 when the Petroleum Derivatives department was shut down. See Messer Dep. at 103:15-24.

[23] See also Cumming Dep. at 86:1-16 (stating that, at the end of 2001, "the oil derivatives business was going absolutely nowhere").

[24] As discussed in Sempra's moving papers, this assessment was partially influenced by information that Mr. Roy received from two of the traders in the Petroleum Derivatives department, Alberto Vogel and James Evans, who advised Mr. Roy that, in their estimation, Plaintiff did not understand the limitations of the risk management services that the department offered its customers and was not able to communicate those limitations to the customers. See Roy Dep. at 175:22-179:13; Roy Affidavit, ¶ 12. Plaintiff's claim that these statements are "clearly hearsay," see Wood Affidavit, ¶ 9, is erroneous. The statements are not hearsay because they are not offered to prove the truth of the matter asserted in those statements (i.e., that Plaintiff did not, in fact, understand the limitations of Sempra's risk management services). Instead, they are offered to show that, whether accurate or not, they were communicated to Mr. Roy and it was not discriminatory for him to rely on those assessments even if they were erroneous. See, e.g., Holder v. City of Raleigh, 867 F.2d 823, 829 (4th Cir. 1989) ("A reason honestly described but poorly founded is not a pretext, as that term is used in the law of discrimination."); Horton v. Dixie-Narco, 749 F. Supp. 746, 748 (N.D. W. Va. 1989) ("The inquiry as to the employer's reason for discharge is not whether the reason is good or bad, correct or incorrect, so long as the decision was not based on sex or other unlawful discriminatory criteria.")

[25] See also Messer Dep. at 34:5-35:20; Cumming Dep. at 11:14-12:13.

Plaintiff repeatedly claims that Mr. Roy was "uncomfortable" with the fact that she was a lesbian and a female. See Wood Affidavit, ¶¶ 44, 45. However, there is simply no admissible evidence to support this claim.[26] Likewise, Plaintiff's claim that Mr. Roy did not give her "advance notice of any deficiencies in her work," Id. at ¶ 40, ignores the context in which the termination decision was made. In particular, for all but the last month of Plaintiff's employment at Sempra (i.e., from February to March 2002), Mr. Roy was Plaintiff's peer, not her supervisor. Thus, it is hardly surprising (and certainly not evidence of discriminatory animus) that Mr. Roy did not speak to Plaintiff about her performance while they were colleagues and not in a supervisor/supervisee relationship.[27] Moreover, given the dismal performance of the Petroleum Derivatives department at the time that Mr. Roy was appointed to head up the marketing function in February 2002, his decision to act quickly in an effort to turn the business around cannot be considered suspect or a pretext for gender-based or sexual orientation-based discrimination.[28]

---

[26] Plaintiff's contention that a co-worker in Sempra's Information Technology department advised her that Sarathi Roy was "not comfortable" with her homosexuality, Id. at ¶ 44, is inadmissible hearsay, inasmuch as it is an out of court statement offered to prove the truth of the matter asserted in the statement (i.e., that Mr. Roy was uncomfortable with Plaintiff). See Sarno v. Douglas Elliman- Gibbons & Ives, Inc., 183 F.3d 155, 160 (2d Cir. 1999) (holding that hearsay statement "did not constitute competent evidence" and thus could not be considered in opposition to motion for summary judgment).

[27] At the same time, since Plaintiff transferred into the Petroleum Derivatives department in February 2001, see Roy Affidavit, ¶ 5, Mr. Roy had a full year to informally observe her performance before making his termination decision. See Roy Dep. at 113:13-22 ("A. . . . We all sit in close proximity of each other. When deals are concluded, it's not quite like how, say, a deal is concluded at a car dealership. But when we all sit there right next to each other, we're all quite aware of when a deal gets done. And so you, over the course of time, you tend to associate a person or different people with bringing in, you know, different deals, the volume of the deal, the quote unquote profitability, which I would find out after talking to the trader with whom the deal was concluded, and yeah, that's how I would know [the deals being negotiated]."). Given these first-hand observations, the fact that Mr. Roy did not review "financial reports" prior to making his termination decision, see Pl.'s Opp. Br. at 15, proves nothing.

