UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SUSAN E. WOOD, | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:03-cv-986 (JCH) |
| | : | |
| SEMPRA ENERGY TRADING | : | |
| CORPORATION, | : | |
| Defendant. | : | FEBRUARY 22, 2005 |

**RULING  RE: DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT [DKT. NO. 41]**

Plaintiff Susan E. Wood ("Wood") brings this action pursuant to state and federal

law against her former employer, Sempra Energy Trading Corporation ("Sempra").

Sempra made a motion for partial summary judgment [Dkt. No. 41], claiming that there

is no issue of fact concerning thirteen of Wood's fourteen claims.

## I.    FACTS & PROCEDURAL HISTORY[1]

Prior to 2000, Wood handled marketing, oil and natural gas at Enron, in Houston,

Texas. Aff. of Susan E. Wood [Dkt. No. 51], ¶ 2 (hereinafter "Wood Aff.").  Wood began

working for Sempra in the position of Assistant Vice President in September 2000.  She

remained an Assistant Vice President for the duration of her employment at Sempra.

Def.'s Local Rule 56(a)(1) Stmt. [Dkt. No. 42] ¶ 35; accord Pl.'s Local Rule 56(a)(2)

Stmt. [Dkt. No. 50] ¶ 35.  Wood was recruited by Audrey Cullen, a principal with First

Call Associates, a recruitment agency, who Wood claims acted as an agent of Sempra.

---

[1]  For the purposes of the instant motion, the court accepts facts undisputed by the parties
as true and resolves disputed facts in favor of the plaintiff where the plaintiff provides evidence to
support her allegations.

Pl.'s Local Rule 56(a)(2) Stmt. [Dkt. No. 50] ¶ 8 (citing Wood Aff., ¶ 7).  Cullen made

certain representations to Wood regarding job security, guaranteed bonuses, and terms

of employment.  Id.  Wood claims that Cullen assured her that she would be entitled to

a minimum bonus equivalent to ten percent of profits attributable to her and that her

employment would not be terminated so long as her employment remained profitable to

Sempra.  Wood Aff., ¶ 5.

In September 2000, but following the commencement of her employment, Wood

signed an Application for Employment ("Application") which states that "nothing

contained in this application or in any policies, procedures or handbooks I might

receive, and nothing said to me in my interview is intended to create an employment

contract . . . ."  Def.'s Local Rule 56(a)(1) Stmt. [Dkt. No. 42] ¶ 2 (citing Employment

Application [Dkt. No. 42, Ex. N] at 8); accord Pl.'s Rule 56(a)(2) Stmt. [Dkt. No. 50] ¶ 2.

In addition to signing the Employment Application, Wood signed an Employment

Agreement ("Agreement").  She claims that the Agreement provided some of the terms

of her employment, but not all of the terms.  Pl.'s Rule 56(a)(2) Stmt. [Dkt. No. 50] ¶ 3.

For example, while the Agreement provides that Sempra "may terminate [Wood's]

employment at will, whether or not for cause," Def.'s Rule 56(a)(1) Stmt. [Dkt. No. 42] ¶

4 (citing Employment Agreement [Dkt. No. 42, Ex. D] ¶ 3), Wood argues that verbal

representations made to her by Audrey Cullen, prior to starting her employment, and

Sempra's President, David Messer, following commencement of employment,

concerning both job security and bonus payments bound Sempra to certain terms of

2

employment.  Pl.'s Rule 56(a)(2) Stmt. [Dkt. No. 50] ¶ 4.  In addition to the Application and Agreement, Sempra indicates that its Policy Manual provides that employment is at will and that no employee is entitled to a bonus.  Def.'s Rule 56(a)(1) Stmt. [Dkt. No. 42] ¶ 6.  Wood disputes that these terms of the Policy Manual were applicable to her employment and denies having received the Policy Manual.  Pl.'s Rule 56(a)(2) Stmt. [Dkt. No. 50] ¶ 6.

