RESPONSE:

Audrey Cullen (Recruiter) – Audrey was my contact and Sempra representative during my hiring process. As a recruiter for Sempra (and a former Sempra employee) she advised that she was authorized to impart the compensation structure at Sempra. She further represented that Sempra's compensation included a salary plus a bonus of 10% of booked profits (less the cost of the desk), which was industry standard, and that Sempra is often more generous and paid bonuses up to 15%. Based on this compensation structure, I agreed to consider and ultimately accept employment at Sempra;

Beth Dwyer – Beth was my supervisor from Oct. 2000 – March 2001. In January of 2001, when she gave me my $10k bonus for 2000, she stated that normally it would be 10% of profit booked, but since my employment had only been for 3 months to date, such was just a nominal bonus;

Brian Cummings – When I set out my 2002 target (in November 2001) of $2 million, he represented that if I met that target I would be paid a bonus of $130k ($2,000,000 (profit) - $700,000 (my costs) = $1,300,000);

Personal experience – In 2001 I booked $400,000 profit for the company ($1,100,000 (profit) - $700,000 (my cost) = $400,000). I was paid a $50,000 bonus, which equates to 12.5%.

INTERROGATORY NO. 10:

With respect to your allegation in paragraph 14 of the Complaint that David Messer "promised [you] on numerous occasions that, as long as [you] made money for the company, [you] would always have a job with [Sempra]," state with specificity the date, time and place at which Mr. Messer made each such "promise[]" and identify each and every person who you believe heard Mr. Messer make such promises.

RESPONSE:

A day or two after the incident with Mr. Howley, I personally went into Mr. Messer's office and discussed the incident. I expressed my concern that the incident may have jeopardized my position in the company. At that point he said, "not to worry, all we care about is making money. So long as you make money for the company, you will always have a job here". We were alone in his office.

In the early spring of 2001 when Mr. Messer assigned me to handle the major airlines he encouraged me by saying, "make money, Susan. That's what we care about. As long as you do that, you will

11

always have a place here at Sempra." We were alone in his office.

About a month before I was let go, in Mr. Messer's office in the presence of Sarathi Roy, Max Strongin and Ian Miur he told the group that that as long as we made money for the company, we would all have a job. This was in response to our concern about the stability of the oil marketing group when it was clear that Brian Cummings was being removed as our manager.

INTERROGATORY NO. 11:

Please state whether you sought, interviewed for, researched, or otherwise considered any other employment opportunities during the time that you were employed by Sempra. If the answer to this question is "yes," identify each such employment opportunity.

RESPONSE:

No.

INTERROGATORY NO. 12:

Identify each of the "sixteen new revenue-generating clients" that you claim to have "brought in" during the course of your employment at Sempra, as alleged in paragraph 19 of the Complaint.

RESPONSE:

1. Air France
2. Carrizo Oil & Gas
3. Cross Oil Refining
4. Crosstex Energy Services
5. Enterprise Products
6. Great Lakes Chemical
7. Jet Blue Airways
8. OCI Chemical
9. Overnight Transportation

10. Pioneer Natural Resources
11. Prior Energy
12. RailAmerica
13. Rumpke
14. Spinnaker Exploration
15. Unimin
16. United Parcel Service
17. Virgin Atlantic Airways
18. World Fuel Services

INTERROGATORY NO. 13:

Identify each and every occasion during the course of your employment at Sempra on which you believe you were discriminated against, harassed, subjected to hostility, or otherwise treated differently because of your gender, sexual orientation, or because you lodged complaints with members of Sempra management. Include in your answer the date, time and location of each and every instance of alleged discrimination, harassment, hostility, or differential treatment.

RESPONSE:

- Joe Howley incident;

- Sarathi Roy constantly referring to me as the "lady" on the desk;

- The general environment of Sempra was very male dominated and hostile to women. Men used to comment often on the attractiveness of the back office ladies. There were often stories of who was "easy", especially before and after holiday parties. It was common knowledge that Cliff Papish had often had complaints against him for sexual harassment. The trading floor was like a "boys club";

- Being reprimanded by Steve Prince after the Joe Howley incident for conduct that was accepted of other Sempra employees;

- Being terminated by Sempra notwithstanding my positive job performance reviews;

- In August I attended a wedding party with my partner. Some employees from Sempra were at the party. One of the Vice Presidents of another group, Scott Lachelle, was there. This was the first

time he met my partner and found out I was gay, after which his treatment of me changed, making me feel less welcome and included;

- Brian Cumming informing me at the end of 2001 to watch out and be careful because some of the managers at Sempra were not comfortable with me.

INTERROGATORY NO. 14:

With respect to paragraphs 37 and 61 of your Complaint, describe with specificity each and every "sexual innuendo []," "inappropriate boast[]," and/or "strange and intrusive conversation[]" allegedly initiated or made by Sarathi Roy. Include in your answer the date, time and location of each and every alleged innuendo, boast and/or conversation.

