23. Among those who witnessed the Howley Incident were Mitchell and Sarathi Roy ("Roy"). Roy, a colleague of Plaintiff's on the trading floor, ultimately became her supervisor and was involved in the decision to terminate Plaintiff.

24. Greatly distressed at being physically attacked and verbally assaulted by a Managing Director on the trading floor, Plaintiff immediately made a formal complaint about the Howley Incident to her immediate supervisor at the time, Cumming, and to Mitchell.

25. After Plaintiff reported the Howley Incident to Cumming and Mitchell, Plaintiff went to the office of the General Counsel of Defendant, Michael Goldstein ("Goldstein"), and lodged a complaint with him (the complaints to Cumming, Mitchell and Goldstein are collectively referred to as "Complaints").

26. In the meeting with Goldstein, Plaintiff made it clear to him that she felt that the Howley Incident needed to be investigated, as it was certainly discriminatory and otherwise unlawful behavior. Further, Plaintiff informed Goldstein that she regarded Howley's actions to be a clear violation of Defendant's Professional Conduct Policy and Prohibition Against Harassment.

27. Further, Plaintiff informed Goldstein that Howley's physical and verbal assault was directed against her as a woman, and therefore, it was imperative that a thorough investigation be conducted.

28. In support of her request that the Howley Incident be investigated, Plaintiff told Goldstein that she feared "being fired a year from now for no reason" based upon the Howley Incident and in retaliation for lodging the Complaints.

29. Despite assurances to the contrary from Cumming, Mitchell and Goldstein, Plaintiff remained uncomfortable based upon experiences she was having at work, as well as

05/15/2003 THU 11:30  [TX/RX NO 5248]  ☒006

though her discussions with Cumming, Mitchell and Goldstein, that Defendant would do nothing to follow up on her Complaints. Further, Plaintiff continued to fear she would be the victim of an adverse employment action sometime in the future.

30. Following the Howley Incident, Plaintiff was treated differently by Defendant. In one instance of such disparate treatment, the President of Defendant, Messer, reprimanded Plaintiff for the Howley Incident despite the fact that Howley was the aggressor, while Messer made no mention to Plaintiff of any discipline that Howley would suffer or any reprimand that he would be given.

31. As time went on, Plaintiff began to feel increasingly uncomfortable in her work environment. Although she attempted to "fit in", Plaintiff felt that, because of her status as a woman, coupled with the fact that she had made the Complaints, her work environment had become more hostile.

32. Concerned that the hostile work environment was an indication that she was going to become the subject of an adverse employment action, Plaintiff spoke to Mitchell about her significant discomfort in the workplace and her concern that she was being treated differently, in part, because she was a woman.

33. Despite Plaintiff's efforts to have the Howley Incident promptly investigated, Defendant continued to delay in properly responding to the Complaints. Ultimately, Plaintiff had to again approach Goldstein in order to prompt Defendant to pursue an investigation of the Howley Incident and to prepare a report on the matter.

34. Ultimately, Defendant conducted "in name" an investigation.

35. Following such investigation by Defendant, the disparate treatment of Plaintiff and Howley continued as follows: (i) Howley was never reprimanded, (ii) Plaintiff's new

supervisor, Roy, cultivated a close working relationship with Howley, (iii) Howley remained in his position as a Managing Director at Defendant, and (iv) Howley maintained an active and valuable role at Defendant.

36. In March of 2002, Roy, who had been Plaintiff's peer in the Oil Group at the time of the Howley Incident, was promoted to head up such group.

37. Prior to this promotion, Roy repeatedly made sexual innuendoes to Plaintiff and frequently made inappropriate boasts to Plaintiff of his conquests with women. Further, Roy would often attempt to engage Plaintiff in strange and intrusive conversations.

38. On March 8, 2002, as Plaintiff had feared from such disparate treatment and increasingly hostile work environment, Defendant initiated an adverse employment action by having Roy terminate Plaintiff from her position with the company.

39. More particularly, Defendant held a termination meeting in which Plaintiff, Roy, Mr. Cookingham (who had a position in corporate security), and Ms. Freida (from the human resources department) were present.

40. The termination of Plaintiff was tainted since Roy, who was both Plaintiff's and Howley's supervisor, had a close personal relationship with Howley. Further, Roy was fully aware of the Howley Incident since he had been on the trading floor at the time the Howley Incident had occurred.

