UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SUSAN E. WOOD,<br><br>                    Plaintiff,<br><br>          v.<br><br>SEMPRA ENERGY TRADING CORPORATION,<br><br>                    Defendant. | CIVIL ACTION NO.<br>3:03-CV-986 (JCH)<br><br><br><br>June 21, 2005 |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION IN LIMINE

**I.   INTRODUCTION**

Plaintiff, Susan E. Wood ("Plaintiff" or "Wood"), hereby submits its Memorandum of Law in Support of Motion in Limine, seeking the Court to enter certain orders against Defendant Sempra Energy Trading Corporation ("Defendant" or "Sempra") prior to trial to preclude certain evidence, and/or for the entry of an adverse inference against Defendant, as a matter of law.

**II.   BACKGROUND**

Plaintiff propounded her First Set of Interrogatories and Requests for Production, dated December 1, 2003 ("Plaintiff's Discovery Requests"). Plaintiff was unable to resolve all objections with respect to objections interposed by the Defendant, and filed a Motion for Adjudication of Objections, dated December 31, 2003 ("Motion to Compel").

Plaintiff sought an order from the Court to compel Sempra to provide certain discovery responses on her Motion to Compel, which responses were needed in order to commence a series of depositions scheduled to take place in early 2004. The Joint Status Report filed by the parties on October 31, 2003, reflected such discovery schedule in the anticipated August 2004 trial. Sempra had made a number of objections to Plaintiff's Discovery Requests which the parties could not resolve, and the Court held a teleconference on or about January 6, 2004 during which time counsel for the parties and the Court had colloquy regarding Plaintiff's Discovery Requests and Sempra's objections. During the colloquy, in response to Sempra's counsel's objection to the term "relate to" as used by Plaintiff in Plaintiff's Discovery Requests, the Court noted that such term was customary usage in discovery requests, and within Sempra's ability to discern. Ultimately, the Court entered its rulings on or about January 6, 2004, overruling a number of Sempra's objections, and compelling Sempra to respond to Plaintiff's Discovery Requests.

This Motion focuses on two discrete areas of discovery abuses by Sempra: first, the knowing refusal and failure by Sempra to search for and produce e-mails and certain other documents "relating to" Wood. Second, Sempra's delayed response to providing financial statements and materials which Plaintiff sought to demonstrate her productivity and profitability. Plaintiff sought such information to rebut Sempra's assertion that Plaintiff was terminated because she was unproductive and did not offer solid future prospects. The financial documents were also sought to support Plaintiff's claim and calculations as to her damages in the way of back pay and front pay.

Following the Court's order adjudicating Sempra's objections, Defendant served upon Plaintiff its First Set of Supplemental and Amended Responses to Plaintiff's Discovery Requests, dated January 23, 2004 ("Sempra's Discovery Responses"). Sempra's Discovery Responses, attached hereto as Exhibit A, set forth the following affirmative statements regarding certain of Plaintiff's Requests for Production of Documents:

- **Request No. 3.** Please produce any and all documents which relate to the termination of Plaintiff's employment.

  **Sempra Response.** "All responsive documents were previously produced."

- **Request No. 12.** Please produce any and all documents which reflect communications by (i) Jackie Mitchell ("Mitchell"), (ii) Steve Prince ("Prince"), (iii) Mr. Cookingham ("Cookingham"), and/or (iv) Ms. Freda ("Freda"), relating to Susan Wood.

  **Sempra Response.** "Please see responsive documents attached hereto as well as documents previously produced."

- **Request No. 24.** Produce any documents relied on by Roy to support the assertions he makes in the Roy Affidavit about Susan Wood.

  **Sempra Response.** "All responsive documents were previously produced."

As noted above, following receipt of Sempra's Discovery Responses, Plaintiff scheduled a number of time consuming and expensive depositions in support of her case. Those depositions included the following:

- Joseph Howley, Managing Director at Sempra, on March 5, 2004;

- Michael Goldstein, General Counsel of Sempra, on March 9, 2004;

- Steven Prince, Chairman of Sempra, on March 9, 2004;

- Vincent Cookingham, Security Officer at Sempra, on April 5, 2004;

- Denise Freda, Human Resources Officer at Sempra, April 5, 2004;

- Sarathi Roy, Managing Director at Sempra, on April 7, 2004;

- Jackie Mitchell, Managing Director at Sempra, on April 13, 3004;

- Brian Cumming, Managing Director at Sempra, on April 14, 2004; and

- David Messer, President of Sempra, on April 28, 2004.

