# Exhibit 3

**Paul, Hastings, Janofsky ⌐ Walker LLP**
1055 Washington Boulevard, Stamford, CT 06901-2216
telephone 203-961-7400 / facsimile 203-359-3031 / internet www.paulhastings.com

# Paul *Hastings*

Atlanta
Beijing
Hong Kong
London
Los Angeles
New York        (203) 961-7495
Orange County
San Diego       peterschultz@paulhastings.com
San Francisco
Stamford        January 6, 2004                                      28309.00004
Tokyo
Washington, D.C.

## VIA FACSIMILE

The Honorable Janet C. Hall, U.S.D.J.
United States District Court
District of Connecticut
915 Lafayette Boulevard
Bridgeport, CT  06604

Re:   **Susan E. Wood v. Sempra Energy Trading Corp.**
      **Civil Action No. 3:03-CV-986 (JCH)**

Dear Judge Hall:

Defendant, Sempra Energy Trading Corporation ("Sempra"), submits the following opposition to
Plaintiff's Motion to Compel Discovery, filed on January 5, 2004.  For reasons discussed more
fully below, Plaintiff's motion to compel should be denied because the discovery requests at issue
are vastly overbroad and in no way reasonably calculated to lead to the discovery of admissible
evidence, particularly insofar as those requests seek information about Defendant's employees and
corporate officers who were not similarly situated to Plaintiff and who have no relevance to this
lawsuit.

I.      **Introduction**

        A.      **Sempra Energy Trading Corp.**

Sempra Energy Trading Corp. ("Sempra") is a wholesale energy trading company, engaged in the
marketing and trading of physical and financial energy products, including natural gas, power,
crude oil and associated commodities.

Susan Wood was employed by Sempra as an Assistant Vice President in September 2000 pursuant
to a written, at-will employment agreement.  From September 2000 through January 2001, Ms.
Wood worked as a trader in the West Coast Gas department under the supervision of Jackie
Mitchell, Managing Director.  In or about February 2001, Ms. Wood requested a transfer to the
Petroleum Derivatives department.  That department services customers who have risk
management needs related to the market pricing of petroleum-based products.  The department

**Paul**Hastings

The Honorable Janet C. Hall, U.S.D.J.
January 6, 2004
Page 2

structures transactions for these customers to remove the price-fluctuation risk from their hands and place it into Sempra's at market prices.

One of Ms. Wood's colleagues in the Petroleum Derivatives department was Sarathi Roy. In February 2002, Mr. Roy became Ms. Wood's direct supervisor when he was appointed to head up the department's marketing function. Shortly after his appointment, Mr. Roy decided to focus the department on growing the business by targeting a specific customer base. See Roy Affidavit, ¶¶ 5, 6 (attached as Exhibit A). That customer base is extremely sophisticated, requires excellent customer service, is keenly desirous of maintaining confidentiality with respect to its investment strategy, and does not have a high tolerance for mistakes. Id. In assessing who best could service this new target group, Mr. Roy was primarily concerned with organizing a team of individuals who had the greatest revenue generation potential, and who could establish long-term client relationships through their professionalism and discretion. Id. at ¶ 7. He considered established revenue history by individuals as well as knowledge of client dealings, experience in and depth of knowledge of the energy markets, behavioral issues and particular deals worked on. Id.

Using these guidelines, it was Mr. Roy's opinion that Ms. Wood was not well-suited to market herself to the customers he was hoping to service. Id. at ¶ 8. In particular, Mr. Roy had known Ms. Wood to make certain "off-color" comments that, although not personally offensive to him, he believed might well offend other Sempra employees or customers. For example, on one occasion, Ms. Wood sent Mr. Roy an electronic message in which she stated that she would "love to have" one of the female employees in their office. On another occasion, a day on which Mr. Roy was wearing a black fleece shirt, Ms. Wood stated that "black on black" looked good. Id. at ¶ 9.[1] Ms. Wood also made comments, post-September 11th, that led Mr. Roy to question her judgment in knowing where to draw the line between humor and offensiveness. For instance, when Ms. Wood heard a rumor in the office that a plane had been hijacked in India, she asked Mr. Roy whether he had anything to do with the hijacking. On another day, a news article about a bomb threat at the New York Mercantile Exchange prompted Ms. Wood to offhandedly ask Mr. Roy if he was "up to my old tricks" again. Id. at ¶ 10. None of the above incidents offended Mr. Roy personally, and he did not speak to Ms. Wood about them. Nevertheless, these and other issues related to Ms. Wood's conduct left him with a nagging uncertainty as to how Ms. Wood would behave with respect to clients, and how such indiscretion might affect his department's ability to secure the customers he was hoping to focus on. Id. at ¶ 11.

