# Exhibit 4

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SUSAN E. WOOD,<br><br>      Plaintiff,<br><br>  - against -<br><br>SEMPRA ENERGY TRADING<br>CORPORATION,<br><br>      Defendant. | CIVIL ACTION NO.<br>3:03-CV-986 (JCH)<br><br><br><br>January 23, 2004 |

**DEFENDANT'S FIRST SET OF SUPPLEMENTAL AND AMENDED RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS**

     Pursuant to the January 6, 2004 Order of this Court, Defendant Sempra Energy

Trading Corporation ("Sempra" or "Defendant") hereby supplements and amends its previously-

served responses to Plaintiff's First Set of Interrogatories and Requests for Production of

Documents as follows:

**I.  RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 1**

    1.  State the name of each person who provided information relevant to any

response to these Interrogatories, along with their work addresses.

## RESPONSE TO INTERROGATORY NO. 1

Sarathi Roy, Brian Cumming, Jackie Mitchell, Denise Freda and Vincent Cookingham, each of whom may be contacted through counsel, provided relevant information in responding to these Interrogatories. The responses were prepared with the assistance of counsel.

## INTERROGATORY NO. 2

2.     State each reason for Sempra's termination of Susan Wood and each person who participated in the decision to terminate Susan Wood.

## RESPONSE TO INTERROGATORY NO. 2

In February 2002, Sarathi Roy was appointed to head up the marketing function of Sempra's Petroleum Derivatives department. Following his appointment, Mr. Roy decided to focus the Petroleum Derivatives department on growing the business by targeting a specific customer base in the market that is extremely sophisticated, requires excellent customer service, is keenly desirous of maintaining confidentiality with respect to its investment strategy, and does not have a high tolerance for mistakes. In assessing who best could service this new target group, Mr. Roy was primarily concerned with organizing a team of individuals who had the greatest revenue generation potential, and who could establish long-term client relationships through their professionalism and discretion. Mr. Roy considered established revenue history by individuals as well as knowledge of client dealings, experience in and depth of knowledge of the energy markets, behavioral issues and particular deals worked on.

Using these broad guidelines, it was Mr. Roy's opinion that Plaintiff was not well-suited to market herself to the customers he was hoping to service. Mr. Roy had known Plaintiff to make certain "off-color" comments that, although not personally offensive to him, he believed might well offend other Sempra employees or customers. For example, on one occasion, Plaintiff sent Mr. Roy an electronic message in which she stated that she would "love to have" one of the female employees in Sempra's office. On another occasion, a day on which Mr. Roy was wearing a black fleece shirt, Plaintiff stated that "black on black" looked good. (Mr. Roy was born in Eastern India and has a dark complexion.).

Plaintiff also made comments, post-September 11th, that led Mr. Roy to question her judgment in knowing where to draw the line between humor and offensiveness. For instance, Mr. Roy recalls a rumor that was spreading across the office one day that a plane had been hijacked in India. When Plaintiff heard the rumor, she asked Mr. Roy whether he had anything to do with the hijacking. On another day, a news article about a bomb threat at the New York Mercantile Exchange prompted Plaintiff to ask Mr. Roy if he was up to his "old tricks" again.

Although these incidents did not offend Mr. Roy personally, they left him with a nagging uncertainty as to whether Plaintiff would behave any differently with clients, and how such indiscretion might affect the ability of the Petroleum Derivatives department to secure the customers that Mr. Roy was hoping to focus on.

With respect to Plaintiff's business generation, Mr. Roy recalls that Plaintiff did bring at least one or two solid clients to Sempra. In Mr. Roy's estimation, however, those

-3-

positives were overshadowed by what he considered to be her ineffectual "big picture"
marketing strategy. In particular, Plaintiff repeatedly sought to bring in smaller customers that
Sempra's credit department deemed to be credit risks, either because the customers had no credit
or would quickly eat up whatever little credit they had. From Mr. Roy's perspective, the bottom
line was that Sempra likely would not see any significant profit from these proposed customers.

