# Exhibit 7

```
 1
 2                      *** CONFIDENTIAL ***
 3              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
 4                                              COPY
 5   ---------------------------------X
 6   SUSAN E. WOOD                    :
 7              Plaintiff          ,:
 8        VS.                        :  NO. 3:03CV098(JCH)
 9   SEMPRA ENERGY TRADING CORP.      :
10              Defendant          ,:
11   ---------------------------------X
12                  D E P O S I T I O N
13
14
15              THE DEPOSITION OF BRIAN CUMMING,
16   taken on behalf of the Plaintiff, pursuant to
17   the Federal Rules of Civil Procedure, before
18   Melodie Ajello, Registered Professional
19   Reporter, Notary Public within the State of
20   Connecticut, on the 14th day of April, 2004, at
21   10 a.m, at the offices of Brendan O'Rourke, & 27
22   Pine Street, New Canaan, Connecticut, 06840.
23
24         GOLDFARB AND AJELLO REPORTING SERVICES
                  24 East Avenue #1372
25            New Canaan, Connecticut  06840
```

Page 6

1  hang on to something, then I will hang on to it.
2       Q.    At one point did Susan Wood work under your
3  supervision?
4       A.    Yes.
5       Q.    Did you ever maintain a file for her?
6       A.    No.
7       Q.    Just for the record here, you got to let me
8  finish the question because when you read this, it will --
9  it gets disjointed, it's not a natural way of talking, but
10 you are each now cutting me off, just be aware of that.
11             Just so I can get the record straight on
12 this, are you saying you don't have -- let me withdraw
13 that.
14             When Susan Wood was working under your
15 supervision, you didn't maintain a file for her?
16      A.    That's correct.
17      Q.    Do you maintain a file for any employees?
18      A.    No.
19      Q.    Can you provide the background of your
20 educational training starting with college, and then
21 summarize your work history up and through the time of
22 your current position at Sempra?
23      A.    Sure.  I hold an undergrad degree in
24 business and CFA charter.  My -- oh, I started with CSFB
25 directly out of school, stayed in the investment banking

1   Q.   In 2001 were there any objective
2   measurements of Susan Wood's contribution to the group?
3           MR. SCHULTZ:   Object to the form of
4           the question.
5   A.   Were there any objective measures?
6   Q.   Measurements.
7   A.   Measurements.
8   Q.   Was there any -- I'll restate the question.
9       Using your word of "profitability," to close
10  profitable business --
11  A.   Right.
12  Q.   -- were there any documents that you recall
13  were produced that set forth numbers to illustrate Susan
14  Wood's profitability?
15  A.   None generated by me or others in the group
16  for her.  I would assume that she kept some track of her
17  own transactions with her estimate of how much was booked
18  on those transactions.
19  Q.   Do you recall her --
20  A.   But those would be her numbers, right, but I
21  don't -- I didn't have any participation in either putting
22  those numbers together or agreeing to those numbers.
23  Q.   Do you recall whether she showed you those
24  numbers?
25  A.   I don't recall.

```
 1       Q.      Do you recall seeing any marketer in 2001
 2  show you numbers as to their profitability?
 3       A.      You know, typically I will ask people how
 4  they're doing, you know:  Do you feel that you're -- where
 5  do you think you are this year, and I probably have had
 6  that conversation with Susan.
 7       Q.      In the Petroleum Derivatives Department in
 8  2001, did you allocate in your mind any overhead to the
 9  individual marketers?
10       A.      Yes.
11       Q.      Okay.  Do you know in 2001 what overhead was
12  allocated to Susan Wood?
13       A.      I think the rule of thumb I was working with
14  at that time was something like 750, 800 thousand.
15       Q.      What did you -- let me withdraw that.
16               What was the purpose of having an overhead
17  allocation at the approximate 750,000 dollar range --
18  withdrawn.
19               Why did you have in your mind an allocation
20  of overhead with respect to the marketers in 2001?
21                       MR. SCHULTZ:  Object to the form of
22                       the question.
23       A.      We've gone to a ridiculous extent to cost
24  out this business, I mean, I'm effectly running a small
25  company, and there's a hard dollar number that comes along
```

Page 39

1  with it, direct costs and allocated cost, and it gets
2  pushed out if you're a revenue -- if you're in a
3  revenue-generating seat, then you basically have to pay
4  for the cost of the seat.
5       Q.   But based on what you testified about
6  earlier, how do you arrive at a revenue number to assess
7  whether the marketer met their overhead?
8       A.   Right.  Once again, the real value of the
9  marketing function at that period of time was not for the
10 profitability in specific transactions, it was to allow
11 the traders to run a large derivatives portfolio and
12 manage that portfolio without having to pay away the bid
13 offer spread every time they wanted to get something done.
14      Q.   Okay.
15      A.   Let me try to explain that again.
16      Q.   Please do.  I actually didn't hear it.
17 Again, if you would, more slowly?
18      A.   If you can succeed in putting together a
19 diversified portfolio of end users so you have all your
20 transportation companies, railways, airlines, trucking on
21 one side, the buy side, the refineries, hedge funds, your
22 producers.  If you're actively doing business with all of
23 those people, you can run large trading risks, but you'll
24 have people taking you out of your positions on both sides
25 of the market, if you need to get something done,

Page 51

1   A.   No, he's not.
2   Q.   Where is he now?
3   A.   Canadian Imperial Bank of Commerce, CIBC.
4   Q.   Did you inform Susan Wood of what Jamie
5   Evans told you?
6   A.   No, I did not.
7   Q.   Did you memorialize in writing what Jamie
8   Evans told you?
9   A.   No, I did not.
10  Q.   Did you tell anyone at Sempra what Jamie
11  Evans told you?
12  A.   No, I did not.
13  Q.   Did Jamie Evans tell you that he was a
14  passive listener for this six-hour regaling?
15           MR. SCHULTZ:   Object to the form of
16           the question.
17  A.   I don't recall.
18  Q.   Did Jamie Evans tell you that he told Susan
19  Wood that he was offended by the discussions?
20  A.   I don't remember.
21  Q.   Do you think Jamie Evans was offended?
22  A.   Yes. I've known Jamie for fifteen years,
23  and he is just not the kind of person you want to have
24  those kind of discussions with.
25  Q.   Other than Alberto Vogel and Jamie Evans,

1   the process.
2       Q.    Well, you talked to Jackie Mitchell, though?
3       A.    I did. Well, I -- again, I called Jackie
4   and said: Please, I'm a long way away, I need you to deal
5   with this for me.
6       Q.    Do you know if Jackie Mitchell was a witness
7   to the incident?
8       A.    I don't know. She would have been sitting
9   directly across from it. But whether she was looking the
10  other way or was off the desk at that time, I don't know.
11      Q.    Do you recall her telling you her version of
12  the incident when you spoke to her?
13      A.    Not really.
14      Q.    I take it you didn't take any notes about
15  the conversation you had about the incident, is that
16  correct?
17      A.    That is correct.
18      Q.    After Mr. Howley called you back, did you
19  have any other conversations with anyone else about the
20  Howley incident?
21      A.    I spoke to Susan afterwards.
22      Q.    Was that the next day?
23      A.    No. The same day.
24      Q.    And what were the circumstances behind that
25  call in terms of who made it?