Not Reported in F.Supp.2d
2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P 41,728
(Cite as: 2004 WL 1620866 (S.D.N.Y.))

Page 10

wide keyword search; counsel could then preserve a copy of each "hit." Although this sounds burdensome, it need not be. Counsel does not have to review these documents, only see that they are retained. For example, counsel could create a broad list of search terms, run a search for a limited time frame, and then segregate responsive documents. [FN75] When the opposing party propounds its document requests, the parties could negotiate a list of search terms to be used in identifying responsive documents, and counsel would only be obliged to review documents that came up as "hits" on the second, more restrictive search. The initial broad cut merely guarantees that relevant documents are not lost.

> FN75. It might be advisable to solicit a list of search terms from the opposing party for this purpose, so that it could not later complain about which terms were used.

In short, it is *not* sufficient to notify all employees of a litigation hold and expect that the party will then retain and produce all relevant information. Counsel must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched. This is not to say that counsel will necessarily succeed in locating all such sources, or that the later discovery of new sources is evidence of a lack of effort. But counsel and client must take *some reasonable steps* to see that sources of relevant information are located.

2. Counsel's Continuing Duty to Ensure Preservation

Once a party and her counsel have identified all of the sources of potentially relevant information, they are under a duty to retain that information (as per *Zubulake IV*) and to produce information responsive to the opposing party's requests. Rule 26 creates a "duty to supplement" those responses. [FN76] Although the Rule 26 duty to supplement is nominally the party's, it really falls on counsel. As the Advisory Committee explains,

> FN76. Fed.R.Civ.P. 26(e).

*9 Although the party signs the answers, it is his lawyer who understands their significance and bears the responsibility to bring answers up to date. In a complex case all sorts of information reaches the party, who little understands its bearing on answers previously given to interrogatories. In practice, therefore, the lawyer under a continuing burden must periodically recheck all interrogatories and canvass all new information. [FN77]

> FN77. 1966 Advisory Committee Note to Fed.R.Civ.P. 26(e).

To ameliorate this burden, the Rules impose a continuing duty to supplement responses to discovery requests *only* when "a party[,] or more frequently his lawyer, obtains actual knowledge that a prior response is incorrect. This exception does not impose a duty to check the accuracy of prior responses, but it prevents knowing concealment by a party or attorney." [FN78]

> FN78. *Id.* The Rules also create a duty to supplement in two other instances: (a) when the Court so orders, and (b) with respect to Rule 26(a) initial disclosures, "because of the obvious importance to each side of knowing all witnesses and because information about witnesses routinely comes to each lawyer's attention," *id.* See Fed.R.Civ.P. 26(e).

The *continuing* duty to supplement disclosures strongly suggests that parties also have a duty to make sure that discoverable information is not lost. Indeed, the notion of a "duty to preserve" connotes an ongoing obligation. Obviously, if information is lost or destroyed, it has not been preserved. [FN79]

> FN79. *See* OXFORD ENGLISH DICTIONARY (2d ed.1989) (defining "preserve" as "[t]o keep safe from harm or injury; to keep in safety, save, take care of, guard"); *see also id.* (defining "retain" as "[t]o keep hold or possession of; to continue having or keeping, in various senses").

The tricky question is what that continuing duty entails. What must a lawyer do to make certain that relevant information--especially electronic information--is being retained? Is it sufficient if she periodically re-sends her initial "litigation hold" instructions? What if she communicates with the party's information technology personnel? Must she make occasional on-site inspections?

Above all, the requirement must be reasonable. A lawyer cannot be obliged to monitor her client like a parent watching a child. At some point, the client must bear responsibility for a failure to preserve. At the same time, counsel is more conscious of the contours of the preservation obligation; a party cannot reasonably be trusted to receive the "litigation

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00986-JCH   Document 96-14   Filed 06/24/2005   Page 2 of 11

Not Reported in F.Supp.2d
2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P 41,728
(Cite as: 2004 WL 1620866 (S.D.N.Y.))

Page 11

hold" instruction once and to fully comply with it without the active supervision of counsel. [FN80]

> FN80. See *Telecom International Am. Ltd. v. AT & T Corp.,* 189 F.R.D. 76, 81 (S.D.N.Y.1999) ("Once on notice [that evidence is relevant], the obligation to preserve evidence runs first to counsel, who then has a duty to advise and explain to the client its obligations to retain pertinent documents that may be relevant to the litigation.") (citing *Kansas-Nebraska Natural Gas Co. v. Marathon Oil Co.,* 109 F.R.D. 12, 18 (D.Neb.1983)).

There are thus a number of steps that counsel should take to ensure compliance with the preservation obligation. While these precautions may not be enough (or may be too much) in some cases, they are designed to promote the continued preservation of potentially relevant information in the typical case.

