UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2005 JUN 24 A 9:03

U.S. DISTRICT COURT

| | |
|---|---|
| SUSAN E. WOOD,<br><br>                  Plaintiff,<br><br>    v.<br><br>SEMPRA ENERGY TRADING CORPORATION,<br><br>                  Defendant. | CIVIL ACTION NO.<br>3:03-CV-986 (JCH)<br><br><br><br>June 20, 2005 |

**PLAINTIFF'S PROPOSED FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW**

**PROPOSED FINDINGS OF FACT**

1. Sempra Energy Trading Corporation ("Sempra" or "Defendant") is a energy/commodities trading firm, with over 500 employees globally.

2. In September 2000, Susan Wood ("Plaintiff") commenced her employment at Sempra as an Assistant Vice President.

3. Plaintiff had extensive marketing experience in the energy/commodities industry in her previous employment with Enron in Houston, Texas, where she handled the marketing of oil and natural gas.

4. In or about February 2001, Plaintiff transferred to Sempra's Petroleum Derivatives Department.

5. During her employment at Sempra, Plaintiff generated profits for Sempra

through her work in the Natural Gas Department, and subsequently in the Petroleum Derivatives Department.

6. In June 2001, Plaintiff was involved in a dispute with Joseph Howley, a colleague of Plaintiff's, in connection with a business transaction, which dispute involved a physical confrontation (the "Howley Incident").

7. The Howley Incident was witnessed by many Sempra employees, including Jackie Mitchell, Plaintiff's initial supervisor, and Sarathi Roy, one of Plaintiff's colleagues in the Petroleum Derivatives Department.

8. Mr. Roy worked in the Petroleum Derivatives Department from approximately February 2000 until December 2002.

9. In February 2002, Mr. Roy became Plaintiff's direct supervisor when he was appointed to head the marketing function of the Petroleum Derivatives Department.

10. Mr. Roy has admitted that he had "misgivings" about Plaintiff, and that he felt uncomfortable with Plaintiff as an employee for reasons relating to her gender and sexual orientation.

11. After the Howley Incident, Plaintiff communicated to Sempra's General Counsel, Michael Goldstein, that she wished to pursue a formal complaint against Mr. Howley, and that she felt significant risk of being terminated in retaliation for pursuing such a complaint against Mr. Howley, who was a powerful employee at Sempra.

12. As a result of his investigation of the Howley Incident, Mr. Goldstein failed to properly pursue Plaintiff's complaint, and prepared two different Incident Reports, and no formal written reprimand of Mr. Howley was ever made.

13. After the 2001 financial year was completed, Plaintiff, in 2002, was given

a $50,000.00 bonus based upon her performance, as well as a $10,000.00 raise in her base salary. In comparison, other Assistant Vice Presidents in the Petroleum Derivatives Department were given no bonuses based upon their performances. Plaintiff was also paid a bonus in 2001 for her work in 2000, which covered approximately three and one half months.

14. Plaintiff's written job evaluations of her performance, which were performed by her peers, as well as by Jackie Mitchell (Plaintiff's former supervisor in the Natural Gas Department) and Brian Cumming (Plaintiff's supervisor in the Petroleum Derivatives Department), were positive in assessing her work and her future prospects at Sempra from the time of the commencement of her employment through her ultimate termination.

15. In March 2002, Plaintiff was terminated from Sempra, despite having been given no advance notice of any deficiency in her work.

16. The person who informed Plaintiff of her termination was Mr. Roy. However, Mr. Roy had counseled with Mr. Goldstein, Mr. Messer (Sempra's President), and other senior executives at Sempra, including Wood's previous supervisors, Mr. Cumming and Ms. Mitchell, in doing so.

17. Each of the officers of Sempra who participated in the decision to terminate Plaintiff were aware and conscious of the Howley incident, and Ms. Wood's complaint filed pursuant to the Anti Harassment Policy at Sempra.

