Page 1

1                UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF CONNECTICUT
2

3                                                    **COPY**
4    _____

                                         )
5    SUSAN E. WOOD,                      )
              Plaintiff,                 )
6                                        )   Civil Action No.
     VS                                  )   3:03-CV-986(JCH)
7                                        )
                                         )
     SEMPRA ENERGY TRADING                )
8    CORPORATION,                        )
              Defendant.                 )
9    _____)

10
11
12
13
14        DEPOSITION OF:   SUSAN ELIZABETH WOOD
15        DATE:            DECEMBER 12, 2003
16        HELD AT:         PAUL, HASTINGS, JANOFSKY &
                           WALKER, LLP
17                         1055 WASHINGTON BOULEVARD
                           STAMFORD, CONNECTICUT
18
19
20
21
22
23        Reporter:   JAMES A. SCALLY, RPR, CRR, LSR #80
                 BRANDON SMITH REPORTING SERVICE
24                      44 Capitol Avenue
                   Hartford, Connecticut 06106
25                       (860) 549-1850

Wood vs Sempra Energy
12/12/2003
Susan Wood

Page 205

1   there.

2   A   Yes.

3   Q   And it asks for you to identify each and
4   every person who has personal knowledge of any fact
5   upon which you base your claims in this lawsuit, et
6   cetera. Do you see that question?

7   A   Yes.

8   Q   Okay. And your response follows at the
9   bottom of the page?

10  A   Yes.

11  Q   Okay. And it says, "Billy Lasher informed me
12  repeatedly of the company and employees being
13  uncomfortable with my status as a lesbian."

14      Do you see that?

15  A   Yes.

16  Q   How many times did Billy Lasher inform you
17  that the company and its employees were uncomfortable
18  with your status as a lesbian? On how many occasions?

19  A   When I told -- actually, add him to the list
20  of people that I told. When I --

21  Q   That you were a lesbian?

22  A   That I was a lesbian, yes.

23  Q   Okay.

24  A   When I told him that I was gay, he said that
25  he was okay with that, but he just warned me and

Page 206

```
 1    cautioned me that there were probably a lot of others
 2    at the company who wouldn't be okay with that, and just
 3    to be very cautious.
 4         Q    Before we get into the substance, my question
 5    was how many times did Billy Lasher make statements
 6    such as those that were reflected in what you have
 7    written here on page 9:  "He informed me repeatedly of
 8    the company and employees being uncomfortable with my
 9    status as a lesbian"?
10         A    At least three.
11         Q    At least three.  Do you recall three
12    instances?
13         A    I can.
14         Q    Okay.  When was the first such instance?
15         A    That was the first such instance that I --
16    that I spoke of.
17         Q    Okay.  When -- when did that occur?
18         A    I can't recall.
19         Q    Do you know if it was in 2001?
20         A    Yes.
21         Q    Okay.
22         A    Yes.
23         Q    Do you know what season?
24         A    Early spring, maybe.
25         Q    Okay.  Now, other than what you've already
```

12/12/2003   Wood vs Sempra Energy   Susan Wood

Page 207

1  stated a few moments ago, tell me everything else that
2  Mr. Lasher said to you on this subject, if anything.
3      A    The second time he --
4      Q    I'm focusing on the first time.
5      A    The first time, sorry.
6      Q    You've already told me something about what
7  he said on that occasion. I'm asking if he said
8  anything else to you on that first occasion.
9      A    Could you go back and tell me what I said?
10              (Answer read.)
11     A    That's sufficient. That's what he said.
12     Q    Did he say anything other than that?
13     A    No.
14     Q    Okay. How about the second occasion? When
15 was the second occasion? The first was approximately
16 in the early spring of 2001.
17     A    Maybe September 2001.
18     Q    Okay. And what did Mr. Lasher say to you on
19 that occasion?
20     A    I was talking to him about Cliff Papish, who
21 does back office functions.
22     Q    Okay.
23     A    And how Cliff had been very helpful and I
24 enjoyed working with him and that he seemed very
25 efficient and helpful as a back office person. And

Page 208

1    Billy cautioned me that, first of all, Cliff had been
2    known to have some sexual harassment allegations
3    against him to begin with, and also that probably the
4    only reason he was being helpful to me was because he
5    thought I was cute, and to be very cautious, if he
6    found out I was gay, because he would -- wouldn't be
7    accepting of that.
8        Q   Do you recall anything else that Mr. Lasher
9    said to you on this occasion?
10       A   No.  That's it.
11       Q   You're not claiming in this lawsuit, are you,
12   that Cliff Papish harassed or discriminated against
13   you, are you?
14       A   No.
15       Q   What about the third occasion that you
16   remember, what did Mr. Lasher -- well, when did that
17   conversation take place?
18       A   Beginning of 2002, when I told him that it
19   looked like Sarathi might end up being in charge of the
20   group, this wasn't confirmed at the time.  And Billy
21   significantly cautioned me that Sarathi was not
22   comfortable with who I was, my status as a lesbian, and
23   he thought it was wrong in some way, so to be extremely
24   cautious about it.
25       Q   When you say he significantly cautioned you,

