UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

----------------------------------X

SUSAN E. WOOD                           :

        Plaintiff          ,:

  VS.                                  : NO. 3:03cv098(JCH)

SEMPRA ENERGY TRADING CORP.             :

        Defendant          ,:

----------------------------------X

D E P O S I T I O N

THE DEPOSITION OF VINCENT P. COOKINGHAM, taken on behalf of the Plaintiff, pursuant to the Federal Rules of Civil Procedure, before Melodie Ajello, Registered Professional Reporter, Notary Public within the State of Connecticut, on the 5th day of April, 2004, at 9:10 a.m, at the offices of O'Rourke & Associates, 27 Pine Street, New Canaan, Connecticut  06840.

GOLDFARB AND AJELLO REPORTING SERVICES

24 East Avenue #1372

New Canaan, Connecticut  06840

Goldfarb & Ajello
203-972-8320

1  A. By looking in my emails and emails of
2  related parties to see if there was anything in connection
3  with this matter.
4  Q. Now, when you say related parties, who are
5  you referring to?
6  A. I can't recall who I searched, but I know I
7  did email searching and probably principal searching was
8  my own emails. Now, I might have gone to Sarathi's, I'm
9  not sure, I don't recall. Anything I could locate
10 reasonably is contained within the folder.
11 Q. Were you given the responsibility for
12 assembling documents that were relevant to this
13 litigation?
14            MR. SHULTZ: Object to the form of
15            the question.
16 A. No. It's something I would do as a matter
17 of form from experience, I know that there's litigation
18 pending, step one in litigation is to assemble all
19 pertinent documents.
20 Q. When you say you're not sure if you looked
21 at Sarathi Roy's email, I'm having --
22 A. I can clarify that for you. My best
23 recollection, I asked: If there were pertinent documents
24 in your email that relate to this matter, would you give
25 them to me. When I say search, that doesn't mean I went

1  online and did a function analysis and a sorting of his
2  whole -- I didn't do that, that's not something we do.
3       Q.   How about Susan Wood's email history?
4       A.   I did not search her emails.
5       Q.   Do you know who did?
6       A.   If anyone did, I'm not aware of it.
7       Q.   In the course of your assembling the file
8  for Susan Wood, did you come across documentation
9  pertaining to the Howley incident?
10      A.   Yes.
11      Q.   And did you come across the incident
12 reports?
13      A.   The only thing I came across with regard to
14 Howley was a one-page report that I recall.
15      Q.   Um-hum.  Where did you obtain that?
16      A.   I believe from her personnel file, though I
17 can't specifically recall that.  Either it could have been
18 given to me by Denise Freda, one or the other vehicle was
19 the way I recovered it.
20      Q.   How long ago did you deliver the file that
21 you referred to in compiling for this matter to your
22 outside counsel?
23      A.   Probably six months ago as a guess, as an
24 approximation.
25      Q.   Have you spoken to Sarathi Roy about this

# UNREPORTED CASES

Westlaw.

Not Reported in F.Supp.2d

Page 1

2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P 41,728

**(Cite as: 2004 WL 1620866 (S.D.N.Y.))**

▷

**Motions, Pleadings and Filings**

United States District Court,
S.D. New York.
Laura ZUBULAKE, Plaintiff,
v.
UBS WARBURG LLC, UBS Warburg, and UBS Ag, Defendants.
No. 02 Civ. 1243(SAS).

July 20, 2004.

James A. Batson, Liddle & Robinson, LLP, New York, New York, for Plaintiff.

Kevin B. Leblang, Norman C. Simon, Kramer Levin Naftalis & Frankel LLP, New York, New York, for Defendants.

*OPINION AND ORDER*

SCHEINDLIN, J.

*1 Commenting on the importance of speaking clearly and listening closely, Phillip Roth memorably quipped, "The English language is a form of communication! ... Words aren't only bombs and bullets--no, they're little gifts, containing meanings!" [FN1] What is true in love is equally true at law: Lawyers and their clients need to communicate clearly and effectively with one another to ensure that litigation proceeds efficiently. When communication between counsel and client breaks down, conversation becomes "just crossfire," [FN2] and there are usually casualties.

FN1. PHILIP ROTH, PORTNOY'S COMPLAINT (1967).

FN2. *Id.*

I. INTRODUCTION

This is the fifth written opinion in this case, a relatively routine employment discrimination dispute in which discovery has now lasted over two years. Laura Zubulake is once again moving to sanction UBS for its failure to produce relevant information and for its tardy production of such material. In order to decide whether sanctions are warranted, the following question must be answered: Did UBS fail to preserve and timely produce relevant information and, if so, did it act negligently, recklessly, or willfully?