[28] Plaintiff argues that the question of intent is one for a jury to resolve and, consequently, the issue of whether Mr. Roy engaged in intentional discrimination should not be resolved at the summary judgment stage. See Pl.'s Opp. Br. at 7. The United States Supreme Court, however, squarely rejected that very argument in Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57 (1985), where it held that a plaintiff opposing a properly supported summary judgment motion may not rely upon mere allegations and must come forward with "affirmative evidence" supporting each element upon which he will have the ultimate burden of proof at trial, including elements that relate to the defendant's state of mind. See Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) ("The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion"). Indeed, the Second Circuit has not hesitated to affirm the grant of summary judgment in discrimination cases where intent is an issue. See Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 19 (2d Cir. 1995) (affirming grant of summary judgment on Title VII claim; plaintiff failed to establish an inference of discrimination in award of severance pay); Bickerstaff v. Vassar College, 196 F.3d 435 (2d Cir. 1999) (same; evidence that decisionmakers were motivated by racial animus in denying plaintiff's promotion deemed insufficient to defeat summary judgment); Brennan v. Metropolitan Opera Ass'n, 192 F.3d 310, 317 (2d Cir. 1999) (affirming summary judgment on ADEA failure to rehire claim; plaintiff failed to rebut decisionmaker's deposition testimony that he was neither aware of nor did he consider plaintiff's age).

In point of fact, without any admissible evidence to refute Sempra's legitimate, non-discriminatory reasons for her termination, Plaintiff resorts to misleading citations to a handful of cases that are readily distinguishable from the case at bar. For example, although Plaintiff claims that United Technologies v. CHRO, 72 Conn. App. 212, 221 (App. Div. 2002), "present[s] a [similar] factual scenario," see Pl.'s Opp. Br. at 11, even a cursory review of that case reveals that it is factually distinct. As an initial matter, the case reached the Appellate Court by way of an appeal from an order by a hearing officer for the Connecticut Commission on Human Rights and Opportunities. Thus, as a procedural matter, the Appellate Court did not conduct a *de novo* review the hearing officer's findings. To the contrary, the Appellate Court "emphasize[d] at the outset" that, under the Administrative Procedure Act, its review of the lower court's judgment upholding the hearing officer's decision was "narrow." Id. at 221-22.

Moreover, the facts found by the administrative hearing officer bear no similarity to this case. The plaintiff in United Technologies, who was terminated following an on-the-job altercation with a co-worker, claimed that the termination was gender-based. The plaintiff's employer denied the discrimination claim, contending that the plaintiff was terminated because she had been the aggressor during the altercation, which allegedly violated the company's rules. The hearing office concluded that the company's explanation for the termination decision was pretextual, based on the following facts, among others: (i) The company determined that the plaintiff had instigated the altercation despite the fact that it *did not know* who started the incident; (ii) The plaintiff's supervisor, who participated in the company's "investigation" of the incident, "refused to talk to [the plaintiff]" about it, although he "willingly spoke about the incident with [the plaintiff's co-worker]," who received only a one-day suspension for his part in the altercation; and (iii) The employer "[did] not properly record[] the substance of what witnesses told investigators [about the incident] despite being advised by witnesses that this was the case." Id. at 217-19.

Unlike United Technologies, there is absolutely no evidence that Plaintiff's role in the Howley Incident played any part in Sempra's decision, nine months later, to terminate her employment. Further, unlike the investigation at issue in that case, which was "riddled . . . with faulty procedures" giving rise to an inference of pretext, id. at 218, there is no evidence that Sempra refused to speak to Plaintiff about the Howley Incident or

misrepresented the information obtained from other witnesses to the incident. Thus, United Technologies is clearly inapposite.