In February 2001, Sempra transferred Wood to its Petroleum Derivatives Department, which department structured transactions for customers interested in risk-management with respect to market price-fluctuation of petroleum-based products. Def.'s Local Rule 56(a)(1) Stmt. [Dkt. No. 42] ¶ 11; accord Pl.'s Local Rule 56(a)(2) Stmt. [Dkt. No. 50] ¶ 11.  In June 2001, Wood had a disagreement with Joseph Howley, a Managing Director at Sempra.  The parties refer to this disagreement as the "Howley Incident."  The parties dispute the nature of the incident.  Wood claims that she was physically assaulted and attacked on the trading floor in front of approximately one hundred and fifty other Sempra employees, including Jackie Mitchell, who had previously been Wood's supervisor, and Sarathi Roy, who would later become Wood's supervisor.  Wood Aff. [Dkt. No. 51], ¶¶ 7-8.  She complained about the incident to Mitchell as well as her then-supervisor, Brian Cumming.  Id. at ¶ 29.  She also made a formal complaint to Sempra's General Counsel, Michael Goldstein, to whom she complained that the assault on her was perpetrated in some part because she is a woman.  Id. at ¶¶ 30-31.  The parties dispute the nature of the Sempra's response to

Wood's complaint.  Wood claims that following her filing the complaint, Sempra failed to act promptly or properly and that she repeatedly demanded that Sempra pursue an investigation, as required pursuant to Sempra's Prohibition Against Harassment Policy. Wood Aff. ¶ 32.  She never received communication that Sempra in any way reprimanded Howley.  Id.

In February 2002, Sarathi Roy became Wood's supervisor when he was appointed to head the marketing function of the Petroleum Derivatives Department. Def.'s Local Rule 56(a)(1) Stmt. [Dkt. No. 42] ¶ 15; accord Pl.'s Local Rule 56(a)(2) Stmt. [Dkt. No. 50] ¶ 15.  Sempra claims that Roy, in his new position, hoped to refocus the department on a specific customer base, hedge funds, and that Roy's opinion, informed by statements made by other employees in the department, was that Wood was not qualified to market Sempra's products to that base.  Def.'s Local Rule 56(a)(1) Stmt. [Dkt. No. 42] ¶¶ 16-19.  Sempra also claims that Wood made "off-color" comments regarding the breast size and religious observation of her colleagues and that she sent Roy a sexually provocative e-mail.  Id. at ¶¶ 20, 21.  Wood disputes those claims and alleges that Roy felt uncomfortable with her because of her sex and sexual orientation.  Pl.'s Local Rule 56(a)(2) Stmt. [Dkt. No. 50] ¶ 18.  In March 2002, Roy terminated Wood's employment.  Sempra alleges that Roy's reasons for doing so included Wood's lack of skills, knowledge, and judgment and a February 2002 incident in which Wood caused Sempra to lose a client.  Def.'s Local Rule 56(a)(1) Stmt. [Dkt. No. 42] ¶¶ 22, 23.  While Sempra claims that Roy, who was not aware of Wood's

4

complaints regarding the Howley incident, decided to terminate her, id. at ¶¶ 24, 25,
Wood claims that other individuals, motivated by her gender and sexual orientation as
well as her complaint, participated in the decision as well.  Pl.'s Local Rule 56(a)(2)
Stmt. [Dkt. No. 50] ¶¶ 24, 25.

Wood alleges that Roy made inappropriate comments with respect to gender
and sexual orientation.  She claims that he boasted about his sexual conquests and
asked Wood whether she or her partner wore "the pants in the family."  Wood Aff. ¶ 34.
Roy asked how traditionally gendered roles were divided in Wood's home and informed
Wood that his wife cooked and cared for him as he "should be taken care of."  Id.  Roy
commented that a "woman's place is in the home" and called Wood the "lady on the
desk."  Id. at ¶ 35.  He described to Wood his masseuse, "a real woman" who "knew
how to take care of him."  Id.  According to Wood, such comments made her feel
unwelcome and uneasy.  Id. at ¶ 36.  She further claims that following her termination,
a fellow employee informed her that Roy was not "comfortable" with her, a comment
she takes to refer to his discomfort with her lesbianism.  Id. at ¶ 44, 45.