OBJECTION:

Unduly burdensome. Subject to this objection and the general objections set forth about, Plaintiff responds as follows:

RESPONSE:

— Upon arriving on the Oil Marketing Desk, Sarathi repeatedly asked me about my relationship with Lynda. How we met, if we lived together, where we lived, what we did for fun, etc. His interest in my personal life was excessive and it made me uncomfortable;

- Repeatedly initiating inappropriate conversations on instant messenger. Specifically using the "falling hearts" environment and choosing the "big kiss" action while chatting with me;

- Repeatedly changing the environment back to "falling hearts" after I would change it to something different. Saying that he "liked that better";

- If I would disagree with him on an issue he would say how his wife would not do that to him because he is the "man of the house";

- Boasting how he was the boss of his house, just like it should be. How the man should always be in charge and that he expects his wife to cook and clean for him. Saying that's the way it should be because he married her and brought her over here and is giving her a good life. That she should be grateful to him for that;

14

- Along those same lines, asking me "who wore the pants in our family", referring to me and my lesbian partner;

- Boasting how he refused to let his wife visit him on the trading floor (he got her a job there soon after he moved her from India after they got married) because it would make him look bad to have a woman hanging around him like that;

- Upon returning from my trip to Southern France with my partner in Sept. 2001, he asked if we wore any clothes on the beach because he heard women did not wear tops in Southern France;

- Boasting about his sexual conquests and how he was once dating two women from the Sempra office at the same time. Following that up by saying that the women at Sempra were "easy";

- Boasting about spending time down at the Boxing Cat Grille and being the resident "stud". Telling tales of how he would go down there to pick up old and lonely women and take them home to please them for the night;

- Continuous boasting about "Miss Kim" his "special masseuse" who is "a lady who really knows how to treat a man". This masseuse works for a local massage parlor, which parlors were referred to at Sempra as rub-and-tugs. He would often say he was going for a massage with Miss Kim after work.

INTERROGATORY NO. 15:

Identify the "former work colleague" referenced in paragraph 51 of the Complaint and describe with specificity each and every statement allegedly made by the "former work colleague" concerning Sarathi Roy's alleged comfort-level with Plaintiff. Include in your answer the date, time and location at which the "former work colleague" made each and every alleged statement.

RESPONSE:

Billy Lasher in the IT Department

- Spring 2001 - When I told him I was gay he said he knew and was ok with it but to be careful because not many of the employees were comfortable with my lesbian status;

- Late Spring 2001 – I mentioned how I thought Cliff (in the back office) was very helpful when I ran clients through his office. Billy warned me that was because he thought I was cute and he didn't

15

know I was gay; but to be careful because if he found out I was gay, he would not be at all accepting about it;

- December 2001 – Cautioned me that it would not be good for me if Sarathi became my boss because he had heard him commenting on how sad it was I was gay and how he thought it was wrong.

### Christine Cantor – Head of West Power Trading

- Nov/Dec 2001 – We were talking about the Oil Marketing Group and what I thought would happen with it. Discussed how Sarathi would most likely be placed in charge of the group. She then asked what I was going to do in a way that implied I would not be part of the group going forward. I said I would remain in the group going forward and she cautioned me as to my expectations. It seemed odd to me at the time but didn't make sense until my employment was terminated.

INTERROGATORY NO. 16:

Identify the "lesbian partner" referenced in paragraph 58 of the Complaint.

RESPONSE:

**Lynda Clemmons.**

INTERROGATORY NO. 17:

With respect to paragraph 60 of your Complaint, describe with specificity: (i) each and every instance of "overt discrimination" that you claim you were subjected to by Sarathi Roy; and (ii) the factual basis for your assertion that Sarathi Roy "evidenced discomfort" with your homosexuality. Include in your answer the date, time and location of each and every alleged instance of "overt discrimination" and display of "discomfort."

RESPONSE:

See responses to Interrogatories #13 and #14.

16

## INTERROGATORY NO. 18:

With respect to paragraph 125 of your Complaint, identify each and every business expense listed on the $2,740.00 expense report that you claim to have "timely filed" with Sempra. Include in your answer the identity of the Sempra employee with whom you claim to have filed the expense report, the date on which the report was filed, the location where the report was filed, and the response, if any, that you received from Sempra regarding the expense report.

## RESPONSE:

**See documents provided in response to Defendant's First Set of Document Requests.**

Dated: October 2, 2003                    Respectfully submitted,

By: _____
Brendan J. O'Rourke (ct00522)
O'ROURKE & ASSOCIATES, LLC
27 Pine Street
New Canaan, CT 06840
Telephone: (203) 966-6664
Facsimile: (203) 966-5710
Email: Brendan@orourkeandassoc.com

(Counsel for Plaintiff)

## VERIFICATION

I, Susan E. Wood, hereby certify that I have reviewed the above Interrogatories and responses thereto and that they are true and accurate to the best of my knowledge and belief.