41. Further evidence that the termination was tainted was demonstrated by the fact that the meeting was conducted in a different manner than other termination meetings, as it was customary for a representative of the legal department to be present at any termination, yet there was no such representative at Plaintiff's termination meeting.

42. Plaintiff inquired why Goldstein was not present, particularly since Plaintiff had made a complaint about the Howley Incident to Goldstein and, more importantly, because she had told him of her fears of a retaliatory termination, but no response to Plaintiff's question was ever given.

43. At the termination meeting, Roy stated that Plaintiff was terminated because there was no place for her on the team going forward.

44. Plaintiff asked a number of questions of Roy during the termination meeting, and his responses to these questions made it clear that Defendant's stated reason for Plaintiff's termination was simply a pretext, and that Defendant had no legitimate, non-discriminatory reason for its decision.

45. When Plaintiff inquired of Roy as to whether she had done anything inappropriate or wrong giving rise to the termination, Roy stated: "no."

46. Further, Roy confirmed that Plaintiff had made money in the first two months of 2002 prior to her termination, as Plaintiff had booked approximately $1,000,000.00 in profits for Defendant during such period.

47. Still further, at the termination meeting, Roy stated that Plaintiff got along well with her co-workers.

48. Within an hour of Plaintiff's departure from Defendant's premises, a notice was disseminated within the company that a man, Steve Soule, had replaced Plaintiff.

49. Immediately upon assuming Plaintiff's position, Steve Soule began contacting the client base that Plaintiff had built during the one and one half years she had worked for Defendant.

50. Consistent with Defendant's practice of treating Plaintiff and Howley differently,

7

Howley remained in the same position with Defendant after Plaintiff was terminated.

51. After her departure from Defendant, Plaintiff was informed by a former work colleague at Defendant that Roy had not been "comfortable" with Plaintiff.

52. Defendant's actions constituted unlawful and intentional discrimination against Plaintiff on the basis of gender in violation of Title VII.

53. Plaintiff has been damaged by Defendant's discrimination, and as such, Defendant is liable to Plaintiff for such damages, including attorney's fees and costs.

COUNT TWO - Sexual Discrimination (C.G.S. § 46a-60(a)(1))

54. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 51 of Count One as Paragraph 54 of this Count Two as if fully set forth herein.

55. Defendant's actions constituted unlawful and intentional discrimination against Plaintiff on the basis of gender in violation of Connecticut General Statutes § 46a-60(a)(1).

56. Plaintiff has been damaged by Defendant's discrimination, and as such, Defendant is liable to Plaintiff.

COUNT THREE - Sexual Orientation Discrimination (C.G.S. § 46a-81c)

57. Plaintiff repeats and realleges the allegations of Paragraphs 54 through 56 of Count Two as Paragraph 57 of this Count Three as if fully set forth herein.

58. Plaintiff is a member of a protected class, as she is a lesbian and lives with her lesbian partner.

59. Sometime after Plaintiff took employment with Defendant, it became known to Defendant and its employees that Plaintiff was a lesbian.

60. Roy, who eventually became Plaintiff's supervisor and was involved in the decision to terminate her employment, evidenced discomfort with Plaintiff's homosexuality and demonstrated overt discrimination towards Plaintiff based on her sexual orientation.

61. As evidence of this discrimination, Roy frequently attempted to engage Plaintiff in harassing sexual innuendo, and made inappropriate boasts to Plaintiff regarding his personal sexual experiences with women.

62. As further evidence of Defendant's discrimination toward homosexuals, during the time Plaintiff was employed by Defendant, there was only one other openly homosexual employee out of approximately 300 employees at the company.

63. Further, Plaintiff was well qualified for the position that she held at Defendant, as evidenced by her prior experience in commodities risk management, trading, business development, corporate management, and her managerial position at Enron where she handled the marketing of oil and natural gas.

64. Further, Plaintiff's job performance throughout her employment with Defendant was very good, which is evidenced by her bonus and raise after her efforts in 2001, the high volume of profits that she had booked in the first two months of 2002, and the fact that she brought in sixteen new revenue-generating clients during the year and a half that she worked for Defendant.

65. When Plaintiff lodged her complaint with Goldstein, Plaintiff told him that she felt that Howley's physical and verbal attacks were directed against her, in part, because she was a lesbian.