Discovery essentially concluded after Mr. Messer's deposition. On May 14, 2004, soon after the conclusion of discovery, Sempra filed its Motion for Partial Summary Judgment[1]. The Court's ruling, dated March 8, 2005, denying Sempra's Motion for Partial Summary Judgment as to Plaintiff's discrimination counts (Counts I, II and III), and retaliation counts (Counts IV and V), left those claims for the trial scheduled to commence on July 25, 2005.

---

[1] The timing of the end of discovery and Sempra's filing of its Motion for Partial Summary Judgment caused Plaintiff's counsel to expend resources in defending the complex and voluminous Motion for Partial Summary Judgment rather than seeking a delay in the litigation to pursue a motion for relief as to the discovery abuses. Plaintiff, however, gave notice to the Court concerning the foregoing discovery abuses in Plaintiff's Motion for Leave to File Plaintiff's Supplemental Appendix, dated October 14, 2004, page 2, FN 1.

## III. ARGUMENT

"The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence." Wechsler v. Hunt Health Systems, Ltd., 2003 WL 22358807, *1 (S.D.N.Y. 2003) (citing Luce v. United States, 469 U.S. 38, 41 (1984); Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996)).

In Chambers v. TRM Copy Centers Corp., 43 F.3d 29 (2d Cir. 1994), the Second Circuit stated that

> Employers are rarely so cooperative as to include a notation in the personnel file that their actions are motivated by factors expressly forbidden by law. Because an employer is unlikely to leave a "smoking gun" attesting to a discriminatory intent, a victim of discrimination is seldom able to prove his claim by direct evidence, and is usually constrained to rely on circumstantial evidence.

Id. at 37. Therefore, the duty to preserve and produce documents rests on the parties, and once such duty is made clear by court order, such ordered party "is on notice of its obligations and acts at its own peril." Zubulake v. UBS Warburg, LLC, 2004 WL 1620866, *12 (S.D.N.Y. 2004). If a party fails to obey a discovery order, the court

> may make such orders in regard to the failure as are just, including but not limited to, [a]n order that … designated facts shall be taken as established for the purposes of the action in accordance with the claim of the party obtaining the order.

Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99, 106 (2d Cir. 2002) (quoting Fed. R. Civ. P. 37(b)(2)) (internal citations and quotations omitted). Further, "[e]ven in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs." Id. at 106-07 (citing DLC Management Corp. v. Town of Hyde Park, 163 F.3d 124, 135-36 (2d Cir. 1998)). The Second Circuit has further held that

> Where, … , the nature of the alleged breach of a discovery obligation is the non-production of evidence, a district court has broad discretion in fashioning an appropriate sanction, including the discretion to delay the start of the trial (at the expense of the party that breached the obligation), to declare a mistrial if the trial has already commenced, or to proceed with a trial and give an adverse inference instruction.

Id. at 107 (citing Reilly v. Natwest Markets Group, Inc., 181 F.3d 253, 267 (2d Cir. 1999)).

A party seeking an adverse inference instruction based upon evidence not being produced in time for use at trial must establish "(1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had "a culpable state of mind"; and (3) that the missing evidence is "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." Id.

As to the determination of a "culpable state of mind," the Second Circuit has held that such factor "is satisfied by a showing that the evidence was [not produced] knowingly, even without intent to breach a duty to [produce] it, or negligently." Id. at 108 (citing Byrnie v. Town of Cromwell, 243 F.3d 93, 109 (2d Cir. 2001)). Further, the Second Circuit has held that the "culpable state of mind" factor should be determined on a case-by-case basis as to a failure to produce evidence because "such failures occur along a continuum of fault – ranging from innocence through the degrees of negligence to intentionality." Id. (citing Reilly, 181 F.3d at 267) (internal quotations omitted).

As to the factor of the missing evidence being "relevant" to the party's claim or defense,

> [T]he party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the

-6-

> destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction [or unavailability].

Id. at 109 (citing Kronisch v. United States, 150 F.3d 112, 127 (2d Cir. 1998); Byrnie, 243 F.3d at 110)) (internal quotations omitted).  However,

> Courts must take care not to hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed or unavailable evidence, because doing so would subvert the purposes of the adverse inference, and would allow parties who have destroyed [or failed to produce] evidence to profit from that destruction [or failure].

Id. (citing Kronisch, 150 F.3d at 128; Byrnie, 243 F.3d at 110)) (internal quotations omitted). Further,

> where a party seeking an adverse inference adduces evidence that its opponent [rendered] potential evidence [unavailable] in bad faith or through gross negligence (satisfying the "culpable state of mind" factor), that same evidence of the opponent's state of mind will frequently also be sufficient to permit a [fact finder] to conclude that the missing evidence is favorable to the party (satisfying the "relevance" factor).