With respect to Ms. Wood's business generation, the one or two solid clients that she did bring to Sempra were overshadowed by what Mr. Roy considered to be her ineffectual "big picture" marketing strategy. In particular, Ms. Wood repeatedly sought to bring in smaller customers that

---

[1] Mr. Roy was born in Eastern India and has a dark complexion. Id.

**Paul**Hastings

The Honorable Janet C. Hall, U.S.D.J.
January 6, 2004
Page 3

Sempra's credit department deemed to be credit risks, either because the customers had no credit or would quickly eat up whatever little credit they had. From Mr. Roy's perspective, the bottom line was that Sempra likely would not see any significant profit from these proposed customers. Id. at ¶ 12. Mr. Roy's assessment of Ms. Wood's ability to generate business was also influenced by the fact that, in or about February 2002, he became aware that she had been involved in a deal with a very substantial client in which she had made an error that resulted in Sempra losing the client's business. Id. at ¶ 13. Mr. Roy learned from another Sempra employee involved in the deal that Ms. Wood had, through miscalculation, quoted the client information which resulted in the client paying more on the deal than it should have paid. Ms. Wood told Mr. Roy herself that, once it discovered the error, the client was upset. Indeed, it was Mr. Roy's understanding that the client had written Sempra off as a provider as a result of this transaction. Id. at ¶ 14.

In light of the foregoing background, in March 2002, Mr. Roy decided that Ms. Wood was not someone who was likely to contribute significantly to expanding the client base in the area in which he wanted to concentrate. To the contrary, he believed that keeping Ms. Wood on the team would always present the risk that, somewhere down the line, she might do or say something that would cause Sempra to lose business. This misgiving was compounded by Mr. Roy's lack of confidence in Ms. Wood's ability to target worthwhile clients. As a result, he made the decision to move Ms. Wood out of the Petroleum Derivatives department. He attempted to find a position for her in another department, without success. Consequently, he decided to terminate her employment. Id. at ¶ 15.

This lawsuit followed. In her fourteen-count complaint, Ms. Wood claims that Sempra: (1) subjected her to a hostile working environment and discriminated against her by terminating her employment because she is a woman and because she is a homosexual (Counts One, Two and Three); (2) retaliated against her for complaining about a June 2001 verbal altercation with a male employee, Joe Howley, by terminating her employment approximately nine months after the altercation took place (Counts Four and Five); (3) breached the terms of the Company's Employee Handbook and Professional Conduct Policy by failing to promptly investigate the altercation with Mr. Howley (Counts Six, Thirteen and Fourteen); (4) breached a contractual and statutory obligation to pay her a bonus based on the profits she allegedly generated for the Company (Counts Seven through Ten; Count Twelve); and (5) breached an implied contractual obligation to compensate Ms. Wood for her unreimbursed business expenses (Count Eleven).

## II.    Discussion

A motion to compel discovery must be denied unless the subject discovery is proper under Fed. R. Civ. P. 26. Rule 26(b)(1) requires disclosure of matters which "[are] relevant to the subject matter involved in the pending action . . . ." In this case, Defendant's overarching concern with Plaintiff's discovery requests is that they are notably overbroad insofar as they request information

**Paul**Hastings

The Honorable Janet C. Hall, U.S.D.J.
January 6, 2004
Page 4

about Defendant's employees and corporate officers who have no relevance to this lawsuit. These requests, which are set forth at length in Plaintiff's moving papers, can be broken down into several discrete categories. For ease of reference, Sempra's opposition to the specific arguments made in Plaintiff's moving papers shall address each of the seven "categories" of Plaintiff's Interrogatories and Document Requests to which Plaintiff claims Defendant's responses are inadequate.