Mr. Roy's assessment of Plaintiff's ability to generate business was also
influenced by the fact that, in or about February 2002, he became aware that Plaintiff had been
involved in a deal with a very substantial client in which she had made an error which resulted in
Sempra losing the client's business. The deal involved the sale of jet fuel to a client with a large
fleet of planes used for commercial delivery. It was later explained to Mr. Roy by another
Sempra employee involved in the deal that Plaintiff had, through miscalculation, quoted the
client information which resulted in the client paying more on the deal than it should have paid.
Plaintiff told Mr. Roy that, once it discovered the error, the client was upset.

In March 2002, with the above incidents in mind, Mr. Roy decided that Plaintiff
was not someone who was likely to contribute significantly to expanding the client base in the
area in which Mr. Roy wanted to concentrate. To the contrary, he believed that keeping Plaintiff
on the team would always present the risk that, somewhere down the line, she might do or say
something that would cause Sempra to lose business. This misgiving was compounded by Mr.
Roy's lack of confidence in Plaintiff's ability to target worthwhile clients. Consequently, Mr.
Roy made the decision to move Plaintiff out of his department. Mr. Roy attempted to find a

position for Plaintiff in another department, without success. Consequently, Mr. Roy decided to terminate Plaintiff's employment.

## INTERROGATORY NO. 3

3.     State the names of each Assistant Vice President and Vice President in Sempra's Gas and Petroleum Derivatives Department from 1999 to the present, and provide for each person the amount of his/her annual bonus paid for the years 1999 through 2003.

## RESPONSE TO INTERROGATORY NO. 3

The names of the Assistant Vice Presidents and Vice Presidents in Sempra's Natural Gas and Petroleum Derivatives Departments from 1999 to the present are/were:

- <u>Petroleum Derivatives</u>: James Evans, Peter Crumbine, Julie Lerner, James Rohan, Jeff Rosenzweig, Sarathi Roy, Ian Muir, Thomas Murtha, Max Strongin, Alberto Vogel and Susan Wood.

- <u>Natural Gas</u>: Donna Arnold, Phillip Borrello, Mary Botty, Ann Burke, Jeff Bussan, Steven Casey, Jackie Crowley, Audrey Cullen, Dave D'Alessandro, Harrison DeStefano, Michael Driscoll, Beth Dwyer, David Egelson, James Evans, Hugh Gleason, Christian Harris, Jed Hershey, Stephen Hourihan, Tom Jacomini, Stefanie Katz, Andrew Knust, Scott LaShelle, Julie Lerner, Jason Lipman, Laura Luce, Shawn Mazza, Michael McCall, Perssy Mergeanian, Russell Murrell, Thomas O'Grady, David

Otte, Gregg Penman, Brian Rickers, Richard Ritholz, Kevin Ruscitti, Romano Savoochi, Keith Shoemaker, Michael Sieckhaus, Jeffrey Stone, Arnon Storfer, Max Strongin, Richard Tomaski, Scott Walton, Wesley Walton, Susan Wood, Peter Yu, Robin Zivic.

Bonuses for the years 1999 through 2003 were paid as follows:

Donna Arnold (1999 - $30,000.00); Phillip Borrello (1999 - $425,000.00); Mary Botty (none); Ann Burke (1999 - $5,000.00, 2000 - $20,000.00); Jeff Bussan (2000 - $3,100,000.00, 2001 - $1,140,000.00, 2002 – 3,974,288.00); Steven Casey (none); Jackie Crowley (2000 - $100,000.00, 2001 - $65,000.00); Peter Crumbine (none); Audrey Cullen (none); Dave D'Alessandro (1999 - $300,000.00, 2000 - $1,200,000.00, 2001 - 1,787,600.00, 2002 - $280,000.00); Harrison DeStefano (2000 - $115,000.00, 2001 - $2,000,000.00, 2002 - $586,250.00); Michael Driscoll (none); Beth Dwyer (1999 - $90,000.00, 2000 - $250,000.00, 2001 - $225,000.00, 2002 - $15,000.00); David Egelson (none); James Evans (1999 - $30,000.00, 2000 - $75,000.00, 2001 - $100,000.00); Hugh Gleason (2002 - $455,000.00); Christian Harris (2002 - $100,000.00); Jed Hershey (none); Stephen Hourihan (none); Tom Jacomini (1999 - $150,000.00, 2000 - $365,000.00, 2001 - $200,000.00, 2002 - $60,000.00); Stefanie Katz (1999 - $60,000.00, 2000 - $600,000.00, 2001 - $1,525,000.00, 2002 - $586,250.00); Andrew Knust (1999 - $40,000.00); Scott LaShelle (1999 - $285,000.00, 2000 - 435,000.00, 2001 - $300,000.00, 2002 - $425,000.00); Julie Lerner (none); Jason Lipman (2001 - $850,000.00, 2002 - $615,000.00); Laura Luce (none); Shawn Mazza (2002 - $340,000.00); Michael McCall (none); Perssy Mergeanian (1999 - $15,000.00, 2000 - $565,000.00, 2001 -

$1,900,000.00, 2002 - $325,000.00); Ian Muir (none); Russell Murrell (none); Thomas Murtha (none); Thomas O'Grady (none); David Otte (1999 - $25,000.00); Gregg Penman (none); Brian Rickers (1999 - $225,000.00, 2000 - $600,000.00, 2001 - $700,000,00); Richard Ritholz (none); James Rohan (1999 - $150,000.00, 2000 - $50,000.00); Jeff Rosenzweig (2001 - $150,000.00); Sarathi Roy (2000 - $250,000.00, 2001 - $400,000.00, 2002 - $550,000.00); Kevin Ruscitti (2002 - $200,000.00); Romano Savoochi (2000 - $35,000.00, 2001 - $15,000.00); Keith Shoemaker (1999 - $50,000.00); Michael Sieckhaus (1999 - $50,000.00, 2000 - $190,000.00, 2001 - $1,324,000.00, 2002 - $350,000.00); Jeffrey Stone (1999 - $70,000.00); Arnon Storfer (2000 - $250,000.00, 2001 - $150,000.00, 2002 - $368,000.00); Max Strongin (2000 - $40,000.00, 2001 - $300,000.00, 2002 - $20,000.00); Richard Tomaski (2002 - $30,000.00); Alberto Vogel (2000 - $50,000.00, 2001 - $200,000.00, 2002 - $15,000.00); Scott Walton (none); Wesley Walton (none); Susan Wood (2000 - $10,000.00; 2001 - $50,000.00); Peter Yu (1999 - $125,000.00, 2000 - $1,450,000.00); Robin Zivic (2002 - $20,000.00).

## INTERROGATORY NO. 4

4.      State the name of each person at Sempra from mid-1999 through the end of 2002 who has been terminated at Sempra, including (i) the reasons for the termination, and (ii) the sex and sexual orientation of each such person.

## RESPONSE TO INTERROGATORY NO. 4

Sempra does not maintain information regarding the sexual orientation of its employees.  With that caveat, Sempra states as follows:

- Linda Thompson, female, terminated 9/1/00; fixed term employment

- Brynne Kelly, female, terminated 9/5/00; improperly engaged in energy futures trading for her own account

- Jacquelyn Richards, female, terminated 5/15/01; misrepresented her past history/education

- Melissa Ellis, female, terminated 3/5/02, failed to report that she had accepted job with competitor company

- John Piecora, male, terminated 7/19/99, unsatisfactory performance

- Richard Ritholz, male, terminated 12/2/99, unsatisfactory performance

- Darnien Donovan, male, terminated 3/3/00, unsatisfactory performance and tardiness