*First,* counsel must issue a "litigation hold" at the outset of litigation or whenever litigation is reasonably anticipated. [FN81] The litigation hold should be periodically re-issued so that new employees are aware of it, and so that it is fresh in the minds of all employees.

> FN81. See *Zubulake IV,* 220 F.R.D. at 218.

*Second,* counsel should communicate directly with the "key players" in the litigation, *i.e.,* the people identified in a party's initial disclosure and any subsequent supplementation thereto. [FN82] Because these "key players" are the "employees likely to have relevant information," [FN83] it is particularly important that the preservation duty be communicated clearly to them. As with the litigation hold, the key players should be periodically reminded that the preservation duty is still in place.

> FN82. See Fed.R.Civ.P. 26(a)(1)(A).

> FN83. *Zubulake IV,* 220 F.R.D. at 218.

*10 *Finally,* counsel should instruct all employees to produce electronic copies of their relevant active files. Counsel must also make sure that all backup media which the party is required to retain is identified and stored in a safe place. In cases involving a small number of relevant backup tapes, counsel might be advised to take physical possession of backup tapes. In other cases, it might make sense for relevant backup tapes to be segregated and placed in storage. Regardless of what particular arrangement counsel chooses to employ, the point is to separate relevant backup tapes from others. One of the primary reasons that electronic data is lost is ineffective communication with information technology personnel. By taking possession of, or otherwise safeguarding, all potentially relevant backup tapes, counsel eliminates the possibility that such tapes will be inadvertently recycled.

*Kier v. UnumProvident Corp.* [FN84] provides a disturbing example of what can happen when counsel and client do not effectively communicate. In that ERISA class action, the court entered an order on December 27, 2002, requiring UnumProvident to preserve electronic data, specifically including e-mails sent or received on six particular days. What ensured was a comedy of errors. First, before the court order was entered (but when it was subject to the common law duty to preserve) UnumProvident's technical staff unilaterally decided to take a "snapshot" of its servers instead of restoring backup tapes, which would have recovered the e-mails in question. (In fact, the snapshot was useless for the purpose of preserving these e-mails because most of them had already been deleted by the time the snapshot was generated.) Once the court issued the preservation order, UnumProvident failed to take any further steps to locate the e-mails, believing that the same person who ordered the snapshot would oversee compliance with the court order. But no one told him that.

> FN84. No. 02 Civ. 8781, 2003 WL 21997747 (S.D.N.Y. Aug. 22, 2003).

Indeed, it was not until January 13, when senior UnumProvident legal personnel inquired whether there was any way to locate the e-mails referenced in the December 27 Order, that anyone sent a copy of the Order to IBM, who provided "email, file server, and electronic data related disaster recovery services to UnumProvident." [FN85] By that time, UnumProvident had written over 881 of the 1,498 tapes that contained backup data for the relevant time period. All of this led to a stern rebuke from the court. [FN86] Had counsel in *Kier* promptly taken the precautions set out above, the e-mails would not have been lost. [FN87]

> FN85. *Id.* at *4.

> FN86. *Id.* at *13 ("If UnumProvident had been as diligent as it should have been ... many fewer [backup] tapes would have been

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00986-JCH  Document 96-14  Filed 06/24/2005  Page 3 of 11

Not Reported in F.Supp.2d
2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P 41,728
(Cite as: 2004 WL 1620866 (S.D.N.Y.))

Page 12

inadvertently overwritten."). Rather than order sanctions, the court recommended that the parties determine the feasibility of retrieving the lost data and the extent of prejudice to the plaintiffs so that an appropriate remedy could be determined.

FN87. See also Metropolitan Opera Assoc., Inc. v. Local 100, Hotel Employees & Restaurant Employees International Union, 212 F.R.D. 178, 222 (S.D.N.Y.2003) (ordering default judgment against defendant as a discovery sanction because "counsel (1) never gave adequate instructions to their clients about the clients' overall discovery obligations, [including] what constitutes a 'document' ...; (2) knew the Union to have no document retention or filing systems and yet never implemented a systematic procedure for document production or for retention of documents, including electronic documents; (3) delegated document production to a layperson who ... was not instructed by counsel[ ] that a document included a draft or other nonidentical copy, a computer file and an e-mail; ... and (5) ... failed to ask important witnesses for documents until the night before their depositions and, instead, made repeated, baseless representations that all documents had been produced.").

3. What Happened at UBS After August 2001?

As more fully described above, UBS's in-house counsel issued a litigation hold in August 2001 and repeated that instruction several times from September 2001 through September 2002. Outside counsel also spoke with some (but not all) of the key players in August 2001. Nonetheless, certain employees unquestionably deleted e-mails. Although many of the deleted e-mails were recovered from backup tapes, a number of backup tapes--and the e-mails on them--are lost forever. [FN88] Other employees, notwithstanding counsel's request that they produce their files on Zubulake, did not do so.