18. Mr. Goldstein, who stated that he acted as an objective fact-finder and investigator regarding Plaintiff's complaint about the Howley incident and her communicated fear of retaliation as a result thereof, nevertheless provided attorney/client

privileged legal advice to Sempra regarding Plaintiff's termination.

19.  Before Plaintiff was terminated by Sempra, none of Mr. Roy, Mr. Messer, Mr. Goldstein, Ms. Mitchell, or Mr. Cumming reviewed Plaintiff's written job evaluations, or any objective criteria, including financial reports as to Plaintiff's productivity or profitability.

20.  Steve Soule, a male, was approached to replace Plaintiff in her position at Sempra before she was terminated, and he ultimately did replace her. In contrast to Plaintiff, Mr. Soule had very little experience in the Petroleum Derivatives Department.

21.  Plaintiff was terminated, based at least in large part, because of the fact that she was a woman, a lesbian, and in retaliation of her complaint about the Howley incident.

22.  Sempra's proffered reasons for Wood's termination - because she was not an effective worker, acted unprofessionally, evidenced poor judgment, and did not have favorable prospects as an employee - were pretextual.

23.  Wood incurred $2,740.00 in expenses in working for Sempra, which Sempra refused to reimburse despite multiple written demands from Wood for such reimbursement shortly following her termination. Sempra paid such sum, without interest, during the pending litigation, more than two years after Wood's termination and demand letters.

24.  Wood suffered a loss of income by reason of her termination as follows:

    (a).  Back pay, dating from the year of termination through the trial date.

    (b).  Front pay, for projected loses of future wages, through age

40.

25. The aggregate damage for lost income, after subtracting Wood's earnings from her present employer, AgCert, equals $1.7 million (reflecting a net present value number, and a 5% discount factor).

26. Wood has incurred approximately $200,000.00 in attorney's fees in pursuing her claims against Sempra.

27. Wood has suffered emotional distress by reason of her termination, and received therapy from a psychotherapist, Mr. Solis, to deal with her depression and anxiety.

28. Wood immediately sought to find new employment upon her termination from Sempra, but could not find a job in the energy trading field that would allow her to match the earnings that she earned at Sempra.

29. Wood eventually became employed in another field at a significantly lower income level than she would have earned at Sempra.

## CONCLUSIONS OF LAW

### Counts

**COUNT ONE - Sexual Discrimination (42 U.S.C. § 2000e, et seq. ("Title VII"))**

**COUNT TWO - Sexual Discrimination (C.G.S. § 46a-60(a)(1))**

**COUNT THREE - Sexual Orientation Discrimination (C.G.S. § 46a-81c)**

In Count One, Plaintiff contends that she was discriminated against, as Sempra's decision to terminate her employment in March 2002 was motivated by her gender, in violation of Title VII of the Civil Rights Act of 1964, as amended.

In Count Two, Plaintiff contends that she was discriminated against for the same reason, in violation of the Connecticut Fair Employment Practices Act ("CFEPA").

In Count Three, Plaintiff contends that she was discriminated against by Sempra's adverse employment action to terminate her, which was motivated by her sexual orientation in violation of the CFEPA.

"Since 1964, Title VII has made it an 'unlawful employment practice for an employer . . . to discriminate against any individual . . ., because of such individual's race, color, religion, sex, or national origin.'" Desert Palace, Inc. v. Costa, 539 U.S. 90, 93 (2003) (citing 42 U.S.C. § 2000e-2(a)(1)). Notably, "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

> A plaintiff may establish a claim of disparate treatment under Title VII either (1) by showing that he has suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race, color, religion, sex, or national origin, ... .

Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004) (citing Raniola v. Bratton, 243 F.3d 610, 617 (2d Cir. 2001). Further, as to Plaintiff's sexual orientation discrimination claim, the CFEPA states that:

> It shall be a discriminatory practice in violation of this section: (1) For an employer, by himself or his agent, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against him in compensation or in terms, conditions or privileges of employment because of the individual's sexual orientation, ... .

C.G.S.A. § 46a-81c.