12/12/2003 — Wood vs Sempra Energy — Susan Wood

Page 209

1  what did you -- what words did he use that led you to
2  characterize it as significant caution?
3      A    I'm not sure of the exact words he used, but
4  he -- he emphasized that I should be very cautious.
5      Q    And he mentioned Sarathi specifically?
6      A    Yes.  We were talking about Sarathi.
7      Q    Okay.  And did you ask him why he thought
8  Sarathi had those impressions or inclinations?
9      A    I didn't know.
10     Q    Do you recall anything else that Mr. Lasher
11 said on this occasion?
12     A    I do not.
13     Q    Do you recall any other conversations that
14 you had with Mr. Lasher regarding your sexual
15 orientation and how people at the company might treat
16 you based on your sexual orientation?
17     A    No.  Not that I can recall.
18     Q    Okay.  If you turn to page 10 of D-1, it
19 says, "Steve Soleil," S-o-l-e-i-l.  Do you see that?
20     A    Yes.
21     Q    And it states, "A man who filled my position
22 immediately after I left and began calling on my
23 customers."  What information do you have that Steve
24 Soleil -- it's actually S-o-u-l-e, correct?
25     A    Right.  It's --

Page 210

```
 1      Q     What information do you have that he was
 2   calling on your customers?
 3      A     About a day or two after I was fired, I got a
 4   call from at least two of my customers on my cell
 5   phone, which they had, asking what was going on and why
 6   this guy Steve was calling them and what had happened.
 7      Q     And did you tell them what had happened?
 8      A     I just explained that I was no longer with
 9   the company.
10      Q     Okay.  You didn't get into any -- any more
11   specifics than that?
12      A     No.
13      Q     Any other basis for your claim that Steve
14   Soul -- Soule was calling on your customers?
15      A     Yeah.  I spoke to Ian Muir afterwards, and he
16   said that Steve was calling my customers.
17      Q     What was the context of the conversation that
18   you and Ian were having that he would mention Steve
19   Soule?
20      A     Just discussing -- oh, I don't know.  Just
21   sort of discussing the general -- general things about
22   trading in the markets, and I believe I asked him.
23      Q     You asked him whether Steve Soule was calling
24   your customers?
25      A     I asked him what was going on on the desk
```

```
1    since I'd left.
2        Q    Do you recall if you called him or Ian called
3    you?
4        A    I don't recall.
5        Q    Taking a look at the -- you have David Messer
6    listed here on page 10.  It says, "He discussed the
7    incident with me."
8             Does that refer to the Howley incident?
9        A    Yes.
10       Q    Okay.  "And told me not to worry about my job
11   security because all he cared about was me making
12   money."
13       A    Right.
14       Q    Do you see where it says that?  "And he also
15   said that 2002 was looking like an excellent year for
16   me"?
17       A    Yes.
18       Q    Is that accurate?
19       A    That is accurate.
20       Q    If the incident -- he was talking to you at
21   this point sometime --
22       A    Well, he -- he had said he heard from Brian
23   Cummings that I was doing well, that 2002 was looking
24   like an excellent year for me.
25       Q    Why would he be referring to 2002 if the
```

Page 212

```
 1    incident that David was talking to you about occurred
 2    in 2001?  This conversation with David Messer occurred
 3    sometime in 2001, I take it?
 4         A    No.  This occurred -- this would have
 5    occurred in the January, February time of 2002.
 6         Q    This was a single conversation you had with
 7    David Messer?
 8         A    Yes.
 9         Q    And at that time --
10         A    I had two conversations with David Messer.
11         Q    That are encapsulated in this paragraph here?
12         A    Yes.  Probably poorly written, though.
13         Q    But your testimony as you sit here today is
14    that what's listed there actually refers to two
15    separate conversations, not one?
16         A    Yes.
17         Q    Okay.  And in one conversation he discussed
18    the Howley incident with you and told you not to worry
19    about your job security?
20         A    Yeah.  The first -- right.  This should
21    probably be separated into two.  The first one was soon
22    after the Howley incident, I went in --
23         Q    Okay.
24         A    -- to talk with David Messer, and I told him
25    I was concerned about my job security because of the
```

Page 213

1  incident, and I thought that -- well, I just told him I
2  was concerned about my job security.  And he said not
3  to worry.  "All we care about is you making money."
4            The second one is the spring of -- I -- I
5  would speak to David Messer on a regular basis.
6       Q    And the second conversation was spring of
7  2002?
8       A    Was probably January, either -- actually, it
9  could have been any time, probably December, January
10 time.
11      Q    Looking at subparagraph K, refers -- says
12 "Alison"?
13      A    Yes.
14      Q    It says that Alison told Billy Lasher that
15 she, meaning Alison, thought the process for your
16 firing was very strange; is that correct?
17      A    That's correct.
18      Q    Who told you that?  Was it Alison who told
19 you that, Billy Lasher who told you that, or somebody
20 else?
21      A    Billy Lasher told me that.
22      Q    Billy Lasher told you that Alison told him
23 that Alison thought the process for your firing was
24 very strange?
25      A    Uh-huh.