This decision addresses counsel's obligation to ensure that relevant information is preserved by giving clear instructions to the client to preserve such information and, perhaps more importantly, a client's obligation to heed those instructions. Early on in this litigation, UBS's counsel--both in-house and outside--instructed UBS personnel to retain relevant electronic information. Notwithstanding these instructions, certain UBS employees deleted relevant e-mails. Other employees never produced relevant information to counsel. As a result, many discoverable e-mails were not produced to Zubulake until recently, even though they were responsive to a document request propounded on June 3, 2002. [FN3] In addition, a number of e-mails responsive to that document request were deleted and have been lost altogether.

FN3. *See Zubulake v. UBS Warburg LLC,* 217 F.R.D. 309, 312 (S.D.N.Y.2003) ( *"Zubulake I"* ) (quoting Zubulake's document request, which called for "[a]ll documents concerning any communications by or between UBS employees concerning Plaintiff," and defining "document" to include "without limitation, electronic or computerized data compilations.").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 2
2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P 41,728
**(Cite as: 2004 WL 1620866 (S.D.N.Y.))**

Counsel, in turn, failed to request retained information from one key employee and to give the litigation hold instructions to another. They also failed to adequately communicate with another employee about how she maintained her computer files. Counsel also failed to safeguard backup tapes that might have contained some of the deleted e-mails, and which would have mitigated the damage done by UBS's destruction of those e-mails.

The conduct of both counsel and client thus calls to mind the now-famous words of the prison captain in *Cool Hand Luke:* "What we've got here is a failure to communicate." [FN4] Because of this failure by *both* UBS and its counsel, Zubulake has been prejudiced. As a result, sanctions are warranted.

> FN4. Captain, Road Prison 36, in COOL HAND LUKE (1967), found at http://ask.yahoo.com/ask/20011026.html.

II. FACTS

The allegations at the heart of this lawsuit and the history of the parties' discovery disputes have been well-documented in the Court's prior decisions, [FN5] familiarity with which is presumed. In short, Zubulake is an equities trader specializing in Asian securities who is suing her former employer for gender discrimination, failure to promote, and retaliation under federal, state, and city law.

> FN5. *See Zubulake I,* 217 F.R.D. 309 (addressing the legal standard for determining the cost allocation for producing e-mails contained on backup tapes); *Zubulake v. UBS Warburg LLC,* No. 02 Civ. 1243, 2003 WL 21087136 (S.D.N.Y. May 13, 2003) (*"Zubulake II"*) (addressing Zubulake's reporting obligations); *Zubulake v. UBS Warburg LLC,* 216 F.R.D. 280 (S.D.N.Y.2003) (*"Zubulake III"*) (allocating backup tape restoration costs between Zubulake and UBS); *Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212 (S.D.N.Y.2003) (*"Zubulake IV"*) (ordering sanctions against UBS for violating its duty to preserve evidence).

A. Background

*2 Zubulake filed an initial charge of gender discrimination with the EEOC on August 16, 2001. [FN6] Well before that, however--as early as April 2001--UBS employees were on notice of Zubulake's impending court action. [FN7] After she received a right-to-sue letter from the EEOC, Zubulake filed this lawsuit on February 15, 2002. [FN8]

> FN6. *See Zubulake I,* 217 F.R.D. at 312.

> FN7. *See Zubulake IV,* 220 F.R.D. at 217 ("Thus, the relevant people at UBS anticipated litigation in April 2001. The duty to preserve attached at the time that litigation was reasonably anticipated.").

> FN8. *See Zubulake I,* 217 F.R.D. at 312.

Fully aware of their common law duty to preserve relevant evidence, UBS's in-house attorneys gave oral instructions in August 2001--immediately after Zubulake filed her EEOC charge--instructing employees not to destroy or delete material potentially relevant to Zubulake's claims, and in fact to segregate such material into separate files for the lawyers' eventual review. [FN9] This warning pertained to both electronic and hard-copy files, but did *not* specifically pertain to so-called "backup tapes," maintained by UBS's information technology personnel. [FN10] In particular, UBS's in-house counsel, Robert L. Salzberg, "advised relevant UBS employees to preserve and turn over to counsel all files, records or other written memoranda or documents concerning the allegations raised in the [EEOC] charge or any aspect of [Zubulake's] employment." [FN11] Subsequently--but still in August 2001-- UBS's outside counsel met with a number of the key players in the litigation and reiterated Mr. Salzberg's instructions, reminding them to preserve relevant documents, "including e-mails." [FN12] Salzberg reduced these instructions to writing in e-mails dated February 22, 2002 [FN13] --immediately after Zubulake filed her

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 3

2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P 41,728

**(Cite as: 2004 WL 1620866 (S.D.N.Y.))**

complaint--and September 25, 2002. [FN14] Finally, in August 2002, after Zubulake propounded a document request that specifically called for e-mails stored on backup tapes, UBS's outside counsel instructed UBS information technology personnel to stop recycling backup tapes. [FN15] *Every* UBS employee mentioned in this Opinion (with the exception of Mike Davies) either personally spoke to UBS's outside counsel about the duty to preserve e-mails, or was a recipient of one of Salzberg's e-mails. [FN16]