Plaintiff's reliance on Sava v. General Electric Company, 877 F. Supp. 81 (D. Conn. 1995), is likewise misplaced. In that case, the employer claimed that the plaintiff was laid off as part of a reduction in force. Notwithstanding this claim, the court observed that: (i) the plaintiff was the *only* employee in her division who was laid off; (ii) her performance appraisals "suggest[ed] [that] plaintiff's work overall was excellent"; (iii) she was "highly recommended by her previous managers and was rated among the highest potential minorities and females"; (iv) despite the company's claimed decision to downsize, it hired two male employees during the relevant time period; and (v) although the plaintiff did not receive salary increases during 1982 and 1983, purportedly due to "adverse business conditions," *four* male employees in the plaintiff's division received increases in 1982 and *six* male employees received increases in 1983. Id. at 83-84. Again, the facts surrounding Plaintiff's termination in this case bear no resemblance to those in Sava.

First, Plaintiff was not terminated pursuant to a reduction in force. Second, there is no evidence that Sempra hired males to replace her.[29] Third, the record evidence shows that Plaintiff's work was by no means considered "excellent" by her previous managers.[30] Finally, Plaintiff makes no allegation in this lawsuit that she was discriminatorily denied compensation paid to similarly-situated male employees.

Plaintiff's discrimination claims must be dismissed.

### IV. PLAINTIFF'S CLAIMS FOR BREACH OF AN EXPRESS CONTRACT, NEGLIGENT INVESTIGATION AND IMPLIED COVENANT CANNOT WITHSTAND SCRUTINY

Plaintiff all but abandons her claims for breach of express contract, negligent investigation and breach of the implied covenant of good faith and fair dealing, devoting little more than a page in her opposition brief to all three claims. See Pl.'s Opp. Br. at 25-26; 34-35. With respect to the express contract and negligent investigation claims, Plaintiff makes no effort to address Sempra's arguments that: (i) the Second Circuit's holding in Malik v. Carrier Corp., 202 F.3d 97, 100 (2d Cir. 2000) mandates dismissal of her negligent investigation claim; (ii) the numerous disclaimers in the Company's Employee Handbook and Employment Application defeat her express

---

[29] As previously noted, Steve Soule did not replace Plaintiff. See discussion supra at 15-16.

[30] See discussion at footnote 21, supra.

contract claim; and (iii) assuming the Company had a contractual obligation to investigate the Howley Incident, Plaintiff's own deposition testimony clearly establishes that Sempra met this obligation. See Def.'s Moving Br. at 26-31. Similarly, with respect to the claim for breach of the implied covenant of good faith and fair dealing, Plaintiff ignores Sempra's argument that this claim cannot lie where, as here, Plaintiff has adequate statutory remedies. Id. at 38-39. Moreover, although Plaintiff admits that she must establish that Sempra violated an important public policy of Connecticut in order to state an implied covenant claim, see Pl.'s Opp. Br. at 34, she does not identify any such public policy nor does she explain why the absence of such an allegation in the Complaint does not require dismissal of the claim. See Def.'s Moving Br. at 40. Thus, summary judgment is clearly required as to Counts Six, Ten, Thirteen and Fourteen.

### V. PLAINTIFF'S CLAIMS FOR BREACH OF AN IMPLIED CONTRACT, PROMISSORY ESTOPPEL AND UNJUST ENRICHMENT ARE FLATLY INCONSISTENT WITH THE TERMS OF PLAINTIFF'S EXPRESS EMPLOYMENT AGREEMENT

As discussed at length in Sempra's moving papers, Plaintiff's claims for breach of implied contract, promissory estoppel and unjust enrichment based on oral statements allegedly made during the course of Plaintiff's employment promising to (i) pay Plaintiff a bonus for 2002 in an amount no less than 10% of her booked profits, and (ii) continue her employment in perpetuity for as long as she "remained profitable" for the Company, are barred because, among other reasons, those alleged oral promises are flatly inconsistent with the terms of Plaintiff's written Employment Agreement and Sempra's Policy Manual, which is incorporated into the Employment Agreement by reference. See Def.'s Moving Br. at 31-35; Employment Agreement, ¶ 3 (stating that Plaintiff's "employment is further subject to the terms and conditions of the Policy Manual as adopted by Sempra Trading") (attached hereto as Exhibit Q).[31] In her opposition brief, Plaintiff attempts to avoid dismissal of these three claims by arguing that: (1) the Rules of Court allow for pleading of inconsistent legal theories; and (2) certain of the alleged oral promises (specifically, promises attributed to the President of Sempra, David Messer, and an executive recruiter, Audrey Cullen) were made *prior to* the date on which Plaintiff executed the Employment Agreement, that Plaintiff reasonably relied upon those promises in deciding to accept employment at

---

[31] At the commencement of her employment, Plaintiff signed an Acknowledgment Form verifying that she "[had] read the Policy Manual of Sempra Energy Trading Corp." See 9/15/00 Policy Manual Acknowl. Form (attached hereto as Exhibit R); Pl.'s Dep. at 106:17-107:5.