In February 2002, Sempra transferred a male Vice President, Steve Soule, to the
Petroleum Derivatives Department.  Def.'s Local Rule 56(a)(1) Stmt. [Dkt. No. 42] ¶ 34.
Wood claims that, while Soule's transfer occurred prior to her termination, he
essentially replaced her in the department.  Wood Aff. ¶ 42.

Sempra has moved for summary judgment [Dkt. No. 41] on thirteen of Wood's
fourteen claims against it.

II.    **SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Hermes Int'l v. Lederer de Paris Fifth Ave, Inc., 219 F.3d 104, 107 (2d Cir. 2000). The moving party bears the burden of showing that no genuine factual dispute exists. Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000) (citing Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994)).  In assessing the record to determine if such issues exist, all ambiguities must be resolved, and all inferences drawn, in favor of the party against whom summary judgment is sought.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 721 (2d Cir.1994).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  Anderson, 477 U.S. at 255.  When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor, Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).  A party may not rely "on mere speculation or conjecture as to the true nature of the facts to

overcome a motion for summary judgment." Lipton v. The Nature Company, 71 F.3d 464, 469 (2d Cir. 1995) (quoting Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986)).  Additionally, a party may not rest on the "mere allegations or denials" contained in his pleadings.  Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995); see also Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993) (holding that party may not rely on conclusory statements or an argument that the affidavits in support of the motion for summary judgment are not credible).

## III.    DISCUSSION

Wood asserts fourteen claims.  Counts One and Two assert discrimination on the basis of Wood's gender pursuant to federal and state law.  Count Three alleges discrimination on the basis of sexual orientation pursuant to state law.  Counts Four and Five allege retaliatory discharge, based on Wood's complaint regarding the Howley incident, in violation of federal and state law.  Count Six alleges breach of contract on the premise that Sempra failed to properly investigate the Howley incident pursuant to its own policy as provided in The Employee Handbook of Sempra Energy Trading Corp. ("Employee Handbook").  Counts Thirteen and Fourteen allege negligent failure to investigate harassment claims as required by the Employee Handbook and Sempra's Professional Conduct Policy, respectively.  Count Seven alleges breach of implied contract on the basis that Sempra violated an implied contract that provided for a ten percent bonus and Wood's continued employment so long as she remained profitable to Sempra.  In the remaining counts, Wood makes claims of promissory estoppel,

unjust enrichment, breach of implied covenant of good faith and fair dealing, and unpaid bonus on the basis of the same alleged facts. Sempra moves for summary judgment on all above counts but does not move for summary judgment on Count Eleven, alleging unpaid business expenses.

### A.    Gender and Sexual Orientation Discrimination

"Since 1964, Title VII has made it an 'unlawful employment practice for an employer . . . to discriminate against any individual . . ., because of such individual's race, color, religion, sex, or national origin.'" Desert Palace, Inc. v. Costa, 539 U.S. 90, 93 (2003) (citing 42 U.S.C. § 2000e-2(a)(1)). Notably, "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

> A plaintiff may establish a claim of disparate treatment under Title VII either (1) by showing that he has suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race, color, religion, sex, or national origin, or (2) by demonstrating that harassment on one or more of these bases amounted to a hostile work environment.

Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004), citing Raniola v. Bratton, 243 F.3d 610, 617 (2d Cir. 2001). Wood claims both that she was subjected to a hostile work environment and that she suffered an adverse employment action on the basis of her sex in violation of Title VII.

### 1.    Adverse Job Action

In cases brought under Title VII and the Connecticut Fair Employment Practices

Act,[2] courts follow the now-familiar, burden-shifting analysis first announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-149 (2000); St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-511 (1993); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-256 (1981).

In McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the Supreme Court "set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment." Burdine, 450 U.S. at 253. The initial burden in a disparate treatment claim brought under Title VII is on the plaintiff to establish a prima facie case of discrimination. To do so, the plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she experienced an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. See Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000)(citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).