*Susan E. Wood*

Subscribed and sworn to before me this 2nd day of October, 2003.

Commissioner of the Superior Court

19

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Plaintiff's Responses to Defendant's First Set of Interrogatories was served this 2nd day of October, 2003, via hand delivery, upon the following counsel of record for Defendant:

Mary C. Dollarhide, Esq.
Peter M. Schultz, Esq.
PAUL, HASTINGS, JANOFSKY & WALKER LLP
1055 Washington Boulevard
Stamford, CT 06901-2217
Telephone: (203) 961-7400
Facsimile: (203) 359-3031
Email: marydollarhide@paulhastings.com

_____
Brendan J. O'Rourke

## Compensatory Damages Spreadsheet

| Age | Year | Sempra Est. Salary | Sempra Est. Bonus | Sempra Est. Other | Employment Salary | Employment Bonus | Employment Other | Compensatory Damages |
|---|---|---|---|---|---|---|---|---|
| 32 | 2002 | $125,000 | $130,000 | $6,720 | $43,262 | $0 | -$2,700 | $221,158 |
| 33 | 2003 | $135,000 | $230,000 | $6,720 | $38,641 | $0 | -$3,600 | $336,679 |
| 34 | 2004 | $145,000 | $330,000 | $6,720 | $90,000 | $7,500 | $3,600 | $380,620 |
| 35 | 2005 | $155,000 | $430,000 | $6,720 | $95,000 | $35,100 | $3,600 | $458,020 |
| 36 | 2006 | $165,000 | $430,000 | $6,720 | $100,000 | $50,710 | $3,600 | $447,410 |
| 37 | 2007 | $175,000 | $430,000 | $6,720 | $105,000 | $66,881 | $3,600 | $436,239 |
| 38 | 2008 | $185,000 | $430,000 | $6,720 | $110,000 | $83,669 | $3,600 | $424,451 |
| 39 | 2009 | $195,000 | $430,000 | $6,720 | $115,000 | $101,136 | $3,600 | $411,984 |
| 40 | 2010 | $205,000 | $430,000 | $6,720 | $120,000 | $119,350 | $3,600 | $398,770 |
| 41 | 2011 | $215,000 | $430,000 | $6,720 | $125,000 | $138,385 | $3,600 | $384,735 |
| 42 | 2012 | $225,000 | $430,000 | $6,720 | $130,000 | $158,323 | $3,600 | $369,797 |
| 43 | 2013 | $235,000 | $430,000 | $6,720 | $135,000 | $179,255 | $3,600 | $353,865 |
| 44 | 2014 | $245,000 | $430,000 | $6,720 | $140,000 | $201,281 | $3,600 | $336,839 |
| 45 | 2015 | $250,000 | $430,000 | $6,720 | $145,000 | $224,509 | $3,600 | $313,611 |
| 46 | 2016 | $250,000 | $430,000 | $6,720 | $150,000 | $249,060 | $3,600 | $284,060 |
| 47 | 2017 | $250,000 | $430,000 | $6,720 | $155,000 | $275,066 | $3,600 | $253,054 |
| 48 | 2018 | $250,000 | $430,000 | $6,720 | $160,000 | $302,672 | $3,600 | $220,448 |
| 49 | 2019 | $250,000 | $430,000 | $6,720 | $165,000 | $332,040 | $3,600 | $186,080 |
| 50 | 2020 | $250,000 | $430,000 | $6,720 | $170,000 | $363,344 | $3,600 | $149,776 |
| | | $3,905,000 | $7,570,000 | $127,680 | $2,291,903 | $2,888,280 | $54,900 | $6,367,597 |

| Assumes $10k salary increase/yr up to $250k | Assumes max revenue generation of $5,000,000<br><br>Bonus paid following year | Gym ($1,200/yr)<br>Health ins. ($200/month)<br>Dental ($100/month)<br>Lunch ($1,920/yr) | Assumes $5k salary increase/yr | Assumes $30k start bonus and $10k bonus increase/yr | Health ins. ($200/month)<br>Dental ($100/month) | |
|---|---|---|---|---|---|---|

Sempra 1/02 - 3/02 ($31,250)
Unemployment 2002 ($12,012)
Consulting 2003 ($16,141)
Employment start 10/03 ($22,500)

Assumes 0.17% ownership in company. Profits start at $3 million in 2004 and increase 10% per year

Susan Wood          Civil Action No.
                    3:03-CV-986 (JCH)
v.

Sempra Engergy
Trading Corporation

Plaintiff's Response to Interrogatory Number 5