Id. However, the party seeking the instruction need not "rely on the same evidence to establish that the missing evidence is "relevant" as it uses to establish the opponent's "culpable state of mind." Id.; see e.g. Byrnie, 243 F.3d at 109-110 (the party seeking the adverse inference established relevance through deposition testimony regarding the nature of the missing documents, which the Second Circuit held were likely "relevant" for purposes of an adverse inference).

An adverse inference sanction upon a party that has failed to produce certain evidence serves the purpose of "(1) deterring parties from [failing to produce] evidence; (2) placing the risk of an erroneous evaluation of the content of the [withheld] evidence on the party responsible for its [not being produced]; and (3) restoring the party harmed

by the loss of evidence helpful to its case to where the party would have been in the absence of the [failure to produce]." Byrnie, 243 F.3d at 107.

In the context of a party that has failed to produce potentially relevant e-mails, the Second Circuit has held that an adverse inference is an appropriate sanction. See Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99 (2d Cir. 2002); see also Zubulake v. UBS Warburg, LLC, 2004 WL 1620866, *12 (S.D.N.Y. 2004) (stating "[t]he effect of losing potentially relevant e-mails is obvious, but the effect of late production cannot be underestimated either … [as] discovery conduct that might have been considered merely discourteous at an earlier point in the litigation may well breach a party's duties to its opponent and to the court."); Coleman (Parent) Holdings, Inc. v. Morgan Stanley & Co., Inc., 2005 WL 679071 (Fla. Cir. Ct. 2005) (the court shifted the burden of proof upon the breaching party as a sanction for its failure to preserve and produce e-mails in accordance with the trial court's prior discovery order).

Further, the Second Circuit has upheld a default judgment being entered as a sanction where a party failed to comply with discovery orders, including a failure to produce certain corporate records. See Paine, Webber, Jackson & Curtis, Inc. v. Inmobiliaria Melia de Puerto Rico, Inc., 543 F.2d 3 (2d Cir. 1976) (stating that "the corporate records sought here appear to be pertinent to the litigation and would normally be expected to be readily obtainable. The failure ever to produce them or by affidavit account for their nonproduction again compels the conclusion that the District Judge did not abuse her discretion in applying the sanctions described").

As to a party's failure to produce profit and loss statements, general ledgers, and/or standard accounting documents, it has been held that, "[h]aving properly

determined that [the party] failed to produce critical evidence that it was required to produce in discovery, it was appropriate to draw an adverse inference against [the party] regarding what those documents would show." Smoothline, Ltd. v. North American Foreign Trading Corp., 2003 WL 941442 (S.D.N.Y.) (citing Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99, 110 (2d Cir. 2002); Reilly v. Natwest Markets Group, Inc., 181 F.3d 253, 267-68 (2d Cir. 1999)).

In this case, pending before the Court at trial are Plaintiff's claims that she was unlawfully discriminated against when Sempra terminated her employment in 2002 based upon her gender and sexual orientation. In addition, Plaintiff has claimed that her termination was also unlawful based upon the fact that it was motivated by retaliation in connection with a harassment complaint that she had made at Sempra in June of 2001 with respect to the matter which has become known in this litigation as the "Howley Incident". Sempra has asserted as a defense that Plaintiff's termination was due to her incompetence, lack of professionalism, and failure to produce value for Sempra.

In that context, Plaintiff, by Plaintiff's Discovery Requests, sought information from Sempra pertaining to (i) her employment status and productivity (ii) the perceptions that various persons at Sempra had regarding her skills as an employee, and (iii) the perception of customers and clients of Sempra. Accordingly, Plaintiff sought, among other documents, e-mails that related to her termination of employment, and communications among fellow colleagues about her. Such matters are clearly within the bounds of the rulings issued by the Court in response to Sempra's objections, and are otherwise relevant in Plaintiff's assertion that any explanation given by Sempra as to her termination was pretextual.

In its response to Plaintiff's Discovery Requests, Sempra first denied that it used any "objective criteria" to evaluate job performance. <u>See</u> Sempra Discovery Responses, Interrogatory No.'s 7, 8. However, a number of Sempra employees at their depositions confirmed that Sempra produced financial reports which were used to measure the profitability of Sempra Departments and the Department's employees, including Wood. Ultimately, Sempra provided late and incomplete records in this area. As such, Plaintiff asserts that Sempra failed to honor its discovery obligations to Plaintiff's prejudice. Plaintiff provides the following examples which demonstrate Sempra's brazen disregard of its obligations:

- **Freda Deposition**

At Ms. Freda's deposition on April 5, 2004, the question had been posed to her whether she had made a search of her computer files with respect to documents which were responsive to Plaintiff's Discovery Requests. Ms. Freda stated that she only looked for e-mails between herself and Wood. She did not search her e-mail files for any communications "relating to Susan Wood". <u>See</u> Freda Deposition, excerpts of which are attached hereto as Exhibit B, pp. 60-67. Significantly, Ms. Freda is Vice President and Human Resources Manager at Sempra, and she participated in Wood's termination. Given her position at Sempra, it can be reasonably concluded that Ms. Freda was in possession of responsive documents. No explanation was given as to why Ms. Freda did not make a more thorough search of her files.