A.    **Personnel Information and Documents Regarding Sempra's Vice Presidents and Assistant Vice Presidents**

**(Interrogatory Nos. 3, 6, 8)**
**(Production Request Nos. 4, 22)**

Plaintiff has made sweeping requests for the production of personnel records and information regarding Sempra's Vice Presidents and Assistant Vice Presidents, including their annual base salary, annual bonus, fringe benefits, and performance evaluations. This information has absolutely no relevance to Plaintiff's claims in this case, nor are these requests reasonably calculated to lead to the discovery of admissible evidence. As an initial matter, Plaintiff makes no claim in this litigation with respect to the payment (or non-payment) of base salary or fringe benefits, nor does she allege that her performance evaluations were negatively affected by the fact that she is a woman and/or a homosexual. Although Plaintiff does claim that she was contractually entitled to receive an annual bonus payment (Counts Seven through Ten), the only issues relevant to this claim are whether promises were made to Plaintiff regarding bonus payments and, if so, whether those promises are legally enforceable. The fact that bonus payments may or may not have been paid to employees other than Plaintiff, and the amount of such bonus payments, is irrelevant to the question of whether an enforceable agreement to make such payments existed as between Sempra and Plaintiff. Nor is this information relevant to Plaintiff's damages on her discrimination claims, since Plaintiff does not allege that she was paid less than similarly-situated co-workers. Instead, she alleges that she was terminated based on her gender and/or sexual orientation, precluding her from receiving bonus payments in an amount equal to ten to fifteen percent of the profits that *she* generated for the Company. Consequently, these interrogatories and document requests are patently improper.

**Paul**Hastings

The Honorable Janet C. Hall, U.S.D.J.
January 6, 2004
Page 5

B.    **Documents, Including E-Mail Messages, Reflecting Communications Between Sempra Employees**

**(Production Request Nos. 10, 11, 12, 17, 18, 19, 20)**

In the course of seven document requests, Plaintiff makes a general demand for the production of "all documents" reflecting communications among a host of Sempra employees, many of whom have only a tangential relation to Plaintiff's claims. These requests are made without any meaningful limitations, whether by time or subject matter.

For example, in Document Request No. 12, Plaintiff demands the production of "any and all documents which reflect communications by (i) Jackie Mitchell ("Mitchell"), (ii) Steve Prince ("Prince"), (iii) [Vincent] Cookingham ("Cookingham"), and/or (iv) [Denise] Freda ("Freda"), relating to Susan Wood." Notably, in her responses to Sempra's First Set of Interrogatories, Plaintiff does not identify Mr. Prince (Sempra's Chairman and Chief Executive Officer), Mr. Cookingham *or* Ms. Freda as persons who have knowledge of any fact upon which Plaintiff bases her claims in this action. See Pl.'s Response to Interrogatory No. 8 (attached hereto as Exhibit B). Indeed, notwithstanding its 145 paragraphs, Mr. Prince's name does not appear *anywhere* in the Complaint. Similarly, the only reference to Mr. Cookingham and Ms. Freda in the Complaint occurs in paragraph 39, in which Plaintiff alleges that both Mr. Cookingham (a representative of Sempra's corporate security department) and Ms. Freda (a human resources representative) were present at a March 8, 2002 meeting during which Plaintiff was advised by Sarathi Roy that her employment was being terminated. Sempra submits that the mere fact that Mr. Cookingham and Ms. Freda were present during this single meeting does not provide a basis for Plaintiff to request the production of "all documents," including e-mail messages, reflecting communications by Mr. Cookingham or Ms. Freda regarding Plaintiff for an unbounded period of time and without regard to the specific subject matter of the communication. With respect to Ms. Mitchell, Plaintiff alleges that she "witnessed" the June 2001 altercation between Plaintiff and Joe Howley and "counseled [Plaintiff] after the incident." See Exhibit B; Complaint, ¶¶ 23, 24. Again, Sempra submits that this discrete allegation does not provide a legitimate basis for the sweeping demand in Document Request No. 12.

Because Document Request Nos. 10, 11, 17, 18, 19 and 20 are similarly overbroad, Sempra has asserted appropriate objections and has agreed to produce documents for a reasonable time frame that are tailored to the allegations in the Complaint.

Paul*Hastings*

The Honorable Janet C. Hall, U.S.D.J.
January 6, 2004
Page 6

**C.    Documents Relating To The Job Performance Of Joe Howley And Sarathi Roy**

**(Production Request Nos. 15, 16)**

Plaintiff's request for "all documents" that relate to Mr. Howley's and Mr. Roy's job performance, including performance reviews, reprimands, sanctions and/or future job prospects at Sempra is well beyond the bounds of permissible discovery.