- Andrew Knust, male, terminated 6/15/00, unsatisfactory performance

- David Otte, male, terminated 6/15/00, unsatisfactory performance

- Mark Harnaga, male, terminated 9/1/00, unsatisfactory performance

- Anthony D'Agostino, male, terminated 11/28/00, unsatisfactory performance

- Keith Malazdrewicz, male, terminated 12/13/00, unsatisfactory performance

- Desmond Nolan, male, terminated 4/10/01, unsatisfactory performance

- James Vasquez, male, terminated 6/5/01, unsatisfactory performance

- Jeffrey Stone, male, terminated 6/25/01, unsatisfactory performance

- Reza Eshaghi, male, terminated 10/1/01, unsatisfactory performance

- Paul Kurzer, male, terminated 10/5/01, unsatisfactory performance

- Peter Doering, male, terminated 11/6/01, unsatisfactory performance

- James Rohan, male, terminated 11/15/01, unsatisfactory performance

- Petrie Verma, male, terminated 11/20/01, breached company policy on reporting transactions

- Paul Henry, male, terminated 12/28/01, unsatisfactory performance

- Raghu Donepudi, male, terminated 1/14/02, unsatisfactory performance

- Angelo Zullo, male, terminated 2/21/02, unsatisfactory performance and tardiness

- Ryan Davis, male, terminated 4/18/02, breached company policy on reporting transactions

- Steven Tilly, male, terminated 5/10/02, unsatisfactory performance

- Michael Mayer, male, terminated 5/14/02, did not consent to probation conditions for continued employment

- Jennifer Dixon, female, terminated 8/1/02, resignation

- Mary Rose Malchow, female, terminated 12/10/02, department liquidated

- Peggy Rathmell, female, terminated 12/31/02, business closed

- Linda Verona, female, terminated 7/22/02, business did not warrant staffing

- Stacy Burke, male, terminated 6/28/02, mutually agreed-to separation

- Jason D'Alessandro, male, terminated 12/31/02, resigned

- Aaron Finch, male, terminated 12/4/02, unsatisfactory performance

- Robert Gola, male, terminated 6/25/02, unsatisfactory performance

- Darren King, male, terminated 12/9/02, unsatisfactory performance

- Eric Kuo, male, terminated 12/6/02, unsatisfactory performance

- Michael McCall, male, terminated 12/5/02, unsatisfactory performance

- Ian Muir, male, terminated 7/5/02, unsatisfactory performance

- Salvatore Penna, male, terminated 12/31/02, department liquidated

- Michael Prosser, male, terminated 12/5/02, unsatisfactory performance

- Kevin Schwartz, male, terminated 8/20/02, unsatisfactory performance

- Stephen Soule, male, terminated 12/5/02, department liquidated

- Alberto Vogel, male, terminated 12/6/02, department liquidated

- Christopher Welch, male, terminated 7/11/02, unsatisfactory performance

- Gregory Woulfe, male, terminated 10/4/02, unsatisfactory performance

**INTERROGATORY NO. 5**

5.    State what specific action Sempra has taken from 1999 through the present to counsel its workforce on ensuring an environment that is free from harassment due to sexual discrimination or sexual orientation discrimination, including the dates and names of the persons involved in such counseling.

## RESPONSE TO INTERROGATORY NO. 5

Sempra has implemented a comprehensive anti-harassment policy which explains the types of conduct that may be considered harassment. The policy provides a clear and effective process for lodging complaints about harassment and discrimination. As further evidence of its commitment to provide employees with a work environment free from harassment, Sempra periodically conducts anti-harassment training seminars. Plaintiff attended one such seminar in December 2000.

## INTERROGATORY NO. 6

6.     State what methodologies Sempra employs to calculate and pay bonuses to employees at the Assistant Vice President level in Sempra's Gas and Petroleum Derivatives Department, including the persons involved and any criteria used to pay bonuses.

## RESPONSE TO INTERROGATORY NO. 6

Sempra does not employ any pre-determined methodologies to calculate and pay bonuses to employees at the Assistant Vice President level. Absent an express agreement between Sempra and an individual Assistant Vice President regarding the manner in which bonuses will be calculated and paid, bonus amounts for Assistant Vice Presidents are determined by Sempra's department heads and/or senior management, who take into account the overall performance of the employee, the department, and the company for the bonus year in question.