FN88. See Zubulake IV, 220 F.R.D. at 218-19 ("By its attorney's directive in August 2002, UBS endeavored to preserve all backup tapes that existed in August 2001 (when Zubulake filed her EEOC charge) that captured data for employees identified by Zubulake in her document request, and all such monthly backup tapes generated thereafter. These backup tapes [all should have] existed in August 2002, because of UBS's document retention policy, which required retention for three years. In August 2001, UBS employees were instructed to maintain active electronic documents pertaining to Zubulake in separate files. Had these directives been followed, UBS would have met its preservation obligations by preserving one copy of all relevant documents that existed at, or were created after, the time when the duty to preserve attached. In fact, UBS employees did not comply with these directives.") (footnotes omitted).

a. UBS's Discovery Failings

*11 UBS's counsel--both in-house and outside--repeatedly advised UBS of its discovery obligations. In fact, counsel came very close to taking the precautions laid out above. First, outside counsel issued a litigation hold in August 2001. The hold order was circulated to many of the key players in this litigation, and reiterated in e-mails in February 2002, when suit was filed, and again in September 2002. Outside counsel made clear that the hold order applied to backup tapes in August 2002, as soon as backup tapes became an issue in this case. Second, outside counsel communicated directly with many of the key players in August 2001 and attempted to impress upon them their preservation obligations. Third, and finally, counsel instructed UBS employees to produce copies of their active computer files. [FN89]

FN89. Kim testified that she was not so instructed.

To be sure, counsel did not fully comply with the standards set forth above. Nonetheless, under the standards existing at the time, counsel acted reasonably to the extent that they directed UBS to implement a litigation hold. Yet notwithstanding the clear instructions of counsel, UBS personnel failed to preserve plainly relevant e-mails.

b. Counsel's Failings

On the other hand, UBS's counsel are not entirely blameless. "While, of course, it is true that counsel need not supervise every step of the document production process and may rely on their clients in some respects," [FN90] counsel is responsible for coordinating her client's discovery efforts. In this

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00986-JCH  Document 96-14  Filed 06/24/2005  Page 4 of 11

Not Reported in F.Supp.2d
2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P 41,728
(Cite as: 2004 WL 1620866 (S.D.N.Y.))

Page 13

case, counsel failed to properly oversee UBS in a number of important ways, both in terms of its duty to locate relevant information and its duty to preserve and timely produce that information.

> FN90. *Metropolitan Opera*, 212 F.R.D. at 222.

With respect to locating relevant information, counsel failed to adequately communicate with Tong about how she stored data. Although counsel determined that Tong kept her files on Zubulake in an "archive," they apparently made no effort to learn what that meant. A few simple questions--like the ones that Zubulake's counsel asked at Tong's re-deposition--would have revealed that she kept those files in a separate *active* file on her computer.

With respect to making sure that relevant data was retained, counsel failed in a number of important respects. *First,* neither in-house nor outside counsel communicated the litigation hold instructions to Mike Davies, a senior human resources employee who was intimately involved in Zubulake's termination. *Second,* even though the litigation hold instructions were communicated to Kim, no one ever asked her to produce her files. And *third,* counsel failed to protect relevant backup tapes; had they done so, Zubulake might have been able to recover some of the e-mails that UBS employees deleted.

In addition, if Varsano's deposition testimony is to be credited, he turned over "all of the e-mails that [he] received concerning Ms. Zubulake." [FN91] If Varsano turned over these e-mails, then counsel must have failed to produce some of them. [FN92]

> FN91. Varsano Dep. at 289.
>
> FN92. I have no reason not to credit Varsano's testimony, given that he is a human resources employee who is not implicated in the alleged discrimination against Zubulake.

*12 In sum, while UBS personnel deleted e-mails, copies of many of these e-mails were lost or belatedly produced as a result of counsel's failures.

c. Summary

Counsel failed to communicate the litigation hold order to all key players. They also failed to ascertain each of the key players' document management habits. By the same token, UBS employees--for unknown reasons--ignored many of the instructions that counsel gave. This case represents a failure of communication, and that failure falls on counsel and client alike.

At the end of the day, however, the duty to preserve and produce documents rests on the party. Once that duty is made clear to a party, either by court order or by instructions from counsel, that party is on notice of its obligations and acts at its own peril. Though more diligent action on the part of counsel would have mitigated some of the damage caused by UBS's deletion of e-mails, UBS deleted the e-mails in defiance of explicit instructions not to.