The initial burden in a disparate treatment claim brought under Title VII and the CFEPA[1] is on the plaintiff to establish a prima facie case of discrimination. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000) (citing St. Mary's Honor Center v. Hicks, 509 U.S. 506 (1993)). In Connecticut, a plaintiff may establish a *prima facie* case of discrimination under Title VII,

> ... through inference by presenting facts [that are] sufficient to remove the most likely bona fide reasons for an employment action. ... From a showing that an employment decision was not made for legitimate reasons, a fact-finder may infer that the decision was made for illegitimate reasons.

United Technologies v. CHRO, 72 Conn.App. 212, 221 (2002) (citation omitted; internal quotation marks omitted); see generally McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Board of Education of the City of Norwalk v. CHRO, 266 Conn. 492, 510 (2003).

To establish a *prima facie* case of discrimination, a plaintiff must produce evidence of the following four elements:

(1) she was a member of a protected class;

(2) she was qualified for her position;

(3) she was discharged; and

(4) the termination occurred under circumstances giving rise to an inference of discrimination.

United Technologies, 72 Conn.App. at 225-26. The fourth element is proven by showing

---

[1] As both parties agree, case law regarding federal fair employment legislation guides interpretation of the CFEPA. Bridgeport Hospital v. CHRO, 232 Conn. 91 (1995).

evidence that a plaintiff received less favorable treatment than a similarly situated employee in circumstances from which it can be inferred that such treatment was based upon unlawful discrimination. Id. at 226.

Once a plaintiff has made out a *prima facie* case, the defendant has the burden to rebut the presumption of discrimination which arises from such *prima facie* case by offering evidence of a legitimate, nondiscriminatory business rationale for its actions. Id. at 231; see also McDonnell Douglas Corp., 411 U.S. at 802; Board of Education of Norwalk, 266 Conn. at 506. Upon the articulation of such a non-discriminatory reason for the employment action, the presumption of discrimination which arose with the establishment of the prima facie case drops out. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993).

Once a defendant offers a legitimate, non-discriminatory reason for its actions, the burden shifts back to the plaintiff to fulfill her ultimate burden of proving that the defendant intentionally discriminated against her in the employment decision. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000). In order to satisfy this burden, the plaintiff may attempt to prove that the legitimate, non-discriminatory reason offered by the defendant was not the employer's true reason, but was a pretext for discrimination. Id. As the Supreme Court explained in Reeves:

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose ... . Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the

> employer is in the best position to put forth the actual reason for its decision.

530 U.S. at 147 (citations omitted).

Gender stereotyping can serve as evidence of pretext. See Price Waterhouse v. Hopkins, 490 U.S. 228, 250 (1989) (holding that an employer violated Title VII when it encouraged a woman to behave according to a gender stereotype and, motivated by such stereotyping, penalized her by denying her a promotion). Recently, the Second Circuit directly considered the question, "[w]hat constitutes a 'gender-based stereotype?'" Back v. Hastings-on-Hudson Union Free School District, 365 F.3d 107, 119-20 (2d Cir. 2004). The Court of Appeals concluded that, "this question must be answered in the particular context in which it arises, and without undue formulation." Id. at 120.

Evidence that an employer's reason is false, combined with the evidence presented to establish a *prima facie* case, can be sufficient to sustain a plaintiff's burden, and a plaintiff need not have further evidence of discrimination. Id.; see also Zimmerman v. Assoc. First Capital Corp., 251 F.3d 376, 381-82 (2d Cir. 2001). Ultimately, a finder of fact may consider the strength of the *prima facie* case, the probative value of the proof that the defendant's reason is pretextual, and any other evidence presented in the case when determining if the plaintiff has sustained her burden. Zimmerman, 251 F.3d at 381-82.

**COUNT FOUR - Retaliatory Discharge (Title VII)**

**COUNT FIVE - Retaliatory Discharge (C.G.S. § 46a-60(a)(4))**

In Counts Four and Five, Plaintiff claims that she was discharged by Sempra in retaliation for filing a formal complaint with respect to the Howley Incident in violation of both Title VII and the CFEPA.