Page 214

```
 1       Q    Okay.
 2       A    Yes.
 3       Q    And when did you have that conversation with
 4  Mr. Lasher?  Subsequent to your termination?
 5       A    Subsequent to my termination, yes.
 6       Q    But do you recall when, how long after?  Was
 7  it weeks, months, days?
 8       A    Weeks, days, yeah.  Somewhere -- it's
 9  probably about a week or so.  It could -- within a
10  week.
11       Q    And subparagraph L refers to Audrey Cullen.
12  It says you spoke with her a week or so after you were
13  fired?
14       A    Yes.
15       Q    Is that you first time you had spoken to her
16  since you were terminated?
17       A    Yes.
18       Q    And what did you tell her during that
19  conversation?  Was it a phone conversation?
20       A    It was a phone conversation, and we
21  discussed -- well, she was a headhunter, so I was
22  discussing with her what job opportunities would be
23  available.
24       Q    But presumably before that, you told her that
25  you were terminated from Sempra, or what -- what did
```

Wood vs Sempra Energy

12/12/2003

Susan Wood

Page 215

1  you say about the reasons for your leaving?
2      A    I just told her I was terminated, that I was
3  no longer at Sempra, and I'd be looking for another
4  job.
5      Q    Did you tell her why you thought you had been
6  terminated from Sempra?
7      A    I told her that I was terminated and not
8  given any reason.  I didn't get into any -- any details
9  with her.
10     Q    And you didn't get into any details about the
11 reasons you thought you were terminated?
12     A    Not on that conversation, no.
13     Q    And did you get into that -- into those
14 details in some subsequent conversation?
15     A    Yes.  I met with Audrey maybe a week after
16 that, and we had lunch up near her offices.
17     Q    And what did you tell her during that lunch
18 meeting?
19     A    I think we had a fairly detailed
20 conversation, and I explained to her in depth about the
21 Howley incident and the uncomfortableness I had on the
22 desk after that.  And just the general
23 uncomfortableness in the office, the lack of inclusion,
24 the issues I had with Sarathi, and that I thought that
25 I was terminated because I was gay, because I was a

Brandon Smith Reporting Service

Wood vs Sempra Energy

12/12/2003

Susan Wood

Page 216

```
 1  woman, and in retaliation for the Howley incident.
 2      Q    You told her -- you told her definitively
 3  that you thought you were terminated because you
 4  were --
 5      A    Yes.
 6      Q    -- being discriminated on the basis of your
 7  gender and your sexual orientation and in retaliation?
 8      A    Yes.
 9      Q    Okay.  If you look at -- for just by way of
10  example, bottom of -- bottom of page 11, which is your
11  response to interrogatory number 10, and I believe --
12  I'll be more general, but in your response to
13  interrogatory number 10, there are statements that are
14  in quotes such as, "At that point he said, 'Not to
15  worry.  All we care about is making money.'"  Period.
16  "'So long as you make money for the company, you will
17  always have a job here.'"  End quote.
18          Do you see that?
19      A    Uh-huh, yes.
20      Q    Were you referring -- is that a direct quote,
21  and if so, where are you getting that from?  A
22  document?
23      A    That was my recollection of the language he
24  used.
25      Q    But as you sit here today, you are not
```

Brandon Smith Reporting Service

4d0624cc-39ff-497a-b315-d6d2e89e8924

12/12/2003                    Wood vs Sempra Energy

                                                          Susan Wood

                                                              Page 239

```
 1
 2
                    STATE OF CONNECTICUT
 3
 4
         I, JAMES A. SCALLY, a Registered Professional
 5  Reporter/Commissioner within and for the State of
    Connecticut, do hereby certify that I took the
 6  deposition of SUSAN E. WOOD on December 12, 2003, at
    the offices of Paul, Hastings, Janofsky & Walker, LLP,
 7  1055 Washington Boulevard, Stamford, Connecticut.
 8       I further certify that the above-named deponent
    was by me first duly sworn to testify to the truth, the
 9  whole truth, and nothing but the truth concerning her
    knowledge in the matter of the case of SUSAN E. WOOD VS
10  SEMPRA ENERGY TRADING CORPORATION, now pending in the
    United States District Court, District of Connecticut.
11
         I further certify that the within testimony was
12  taken by me stenographically and reduced to typewritten
    form under my direction by means of COMPUTER ASSISTED
13  TRANSCRIPTION; and I further certify that said
    deposition is a true record of the testimony given by
14  said witness.
15       I further certify that I am neither counsel for,
    related to, nor employed by any of the parties to the
16  action in which this deposition is taken; and further,
    that I am not a relative or employee of any attorney or
17  counsel employed by the parties hereto, nor financially
    or otherwise interested in the outcome of the action.
18
         WITNESS my hand and affixed my seal this 24th day
19  of December, 2003.
                        James A. Scally
20
21
                        James A. Scally, RPR, CRR
22                      Commissioner
23
    My commission expires
24  May 31, 2004
25
```

Brandon Smith Reporting Service

4d0624cc-39ff-497a-b315-d6d2e89e8924