> FN9. *See Zubulake IV,* 220 F.R.D. at 215.
>
> FN10. *See id.*
>
> FN11. *See* 10/14/03 Letter from Norman Simon, counsel to UBS, to the Court ("10/14/03 Simon Ltr.") at 1.
>
> FN12. *Id.* at 1 n. 1.
>
> FN13. *See* Ex. A to 10/14/03 Simon Ltr.
>
> FN14. *See* Ex. C to 10/14/03 Simon Ltr.
>
> FN15. *See Zubulake IV,* 220 F.R.D. at 215. *See also* 10/14/03 Simon Ltr. at 2 ("In late August 2002, plaintiff first requested backup e-mails from certain UBS employees. Thereafter, I advised UBS's information technology personnel to locate and retain all existing backup tapes for employees identified by plaintiff. I re-emphasized that directive and confirmed that these tapes continued to be preserved both orally and in writing on several subsequent occasions.").
>
> FN16. Specifically, UBS's outside counsel spoke with Matthew Chapin on August 29, 2001, with Joy Kim and Andrew Clarke on August 30, 2001, and with Jeremy Hardisty, John Holland, and Dominic Vail on August 31, 2001. *See* 10/14/03 Simon Ltr. at 1 n. 1. Holland, Chapin, Hardisty, Brad Orgill, James Tregear, Rose Tong, Vail, Barbara Amone, Joshua Varsano, and Rebecca White were all direct recipients of Salzberg's e-mails. *See* Ex. A to 10/14/03 Simon Ltr.

B. Procedural History

In *Zubulake I,* I addressed Zubulake's claim that relevant e-mails had been deleted from UBS's active servers and existed only on "inaccessible" archival media (*i.e.,* backup tapes). [FN17] Arguing that e-mail correspondence that she needed to prove her case existed only on those backup tapes, Zubulake called for their production. UBS moved for a protective order shielding it from discovery altogether or, in the alternative, shifting the cost of backup tape restoration onto Zubulake. Because the evidentiary record was sparse, I ordered UBS to bear the costs of restoring a sample of the backup tapes. [FN18]

> FN17. *See generally Zubulake I,* 217 F.R.D. 309.
>
> FN18. *See id.* at 324.

After the sample tapes were restored, UBS continued to press for cost shifting with respect to any further restoration of backup tapes. In *Zubulake III,* I ordered UBS to bear the lion's share of restoring certain backup tapes because Zubulake was able to demonstrate that those tapes were likely to contain relevant information. [FN19] Specifically, Zubulake had demonstrated that UBS had failed to maintain all relevant information (principally e-mails) in its active files. After *Zubulake III,* Zubulake chose to restore sixteen backup tapes. [FN20] "In the restoration effort, the parties discovered that certain backup tapes [were] missing." [FN21] They also discovered a number of e-mails on the backup tapes that were missing from UBS's active files, confirming Zubulake's suspicion that relevant e-mails were being deleted or otherwise lost. [FN22]

> FN19. *See Zubulake III,* 216 F.R.D. at 289.
>
> FN20. 4/22/04 Oral Argument Transcript ("Tr.") at 29-30.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P 41,728

**(Cite as: 2004 WL 1620866 (S.D.N.Y.))**

Page 4

> FN21. *Zubulake IV*, 220 F.R.D. at 215.
>
> FN22. *See id.; see also Zubulake III*, 216 F.R.D. at 287.

**\*3** *Zubulake III* begat *Zubulake IV*, where Zubulake moved for sanctions as a result of UBS's failure to preserve all relevant backup tapes, and UBS's deletion of relevant e-mails. Finding fault in UBS's document preservation strategy but lacking evidence that the lost tapes and deleted e-mails were particularly favorable to Zubulake, I ordered UBS to pay for the re-deposition of several key UBS employees--Varsano, Chapin, Hardisty, Kim, and Tong--so that Zubulake could inquire about the newly-restored e-mails. [FN23]

> FN23. *See Zubulake IV*, 220 F.R.D. at 222 (finding that spoliation was not willful and declining to grant an adverse inference instruction).

C. The Instant Dispute

The essence of the current dispute is that during the re-depositions required by *Zubulake IV*, Zubulake learned about more deleted e-mails and about the existence of e-mails preserved on UBS's active servers that were, to that point, never produced. In sum, Zubulake has now presented evidence that UBS personnel deleted relevant e-mails, some of which were subsequently recovered from backup tapes (or elsewhere) and thus produced to Zubulake long after her initial document requests, and some of which were lost altogether. Zubulake has also presented evidence that some UBS personnel did not produce responsive documents to counsel until recently, depriving Zubulake of the documents for almost two years.