Sempra and move from Texas to Connecticut, and, therefore, the promises are not barred by the Agreement. See Pl.'s Opp. Br. at 26-35; Wood Affidavit, ¶¶ 5, 16, 19, 20. Both of these contentions fail.

Plaintiff's first assertion - - i.e., that a litigant may assert inconsistent legal theories - - is an accurate statement of the law, but does not address Sempra's argument that Plaintiff's claims for implied contract, promissory estoppel and unjust enrichment fail because they are inconsistent with the terms of Plaintiff's Employment Agreement. Sempra does not dispute, for example, that Plaintiff would be entitled to assert such claims based on the alleged non-payment of a bonus if she were *otherwise unable* to establish the existence of an enforceable express contract with the Company that addressed the subject matter of bonuses. But that is not this case, since it is undisputed that Plaintiff *did* enter into an enforceable express contract that addresses Plaintiff's bonus eligibility. See Complaint, ¶ 86 (stating that "[b]y letter dated August 31, 2000, Defendant offered Plaintiff employment under certain express conditions, which letter was signed on Defendant's behalf . . . and counter-signed by Plaintiff on September [6], 2000 ('Letter Agreement')"). Sempra's position, as supported by the wealth of caselaw cited in its moving papers which Plaintiff makes no effort to address, see Def.'s Moving Br. at 31-33, is that Plaintiff may not *ignore* an enforceable written contract because she dislikes its terms and rely instead on oral statements that directly conflict with the terms of the express contract.[32]

Plaintiff's claim that, prior to signing the Employment Agreement, David Messer and Audrey Cullen made enforceable oral promises to her regarding bonus payments and job security that induced her to accept employment at Sempra, is also specious. With respect to Mr. Messer, Plaintiff claims that, "during her recruitment interview," he promised her "a bonus of a minimum of 10% of her generated profits" and "job

---

[32] The cases cited by Plaintiff are completely inapposite, as none of them holds that a litigant may state a claim for breach of an implied contract, promissory estoppel or unjust enrichment based on terms or promises that are inconsistent with the parties' express, written agreement. See Pl.'s Opp. Br. at 27-32. For example, in Torosyan v. Boehringer Ingelheim Pharm., Inc., 234 Conn. 1 (1995), the court held that the trial court was not "clearly erroneous" when it determined that the plaintiff, a non-native English speaker who *specifically requested* long-term employment and job security prior to accepting employment with the defendant and moving his family across the country, established the existence of an implied contract based upon pre-employment statements by a company representative *and* statements in a personnel manual that employment could be terminated only for cause. Id. at 7. Critically, there was no express contract between the parties addressing the issue of job security or whether the plaintiff could be terminated without cause. Indeed, the court observed at the outset of its analysis that "all employer-employee relationships *not governed by express contracts* involve some type of implied 'contract' of employment." Id. at 13. Similarly, in Gaudio v. Griffin Health Serv. Corp., 249 Conn. 523 (1999), the court upheld a jury's verdict finding that the plaintiff had proven the existence of an implied contract that he would not be terminated except for cause. Id. at 532-33. The implied contract arose from language in the defendant's personnel manual, which contained "no disclaimers." Id. at 535. As in Torosyan, there was no express agreement between the parties addressing the subject matter of the implied contract (i.e., job security). Again, the court noted that all employment relationships that are *not* governed by express contracts involve some type of implied contract. Id. at 532.