Once a plaintiff has established a prima facie case, a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for its actions. See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). Upon the articulation of such a non-discriminatory reason for the

---

[2]   As both parties agree, case law regarding federal fair employment legislation guides interpretation of the CFEPA. See Bridgeport Hospital v. Commission on Human  Rights and Opportunities, 232 Conn. 91 (1995).

employment action, the presumption of discrimination which arose with the establishment of the prima facie case drops out.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993).

Once a defendant offers a legitimate, non-discriminatory reason for its actions, the burden shifts back to the plaintiff to fulfill her ultimate burden of proving that the defendant intentionally discriminated against her in the employment decision.  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000).  In order to satisfy this burden, the plaintiff may attempt to prove that the legitimate, non-discriminatory reason offered by the defendant was not the employer's true reason, but was a pretext for discrimination.  Id.  As the Supreme Court explained in Reeves:

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.  In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. . . .  Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.

530 U.S. at 147 (citations omitted).

Gender stereotyping can serve as evidence of pretext.  See Price Waterhouse v. Hopkins, 490 U.S. 228, 250 (1989) (holding that an employer violated Title VII when it encouraged a woman to behave according to a gender stereotype and, motivated by such stereotyping, penalized her by denying her a promotion).  Recently, the Second Circuit directly considered the question, "What constitutes a 'gender-based

10

stereotype'?"  Back v. Hastings-on-Hudson Union Free School District, 365 F.3d 107,

119-20 (2d Cir. 2004).  The Court of Appeals concluded that, "this question must be

answered in the particular context in which it arises, and without undue formulation."  Id.

at 120.

Evidence that an employer's reason is false, combined with the evidence

presented to establish a prima facie case, in some cases can be sufficient to sustain a

plaintiff's burden, and a plaintiff need not have further evidence of discrimination.  Id.;

see also Zimmerman v. Assoc. First Capital Corp., 251 F.3d 376, 381-82 (2d Cir. 2001).

Ultimately, a finder of fact may consider the strength of the prima facie case, the

probative value of the proof that the defendant's reason is pretextual, and any other

evidence presented in the case when determining if the plaintiff has sustained her

burden.  Zimmerman, 251 F.3d at 381-82.

However, even courts mindful of the fact that "summary judgment is ordinarily

inappropriate where an individual's intent and state of mind are implicated" have

nonetheless granted summary judgment at the pretext stage where the plaintiff has

"provided no indication that any evidence exists that would permit the trier of fact to

draw a reasonable inference of pretext."  See Meiri v. Dacon, 759 F.2d 989, 997 (2d

Cir. 1985);  see also Dister, 859 F.2d 1108; Norton v. Sam's Club, 145 F.3d 114, 119

(2d Cir. 1998)(reversing jury verdict in ADEA case because "Norton's very weak prima

facie case, combined with an at best highly dubious showing of pretext, that in itself

does not implicate discrimination, is simply not enough to support the jury's conclusion

that he was fired because of his age.").  According to the Second Circuit Court of
Appeals in Meiri, "[t]o allow a party to defeat a motion for summary judgment by offering
purely conclusory allegations of discrimination, absent any concrete particulars, would
necessitate a trial in all Title VII cases."  See 759 F.2d at 98.

In order for her claims to survive Sempra's motion for summary judgment, Kahn
must show that there is an issue of material fact about whether Sempra discriminated
against her on the basis of her sex or, under state law, on the basis of her sexual
orientation. See St. Mary's Honor Center, 509 U.S. at 511; Fisher v. Vassar College,
114 F.3d 1332, 1336 (2d Cir. 1997) (en banc).  "At summary judgment in an
employment discrimination case, a court should examine the record as a whole, just as
a jury would, to determine whether a jury could reasonably find an invidious
discriminatory purpose on the part of an employer."  Byrnie v. Town of Cromwell, Board
of Education, 243 F.3d 93, 102 (2d Cir. 2001).  "Findings of discrimination,
discriminatory intent, and causation are findings of fact."  Cornwell v. Robinson, 23 F.3d
694, 706 (2d Cir. 1994).  Reviewing the record as whole, as a jury would, see
Bickerstaff v. Vassar College, 196 F.3d 435, 448 (2d Cir. 1999), the court concludes
that Wood has established a prima facie case; Sempra has supplied legitimate, non-
discriminatory reasons for its actions; and Wood has produced sufficient evidence
suggesting that these reasons are pretextual to create a question of material fact.