- **Prince Deposition**

At the deposition of Mr. Prince on March 9, 2004, Mr. Prince testified that certain "written reports" existed to assess the profitability of Wood (contradicting Sempra's

Interrogatory responses). See Prince Deposition, excerpts of which are attached hereto as Exhibit C, pp. 34-36. Significantly, the profitability reports which were referenced by Mr. Prince at his deposition were not produced by Sempra until after Roy's deposition, and the reports that were in fact produced were only partial reports, and do not specifically identify Wood. At Mr. Prince's deposition, a record was created to establish the fact that Plaintiff was demanding that the profitability reports be produced in furtherance of Plaintiff's Discovery Requests. Prince Deposition, pp. 57-65.

- **Cumming Deposition**

At Mr. Cumming's deposition on April 14, 2004, he was asked whether he had searched his records for documentation relating to Wood's claim against Sempra, and he responded that he had not. See Cumming Deposition, excerpts of which are attached hereto as Exhibit D, p. 4-5. Significantly, Mr. Cumming was Plaintiff's supervisor before Mr. Roy was made head of the Petroleum Derivatives Department, and was responsible for Plaintiff's performance reviews. In addition, Mr. Cumming testified that he had discussions regarding Wood with a number of people, including Wood. Accordingly, it can be reasonably concluded that he had possession of documents relating to Plaintiff, which have not been produced by Sempra.

- **Howley Deposition**

At the deposition of Joseph Howley on March 5, 2004, Mr. Howley made statements under oath that he made little effort to retrieve e-mails which may have related to Wood. Howley Deposition, excerpts of which are attached hereto as Exhibit E, pp. 8-15. Given the formal complaint filed against him by Wood, it can be reasonably concluded that he had responsive e-mails, which have not been produced by Sempra.

- **Mitchell Deposition**

Jackie Mitchell's deposition took place on April 13, 2004. At her deposition, Ms. Mitchell referenced "P&Ls" as "very detailed reports on what the business managers bring in and how profitable the business is." Mitchell Deposition, excerpts of which are attached hereto as Exhibit F, pp. 23-27. Ms. Mitchell confirmed that these reports, which she stated she compiled, could be used to determine the "profitability of each individual marketer." Mitchell Deposition, p. 27. Ms. Mitchell, Wood's supervisor before she transferred to the Petroleum Derivatives Department (at which time Brian Cumming became her supervisor), clearly established the fact that financial statements and other documents existed with respect to Wood's profitability. Such documents were essential for Plaintiff to review and examine at the deposition of Ms. Mitchell to build her case that she was an effective and profitable employee, and for her claim for lost income. See Mitchell Deposition, pp. 22-24.

- **Roy Deposition**

At Sarathi Roy's deposition on April 7, 2004, Mr. Roy disclosed that he maintains a notebook in which he records notes on a daily basis regarding business and work-related matters. Roy Deposition, excerpts of which are attached hereto as Exhibit G, p. 41. As an example of Mr. Roy's evasion, he stated that he used his notes in compiling his affidavit that was submitted to the Connecticut Commission on Human Rights and Opportunities ("CCHRO") in defense of the discrimination complaint filed by Wood. Roy Deposition pp. 90-94; see also Roy's CCHRO Affidavit, attached hereto as Exhibit H. Yet such notes were not produced by Sempra. Further, Mr. Roy testified that he looked through his e-mails to find documents that "related to" Wood, but that he did not

"recall" if he found any such documents. Roy Deposition, p. 101. When pressed as to whether he had any e-mails that "relate to Susan Wood", Mr. Roy answered "I don't know. I don't know." Roy Deposition, p. 102. He later reaffirmed a lack of knowledge of any e-mails that he had relating to Wood. Roy Deposition, pp. 103-104. Earlier in his deposition, however, Mr. Roy testified, in response to a question, that he had e-mails with Wood, and advised General Counsel Michael Goldstein of such fact. Roy Deposition, pp. 98-99.