Plaintiff alleges that Mr. Howley's behavior during the June 2001 altercation was motivated by Mr. Howley's alleged animus toward Plaintiff based on her gender or sexual orientation.  Plaintiff further alleges that, approximately nine months after the Howley incident, she was terminated by Sarathi Roy, who allegedly was friendly with Mr. Howley and shared his alleged gender-based and/or sexual orientation-based animus toward Plaintiff.  Given these allegations, evidence tending to show that Mr. Howley or Mr. Roy harbored such alleged hostility toward Plaintiff would admittedly be pertinent to Plaintiff's claims.  Defendant is therefore prepared to produce information and documents, if any, reflecting previous complaints of sex or sexual orientation discrimination or harassment asserted against Mr. Roy or Mr. Howley by other Sempra employees. However, Plaintiff's blanket request for "all documents" relating to Mr. Howley's and Mr. Roy's "job performance" goes well beyond this narrow area of legitimate inquiry.

**D.    Documents Relating To Employees Investigated Or Disciplined For Violation Of Sempra's Employment Policies**

**(Production Request No. 21)**

There is no legitimate basis for this Request.  Plaintiff alleges that Sempra breached the terms of its Employee Handbook and its Anti-Harassment Policy by negligently failing to promptly and thoroughly investigate the June 2001 altercation between Plaintiff and Joe Howley.  See Complaint (Counts Six, Thirteen, Fourteen).  The only issues relevant to these claims are whether Sempra contractually bound itself to investigate allegations of discrimination (Count Six) and, if so, whether the Company negligently failed to conduct such an investigation in connection with the June 2001 altercation between Plaintiff and Mr. Howley.  Documents relating to employees *other than Mr. Howley* who may or may not have been investigated or disciplined for violating Sempra's "employment policies" has no bearing on the question of whether Sempra properly investigated Plaintiff's allegations regarding the Howley incident and meted out appropriate discipline as a result of that investigation.

**Paul**Hastings

The Honorable Janet C. Hall, U.S.D.J.
January 6, 2004
Page 7

E.    **Information Regarding All Sempra Employees Terminated From 1999 Through The Present**

   **(Interrogatory No. 4)**

Plaintiff claims that she was terminated in March 2002 because of her gender or sexual orientation. In order to prove her discrimination claim, Plaintiff must show that her gender or her sexual orientation was a motivating factor for her discharge. The fact that Plaintiff alleges that she was terminated because of gender discrimination[2] does not entitle her to sweeping discovery regarding the universe of all employees who were terminated by Sempra under all circumstances since 1999. There is no legal or factual authority that would support discovery related to employees who are not similarly situated to Plaintiff, and Plaintiff's discovery request makes no attempt to appropriately limit discovery to such similarly-situated employees. Plaintiff's request for this information is therefore improper.

F.    **Request To Create A Post-Hoc Appraisal of Plaintiff's Job Performance**

   **(Interrogatory No. 7)**

Plaintiff's request that Sempra create an appraisal of Plaintiff job performance during the entire period of her employment at Sempra, including specific references to clients, transactions and revenue generated, is vague, irrelevant, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

As previously discussed, Plaintiff claims that she was terminated because of her gender and sexual orientation. Sempra denies this allegation and has articulated legitimate, non-discriminatory reasons supporting Sarathi Roy's decision to terminate Plaintiff's employment. Plaintiff, of course, is entitled to request discovery of factual information tending to show that Mr. Roy's articulated reasons for her termination are false. However, Plaintiff's request that Sempra create a post-hoc performance appraisal goes well beyond the bounds of permissible fact discovery.

---

[2] Sempra has already advised Plaintiff's counsel that the Company does not maintain information regarding the sexual orientation of its employees.

**Paul**Hastings

The Honorable Janet C. Hall, U.S.D.J.
January 6, 2004
Page 8

G.     **Requests In Response To Which Sempra Has Agreed To Produce Responsive Information And Documents, Subject To Its Asserted Objections**

**(Interrogatory Nos. 15, 17)**
**(Production Request Nos. 5, 26, 27)**

In response to each of the above-referenced discovery requests, Sempra has lodged objections based on vagueness, ambiguity, and overbreadth, among others. Subject to these objections, Sempra has agreed to produce responsive information and documents. Sempra submits that its objections to these discovery requests are entirely appropriate and should not be stricken.

## III.     Conclusion

For all the foregoing reasons, Sempra respectfully submits that Plaintiff's Motion to Compel Discovery should be denied in its entirety.

Respectfully submitted,

*Peter M. Schultz*

Peter M. Schultz
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

cc:     Brendan O'Rourke (via facsimile)

STM/265994.1