**INTERROGATORY NO. 7**

7.      For the period from January 2000 through December 2002, identify the objective criteria, if any, used by Sempra to evaluate the job performance of its employees and provide an appraisal of Susan Wood's job performance based on those criteria.

**RESPONSE TO INTERROGATORY NO. 7**

During the identified time frame, Sempra did not specify quantifiable, objective criteria (e.g., threshold dollar amounts of revenue generation, numbers of trades, contact with a minimum number of customers over a given time period) to be used when evaluating the job performance of its employees.  As Plaintiff's own Annual Performance Review for 2000 reveals, supervisors evaluated performance based on criteria such as: (a) the employee's ability to work as a team player; (b) the employee's ability to deal with customers in a positive manner; (c) the supervisor's perception of the employee's revenue generating and non-revenue generating activities; (d) the supervisor's perception as to whether the employee is well liked in his/her department; (e) the employee's ability to handle pressure well; (f) the employee's knowledge of the supervisor's work and business unit; and (g) the employee's willingness and ability to take on more responsibility.  Sempra did not issue objective benchmarks pursuant to which these criteria were to be applied.

**INTERROGATORY NO. 8**

8.      For the period from January 2000 through December 2002, identify the objective criteria, if any, used by Sempra to evaluate the job performance of its employees and provide an appraisal of all Assistant Vice Presidents and Vice Presidents in Sempra's Gas and Petroleum Derivatives Departments based on those criteria.

**RESPONSE TO INTERROGATORY NO. 8**

As discussed in response to Interrogatory No. 7, Sempra did not specify quantifiable, objective criteria to be used when evaluating the job performance of its employees during the identified time frame.

**INTERROGATORY NO. 9**

9.      State each aspect of every criteria that was evaluated, and each person involved in such evaluation, that resulted in Susan Wood being paid a $50,000 bonus in the year 2001.

**RESPONSE TO INTERROGATORY NO. 9**

Brian Cumming made the decision to pay Plaintiff an amount equal to her replacement cost (i.e., Mr. Cumming's estimation of the amount of money it would cost Sempra to replace Plaintiff).  At the time the bonus was paid, Mr. Cumming estimated Plaintiff's replacement cost to be approximately $50,000.00.

## INTERROGATORY NO. 10

10.    State each aspect of every criteria evaluated, and each person involved in such evaluation, which resulted in Sempra giving Susan Wood a salary increase of $10,000 in 2001.

## RESPONSE TO INTERROGATORY NO. 10

Upon information and belief, Sempra states that the salary increase was likely a nominal, ordinary course increase predicated upon Plaintiff's length of time with the Company. Neither Sarathi Roy nor Brian Cumming recalls authorizing this salary increase.

## INTERROGATORY NO. 11

11.    State how many new revenue-generating clients Susan Wood brought to Sempra during the course of her employment, identifying (i) the name of the client, (ii) when the client was brought to Sempra, and (iii) the amount of revenue and/or profits derived by Sempra for each such client.

## RESPONSE TO INTERROGATORY NO. 11

Sempra does not maintain client files by "originator" nor does the Company track the revenue or profit generated from a particular client. Instead, Sempra's accounts are maintained on a portfolio basis showing overall profit and loss. Consequently, Sempra cannot provide the information requested in this Interrogatory.

-15-

**INTERROGATORY NO. 12**

12.    State why Susan Wood was transferred to the Petroleum Derivatives'
department in February 2001, and include in the response the reason for the transfer, and each
person who participated in the evaluation and/or decision for the transfer.

**RESPONSE TO INTERROGATORY NO. 12**

Plaintiff was transferred to the Petroleum Derivatives department at her own
initiative.  Sempra lacks knowledge as to why Plaintiff was interested in moving to the
Petroleum Derivative department.  Jackie Mitchell and Beth Dwyer did not oppose the move,
and the transfer was agreeable to Brian Cumming.