Because UBS personnel continued to delete relevant e-mails, Zubulake was denied access to e-mails to which she was entitled. Even those e-mails that were deleted but ultimately salvaged from other sources (*e.g.,* backup tapes or Tong and Kim's active files) were produced 22 months after they were initially requested. The effect of losing potentially relevant e-mails is obvious, but the effect of late production cannot be underestimated either. "[A]s a discovery deadline ... draws near, discovery conduct that might have been considered 'merely' discourteous at an earlier point in the litigation may well breach a party's duties to its opponent and to the court." [FN93] Here, as UBS points out, Zubulake's instant motion "comes more than a year after the Court's previously imposed March 3, 2003 discovery cutoff." [FN94] Although UBS attempts to portray this fact as evidence that Zubulake is being overly litigious, it is in fact a testament to the time wasted by UBS's failure to timely produce all relevant and responsive information. With the discovery deadline long past, UBS "was under an obligation to be *as cooperative as possible."* [FN95] Instead, the extent of UBS's spoliation was uncovered by Zubulake during court-ordered re-depositions.

> FN93. *Residential Funding,* 306 F.3d at 112.
>
> FN94. Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Sanctions ("Def.Mem.") at 3.
>
> FN95. *Residential Funding,* 306 F.3d at 112 (emphasis in original); *see also id.* (suggesting that breach of that obligation might "constitute[ ] sanctionable misconduct in [its] own right").

I therefore conclude that UBS acted wilfully in destroying potentially relevant information, which

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00986-JCH    Document 96-14    Filed 06/24/2005    Page 5 of 11

Not Reported in F.Supp.2d                                                                                        Page 14
2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P 41,728
(Cite as: 2004 WL 1620866 (S.D.N.Y.))

resulted either in the absence of such information or its tardy production (because duplicates were recovered from Kim or Tong's active files, or restored from backup tapes). Because UBS's spoliation was willful, the lost information is presumed to be relevant. [FN96]

> FN96. See Kronisch, 150 F.3d at 126 ("It is a well-established and long-standing principle of law that a party's intentional destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction.") (cited in Residential Funding, 306 F.3d at 109); see also Residential Funding, 306 F.3d at 109 ("[A] showing of [wilfullness or] gross negligence in the destruction or untimely production of evidence will in some circumstances suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party.") (emphasis added); see also id. at 110 ("Just as the intentional or grossly negligent destruction of evidence in bad faith can support an inference that the destroyed evidence was harmful to the destroying party, so, too, can intentional or grossly negligent acts that hinder discovery support such an inference ....") (emphasis in original).

B. Remedy

Having concluded that UBS was under a duty to preserve the e-mails and that it deleted presumably relevant e-mails wilfully, I now consider the full panoply of available sanctions. [FN97] In doing so, I recognize that a major consideration in choosing an appropriate sanction--along with punishing UBS and deterring future misconduct--is to restore Zubulake to the position that she would have been in had UBS faithfully discharged its discovery obligations. [FN98] That being so, I find that the following sanctions are warranted.

> FN97. See Fujitsu, 247 F.3d at 436 (holding that the choice of sanctions for spoliation and failure to produce evidence "is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis").

> FN98. See West, 167 F.3d at 779 (explaining that the chosen sanction should "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." ') (quoting Kronisch, 150 F.3d at 126); see also Pastorello v. City of New York, No. 95 Civ. 470, 2003 WL 1740606, at *8 (S.D.N.Y. Apr. 1, 2003).

*13 First, the jury empanelled to hear this case will be given an adverse inference instruction with respect to e-mails deleted after August 2001, and in particular, with respect to e-mails that were irretrievably lost when UBS's backup tapes were recycled. No one can ever know precisely what was on those tapes, but the content of e-mails recovered from other sources--along with the fact that UBS employees wilfully deleted e-mails--is sufficiently favorable to Zubulake that I am convinced that the contents of the lost tapes would have been similarly, if not more, favorable. [FN99]

> FN99. Cf. Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir.1994) (" '[e]mployers are rarely so cooperative as to include a notation in the personnel file' that their actions are motivated by factors expressly forbidden by law. Because an employer who discriminates is unlikely to leave a 'smoking gun' attesting to a discriminatory intent, a victim of discrimination is seldom able to prove his claim by direct evidence, and is usually constrained to rely on circumstantial evidence.") (quoting Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 464 (2d Cir.1989)) (citations omitted); Dister v. Continental Group, Inc., 859 F.2d 1108, 1112 (2d Cir.1988) ("[In] reality ... direct evidence of discrimination is difficult to find precisely because its practitioners deliberately try to hide it. Employers of a mind to act contrary to law seldom note such a motive in their employee's personnel dossier.")