In order for Plaintiff to make a case for retaliatory discharge, she must show "(1) that she was engaged in protected activity by opposing a practice made unlawful by Title VII; (2) that the employer was aware of that activity; (3) that she suffered adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action." Galdieri-Ambrosini v. Nat' Realty and Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998).

Even if an employee is not the victim of prohibited discrimination, Title VII protects her against retaliation for protesting against such discrimination. Id. at 285 (citing Manoharan v. Columbia University College of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir.1988)).

"Proof of causal connection can be established indirectly by showing that the protected activity was followed closely by discriminatory treatment." DeCintio v. Westchester County Medical Center, 821 F.2d 111, 115 (2d Cir. 1987) (citing Davis v. State University of New York, 802 F.2d 638, 642 (2d Cir.1986)). While the Second Circuit has concluded that two years is too long a time to support an inference of a causal connection, Richardson v. New York State Dept. of Correctional Service, 180 F.3d 426, 447 (2d Cir. 1999), it has also found that a causal connection could be inferred where

termination occurred less than two months after a complaint was made. Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998).

A gap between the incidents of discrimination and the retaliatory action is not dispositive for purposes of determining whether a plaintiff has met its burden on causation. Marx v. Schnuck Markets, Inc., 76 F.3d 324, 329 (10th Cir. 1996). The court in Marx was analyzing whether or not the plaintiff had made out a case for retaliation under the Fair Labor Standards Act. Id. With respect to causation, the Circuit Court stated that protected conduct closely followed by an adverse employment action might justify an inference of retaliatory motive; however, the court cautioned that "'closely followed' must not be read too restrictively where the pattern of retaliatory conduct begins soon after the filing of the FLSA complaint and only culminates later in actual discharge." Id.; see also Kull v. Davidoff of Geneva, 2004 WL 1418088, *10 (S.D.N.Y.). Further, it is well established that courts look to the totality of the factual circumstances giving rise to the discrimination claim in evaluating whether Plaintiff has made a sufficient case for such claim. National Railroad Passenger Corporation v. Morgan, 122 S.Ct. 2061, 2074 (2002).

Also, whether the person who ultimately made the decision to terminate the plaintiff had knowledge of the plaintiff's complaints is merely suggestive as to the causal connection prong of a plaintiff's case. Gordon v. New York City Bd. Of Educ., 232 F.3d 111, 117 (2d Cir. 2000). In fact, the court in Gordon stated that a jury could find retaliation even if the agent denied direct knowledge of a plaintiff's activities. Id.

## COUNT ELEVEN - Unreimbursed Business Expenses

In Count Eleven, Plaintiff asserts that, prior to her termination from Sempra, she incurred certain business related expenses in the amount of $2,740.00, and in accordance with Defendant's policy regarding reimbursement, Plaintiff timely filed the appropriate expense report with Defendant. Defendant refused to reimburse Plaintiff for such expenses, despite several written requests from Plaintiff for such reimbursement, until over two years after Plaintiff's termination, when such sum was reimbursed without any interest. Based on the foregoing, Defendant breached the implied contract to reimburse Plaintiff for business expenses incurred and reported.

Connecticut courts have held that:

> An implied contract is an agreement between the parties which is not expressed in words but which is inferred from the acts and the conduct of the parties. Connecticut does recognize implied contracts as long as the essential elements of a contract are met. Thus, in order to set forth a claim for breach of an implied contract, a plaintiff must allege that the defendant agreed, either by words or actions or conduct, to undertake [some] form of actual contract commitment to the plaintiff.

Bascetta v. O'Neill's Chevrolet & Buick, Inc., 2004 WL 1926220 (Conn.Super.) (quoting Culbro Land Resources, Inc. v. Casle Corp., Superior Court, judicial district of Hartford/New Britain at Hartford, Docket No. 532911 (December 29, 1997, Teller, J.)) (citations and quotation marks omitted). Further, "it is not fatal to a finding of an implied contract that there were no express manifestations of mutual assent if the parties, by their conduct, recognized the existence of contractual obligations." Janusauskas v. Fichman, 264 Conn. 796, 805 (2003)). "The test is whether the conduct and acts of the parties show an agreement." Brighenti v. New Britain Shirt Corporation, 167 Conn. 403, 406

(1974) (citing Skelly v. Bristol Savings Bank, 63 Conn. 83, 87 (1893)).