1. Deleted E-Mails

Notwithstanding the clear and repeated warnings of counsel, Zubulake has proffered evidence that a number of key UBS employees--Orgill, Hardisty, Holland, Chapin, Varsano, and Amone--failed to retain e-mails germane to Zubulake's claims. Some of the deleted e-mails were restored from backup tapes (or other sources) and have been produced to Zubulake, others have been altogether lost, though there is strong evidence that they once existed. Although I have long been aware that certain e-mails were deleted, [FN24] the re-depositions demonstrate the scope and importance of those documents.

> FN24. *See Zubulake III*, 216 F.R.D. at 287.

a. At Least One E-Mail Has Never Been Produced

At least one e-mail has been irretrievably lost; the existence of that e-mail is known only because of oblique references to it in other correspondence. It has already been shown that Chapin--the alleged primary discriminator--deleted relevant e-mails. [FN25] In addition to those e-mails, Zubulake has evidence suggesting that Chapin deleted at least one other e-mail that has been lost *entirely*. An e-mail from Chapin sent at 10:47 AM on September 21, 2001, asks Kim to send him a "document" recounting a conversation between Zubulake and a co-worker. [FN26] Approximately 45 minutes later, Chapin sent an e-mail complaining about Zubulake to his boss and to the human resources employees handling Zubulake's case purporting to contain a verbatim recitation of a conversation between Zubulake and her co-worker, as overheard by Kim. [FN27] This conversation allegedly took place on September 18, 2001, at 10:58 AM . [FN28] There is reason to believe that immediately after that conversation, Kim sent Chapin an e-mail that contained the verbatim quotation that appears in Chapin's September 21 e-mail--the "document" that Chapin sought from Kim just prior to sending that e-mail--and that Chapin deleted it. [FN29] That e-mail, however, has never been recovered and is apparently lost.

> FN25. *See id.* (finding that Chapin "was concealing and deleting especially relevant e-mails").
>
> FN26. *See* 9/21/01 e-mail from Chapin to Kim, UBSZ 001400.
>
> FN27. 7/21/01 e-mail from Chapin to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 5

2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P 41,728

**(Cite as: 2004 WL 1620866 (S.D.N.Y.))**

Holland, Varsano and Tong, UBSZ 001399.

FN28. *See id.*

FN29. Kim sent an e-mail at 11:19 AM on September 18, bearing the subject "2," which appears to contain a *different* verbatim quotation from Zubulake. *See* UBSZ 004047. The e-mail containing the quotation that Chapin used in his September 21 e-mail would have borne the subject "1" and been sent sometime between 10:58 AM and 11:19 AM. *See also* 2/6/04 Deposition of Matthew Chapin at 565 (Chapin testifying that he might have pasted the quotation from another document); *id.* at 587 (Chapin testifying that he wasn't sure whether the quotation was a paraphrase or pasted from another e-mail).

*4 Although Zubulake has only been able to present concrete evidence that this one e-mail was irretrievably lost, there may well be others. Zubulake has presented extensive proof, detailed below, that UBS personnel were deleting relevant e-mails. Many of those e-mails were recovered from backup tapes. The UBS record retention policies called for monthly backup tapes to be retained for three years. [FN30] The tapes covering the relevant time period (circa August 2001) should have been available to UBS in August 2002, when counsel instructed UBS's information technology personnel that backup tapes were also subject to the litigation hold.

FN30. *See Zubulake I,* 217 F.R.D. at 314 ("Nightly backup tapes were kept for twenty working days, weekly tapes for one year, and monthly tapes for three years. After the relevant time period elapsed, the tapes were recycled.").

Nonetheless, many backup tapes for the most relevant time periods are missing, including: Tong's tapes for June, July, August, and September of 2001; Hardisty's tapes for May, June, and August of 2001; Clarke and Vinay Datta's tapes for April and September 2001; and Chapin's tape for April 2001. [FN31] Zubulake did not even learn that four of these tapes were missing until after *Zubulake IV.* Thus, it is impossible to know just how many relevant e-mails have been lost in their entirety. [FN32]

FN31. *See* Current List of Missing Monthly Backup Tapes, Ex. E to 5/21/04 Reply Affirmation of James A. Batson, counsel to Zubulake ("Batson Reply Aff."). UBS does have some weekly backup tapes for portions of these times for everyone but Tong. *See id.* n. 1.