security based on continued profitability." See Pl.'s Opp. Br. at 32-33; Wood Affidavit, ¶ 5. This claim is directly contrary to Plaintiff's deposition testimony, during which Plaintiff testified in detail about the chronology leading up to her employment at Sempra, from her first steps to secure a new job in or about May 2000 through her execution of the Sempra Employment Agreement on September 6, 2000. See Pl.'s Dep. at 28:20-52:11. In particular, Plaintiff testified that, in mid-August 2000, she flew from Texas to Connecticut to interview with five Sempra employees during a single-day interview process. Id. at 36:2-39:9. Notably, David Messer was *not* one of the five Sempra employees with whom Plaintiff claimed she had interviewed. Id. at 38:13-25. Indeed, Plaintiff stated that she did not even speak to (let alone interview with) any other Sempra employees on that day, since she "didn't know anybody there." Id. at 39:1-9.

Moreover, in its First Set of Interrogatories to Plaintiff, Sempra expressly asked Plaintiff to "identify each and every person" who purportedly promised her "that [she] would be paid an annual bonus in the range of 10% to 15% of the profits that [she] booked for Sempra in a given calendar year," as alleged in the Complaint. In her verified response to this Interrogatory, Plaintiff identified Audrey Cullen but did *not* identify Mr. Messer. See Pl.'s Response to Def.'s Interrog. No. 9 (attached hereto as Exhibit S). Likewise, when asked to identify witnesses with knowledge of facts relating to her claims and to state the substance of the witnesses' knowledge, Plaintiff identified Mr. Messer as a person with knowledge but did *not* state that Mr. Messer discussed bonuses with her or that his knowledge otherwise related to her bonus claim. Id. (Pl.'s Response to Interrog. No. 8). In short, Plaintiff's eleventh-hour contention that David Messer made promises to her regarding bonuses directly contradicts Plaintiff's earlier deposition testimony and verified discovery responses. Consequently, it cannot be considered in opposition to Sempra's motion for summary judgment. See Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) ("[F]actual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony.").

Similarly, although Plaintiff's current contention that Mr. Messer spoke to her about "job security" at *some point in time* is consistent with her previous testimony, Plaintiff's claim that she discussed this issue with Mr. Messer *before* she commenced her employment, and relied on those statements when she accepted employment at Sempra, stands in glaring contradiction to Plaintiff's discovery responses. That is, Sempra served

-22-

Plaintiff with an interrogatory asking her to "state with specificity the date, time and place" at which Mr. Messer allegedly made promises to her regarding job security. In response to that question, Plaintiff identified three such instances, the earliest of which Plaintiff described as having occurred in "early spring of 2001." See Exhibit S (Pl.'s Response to Interrog. No. 10).[33] This time frame is at least six months after Plaintiff commenced her employment at Sempra and, more importantly, signed an Employment Agreement which clearly defined the at-will nature of her employment. Thus, Plaintiff's claim that, prior to the commencement of her employment, David Messer made statements to her regarding bonus eligibility and job security contradicts Plaintiff's previous deposition testimony and discovery responses and, therefore, cannot be used to avoid the dismissal of her claims for breach of implied contract, promissory estoppel and unjust enrichment.

In addition to her false claims about Mr. Messer, Plaintiff points to pre-employment statements regarding "bonus eligibility" purportedly made by Audrey Cullen, an executive recruiter to whom Plaintiff spoke prior to becoming employed at Sempra. See Pl.'s Opp. Br. at 32-34; Wood Affidavit, ¶ 5. Specifically, Plaintiff alleges that Ms. Cullen advised her that Sempra would pay a guaranteed, annual bonus equal to 10% of her booked profits. See Pl.'s Opp. Br. at 32-34.[34] Since it is undisputed that Ms. Cullen was not employed by Sempra at the time of her alleged discussions with Plaintiff, Sempra argued in its moving papers that there is no basis upon which to hold the Company liable in contract or quasi-contract for Ms. Cullen's alleged statements, assuming any were made, and that the alleged statements are inadmissible hearsay in any event. See Def.'s Moving Br. at 37. In response to this argument, Plaintiff claims that Ms. Cullen "was acting as Sempra's authorized agent" when speaking to Plaintiff, and that the Company is consequently "bound by" any statements Ms. Cullen may have

---

[33] This response is consistent with the Complaint in this matter, which specifically alleges that Mr. Messer made statements regarding job security "*[a]fter* Plaintiff took employment with Defendant." See Complaint, ¶ 14 (emphasis added).