### a.     Wood Establishes a Prima Facie Case of Sex Discrimination

Wood has succeeded in establishing a prima facie case of sex discrimination.

"The burden of establishing a <u>prima</u> <u>facie</u> case of disparate treatment is not onerous." <u>Burdine</u>, 450 U.S. at 253.  First, as a woman, Wood is a member of a protected class. Second, Wood's profitability to Sempra and her professional qualifications establish that she was qualified for the position.  Third, she suffered an adverse employment action when Sempra terminated her.  Fourth, this refusal to promote Wood occurred under circumstances giving rise to an inference of discrimination: she was fired one month after a man who made comments stereotyping women became her supervisor and Wood has created a material issue of fact regarding whether she was effectively replaced by a man.

### b.    Sempra Provides Legitimate Non-Discriminatory Reasons for Its Actions

"Once a prima facie case has been established, the burden of production shifts to the employer who must defeat a rebuttable presumption of discrimination by articulating a legitimate, non-discriminatory reason for the employment decision." <u>Byrnie</u>, 243 F.3d at 102.  Sempra asserts such "legitimate, non-discriminatory reason[s]." <u>Id</u>.  According to Sempra, Wood was not qualified to fulfill the new objectives for the department established by her supervisor, Roy, and, further, Sempra lost a client due to Wood's incompetence.

### c.    Wood Creates a Material Question of Fact Regarding Pretext

In order for her claims to survive Sempra's motion for summary judgment, Wood must provide evidence, whether direct or indirect, that Sempra's legitimate, non-discriminatory reasons are simply pretext and that  an improper gender bias served as

a motivating factor behind her termination.  With respect to her gender discrimination claim, Wood provides such evidence in her affidavit.  Roy's alleged comments regarding the appropriate role of women provides evidence of gender animus and supports an inference that Roy's purported reasons for termination Wood's employment are simply pretext.  Wood claims that she received performance bonuses for 2000 and 2001 and good reviews of her work.  Furthermore, Wood claims that the transaction that allegedly resulted in the loss of a client was reviewed by and approved by other employees who were not terminated, as she was.

A jury is free to credit or discredit testimony by Sempra's employees regarding their motives for terminating Wood's employment.  Similarly, a jury may credit or discredit evidence offered by Wood to support an inference that her termination was based on improper gender discrimination, specifically her supervisor's stated opinions on the proper place of women.  Wood has provided sufficient evidence such that "[v]iewing the evidence in the light most favorable to [the plaintiff], a jury could find that the [legitimate non-discriminatory reasons] were minor, and unimportant to the defendant[] before the development of the purported discriminatory motive."  Id.

### 2.  Hostile Work Environment

"Whereas other disparate treatment claims may scrutinize discrete harms such as hiring or discharge, a hostile work environment claim analyses a workplace environment as a whole to discover whether it is 'abusive.'" Raniola v. Bratton, 243 F.3d 610, 617 (2d Cir. 2001) quoting Harris v. Forklift, 510 U.S. 17, 22 (1993).

14

> The Supreme Court has set forth a non-exclusive list of factors to consider when evaluating a workplace environment, consisting of "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it reasonably interferes with an employee's work performance."