In short, the dearth of any e-mails produced by Mr. Roy relating to Wood, and the failure to produce at least portions of Mr. Roy's notebook, in which he memorialized certain business matters on a daily basis and referenced to prepare his CCHRO Affidavit, provides ample basis to conclude that Sempra has avoided its discovery obligations.

At Mr. Roy's deposition, counsel for Plaintiff presented its letter of April 2, 2004 to counsel for Sempra for Mr. Roy's review. Such correspondence outlined the background of the discovery abuses and Plaintiff's demand for Sempra's compliance with Plaintiff's Discovery Requests. Such letter is attached hereto as Exhibit I. Sempra, other than delivering limited financial statements and several employment contracts on or about April 9, 2004 (after most the depositions were concluded), never responded to Plaintiff's request for compliance.

- **Sempra's Discovery Responses versus Proposed Exhibits**

Sempra produced a negligible amount of documents, and in particular e-mails relating to Wood, except for e-mails to or from Wood which Sempra has proposed to enter as exhibits at trial. In particular, Sempra, in the Joint Pretrial Memorandum, has

listed dozens of e-mails to or from Wood as proposed exhibits in support of its defense. Such e-mails of Wood were retrieved by Sempra in preparing its defense.

Given the following background: (i) Wood's relatively recent hiring at Sempra, (ii) her transfer from the Natural Gas Department to the Petroleum Derivatives Department, (iii) the Howley Incident and its investigation, and (iv) the fact that a number of communications took place between and among a number of Sempra employees concerning Wood and her ultimate firing, and when such background is considered in view of the record that Sempra employees failed to search or provide their records relating to such matters, it is clear that Sempra has purposefully flouted its discovery obligations in this matter, particularly in the face of the Court's order regarding responses to discovery.

Based upon the foregoing, the Court should conclude that Sempra's failure to seek to find relevant e-mails and other documents relating to Wood resulted in Wood's being deprived of documents which support her claims. The same is true concerning Mr. Roy's notebook from which Sempra produced no documents. Finally, the failure to timely deliver financial statements relating to Wood deprived Wood of evidence that would have supported her claim that she was an effective and profitable employee, and also deprived her of the ability to build her case for damages.

## IV.    CONCLUSION

In conclusion, Sempra, either by bad faith, willful disregard, and/or negligence, failed to properly respond to Plaintiff's Discovery Requests. Although Sempra did produce a certain number of limited profit and loss statements, and certain employment

contracts, such delivery of partial documents was done after a number of critical depositions. Further, no notes from Mr. Roy's notebook, or additional e-mails, were ever transmitted by Sempra after Plaintiff's counsel demanded compliance in his April 2, 2004 correspondence.

Based upon this background, Plaintiff seeks relief in the form of an order from the Court that (i) excludes certain evidence from being utilized by Defendant at trial, and/or (ii) enters an adverse inference against Defendant that the evidence that it failed to produce is harmful to Sempra, and supportive of Wood's claims. In particular, Plaintiff moves that the Court enter one or more of the following orders in connection with the trial in this matter:

1. (a) Defendant's proffered reasons for the termination of Wood were pretextual, or that (b) Defendant has the burden of proof to prove that its proffered reasons for terminating Plaintiff were not pretextual.

2. Plaintiff shall be deemed to have proven that she was an effective and profitable employee while employed at Sempra.

3. Plaintiff's claims for back pay and front pay shall be deemed proven based upon the average bonuses earned by Sempra employees at the Assistant Vice President and Vice President level for the years 1999 through 2002.

4. Defendant shall not be permitted to introduce evidence limiting Wood's claim for lost income damages through 2002 due to the closing of the Petroleum Derivatives Department.

5. Sempra shall not be permitted to produce evidence to prove that (i) Wood was not an effective, profitable employee with solid future prospects, and (ii) Wood was an unprofessional employee in her interactions with colleagues and customers.

PLAINTIFF,
SUSAN E. WOOD

By:_____
Brendan J. O'Rourke (ct00522)
Jeffrey M. McCormick  (ct21185)
O'ROURKE & ASSOCIATES LLC
27 Pine Street
New Canaan, CT  06840
Telephone: (203) 966-6664
Facsimile:  (203) 966-5710

## CERTIFICATION

This is to certify that a copy of the foregoing was mailed via first class mail, postage prepaid, to counsel of record as listed below this 21st day of June, 2005.

_____
Jeffrey M. McCormick

Raymond W. Bertrand, Esq.
Paul, Hastings, Janofsky & Walker LLP
1055 Washington Boulevard
Stamford, CT  06901

Mary C. Dollarhide, Esq.
Paul, Hastings, Janofsky & Walker LLP
3579 Valley Centre Drive
San Diego, CA  92130