**INTERROGATORY NO. 13**

13.    State (A) what formal actions in the investigation and evaluation of the
Howley Incident (as referenced in the Complaint and Answer) were taken by Sempra including,
specific reference to all individuals involved, dates, and specific actions taken, and (B) any final
findings and employment actions resulting therefrom.

**RESPONSE TO INTERROGATORY NO. 13**

Michael Goldstein conducted interviews of pertinent witnesses to the June 20,
2001 incident, including Plaintiff, Joe Howley, Brian Rickers and Sarathi Roy.  At the
conclusion of the investigation, Attorney Goldstein drafted a report, dated July 10, 2001,
memorializing the incident and his findings with respect to the incident, which was submitted to

-16-

Plaintiff for her review and comment. Plaintiff and Mr. Howley were both reprimanded as a result of the incident.

## INTERROGATORY NO. 14

14.    State the details of the discussion that Ms. Mitchell and Susan Wood had with respect to the workplace issues referenced in Paragraph 32 of the Complaint (concerning which Sempra admitted in the Answer that Plaintiff spoke with Ms. Mitchell regarding workplace issues), giving specific reference to the time and date of such conversation, and whether any documents exist to evidence such conversation, and identify any such documents.

## RESPONSE TO INTERROGATORY NO. 14

Ms. Mitchell does not recall the details of any discussion(s) that she had with Plaintiff regarding workplace issues.

## INTERROGATORY NO. 15

15.    State what procedures exist for terminating employees at Sempra, giving reference as to whom is in attendance at any such termination meeting, and what specific protocols are to be followed, and explain whether those procedures and protocols were followed by Sempra with respect to the termination of Susan Wood, and if not, why not.

## RESPONSE TO INTERROGATORY NO. 15

There are no formal procedures or protocols for terminating employees at Sempra. However, Sempra's Employee Handbook states, in pertinent part, that "[a]ny person who resigns

or is terminated agrees to (i) participate in an exit interview to be conducted by the person or persons of the Company's choosing." See Plaintiff's Document Production to Sempra (Document No. P00071). In addition, termination decisions are typically communicated to employees in the presence of more than one Company witness. (In the past, such witnesses occasionally have included in-house counsel.). This procedure was followed during the March 8, 2002 meeting at which Plaintiff was notified that her employment was being terminated, inasmuch as Denise Freda and Vincent Cookingham were both in attendance at the meeting.

## INTERROGATORY NO. 16

16. State when, to whom, and the substance of any formal notice by Sempra that was given at Sempra to employees or customers relating to Susan Wood's termination.

## RESPONSE TO INTERROGATORY NO. 16

Denise Freda forwarded an e-mail message indicating the discontinuation of Ms. Wood's employment as of March 8, 2002. A copy of that e-mail has previously been produced.

## INTERROGATORY NO. 17

17. State when and why Steve Soule was hired, and what background he had when hired, and what job responsibilities he assumed at Sempra.

## RESPONSE TO INTERROGATORY NO. 17

Steve Soule was a Sempra employee from August 16, 1995 to December 5, 2002. During his employment, Mr. Soule worked in Sempra's business development group. He also

-18-

worked as a marketer in Energy America, Sempra's retail gas and power subsidiary. In February 2002, following the sale of Energy America, David Messer announced that Mr. Soule would be transferring into the Petroleum Derivatives department.

## II.    REQUESTS FOR PRODUCTION OF DOCUMENTS

### REQUEST NO. 1

1.    Please produce any and all documents which relate to the hiring of Plaintiff.

### RESPONSE TO REQUEST NO. 1

All responsive documents were previously produced.

### REQUEST NO. 2

2.    Please produce any and all documents which relate to the compensation paid to Plaintiff.

### RESPONSE TO REQUEST NO. 2

All responsive documents were previously produced.

### REQUEST NO. 3

3.    Please produce any and all documents which relate to the termination of Plaintiff's employment.

## RESPONSE TO REQUEST NO. 3

All responsive documents were previously produced.

## REQUEST NO. 4

4.    For the period from July 1999 through the end of 2002, please produce any and all documents which relate to the calculation and payment of bonuses paid to employees at the Assistant Vice President and Vice President level.