Note that I am not sanctioning UBS for the loss of the tapes (which was negligent), but rather for its willful deletion of e-mails. Those e-mails happen to be lost forever because the tapes that might otherwise have contained them were lost.

Second, Zubulake argues that the e-mails that were produced, albeit late, "are brand new and very

Case 3:03-cv-00986-JCH     Document 96-14     Filed 06/24/2005     Page 6 of 11

Not Reported in F.Supp.2d
2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P 41,728
(Cite as: 2004 WL 1620866 (S.D.N.Y.))

Page 15

significant to Ms. Zubulake's retaliation claim and would have affected [her] examination of every witness ... in this case." [FN100] Likewise, Zubulake claims, with respect to the newly produced e-mails from Kim and Tong's active files, that UBS's "failure to produce these e-mails in a timely fashion precluded [her] from questioning any witness about them." [FN101] These arguments stand unrebutted and are therefore adopted in full by the Court. Accordingly, UBS is ordered to pay the costs of any depositions or re-depositions required by the late production.

> FN100. Tr. at 10.
>
> FN101. Pl. Mem. at 10.

*Third,* UBS is ordered to pay the costs of this motion. [FN102]

> FN102. Fed.R.Civ.P. 37(b)(2).

Finally, I note that UBS's belated production has resulted in a self-executing sanction. Not only was Zubulake unable to question UBS's witnesses using the newly produced e-mails, but UBS was unable to prepare those witnesses with the aid of those e-mails. Some of UBS's witnesses, not having seen these e-mails, have already given deposition testimony that seems to contradict the newly discovered evidence. For example, if Zubulake's version of the evidence is credited, the e-mail from Davies acknowledging receipt of Zubulake's EEOC charge at 11:06 AM on August 21, 2001, puts the lie to Davies' testimony that he had not seen the charge when he spoke to Orgill--a conversation that was reflected in an e-mail sent at 2:02 PM. Zubulake is, of course, free to use this testimony at trial.

These sanctions are designed to compensate Zubulake for the harm done to her by the loss of or extremely delayed access to potentially relevant evidence. [FN103] They should also stem the need for any further litigation over the backup tapes.

> FN103. Another possible remedy would have been to order UBS to pay for the restoration of the remaining backup tapes. Zubulake, however, has conceded that further restoration is unlikely to be fruitful. *See* Tr. at 30-31.

C. Other Alleged Discovery Abuses

In addition to the deleted (and thus never- or belatedly produced) e-mails, Zubulake complains of two other perceived discovery abuses: the destruction of a September 2001 backup tape from Tong's server, and the belated production of a UBS document retention policy.

1. Tong's September 2001 Backup Tape

Zubulake moves for sanctions because of the destruction of Tong's September 2001 backup tape. In *Zubulake III,* I ordered UBS to pay 75% of the cost of restoring certain backup tapes. [FN104] Understandably, one of the tapes that Zubulake chose to restore was Tong's tape for August 2001, the month that Zubulake filed her EEOC charge. That tape, however, had been recycled by UBS. Zubulake then chose to restore Tong's September 2001 tape, on the theory that "the majority of the e-mails on [the August 2001] tape are preserved on the September 2001 tape." [FN105] When that tape was actually restored, however, it turned out not to be the September 2001 tape at all, but rather Tong's October 2001 tape. This tape, according to UBS, was simply mislabeled. [FN106]

> FN104. *See Zubulake III,* 216 F.R.D. at 291.
>
> FN105. *Zubulake IV,* 220 F.R.D. at 221.
>
> FN106. *See* Def. Mem. at 12 n. 8; Tr. at 57 (attributing mislabeling of tape to "human error"); *see also* Declaration of James E. Gordon, Vice President of Pinkerton Consulting & Investigations, Inc. (detailing UBS's investigation into the missing September 2001 tape), Ex. I to the 5/14/04 Declaration of Norman C. Simon ("Simon Decl.").

*14 Zubulake has already (unintentionally) restored Tong's October 2001 tape, which should contain the majority of the data on the September 2001 tape. In addition, UBS has offered to pay to restore Varsano's backup tape for August 2001, which it has and which has not yet been restored. [FN107] Varsano was Tong's HR counterpart in the United States, and was copied on many (but not all) of the e-mails that went to or from Tong. [FN108] These backup tapes, taken together, should recreate the lion's share of data from Tong's August 2001 tape. UBS must therefore pay for the restoration and production of relevant e-mails from Varsano's August 2001 backup tape, and pay for any re-deposition of Tong or Varsano that is necessitated by new e-mails found on that tape.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00986-JCH   Document 96-14   Filed 06/24/2005   Page 7 of 11

Not Reported in F.Supp.2d
2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P 41,728
(Cite as: 2004 WL 1620866 (S.D.N.Y.))