"Whether the parties have entered into [an implied contract] is a question of fact." Christensen v. Bic Corporation, 18 Conn.App. 451, 454 (1989) (citing Corriveau v. Jenkins Bros., 144 Conn. 383, 387 (1957)).

## Damages

### 1. Remedies Under Title VII and CFEPA

Along with appropriate remedies pursuant to successful Title VII claims, the "CFEPA authorizes the court to grant 'such legal and equitable relief which it deems appropriate … .'" Oliver v. Cole Gift Centers, Inc., 2000 WL 435436, *2, FN 1 (D. Conn.) (quoting Conn. Gen. Stat. § 46a-104). Further,

> Title VII and CFEPA, are co-extensive in the forms of relief they provide. A successful plaintiff may be entitled to a full panoply of remedies under either statutory system, including back pay, reinstatement, front pay, prejudgment interest, and other injunctive relief, as well as compensatory and punitive damages.

Id. at *4.

### 2. Back Pay and Pre-Judgment Interest

"A backpay award for discriminatory discharge is intended to restore the employee to the status quo [she] would have enjoyed if the discriminatory discharge had not taken place." Id. (quoting Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 166 (2d Cir. 1998)). "Therefore, a back pay award should consist of lost wages, pay increases, fringe benefits like insurance, medical and pension benefits, and overtime." Evans v. State of

Connecticut, 967 F.Supp. 673 (D. Conn. 1997) (citing Saulpaugh v. Monroe Community Hospital, 4 F.3d 134, 145 (2d Cir. 1993)); see also Bonura v. Chase Manhattan Bank, N.A., 629 F.Supp. 353 (S.D.N.Y. 1986) (award includes those benefits that would have accrued to plaintiffs in the course of their employment with defendant if they had not been discriminatorily discharged). "The ordinary rule of the Circuit is that the back pay award runs from the date of the discriminatory action to the date of judgment ... ." EEOC v. Joint Apprenticeship Committee of the Joint Industry Board of the Electrical Industry, 164 F.3d 89, 102 (2d Cir. 1998) (citing Sands v. Runyon, 28 F.3d 1323, 1328 (2d Cir. 1994)).

"[I]n determining damages, 'all doubts are to be resolved in favor of the injured party; the wrongdoer does not become the beneficiary of his own wrongful conduct.'" Evans, 673 F.Supp. at 680 (quoting E.E.O.C. v. Kallir, Philips, Ross, Inc., 420 F.Supp. 919, 923 (S.D.N.Y. 1976), aff'd, 559 F.2d 1203 (2d Cir), cert. denied, 434 U.S. 920 (1977)).

Since the intention of an award for back pay pursuant to a Title VII claim is to make persons whole for injuries suffered through past discrimination, "[p]re-judgment interest, of course, is an element of complete compensation." Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1183 (2d Cir. 1996) (citing Loeffler v. Frank, 486 U.S. 549, 558 (1988)).

Further, in an action under the CFEPA, an award of back pay and pre-judgment interest are appropriate remedies, with pre-judgment interest being a matter for the trial judge's discretion. Shaw v. Greenwich Anesthesiology Assocs., P.C., 200 F.Supp.2d 110, 188 (D. Conn. 2002).

3.   **Front Pay**

"The decision to award front pay is discretionary." Greenway v. Buffalo Hilton Hotel, 951 F.Supp. 1039, 1064 (W.D.N.Y. 1997) (citing Saulpaugh v. Monroe Community Hospital, 4 F.3d 134, 145 (2d Cir. 1993)). "While back pay – which the [court] awarded – compensates the victim of discrimination for lost wages and benefits before trial, front pay is intended to compensate her for losses after trial." Palma v. Pharmedica Communications, Inc., 2003 WL 22750600 (D. Conn.) (quoting Smith v. Diffee Ford-Lincoln-Mercury, Inc., 298 F.3d 955, 964 (10th Cir. 2002)).