FN32. In *Zubulake IV,* I held that UBS's destruction of relevant backup tapes was negligent, rather than willful, because whether the duty to preserve extended to backup tapes was "a grey area." 220 F.R.D. at 221. I further held that "[l]itigants are now on notice, at least in this Court, that backup tapes that can be identified as storing information created by or for 'key players' must be preserved." *Id.* at 221 n. 47.
Because UBS lost the backup tapes mentioned in this opinion well before *Zubulake IV* was issued, it was not on notice of the precise contours of its duty to preserve backup tapes. Accordingly, I do not discuss UBS's destruction of relevant backup tapes as proof that UBS acted willfully, but rather to show that Zubulake can no longer prove what was deleted and when, and to demonstrate that the scope of e-mails that have been irrevocably lost is broader than initially thought.

b. Many E-Mails Were Deleted and Only Later Recovered from Alternate Sources

Other e-mails were deleted in contravention of counsel's "litigation hold" instructions, but were subsequently recovered from alternative sources--such as backup tapes--and thus produced to Zubulake, albeit almost two years after she

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 6

2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P 41,728

(Cite as: 2004 WL 1620866 (S.D.N.Y.))

propounded her initial document requests. For example, an e-mail from Hardisty to Holland (and on which Chapin was copied) reported that Zubulake said "that all she want[ed] is to be treated like the other 'guys' on the desk." [FN33] That e-mail was recovered from Hardisty's August 2001 backup tape-- and thus it was on his active server as late as August 31, 2001, when the backup was generated--but was not in his active files. That e-mail therefore *must have* been deleted subsequent to counsel's warnings. [FN34]

> FN33. 7/23/01 e-mail from Hardisty to Holland, UBSZ 002957.
>
> FN34. Because the e-mail was dated July 23, 2001, the same cannot be said of Chapin or Holland. Although they had a duty to preserve relevant e-mails starting in April 2001, counsel did not specifically warn them until August 2001. Chapin and Holland might have deleted the e-mail prior to counsel's warning.

Another e-mail, from Varsano to Hardisty dated August 31, 2001--the very day that Hardisty met with outside counsel--forwarded an earlier message from Hardisty dated June 29, 2001, that recounted a conversation in which Hardisty "warned" Chapin about his management of Zubulake, and in which Hardisty reminded Chapin that Zubulake could "be a good broker." [FN35] This e-mail was absent from UBS's initial production and had to be restored from backup; apparently neither Varsano nor Hardisty had retained it. [FN36] This deletion is especially surprising because Varsano retained the June 29, 2001 e-mail for over two months before he forwarded it to Hardisty. [FN37] Indeed, Varsano testified in his deposition that he "definitely" "saved all of the e-mails that [he] received concerning Ms. Zubulake" in 2001, that they were saved in a separate "very specific folder," and that "all of those e-mails" were produced to counsel. [FN38]

> FN35. 8/31/01 e-mail from Varsano to Hardisty, UBSZ 002968. Because the header information from Hardisty's June 29, 2001 e-mail was cropped when Varsano forwarded it, it is not clear who--besides, presumably, Varsano--received that message.
>
> FN36. *See* Example of Relevant E-Mails, in Chronological Order, That Were Restored From April to October 2001 Backup Tapes, Ex. I to the 4/30/04 Affirmation of James A. Batson ("Batson Aff."). This chart does not clearly indicate from which backup tape the e-mail was restored.
>
> FN37. *See id.; see also* 6/29/01 e-mail from Hardisty to Holland, Amone and Varsano, UBSZ 004097 (the underlying e-mail, also restored from a backup tape).
>
> FN38. 1/26/04 Deposition of Joshua Varsano ("Varsano Dep.") at 289- 90. If Varsano's testimony is credited, then counsel somehow failed to produce those e-mails to Zubulake.

As a final example, an e-mail from Hardisty to Varsano and Orgill, dated September 1, 2001, specifically discussed Zubulake's termination. It read: "LZ--ok once lawyers have been signed off, probably one month, but most easily done in combination with the full Asiapc [downsizing] announcement. We will need to document her performance post her warning HK. Matt [Chapin] is doing that." [FN39] Thus, Orgill and Hardisty had decided to terminate Zubulake as early as September 1, 2001. Indeed, two days later Orgill replied, "It's a pity we can't act on LZ earlier." [FN40] Neither the authors nor any of the recipients of these e-mails retained any of them, even though these e-mails were sent within days of Hardisty's meeting with outside counsel. They were not even preserved on backup tapes, but were only recovered because Kim happened to have retained copies. [FN41] Rather, all three people (Hardisty, Orgill and Varsano) deleted these e-mails from their computers by the end of September 2001. Apart from their direct relevance to Zubulake's claims, these e-mails may also serve to rebut Orgill and Hardisty's deposition testimony. Orgill testified that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 7
2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P 41,728
**(Cite as: 2004 WL 1620866 (S.D.N.Y.))**

he played no role in the decision to terminate Zubulake. [FN42] And Hardisty testified that he did not recall discussing Zubulake's termination with Orgill. [FN43]

> FN39. 9/3/01 e-mail from Orgill to Hardisty and Varsano (replying to and attaching 9/1/01 e-mail from Hardisty to Varsano and Orgill), UBSZ 002965.
>
> FN40. *Id.*
>
> FN41. These e-mails were some of the ones fortuitously recovered from Kim's active files, as discussed below. *See* Memorandum of Law in Support of Plaintiff's Motion for Sanctions ("Pl.Mem.") at 6 n. 18. And, indeed, Kim did not have all of the original e-mails, but retained only the last e-mail in the chain of correspondence, which had the earlier e-mails in the same chain embedded in it. It is not clear why or how she obtained this e-mail.
>
> FN42. *See* 3/4/03 Deposition of Brad Orgill at 43.
>
> FN43. *See* 2/26/03 Deposition of Jeremy Hardisty at 262.