[34] During her deposition, Plaintiff testified that, prior to signing the Employment Agreement, Ms. Cullen was the only person who allegedly made representations to her regarding the availability of profit-based bonuses at Sempra. See Pl.'s Dep. at 28:18-29:16; 45:7-47:13. Continuing a remarkable string of falsehoods, Plaintiff's opposition brief mischaracterizes Sempra's argument on this point, falsely indicating to the Court that Sempra takes the position that Ms. Cullen is the only person who *at any time* allegedly made statements to Plaintiff regarding bonus eligibility. See Pl.'s Opp. Br. at 32. As Sempra's moving papers make clear, the Company's position is that Ms. Cullen is the only person alleged by the Plaintiff to have made such statements *prior to September 6, 2000* - - the date on which Plaintiff signed the Employment Agreement. See Def.'s Moving Br. at 37.

made. See Pl.'s Opp. Br. at 33-34. This unsupported allegation to the contrary notwithstanding, there is simply no basis upon which to hold Sempra liable for Ms. Cullen's purported statements based on agency principles.[35]

"It is a general rule of law that the principal in a principal/agent relationship is only bound by, and liable for, the acts which his agent does with or within the actual or apparent authority from the principal, and within the scope of the agent's employment." Newtown Associates v. Northeast Structures, Inc., 15 Conn. App. 633, 637-38, 546 A.2d 310 (1988) (citations and internal quotation marks omitted.). Actual authority exists when an agent's actions are expressly or impliedly authorized by the principal. Hallas v. Boehmke and Dobosz, Inc., 239 Conn. 658, 674, 686 A.2d 491 (1997). Similarly, "[a]pparent authority is that semblance of authority which a principal, *through his own acts or inadvertences*, causes or allows third persons to believe his agent possesses . . . . First, it must appear *from the principal's conduct* that the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted [the agent] to act as having such authority. Second, the party dealing with the agent must have, acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority to bind the principal to the agent's action." Tomlinson v. Board of Education, 226 Conn. 704, 734-35 (1993) (emphasis added, internal quotation marks and citations omitted).

In her opposition brief, Plaintiff makes no effort to explain whether she contends that Ms. Cullen was acting with actual or apparent authority, or both, when she allegedly spoke to Plaintiff regarding her supposed entitlement to bonus payments while employed at Sempra. This oversight is irrelevant, however, as both contentions fail. First, Plaintiff has not produced a shred of evidence showing that *anyone* at Sempra expressly or impliedly authorized Ms. Cullen to tell Plaintiff that she would receive an annual, guaranteed bonus in an amount equal to 10% of her booked profits. Thus, Plaintiff's claim of *actual* authority must fail. See Hallas, 239 Conn. at 674, 686 A.2d 491 (1997). Plaintiff's claim that Ms. Cullen had *apparent* authority to make such a statement is likewise meritless, since there is absolutely no evidence, nor does Plaintiff even claim, that Sempra engaged in any conduct that could reasonably lead Plaintiff to reach such a conclusion. See Tomlinson, 226 Conn. 704 at

---

[35] Plaintiff's claim that "[agency] issues are wholly inappropriate to be determined at the summary judgment stage," see Pl.'s Opp. Br. at 34, is a gross misstatement of the law. The Connecticut Supreme Court has held that, when no reasonable juror could find the existence of an agent/principal relationship under the circumstances presented, the question of agency may be decided as a matter of law. Hallas v. Boehmke and Dobosz, Inc., 239 Conn. 658, 674, 686 A.2d 491 (1997) (citing Russo v. McAviney, 96 Conn. 21, 24, 112 A. 657 (1921) (agency relationship decided as matter of law)).

734-35 (stating that, in order to prove apparent authority, "it must appear *from the principal's conduct* that the principal held the agent out as possessing sufficient authority to embrace the act in question") (emphasis added). Thus, even if the Court were to conclude that Ms. Cullen's alleged statements to Plaintiff are *not* hearsay (and therefore inadmissible in opposition to Sempra's motion for summary judgment), those statements still cannot be attributed to Sempra because there is no evidence that Ms. Cullen was acting as Sempra's agent.