Raniola, 243 F.3d at 620 quoting Harris 510 U.S. at 23.  Notably, "no single factor is required."  Harris, 510 at 23.  In this case, the alleged discriminatory conduct was neither frequent nor severe.  Roy's alleged comments were largely "mere offensive utterance[s]."  Id.  Furthermore, Wood has come forward with no evidence that she complained about Roy's behavior to his superiors.  At her deposition she testified that outside of the Howley incident, she did not complain about any harassment or discrimination on the basis of her gender or sexual orientation.  Wood Depo. [Dkt. No. 45-2, Ex. A] at 104.  While the Howley incident involved a physical altercation, it was isolated and Wood comes forth with no evidence to suggest that it interfered with her work performance.

## B.    Retaliatory Discharge

The plaintiff claims that she was discharged in retaliation for filing a complaint with respect to the Howley Incident in violation of both state and federal law. As both parties agree, in order for the plaintiff to make a case for retaliatory discharge, she must show "(1) that she was engaged in protected activity by opposing a practice made unlawful by Title VII; (2) that the employer was aware of that activity; (3) that she suffered adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action."  Galdieri-Ambrosini v. Nat'

Realty and Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998).

Even if an employee is not the victim of prohibited discrimination, Title VII protects her against retaliation for protesting against such discrimination. Id. at 285 (citing Manoharan v. Columbia University College of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir.1988)). Wood claims to have included in her complaint regarding the Howley Incident her contention that Howley's behavior was motivated by her gender. Whether his behavior was in fact motivated by her gender or sexual orientation is immaterial. The complaint in and of itself is sufficient. Because the complaint was made to the company's General Counsel and the individual acknowledged by the company to have been responsible for terminating Wood, Sarathi Roy, was interviewed in the course of the investigation into the complaint, Wood has succeeded in creating a genuine issue of material fact with respect to the third prong. Wood's termination constitutes an adverse employment action.

Wood faces difficulty in establishing a causal connection between the complaint and her termination, nine months later. "Proof of causal connection can be established indirectly by showing that the protected activity was followed closely by discriminatory treatment." DeCintio v. Westchester County Medical Center, 821 F.2d 111, 115 (2d Cir. 1987) (citing Davis v. State University of New York, 802 F.2d 638, 642 (2d Cir.1986)). The Second Circuit has concluded that two years is too long a time to support an inference of a causal connection. Richardson v. New York State Dept. of Correctional Service, 180 F.3d 426, 447 (2d Cir. 1999). Wood attempts to support an inference of

such a connection by asserting that Roy, who is friendly with Howley, could not terminate her until he was made her supervisor, only a month prior to her termination. The one month is sufficient to support an inference of causal connection. See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998) (finding that causal connection could be inferred where termination occurred less than two months after complaint was made). With this evidence, Wood succeeds in creating a genuine issue of material fact. While the court questions whether the plaintiff can prevail on this theory, it cannot conclude, as it must for the purposes of a motion for summary judgement, that Wood could not prevail with this evidence before a finder of fact.

**C.     Sempra's Investigation of the Howley Incident**

Count Six of Wood's complaint alleges breach of contract on the premise that Sempra failed to properly investigate the Howley incident pursuant to its own policy as provided in The Employee Handbook of Sempra Energy Trading Corp. (" Employee Handbook"). Counts Thirteen and Fourteen allege negligent failure to investigate harassment claims as required by the Employee Handbook and Sempra's Professional Conduct Policy, respectively.

A personnel manual can create a contract. See Finley v. Aetna Life and Casualty Company, 202 Conn. 190 (1987). The Connecticut Supreme Court has held that "under appropriate circumstances, [representations in a personnel manual] may give rise to an express or implied contract between employer and employee." Id. at 198 (citing Magnan v. Anaconda Industries, Inc., 193 Conn. 558, 564 (1984)). Where

17

employers "includ[e] appropriate disclaimers of the intention to contract," however, "employers can protect themselves against employee contract claims based on statements made in personnel manuals."  Id. at 199, n. 5.; see also Gaudio v. Griffin Health Services Corp., 249 Conn. 523, 535 (1999).  In the instant case, it is undisputed that the Employee Handbook included express language disclaiming formation of a contract:  "This handbook is not intended to be an express or implied contract of employment for a specified period of time, a guarantee of employment, or a promise to provide benefits."  Employee Handbook (Dkt. No. 45-2, Ex. I) at 1.  Wood cannot support a claim of breach of contract relying on the Employee Handbook.