## RESPONSE TO REQUEST NO. 4

Please see responsive documents attached hereto.

## REQUEST NO. 5

5.    Please produce any and all documents relating to the executive search firm used by Defendant to recruit Plaintiff on Defendant's behalf and the efforts, promises, and inducements made by such search firm to induce Plaintiff to join Defendant.

## RESPONSE TO REQUEST NO. 5

All responsive documents were previously produced.

**REQUEST NO. 6**

6.    Please produce any and all documents which relate to the incident between Mr. Howley ("Howley") and the Plaintiff ("Howley Incident") as alleged in the Complaint and responded to in Defendant's Answer.

**RESPONSE TO REQUEST NO. 6**

Please see responsive documents attached hereto as well as documents previously produced.

**REQUEST NO. 7**

7.    Please produce any and all documents which relate to the investigation of the Howley Incident.

**RESPONSE TO REQUEST NO. 7**

Please see responsive documents attached hereto as well as documents previously produced.

**REQUEST NO. 8**

8.    Please produce any and all documents which constitute a final report by the Defendant as to assessing responsibility regarding the Howley Incident, and any actions taken in response thereto.

**RESPONSE TO REQUEST NO. 8**

Please see responsive documents attached hereto as well as documents previously produced.

**REQUEST NO. 9**

9.    Please produce any and all documents which relate to any action or discipline by Sempra taken against Mr. Howley by reason of the Howley Incident.

**RESPONSE TO REQUEST NO. 9**

Please see responsive documents attached hereto as well as documents previously produced.

**REQUEST NO. 10**

10.    For the period from March 2000 through April 26, 2002, please produce any and all documents which reflect communications between Sarathi Roy ("Roy") and Joe Howley relating to Susan Wood.

**RESPONSE TO REQUEST NO. 10**

All responsive documents were previously produced.

## REQUEST NO. 11

11.    For the period from March 2000 through April 26, 2002, please produce any and all documents which reflect communications by Sempra's General Counsel Michael Goldstein ("Goldstein") relating to Susan Wood, including without limitation, any investigation and any reports or actions taken as a result of the Howley Incident.

## RESPONSE TO REQUEST NO. 11

Please see responsive documents attached hereto as well as documents previously produced.

## REQUEST NO. 12

12.    Please produce any and all documents which reflect communications by (i) Jackie Mitchell ("Mitchell") (for the period from September 2000 through April 26, 2002), (ii) Steve Prince ("Prince") (for the period from September 2000 through April 26, 2002), (iii) Mr. Cookingham ("Cookingham") (from February 2002 through April 26, 2002), and/or (iv) Ms. Freda ("Freda") (for the period from September 2000 through April 26, 2002), relating to Susan Wood.

## RESPONSE TO REQUEST NO. 12

Please see responsive documents attached hereto as well as documents previously produced.

**REQUEST NO. 13**

13.     Please produce any and all documents which reflect any explanation for the termination of Susan Wood.

**RESPONSE TO REQUEST NO. 13**

All responsive documents were previously produced.

**REQUEST NO. 14**

14.     Please produce any and all documents which set forth any of Sempra's policies prohibiting employment discrimination ("Employment Policies").

**RESPONSE TO REQUEST NO. 14**

All responsive documents were previously produced.

**REQUEST NO. 15**

15.     Please produce any and all documents which relate to: (i) the June 2001 altercation between Plaintiff and Joe Howley; (ii) both Plaintiff and Joe Howley; (iii) Joe Howley's performance reviews for the years 2000 through 2002; and (iv) any considered or actual reprimands or sanctions against Joe Howley for the period from 2000 through 2002.

**RESPONSE TO REQUEST NO. 15**

Please see responsive documents attached hereto as well as documents previously produced.

**REQUEST NO. 16**

16.     Please produce any and all documents which relate to: (i) Sarathi Roy's performance reviews for the years 2000 through 2002; and (ii) any considered or actual reprimands or sanctions against Mr. Roy for the period from 2000 through 2002.

**RESPONSE TO REQUEST NO. 16**

Please see responsive documents attached hereto.

**REQUEST NO. 17**

17.     For the period from 2000 through April 26, 2002, please produce any and all documents which relate to any and all communications: (i) between Goldstein and Susan Wood; and (ii) to or from Goldstein that relate to Wood's claims in this lawsuit.

**RESPONSE TO REQUEST NO. 17**

All responsive documents were previously produced.

**REQUEST NO. 18**

18.     For the period from September 2000 through April 26, 2002, please produce any and all documents which relate to any and all communications between Goldstein and Howley that relate to Susan Wood.

**RESPONSE TO REQUEST NO. 18**

All responsive documents were previously produced.

**REQUEST NO. 20**

20.     For the period from September 2000 through April 26, 2002, please produce any and all documents which reflect any and all communications to or from Prince relating to Susan Wood.

**RESPONSE TO REQUEST NO. 20**

All responsive documents were previously produced.

**REQUEST NO. 21**

21.     For the period from 2000 through the end of 2002, please produce any and all documents relating to employees investigated and/or disciplined at Sempra for violation of Sempra's anti-discrimination and/or anti-harassment policies.

## RESPONSE TO REQUEST NO. 21

There are no responsive documents.

## REQUEST NO. 22

22.     Provide a copy of all performance reviews of all Vice Presidents and Assistant Vice Presidents in the Petroleum Derivatives Department of Sempra, and in the Gas Department of Sempra, for the years 2000 through 2002.

## RESPONSE TO REQUEST NO. 22

Please see responsive documents attached hereto.

## REQUEST NO. 23

23.     Provide the document Roy has identified as an electronic message sent from him to Susan Wood purporting to say that Susan Wood "would love to have one of the female employees in the office" as set forth in Roy's June 10, 2002 affidavit submitted to the Connecticut Commission on Human Rights and Opportunities ("Roy Affidavit").

## RESPONSE TO REQUEST NO. 23

Sempra has been unable to recover the electronic message.

**REQUEST NO. 24**

24.    Produce any documents relied on by Roy to support the assertions he makes in the Roy Affidavit about Susan Wood.

**RESPONSE TO REQUEST NO. 24**

All responsive documents were previously produced.

**REQUEST NO. 25**

25.    Provide any and all documents which relate to Steve Soule including his hiring, compensation and job performance.

**RESPONSE TO REQUEST NO. 25**

All responsive documents were previously produced.

**REQUEST NO. 26**

26.    Provide any and all documents relating to Sempra's attempt to find Susan Wood another position at Sempra by anyone at Sempra after it was decided to terminate her from her position in the Petroleum Derivatives Group.

**RESPONSE TO REQUEST NO. 26**

All responsive documents were previously produced.

**REQUEST NO. 27**

    27.    For the period from 2000 through April 26, 2002, provide any and all documents and organization charts for the Gas and Petroleum Derivatives Department at Sempra.

**RESPONSE TO REQUEST NO. 27**

    There are no organization charts responsive to this Request.

DATED:  January 23, 2004        Respectfully submitted,

                              DEFENDANT SEMPRA ENERGY TRADING CORPORATION

                By:    *Peter M. Schultz*

                      Mary C. Dollarhide (ct12251)
                      Peter M. Schultz (ct19425)
                      Paul, Hastings, Janofsky & Walker, LLP
                      1055 Washington Boulevard
                      Stamford, CT  06901-2217
                      Telephone:  (203) 961-7400
                      Facsimile:  (203) 359-3031
                      peterschultz@paulhastings.com

## CERTIFICATE OF SERVICE

This is to certify that on this 23rd day of January, 2004, a copy of the foregoing

was forwarded via messenger to counsel for the Plaintiff at the following address:

> Brendan J. O'Rourke, Esq.
> O'ROURKE & ASSOCIATES, LLC
> 27 Pine Street
> New Canaan, CT  06840

Peter M. Schultz