Page 16

FN107. See Tr. at 58-59.

FN108. See id.

### 2. The July 1999 Record Management Policy

Zubulake also moves for sanctions in connection with what she refers to as "bad faith discovery tactics" on the part of UBS's counsel. [FN109] In particular, Zubulake complains of a late-produced record management policy. [FN110] The existence of this policy was revealed to Zubulake at Varsano's second deposition on January 26, 2004, [FN111] at which time Zubulake called for its production. [FN112] Zubulake twice reiterated this request in writing, in the hopes that she would have the policy in time for Hardisty's deposition on February 5, 2004. UBS did not produce the policy, however, until February 26, 2004. [FN113]

FN109. Pl. Mem. at 8.

FN110. See June 1999 UBS Record Management Policy for the Americas Region (the "June 1999 policy"), Ex. M to the Batson Aff.

FN111. See Varsano Dep. at 489-94.

FN112. See id. at 494.

FN113. See 4/26/04 Letter from Norman Simon, counsel to UBS, to James Batson, Ex. N to the Batson Aff.

The late production of the July 1999 policy does not warrant sanctions at all. *First,* UBS's production of the policy was not late. Zubulake requested it at Varsano's deposition on January 26, 2004, and UBS produced it one month later, on February 26. The Federal Rules afford litigants thirty days to respond to document requests, [FN114] and UBS produced the policy within that time. The fact that Zubulake wanted the document earlier is immaterial--if it was truly necessary to confront Hardisty with the policy, then his deposition should have been rescheduled or Zubulake should have requested relief from the Court. [FN115] Not having done so, Zubulake cannot now complain that UBS improperly delayed its production of that document.

FN114. See Fed.R.Civ.P. 34(b).

FN115. See id. (reserving to the court the authority to lengthen or shorten the time in which a party must respond to a document request).

*Second,* even if UBS was tardy in producing the policy, Zubulake has not demonstrated that she was prejudiced. She suggests that she would have used the policy in the depositions of Hardisty and perhaps Chapin, but does not explain how. Nor is it at all clear how Zubulake might have used the policy. With respect to e-mail, the policy states: "Email is another priority. We will have a separate policy regarding email with appropriate reference or citation in this policy and/or retention schedules." [FN116] Prior to these depositions, Zubulake had a number of UBS document retention policies that post-dated the June 1999 Policy. [FN117]

FN116. June 1999 Policy § 3.2.

FN117. See Retention of Back-up Tapes of Email Servers (dated June 2001), Ex. H to Simon Decl.; Retention of Back-Up Tapes of E-mail and Interchange (dated October 2001), Ex. K to Simon Decl.; *see also* Ex. M to Batson Aff. (consisting of four UBS document retention policies, including one entitled "Use of Electronic Mail, Chat and Text Messaging," dated November 2002).

### V. CONCLUSION

In sum, counsel has a duty to effectively communicate to her client its discovery obligations so that all relevant information is discovered, retained, and produced. In particular, once the duty to preserve attaches, counsel must identify sources of discoverable information. This will usually entail speaking directly with the key players in the litigation, as well as the client's information technology personnel. In addition, when the duty to preserve attaches, counsel must put in place a litigation hold and make that known to all relevant employees by communicating with them directly. The litigation hold instructions must be reiterated regularly and compliance must be monitored. Counsel must also call for employees to produce copies of relevant electronic evidence, and must arrange for the segregation and safeguarding of any archival media (*e.g.,* backup tapes) that the party has a duty to preserve.

*15 Once counsel takes these steps (or once a court order is in place), a party is fully on notice of its discovery obligations. If a party acts contrary to counsel's instructions or to a court's order, it acts at

Case 3:03-cv-00986-JCH    Document 96-14    Filed 06/24/2005    Page 8 of 11

Not Reported in F.Supp.2d                                                                Page 17
2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P 41,728
**(Cite as: 2004 WL 1620866 (S.D.N.Y.))**

its own peril.

UBS failed to preserve relevant e-mails, even after receiving adequate warnings from counsel, resulting in the production of some relevant e-mails almost two years after they were initially requested, and resulting in the complete destruction of others. For that reason, Zubulake's motion is granted and sanctions are warranted. UBS is ordered to:

1. Pay for the re-deposition of relevant UBS personnel, limited to the subject of the newly-discovered e-mails;
2. Restore and produce relevant documents from Varsano's August 2001 backup tape;
3. Pay for the re-deposition of Varsano and Tong, limited to the new material produced from Varsano's August 2001 backup tape; [FN118] and

> FN118. Rulings numbered (1) and (3) may both result in the re-deposition of Tong and Varsano. Obviously, each should only be re-deposed once.