"In calculating the size of a front pay award, the court must estimate the plaintiff's ability to mitigate damages in the future. This determination is subject to the court's discretion. Equitable factors which courts have considered in determining whether to award front pay include both the age of the plaintiff and [her] reasonable prospects of obtaining comparable employment." Id. (citing Fernandez v. North Shore Orthopedic Surgery & Sports Medicine, P.C., 79 F.Supp.2d 197, 204 (E.D.N.Y. 2000)).

In this case, front pay is an appropriate alternative to reinstatement. "Courts have acknowledged that there are times when reinstatement is impractical and should not be granted, such as when the employee-employer relationship has become hostile and has been irreparably damaged due to on-going litigation … ." Id. (citing Whittlesey v. Union Carbide Corp., 742 F.2d 724, 728 (2d Cir. 1984)).

Further, in an action under the CFEPA, an award of front pay is a form of equitable relief, which is a matter for the trial judge's equitable discretion. Shaw v.

Greenwich Anesthesiology Assocs., P.C., 200 F.Supp.2d 110 (D. Conn. 2002) (citing Conn. Gen. Stat. § 46a-60(a)(1)).

### 4.   Mitigation

"[A] prevailing plaintiff in a Title VII case must attempt to mitigate her damages by using 'reasonable diligence in finding other suitable employment.'" Palma v. Pharmedica Communications, Inc., 2003 WL 22750547 (D. Conn.) (quoting Dailey v. Societe Generale, 108 F.3d 451, 455-56 (2d Cir. 1997)); see 42 U.S.C. § 2000e-5(g)(1)). "[T]he claimant's burden is not onerous, and does not require him to be successful in mitigation." Id. (quoting Dailey, 108 F.3d at 456).

"While it is the plaintiff's duty to mitigate, it is the defendant who has the evidentiary burden of demonstrating at trial that a plaintiff has failed to satisfy this duty." Id. "[A] Title VII plaintiff does not have to endure extreme hardship to meet her mitigation obligations. Rather the obligation is one of reasonable diligence in finding other suitable employment, ... which need not be comparable to their previous position." Id. (quoting Dailey, 108 F.3d at 456; Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 53 (2d Cir. 1998)) (citations and quotation marks omitted).

### 5.   Emotional Distress Damages

It is well-established that courts may award emotional distress damages in Title VII cases. See e.g. Oliver v. Cole Gift Centers, Inc., 85 F.Supp.2d 109 (D. Conn. 2000) (compensatory damage award of $100,000.00 in Title VII action claiming emotional and mental distress); Ikram v. Waterbury Bd. of Educ., 1997 WL 597111 (D.Conn.)

-16-

($100,000.00 compensatory damage award in Title VII claim for emotional and mental distress); Gonzalez v. Bratton, 147 F.Supp.2d 180 (S.D.N.Y. 2001) (jury awarded $250,000.00 for emotional distress in Title VII claim); Phillips v. Bowen, 115 F.Supp.2d 303 (N.D.N.Y. 2000) (in sexual harassment and retaliation case jury awarded $400,000.00 in emotional distress damages). However, the plaintiff must establish that she suffered an actual injury caused by the deprivation. Id.; see also Carey v. Piphus, 435 U.S. 247, 263-64 (1978). The damage award "must be supported by competent evidence concerning the injury." Id. (citing Carey at 264, FN. 20). "The plaintiff's testimony of emotional injury must be substantiated by other evidence that such an injury occurred, such as the testimony of witnesses to the plaintiff's distress, or the objective circumstances of the violation itself. Id.; (citing Miner, 999 F.2d at 663; Walz v. Town of Smithtown, 46 F.3d 162, 170 (2d Cir. 1995)). Evidence that a plaintiff has sought medical treatment for the emotional injury is supportive to substantiate such a claim. Id. (citing Carrero v. New York City Hous. Auth., 890 F.2d 569, 581 (2d Cir.1989)).