*5 These are merely examples. The proof is clear: UBS personnel unquestionably deleted relevant e-mails from their computers after August 2001, even though they had received at least two directions from counsel not to. Some of those e-mails were recovered (Zubulake has pointed to at least 45), [FN44] but some--and no one can say how many--were not. And even those e-mails that were recovered were produced to Zubulake well after she originally asked for them.

> FN44. *See* The Actual Number of E-Mails not Retained by UBS Executives Post-Dating the August EEOC Filing, Ex. H to Batson Reply Aff.

2. Retained, But Unproduced, E-Mails

Separate and apart from the deleted material are a number of e-mails that were absent from UBS's initial production even though they were not deleted. These e-mails existed in the active, on-line files of two UBS employees--Kim and Tong--but were not produced to counsel and thus not turned over to Zubulake until she learned of their existence as a result of her counsel's questions at deposition. Indeed, these e-mails were not produced until after Zubulake had conducted thirteen depositions and four re-depositions. [FN45]

> FN45. *See* Batson Reply Aff. ¶ 6.

During her February 19, 2004, deposition, Kim testified that she was *never* asked to produce her files regarding Zubulake to counsel, nor did she ever actually produce them, [FN46] although she was asked to retain them. [FN47] One week after Kim's deposition, UBS produced seven new e-mails. The obvious inference to be drawn is that, subsequent to the deposition, counsel for the first time asked Kim to produce her files. Included among the new e-mails produced from Kim's computer was one (dated September 18, 2001) that recounts a conversation between Zubulake and Kim in which Zubulake complains about the way women are treated at UBS. [FN48] Another e-mail recovered from Kim's computer contained the correspondence, described above, in which Hardisty and Orgill discuss Zubulake's termination, and in which Orgill laments that she could not be fired sooner than she was.

> FN46. *See* 2/19/04 Deposition of Joy Kim at 44-45.
>
> FN47. *See id.* at 35.
>
> FN48. *See* UBSZ 004047.

On March 29, 2004, UBS produced several new e-mails, and three new e-mail retention policies, from Tong's active files. [FN49] At her deposition two weeks earlier, Tong explained (as she had at her first deposition, a year previous) that she kept a separate "archive" file on her computer with documents pertaining to Zubulake. [FN50] UBS

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 8

2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P 41,728

**(Cite as: 2004 WL 1620866 (S.D.N.Y.))**

admits that until the March 2004 deposition, it misunderstood Tong's use of the word "archive" to mean backup tapes; after her March 2004 testimony, it was clear that she meant active data. Again, the inference is that UBS's counsel then, for the first time, asked her to produce her active computer files.

> FN49. *See* Ex. M to the Batson Aff.
>
> FN50. *See* 3/10/04 Deposition of Rose Tong at 97, 140; *see also* 3/4/03 Deposition of Rose Tong at 66-67.

Among the new e-mails recovered from Tong's computer was one, dated August 21, 2001, at 11:06 AM, from Mike Davies [FN51] to Tong that read, "received [.] thanks[,] mike," [FN52] and which was in response to an e-mail from Tong, sent eleven minutes earlier, that read, "Mike, I have just faxed over to you the 7 pages of Laura's [EEOC] charge against the bank." [FN53] While Davies' three-word e-mail seems insignificant in isolation, it is actually quite important.

> FN51. Davies, Tong's supervisor, was--as far as the record before the Court shows--not specifically instructed about the litigation hold by UBS's counsel.
>
> FN52. 8/21/01 e-mail from Davies to Tong, UBSZ 004352.
>
> FN53. 8/21/01 e-mail from Tong to Davies, UBSZ 004351.

*6 Three hours after sending that three word response, Davies sent an e-mail to Tong with the subject line "Laura Zubulake" that reads:
I spoke to Brad [Orgill]--he's looking to exit her asap [by the end of month], and looking for guidance from us following letter? we sent her re her performance [or does he mean PMM]
I said you were on call with U.S. yesterday and that we need U.S. legal advise etc, but be aware he's looking to finalise quickly!--said if off by end August then no bonus consideration, but if still employed after aug consideration should be given? [FN54]

> FN54. 8/21/01 e-mail from Davies to Tong, UBSZ 004353. The text of this e-mail was part of UBS's initial production.