Even if Plaintiff were otherwise able to adduce admissible evidence demonstrating that Audrey Cullen made statements to her regarding bonus eligibility and that she made those statements while acting as Sempra's agent, Plaintiff still cannot establish a claim for promissory estoppel, because she cannot show that: (i) she relied on those alleged statements; or (ii) any such reliance, if it occurred, was reasonable.[36] Initially, it is clear that Plaintiff did *not* rely on any alleged oral promises regarding the payment of a bonus, because she testified that she did not decide to leave her former job until *after* she received an offer of employment (i.e., the 8/31/00 Employment Agreement) from Sempra. See Pl.'s Dep. at 21:4-7 ("Q. So your testimony is you made your decision to -- to leave Enron only after you obtained an offer from Sempra? A. That's correct."); Id. at 19:25-20:1 ("Q. And you ultimately quit your job at Enron in September of 2000, right? A. That's correct."). Thus, Plaintiff's present claim that she relied on alleged oral statements by Ms. Cullen which preceded her receipt of the Employment Agreement is specious.[37] Nor would such reliance be reasonable in any event, given the terms of the Employment Agreement. As discussed in Sempra's moving papers, the Employment Agreement specifically addresses Plaintiff's "entitlement" to a bonus, states that the amount of such bonus, if any, is to be determined by Sempra solely in its discretion, and makes absolutely no mention of bonus payments being made to Plaintiff based on a percentage (10% or otherwise) of her profit margin. See Exhibit Q, ¶ 2. In the face of these

---

[36] Reasonable reliance is a central element of a promissory estoppel claim, the existence or non-existence of which may be decided as a matter of law. Cowen v. Federal Express Corp., 25 F. Supp.2d 33, 38-39 (D. Conn. 1998).

[37] Plaintiff also contends that her purported reliance on Ms. Cullen's alleged statements was "significant given the employment opportunities that were available to [her] in Texas as well as elsewhere." See Wood Affidavit, ¶ 17. Although Plaintiff apparently would have the Court believe that she was entertaining employment offers from companies across the United States, it is undisputed that Plaintiff began looking for a new job after Lynda Clemmons, her lesbian partner and co-worker at Enron, told Plaintiff that she had obtained a position in Connecticut and asked Plaintiff if she would consider moving with her. See Pl.'s Response to Def.'s Interrog. No. 2 (describing Plaintiff's "[r]eason for leaving" Enron as "[f]ollowed partner as she moved to CT for a new job") (attached hereto as Exhibit S). Thus, it is clear that Plaintiff was not conducting a nationwide employment search, but was hoping to obtain a job in Connecticut with her partner. Indeed, Plaintiff testified that, excluding Sempra, she interviewed with approximately three companies, all of which were located in New York. See Pl.'s Dep. at 30:16-31:9. Plaintiff did not receive offers of employment from any company other than Sempra. Id. at 31:2-6.

unambiguous terms, which she admits she had available to her before she resigned her former employment, see Pl.'s Dep. at 21:4-7, Plaintiff, who has taken great pains in this lawsuit to portray herself as a sophisticated businesswoman, cannot claim that she reasonably relied on any contradictory oral statements allegedly made by Ms. Cullen.

Plaintiff's claims for breach of implied contract, promissory estoppel and unjust enrichment must therefore be dismissed.