Furthermore, "Connecticut law does not permit recovery for an employer's negligent conduct of an investigation into charges of sexual harassment that is required by federal law."  Malik v. Carrier Corp., 202 F.3d 97, 100 (2d Cir. 2000).  "[C]orrective actions that a risk-averse employer might take to comply with federal law may not give rise to a negligence action, whether the rationale is couched in terms of breach, legal duty, or privilege."  Id. at 106.

### D.    Breach of Implied Contract and the Implied Covenant of Good Faith and Fair Dealing

Wood claims that Sempra violated an implied contract with respect to both her termination and Sempra's refusal to pay Wood a bonus for her work in 2002.  Wood is correct to argue that, "[w]hether the parties have entered into [an implied contract] is a question of fact."  Christensen v. Bic Corporation, 18 Conn.App. 451, 454 (1989) (citing Corriveau v. Jenkins Bros., 144 Conn. 383, 387 (1957).  Wood does not dispute,

18

however, that an express contract controlled her employment relationship with Sempra.
Furthermore, that contract provides that Wood "may also be eligible for a bonus, based
on [her] performance and that of Sempra Trading and its subsidiaries, in an amount to
be determined by Sempra Trading's management solely in their discretion."
Employment Contract [Dkt. No. 45-2, Ex. D] at 1.  Wood signed that contract on
September 6, 2000.  Id.

While Wood claims that she understood the contract to include by implication
promises made to her by Audrey Cullen and Sempra's President, David Messer, the
explicit terms of the contract are entirely inconsistent with the terms she claims to be
binding upon Sempra.  The written contract makes the amount of any bonus entirely
discretionary.  Such provision cannot be reconciled with an implicit term that a bonus
would be paid in a minimum amount of ten percent of booked profits.

Similarly, the employment contract includes a provision that "Sempra Trading
may terminate [Wood's] employment at will and whether or not for cause." Employment
Contract [Dkt. No. 45-2, Ex. D] at 1.  This provision contradicts Wood's allegation that
an implied contract existed for sustained employment so long as Wood remained
profitable.   The Connecticut Supreme Court has found that an implicit contract
requiring that termination be for cause only can exist even where an explicit letter
contract exists.  Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc., 234 Conn. 1
(1995).  In that case, however, the letter contract made no reference to the company's
ability to terminate the former employee.  Id. at 8-9.  Here, Wood also relies on Gaudio

19

v. Griffin Health Services, 249 Conn. 523 (1999). There, the Connecticut Supreme

Court found that an implicit contract existed because the parties had not entered into an

express contract. Id. at 532. The facts are entirely inapposite to those here. "[P]arties

who have entered into controlling express contracts are bound by such contracts to the

exclusion of inconsistent implied contract obligations." H.B. Toms Tree Surgery v.

Brant, 187 Conn. 343, 347 (1982). Therefore, Wood cannot sustain a claim under a

theory of implied contract.

Wood also asserts a claim for breach of the implied duty of good faith and fair

dealing. "It is axiomatic that the . . . duty of good faith and fair dealing is a covenant

implied into a contract or a contractual relationship." Magnan v. Anaconda Industries,

Inc., 193 Conn. 558, 566, 479 A.2d 781 (1984) (emphasis added). "In other words,

every contract carries an implied duty requiring that neither party do anything that will

injure the right of the other to receive the benefits of the agreement." De La Concha of

Hartford, Inc. v. Aetna Life Insurance Company, 269 Conn. 424, 433 (2004) (internal

citations and quotations omitted; emphasis added). Because Wood's claim that

Sempra breached the implied covenant of good faith and fair dealing is made

"[p]ursuant to the implied contracts that were created," Compl. [Dkt. No. 1, Ex. A] at ¶

117, there is no genuine question of fact with respect to that claim because there is no

implied contract.