4. Pay all "reasonable expenses, including attorney's fees," [FN119] incurred by Zubulake in connection with the making of this motion.

> FN119. Fed.R.Civ.P. 37(b)(2).

In addition, I will give the following instruction to the jury that hears this case:

> You have heard that UBS failed to produce some of the e-mails sent or received by UBS personnel in August and September 2001. Plaintiff has argued that this evidence was in defendants' control and would have proven facts material to the matter in controversy.
>
> If you find that UBS could have produced this evidence, and that the evidence was within its control, and that the evidence would have been material in deciding facts in dispute in this case, you are permitted, but not required, to infer that the evidence would have been unfavorable to UBS.
>
> In deciding whether to draw this inference, you should consider whether the evidence not produced would merely have duplicated other evidence already before you. You may also consider whether you are satisfied that UBS's failure to produce this information was reasonable. Again, any inference you decide to draw should be based on all of the facts and circumstances in this case. [FN120]

> FN120. This instruction was adapted from LEONARD B. SAND ET AL., MODERN FEDERAL JURY INSTRUCTIONS 75-7 (2004); see also Zimmerman v. Associates First Capital Corp., 251 F.3d 376, 383 (2d Cir.2001) (affirming district court's use of a similar charge); cf. New York Pattern Jury Instructions--Civil 1:77 (3d ed.2004).

The Clerk is directed to close this motion [number 43 on the docket sheet]. Fact discovery shall close on October 4, 2004. A final pretrial conference is scheduled for 4:30 PM on October 13, 2004, in Courtroom 15C. If either party believes that a dispositive motion is appropriate, that date will be converted to a pre-motion conference.

VI. POSTSCRIPT

The subject of the discovery of electronically stored information is rapidly evolving. When this case began more than two years ago, there was little guidance from the judiciary, bar associations or the academy as to the governing standards. Much has changed in that time. There have been a flood of recent opinions--including a number from appellate courts--and there are now several treatises on the subject. [FN121] In addition, professional groups such as the American Bar Association and the Sedona Conference have provided very useful guidance on thorny issues relating to the discovery of electronically stored information. [FN122] Many courts have adopted, or are considering adopting, local rules addressing the subject. [FN123] Most recently, the Standing Committee on Rules and Procedures has approved for publication and public comment a proposal for revisions to the Federal Rules of Civil Procedure designed to address many of the issues raised by the discovery of electronically stored information. [FN124]

> FN121. See MICHAEL ARKFELD, ELECTRONIC DISCOVERY AND EVIDENCE (2003); ADAM I. COHEN & DAVID J. LENDER, ELECTRONIC DISCOVERY: LAW AND PRACTICE (2004).

> FN122. See Memorandum from Gregory P. Joseph & Barry F. McNeil, *Electronic Discovery Standards--Draft Amendments to ABA Civil Discovery Standards* (Nov. 17, 2003), available at http://www.abanet.org/litigation/taskforces/electronic/document.pdf; The Sedona Conference, *The Sedona Principles: Best Practices Recommendations & Principles for Addressing Electronic Document*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00986-JCH   Document 96-14   Filed 06/24/2005   Page 9 of 11

Not Reported in F.Supp.2d
Page 18
2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P 41,728
(Cite as: 2004 WL 1620866 (S.D.N.Y.))

*Production* (January 2004), available at http://www.thesedonaconference.org/publications_html.

FN123. *See, e.g.,* E.D. Ark. Local Rule 26.1; W.D. Ark. Local Rule 26.1; D. Wy. Local Rule 26.1; D.N.J. Local Rule 26.1(d); *see also* Memorandum from the Ninth Circuit Advisory Board, *Proposed Model Local Rule on Electronic Discovery,* available at http://www.krollontrack.com/LawLibrary/Statutes/9thCirDraft.pdf, D. Kan. *Electronic Discovery Guidelines;* D. Del. *Default Standards for Discovery of Electronic Document.* In addition, a number of states have adopted rules governing electronic discovery. *See, e.g.,* Miss. R. Civ. P. 26; Tex.R. Civ. P. 193.3, 196.4. With the exception of the proposed Ninth Circuit model rule, all of these rules are collected at http:// www.kenwithers.com/rulemaking/.

FN124. The proposals forwarded from the Civil Rules Advisory Committee to the Standing Committee can be found on pages 20-70 of the memorandum available at http://www.kenwithers.com/rulemaking/civilrules/report051704.pdf. Those proposals were subsequently revised by the Standing Committee; the final text of the proposed rules that will be published for comment should be available some time in August 2004.

*16 Now that the key issues have been addressed and national standards are developing, parties and their counsel are fully on notice of their responsibility to preserve and produce electronically stored information. The tedious and difficult fact finding encompassed in this opinion and others like it is a great burden on a court's limited resources. The time and effort spent by counsel to litigate these issues has also been time-consuming and distracting. This Court, for one, is optimistic that with the guidance now provided it will not be necessary to spend this amount of time again. It is hoped that counsel will heed the guidance provided by these resources and will work to ensure that preservation, production and spoliation issues are limited, if not eliminated.

SO ORDERED:

2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P 41,728

**Motions, Pleadings and Filings (Back to top)**

• 2003 WL 23724585 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for an Order Compelling Defendants to Produce E-Mails, Permitting Disclosure of Deposition Transcript and Directing Defendants to Bear Certain Expenses (Mar. 21, 2003)

• 2002 WL 32632000 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Compel Discovery (Oct. 09, 2002)

• 2002 WL 32631998 (Trial Pleading) Answer (Mar. 12, 2002)

• 1:02CV01243 (Docket) (Feb. 15, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.  Page 1
1995 WL 753892 (S.D.N.Y.)
(Cite as: 1995 WL 753892 (S.D.N.Y.))

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Susan DeFELICE, Plaintiff,
v.
AMERICAN INTERNATIONAL LIFE
ASSURANCE COMPANY OF NEW YORK,
Defendant.
No. 94CIV.8165(AGS)(RLE).

Dec. 19, 1995.

MEMORANDUM OPINION AND ORDER

ELLIS, United States Magistrate Judge:

*1 Before the court is the request of the defendant to compel answers to certain of its document requests and to modify the court's oral order of June 14, 1995, concerning the payment of expert witness fees. For the reasons which follow, the request is DENIED.

I. DISCUSSION

A. PROPRIETY OF THE REQUESTS

Pursuant to Judge Schwartz' original scheduling order of February 8, 1995, discovery was to be completed by June 15, 1995. The case was referred to the undersigned on May 22, 1995, to resolve discovery disputes. The deadline was extended to early September for purposes of expert discovery. The parties had a final pre-trial conference before Judge Schwartz on November 13, 1995, and the parties were directed to file a joint pre-trial order by December 29, 1995. The discovery stage of this action would appear to be over and any discovery disputes untimely raised. The defendant seeks to avoid this result by asserting that it seeks only to have the plaintiff timely supplement earlier discovery, as required by Rule 26(e). Given the due date for the pre-trial order, the court has serious concerns about the appropriateness of raising these issues at this time before me. Nevertheless, the merits of the requests are briefly addressed.

B. DOCUMENTS ON ATTORNEYS' FEES

Defendant had sought to have the plaintiff produce documents concerning attorneys' fees incurred by plaintiff as a result of defendant's denial of her claim. The plaintiff objected to these requests as "premature" and "overbroad." Notwithstanding these responses to the document requests, plaintiff answered an interrogatory seeking the amount of fees incurred as of that time. This dispute was not resolved prior to the discovery deadline. Although the discovery deadline had passed, the defendant indicated to plaintiff by letter dated November 15, 1995, that, because Judge Schwartz had set a date for the joint pre-trial order, responses were no longer "premature" and requesting "copies of all bills, invoices and other documentation which reflects the amount of legal fees and expenses incurred to date by plaintiff in this case."

The defendant's position is that because the plaintiff provided some data on attorneys' fees, it is entitled to updated information. This view is not supportable. The relevance requirement in Rule 26 is not waivable. Even if a party provides responses at one time, it is not precluded from objecting to additional requests of the same type. The defendant has failed to even argue what admissible evidence might result from such discovery or why this information is needed before the due date of the joint pre-trial order. Unless the plaintiff prevails, the issue of attorneys' fees will not be relevant. The plaintiff is, therefore, not required to produce additional information on attorneys' fees.

C. EXPERT WITNESS FEES

The plaintiff had sought to depose defendant's expert, Dr. Spitz. When informed that Dr. Spitz' fee for the deposition would be $4800 plus travel expenses of approximately $300, the plaintiff sought court resolution of the dispute. Based on the presentations at a conference on June 14, 1995, the court directed a payment of $2000 to Dr. Spitz, but allowed defendant to present additional evidence of fees charged by similarly qualified experts for comparable work. The court has considered the additional submissions, together with the most recent letters of both parties and finds that modification of that decision is not warranted.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                         Page 2
1995 WL 753892 (S.D.N.Y.)
**(Cite as: 1995 WL 753892 (S.D.N.Y.))**

***2 IT IS THEREFORE ORDERED** that the plaintiff need not supplement its responses on attorneys' fees as part of the pre-trial discovery in this case AND no additional payments shall be made in connection with the deposition of Dr. Spitz.

SO ORDERED.

1995 WL 753892 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

•         1:94CV08165         (Docket) (Nov. 10, 1994)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.