6. **Punitive Damages**

Available remedies for a successful Title VII claim include punitive damages. Pollard v. Pont de Nemours & Co., 532 U.S. 843, 844 (2001). More particularly,

> Title VII provides that a plaintiff may recover punitive damages where the plaintiff demonstrates that the defendant "engaged in a discriminatory practice ... with malice or with reckless indifference to the federally protected rights of an aggrieved individual." In order to establish malice or reckless indifference, a plaintiff need not show that the defendant committed egregious or outrageous acts. Rather, a plaintiff need only demonstrate that the defendant had the "requisite state of mind" of malice or reckless indifference. Specifically, a plaintiff seeking to establish this must

demonstrate that the "employer ... at least discriminate[d] in the face of a perceived risk that its actions will violate federal law." Cush-Crawford v. Adchem Corp., 271 F.3d 352, 356 (2d Cir. 2001) (quoting 42 U.S.C. § 1981a(b)(1); Kolstad v. American Dental Association, 527 U.S. 526, 536-38 (1999)).

### 7. Attorneys' Fees

"The question of attorneys' fees, including fees with respect to unsuccessful claims, is an issue left to the discretion of the district court." Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1183 (2d Cir. 1996) (citing Saulpaugh v. Monroe Community Hospital, 4 F.3d 134, 145 (2d Cir. 1993)). "Where the district court determines that the successful claims are 'inextricably intertwined' and 'involve a common core of facts or [are] based on related legal theories,' it is not an abuse of discretion for the court to award the entire fee." Id. (quoting Dominic v. Consolidated Edison Co. of New York, Inc., 822 F.2d 1249, 1259 (2d Cir. 1987)).

Further, the CFEPA expressly provides for awards of attorneys' fees. Shaw v. Greenwich Anesthesiology Associates. P.C., 200 F.Supp.2d 110, 117 (D. Conn. 2002) (citing Conn. Gen. Stat. § 46a-104).

### 8. Statutory Cap

The amount of future compensatory and punitive damages awarded under a Title VII claim is subject to a statutory cap pursuant to 42 U.S.C. § 1981a(b)(3). Cush-Crawford v. Adchem Corp., 271 F.3d 352, 356-57 (2d Cir. 2001); Parrish v. Sollecito, 280 F.Supp.2d 145, 154 (S.D.N.Y. 2003). More particularly, depending upon the number

of employees that a defendant employer has, a schedule places caps on the "sum of the amount of compensatory damages awarded ... for future pecuniary losses, emotional pain, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded ... ." 42 U.S.C. § 1981a(b)(3).

However, front pay "is excluded from the meaning of compensatory damages under § 1981a and it would not be subject to § 1981a(b)(3)'s cap." Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 844 (2001); see also Parrish, 280 F.Supp.2d at 154 (stating that lost income and benefits are not subject to the mandatory statutory cap).

In the case of a defendant employer who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding year, the amount of punitive damages and future compensation shall not exceed $300,000.00. Parrish, 280 F.Supp.2d at 154-55 (citing 42 U.S.C. § 1981a(b)(3)(D)).

PLAINTIFF,
SUSAN E. WOOD

By:_____
Brendan J. O'Rourke (ct00522)
Jeffrey M. McCormick (ct21185)
O'ROURKE & ASSOCIATES LLC
27 Pine Street
New Canaan, CT 06840
Telephone: (203) 966-6664
Facsimile: (203) 966-5710

## CERTIFICATION

This is to certify that a copy of the foregoing was served via email and first class mail, to counsel of record as listed below this 20th day of June, 2005.

_____
Marianne F. Murray

Raymond W. Bertrand, Esq.
Paul, Hastings, Janofsky & Walker LLP
1055 Washington Boulevard
Stamford, CT 06901

Mary C. Dollarhide, Esq.
Paul, Hastings, Janofsky & Walker LLP
3579 Valley Centre Drive
San Diego, CA 92130