Davies testified that he was unaware of Zubulake's EEOC charge when he spoke with Orgill. [FN55] The timing of his e-mails, however--the newly produced e-mail that acknowledges receiving Zubulake's EEOC charge coming three hours before the e-mail beginning "I spoke to Brad"--strongly undercuts this claim. The new e-mail, therefore, is circumstantial evidence that could support the inference that Davies knew about the EEOC charge when he spoke with Orgill, and suggests that Orgill knew about the EEOC charge when the decision was made to terminate Zubulake. [FN56] Its relevance to Zubulake's retaliation claim is unquestionable, and yet it was not produced until April 20, 2004. [FN57]

> FN55. *See* 3/11/03 Deposition of Mike Davies at 21 ("The EEOC application was something new to me, so it did stand out in my mind, and I hadn't had a conversation with anyone about it, so I hadn't spoken to Brad about it"); *see also id.* (Davies replying "no" in response to the question "Did you ever speak to Brad about it?").
>
> FN56. It is also plausible that Orgill and Davies spoke days earlier--before either knew about the EEOC charge--and Davies might have omitted that information from his initial e-mail to Tong. The newly discovered e-mail, however, is helpful to Zubulake in arguing her view of the evidence.
>
> FN57. Ostensible copies of these e-mails were produced on March 29, 2004--from where is not clear--but they appear to have the incorrect time/date stamps. The copies produced on April 20, because they came directly from Tong's computer, are more reliable.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 9

2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P 41,728

**(Cite as: 2004 WL 1620866 (S.D.N.Y.))**

\* \* \*

Zubulake now moves for sanctions as a result of UBS's purported discovery failings. In particular, she asks--as she did in *Zubulake IV*--that an adverse inference instruction be given to the jury that eventually hears this case.

III. LEGAL STANDARD

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." [FN58] "The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis." [FN59] The authority to sanction litigants for spoliation arises jointly under the Federal Rules of Civil Procedure and the court's inherent powers. [FN60]

> FN58. *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir.1999).
>
> FN59. *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 436 (2d Cir.2001).
>
> FN60. *See Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 72 (S.D.N.Y.1991) (Francis, M.J.) (citing Fed.R.Civ.P. 37); *see also Shepherd v. American Broadcasting Cos.,* 62 F.3d 1469, 1474 (D.C.Cir.1995) ("When rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of the judicial process, the inherent power fills the gap."); *id.* at 1475 (holding that sanctions under the court's inherent power can "include ... drawing adverse evidentiary inferences").

The spoliation of evidence germane "to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction." [FN61] A party seeking an adverse inference instruction (or other sanctions) based on the spoliation of evidence must establish the following three elements: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a "culpable state of mind" and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. [FN62]

> FN61. *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir.1998).
>
> FN62. *Byrnie v. Town of Cromwell,* 243 F.3d 93, 107-12 (2d Cir.2001). An adverse inference instruction may also be warranted, in some circumstances, for the untimely production of evidence. *See Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 107 (2d Cir.2002).

In this circuit, a "culpable state of mind" for purposes of a spoliation inference includes ordinary negligence. [FN63] When evidence is destroyed in bad faith (*i.e.,* intentionally or willfully), that fact alone is sufficient to demonstrate relevance. [FN64] By contrast, when the destruction is negligent, relevance must be proven by the party seeking the sanctions. [FN65]

> FN63. *See Residential Funding,* 306 F.3d at 108.
>
> FN64. *See id.* at 109.
>
> FN65. *See id.*

\*7 In the context of a request for an adverse inference instruction, the concept of "relevance" encompasses not only the ordinary meaning of the term, [FN66] but also that the destroyed evidence would have been favorable to the movant. [FN67] "This corroboration requirement is even more necessary where the destruction was merely negligent, since in those cases it cannot be inferred from the conduct of the spoliator that the evidence would even have been harmful to him." [FN68] This is equally true in cases of gross negligence or recklessness; only in the case of *willful* spoliation

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 10

2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P 41,728

**(Cite as: 2004 WL 1620866 (S.D.N.Y.))**

does the degree of culpability give rise to a presumption of the relevance of the documents destroyed. [FN69]

> FN66. *See* Fed.R.Evid. 401; Fed.R.Civ.P. 26(b)(1).
>
> FN67. *See Residential Funding,* 306 F.3d at 108-09 ("Although we have stated that, to obtain an adverse inference instruction, a party must establish that the unavailable evidence is 'relevant' to its claims or defenses, our cases make clear that 'relevant' in this context means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence. Rather, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction.") (quotation marks, citations, footnote, and alterations omitted).
>
> FN68. *Turner,* 142 F.R.D. at 77 (citing *Stanojev v. Ebasco Services, Inc.,* 643 F.2d 914, 924 n. 7 (2d Cir.1981)).
>
> FN69. *See Residential Funding,* 306 F.3d at 109.

## IV. DISCUSSION

In *Zubulake IV,* I held that UBS had a duty to preserve its employees' active files as early as April 2001, and certainly by August 2001, when Zubulake filed her EEOC charge. [FN70] Zubulake has thus satisfied the first element of the adverse inference test. As noted, the central question implicated by this motion is whether UBS and its counsel took all necessary steps to guarantee that relevant data was both preserved and produced. If the answer is "no," then the next question is whether UBS acted wilfully when it deleted or failed to timely produce relevant information--resulting in either a complete loss or the production of responsive information close to two years after it was initially sought. If UBS acted wilfully, this satisfies the mental culpability prong of the adverse inference test and also demonstrates that the deleted material was relevant. [FN71] If UBS acted negligently or even recklessly, then Zubulake must show that the missing or late-produced information was relevant.

> FN70. *See Zubulake IV,* 220 F.R.D. at 216-17.
>
> FN71. *See Residential Funding,* 306 F.3d at 109 ("[O]nly in the case of *willful* spoliation is the spoliator's mental culpability itself evidence of the relevance of the documents destroyed.")

### A. Counsel's Duty to Monitor Compliance

In *Zubulake IV,* I summarized a litigant's preservation obligations:

> Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a "litigation hold" to ensure the preservation of relevant documents. As a general rule, that litigation hold does not apply to inaccessible backup tapes (*e.g.,* those typically maintained solely for the purpose of disaster recovery), which may continue to be recycled on the schedule set forth in the company's policy. On the other hand, if backup tapes are accessible (*i.e.,* actively used for information retrieval), then such tapes *would* likely be subject to the litigation hold. [FN72]

> FN72. *Zubulake IV,* 220 F.R.D. at 218 (emphasis in original); *see also id.* ("[I]t does make sense to create one exception to this general rule. If a company can identify where particular employee documents are stored on backup tapes, then the tapes storing the documents of "key players" to the existing or threatened litigation should be preserved if the information contained on those tapes is not otherwise available. This exception applies to *all* backup tapes.") (emphasis in original).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 11

2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P 41,728

**(Cite as: 2004 WL 1620866 (S.D.N.Y.))**

A party's discovery obligations do not end with the implementation of a "litigation hold"--to the contrary, that's only the beginning. Counsel must oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce the relevant documents. Proper communication between a party and her lawyer will ensure (1) that all relevant information (or at least all sources of relevant information) is discovered, (2) that relevant information is retained on a continuing basis; and (3) that relevant non-privileged material is produced to the opposing party.

1. Counsel's Duty to Locate Relevant Information

*8 Once a "litigation hold" is in place, a party and her counsel must make certain that all sources of potentially relevant information are identified and placed "on hold," to the extent required in *Zubulake IV*. To do this, counsel must become fully familiar with her client's document retention policies, as well as the client's data retention architecture. [FN73] This will invariably involve speaking with information technology personnel, who can explain system-wide backup procedures and the actual (as opposed to theoretical) implementation of the firm's recycling policy. It will also involve communicating with the "key players" in the litigation, [FN74] in order to understand how they stored information. In this case, for example, some UBS employees created separate computer files pertaining to Zubulake, while others printed out relevant e-mails and retained them in hard copy only. Unless counsel interviews each employee, it is impossible to determine whether all potential sources of information have been inspected. A brief conversation with counsel, for example, might have revealed that Tong maintained "archive" copies of e-mails concerning Zubulake, and that "archive" meant a separate on-line computer file, not a backup tape. Had that conversation taken place, Zubulake might have had relevant e-mails from that file two years ago.

> FN73. *Cf. Zubulake I*, 217 F.R.D. at 324 ("[i]t is necessary to thoroughly understand the responding party's computer system, both with respect to active and stored data").

> FN74. *Zubulake IV*, 220 F.R.D. at 218.

To the extent that it may not be feasible for counsel to speak with every key player, given the size of a company or the scope of the lawsuit, counsel must be more creative. It may be possible to run a system-wide keyword search; counsel could then preserve a copy of each "hit." Although this sounds burdensome, it need not be. Counsel does not have to review these documents, only see that they are retained. For example, counsel could create a broad list of search terms, run a search for a limited time frame, and then segregate responsive documents. [FN75] When the opposing party propounds its document requests, the parties could negotiate a list of search terms to be used in identifying responsive documents, and counsel would only be obliged to review documents that came up as "hits" on the second, more restrictive search. The initial broad cut merely guarantees that relevant documents are not lost.

> FN75. It might be advisable to solicit a list of search terms from the opposing party for this purpose, so that it could not later complain about which terms were used.

In short, it is *not* sufficient to notify all employees of a litigation hold and expect that the party will then retain and produce all relevant information. Counsel must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched. This is not to say that counsel will necessarily succeed in locating all such sources, or that the later discovery of new sources is evidence of a lack of effort. But counsel and client must take *some reasonable steps* to see that sources of relevant information are located.

2. Counsel's Continuing Duty to Ensure Preservation

Once a party and her counsel have identified all of the sources of potentially relevant information, they are under a duty to retain that information (as per

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.