### VI. PLAINTIFF HAS NO TENABLE CLAIM UNDER THE CONNECTICUT WAGE ACT

Plaintiff does not dispute that a claim under the Connecticut Wage Act premised upon the non-payment of a bonus will not lie unless the bonus is payable solely as compensation for an employee's individual work performance. See Pl.'s Opp. Br. at 35. Stated differently, Plaintiff admits that a Wage Act claim fails if the bonus is based, in whole or in part, on an *employer's* overall profitability or performance. Id. Having conceded this point, however, Plaintiff attempts to avoid dismissal of her Wage Act claim by engaging in outright fabrication, asserting that she was promised "that she would be paid an annual bonus based upon [her] profitability, and [her] profitability alone." Id. (emphasis in original). This claim flies in the face of Plaintiff's sworn deposition testimony, during which Plaintiff unambiguously stated: "A. I understood that the impact of Sempra's performance *would affect everybody's bonus across the board. Not just mine.* Q. But it would include yours - - A. *Yes.* Q. - - impact yours? A. *Yes.*" See Pl.'s Dep. at 52-53 (emphasis added).[38] Plaintiff further testified that it was her understanding that there were factors *in addition to* Sempra's profitability that would also affect her bonus eligibility: "Q. Meaning the company's overall performance was one of the factors [affecting bonus payments]? A. Uh-huh. Yes. Q. But there were other factors; is that what you believe? A. I would assume so, *yes, is my understanding*." Id. (emphasis added). Plaintiff's transparent attempt to mislead the Court on this point borders on sanctionable conduct and, at a minimum, cannot be used to defeat Sempra's properly-supported motion for summary judgment.

Finally, Plaintiff's claim for double damages, attorneys' fees and costs under the Wage Act must be dismissed because there is absolutely no evidence that Plaintiff's employment was terminated in an effort to avoid

---

[38] When directly questioned regarding the language in the Employment Agreement, which stated that Plaintiff may be eligible for a bonus "based on [her] performance and that of Sempra Trading and its subsidiaries," Plaintiff testified that she believed this language "reaffirmed what Audrey [Cullen] had imparted to [her]." Id. at 54:13-55:17.

-26-

paying her a bonus or that Sempra's decision not to pay Plaintiff a bonus was precipitated by anything other than the Company's legitimate, good faith interpretation of the terms of Plaintiff's Employment Agreement and Sempra's Policy Manual, both of which clearly state that bonus payments are entirely discretionary. See Def.'s Moving Br. at 33-34. Apparently misunderstanding the bad faith requirement, Plaintiff argues generally that Sempra engaged in various "bad acts," including subjecting her to a hostile work environment on the basis of her gender and terminating her employment in retaliation for her complaint regarding the Howley Incident. See Pl.'s Opp. Br. at 36. As explained in Sempra's moving papers, amplified herein, these claims are baseless. Moreover, even if the Court were to conclude that Sempra discriminated against Plaintiff or engaged in retaliatory discharge, such a finding would have no bearing on the separate issue of whether Sempra's decision *not to pay Plaintiff a bonus* was made in bad faith. As the Connecticut Supreme Court noted in Sansone v. Clifford, 219 Conn. 217, 592 A.2d 931 (1991), a plaintiff seeking an award of double damages under the Wage Act must do more than allege bad faith "in the air." Instead, the plaintiff has the burden of proving bad faith in connection with the decision not to pay the disputed wage. See Sansone, 219 Conn. at 229 ("Sansone challenges the finding of lack of bad faith and arbitrariness as wholly inconsistent with Clifford's flagrant violation of the charter in twice appointing nonresidents to the position of building inspector. Those appointments, however, are only remotely related to the failure to pay Sansone the $360 due him for services performed . . . ."). Because Plaintiff has utterly failed to meet her burden of proof, she cannot establish her entitlement to double damages. Thus, Plaintiff's claim under the Connecticut Wage Act must be dismissed in its entirety.

## CONCLUSION

For all of the reasons discussed above, the Court should grant the Defendant's Motion for Partial Summary Judgment in its entirety.

Dated: Stamford, Connecticut
       August 6, 2004

                                              Respectfully Submitted,

By: *Peter M. Schultz*
Mary C. Dollarhide (ct12251)
Peter M. Schultz (ct19425)
Paul, Hastings, Janofsky & Walker, LLP
1055 Washington Boulevard
Stamford, CT  06901
Telephone:  (203) 961-7400
Facsimile:  (203) 359-3031
peterschultz@paulhastings.com

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing Defendant's Reply Memorandum of Law in Further Support of Its Motion for Summary Judgment, and all attachments thereto, was served on the following counsel of record via UPS (next business day delivery) on this 6th day of August 2004:

>Brendan J. O'Rourke
>O'Rourke & Associates, LLC
>27 Pine Street
>New Canaan, CT 06840

_____
Peter M. Schultz

STM /279766.2