### E.  Promissory Estoppel and Unjust Enrichment

While inconsistent pleading is permitted under the Federal Rules of Civil

20

Procedure, Wood cannot attempt to circumvent the terms of a contract that she indisputably entered by proposing a legal theory for which she cannot put forward any evidence.  As the plaintiff concedes in her Memorandum, both of these theories are inconsistent with the existence of a contract.  Neither party denies the existence and application of a contract.  Def.'s Local Rule 56(a)(1) Statement [Dkt. No. 42] at ¶ 3; accord Pl.'s Local Rule 56(a)(2) Response and Statement [Dkt. No. 50] at ¶ 3.  She cannot use the theories of promissory estoppel and unjust enrichment to add terms to that contract that are entirely inconsistent with those expressly stated in it.

Where a contract claim fails, a claim of promissory estoppel may lie.  The cases cited by Wood for this proposition do not involve scenarios where the contract claim fails because there is an express contract providing the opposite terms to those argued by the plaintiff.  In Suffield Dev. Assoc. v. Society of Savings, 243 Conn. 832 (1998), there was no written contract between the parties, and the court found that the plaintiff could not prove that a contract existed.  Having so concluded, the court allowed the plaintiff to proceed on a theory of promissory estoppel.  Id. at 846.  This finding does not allow the plaintiff here, facing an inability to win her case on the express contract that both Wood and Sempra agree exists and binds them, to argue that promissory estoppel can allow her a victory expressly prohibited by the terms of the contract.

"Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited [sic], (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs'

21

detriment." Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co., 231 Conn. 276, 282-83, 649 A.2d 518 (1994) (citations omitted; internal quotation omitted). The doctrine applies only where "'justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract.'" Id. at 282 (quoting 5 S. Williston, Contracts (Rev.Ed.) § 1479). As the court has concluded above, Wood cannot deny that she rendered services under a contract. She entered into an agreement that provided that she would be eligible for a bonus, at the discretion of Sempra's management. Sempra's management having determined, in its discretion and pursuant to the contract, not to pay Wood a bonus for the year 2002, Wood cannot claim that Sempra was unjustly enriched by her work during that year.

### F.    Unpaid Bonus

Finally, Wood argues that she is entitled to payment of a bonus for the year 2002 under the Connecticut state law. Conn. Gen. Stat. §31-71a, et seq. Connecticut law provides that employees denied wages are entitled to bring a civil action for recovery of such wages. Conn. Gen. Stat. §31-72. The term "wages" is defined in section 31-72(a) of the Connecticut General Statutes as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation."

"[A] bonus may constitute wages under section 31-71a(3)." Garry v. Bertucci's Restaurant Corp., 2001 WL 1795539, *4 (D.Conn. 2001). Whether a bonus constitutes wages for the purposes of the statute depends on the nature of the bonus. Where a

bonus is "promised in exchange for additional services or based on an employee's individual performance" it constitutes wages for the purposes of the statute and the employee may bring suit pursuant to section 31-72.  In the instant case, the Employment Contract provides that bonuses are "based on [the employee's] performance <u>and that of Sempra Trading and its subsidiaries</u>."  Employment Contract [Dkt. No. 45-2, Ex. D] at 1.  Like the bonus contested in <u>Garry</u>, Wood's "bonus did not depend on her efforts alone," but was determined according to the performance of the company and its subsidiaries.  <u>Garry</u>, 2001 WL 1795539, *5.

IV.    **CONCLUSION**

For the foregoing reasons, Sempra's motion for summary judgment [Dkt. No. 41] is DENIED as to Counts One, Two, and Three with respect to Wood's allegations of adverse employment action and GRANTED with respect to Wood's allegations of hostile work environment.  Sempra's motion for summary judgment [Dkt. No. 41] is DENIED as to Counts Four and Five and GRANTED as to Counts Six, Seven, Eight, Nine, Ten, Twelve, Thirteen, and Fourteen.

**SO ORDERED.**

Dated this 22nd day of February, 2005, at Bridgeport, Connecticut.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge