UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SUSAN E. WOOD,<br><br>            Plaintiff,<br><br>- against -<br><br>SEMPRA ENERGY TRADING CORP.,<br><br>            Defendant. | CIVIL ACTION NO.<br>3:03-CV-986 (JCH) |

### AFFIDAVIT OF MICHAEL CASTEEL

I, Michael Casteel, being duly sworn, depose and say:

1. I am over the age of eighteen years and understand the obligations of an oath. This affidavit is based upon my personal knowledge and, where indicated, my information and belief.

2. I work in the Procurement Group at UPS and handle the purchase of jet fuel products for the Company. (at the time in question)

3. I worked on a trade with Susan Wood at Sempra Energy Trading in December 2001 through January 2002 which involved "Jet Crack."

4. In connection with this deal I asked Susan Wood to provide me with historical pricing data and market indicators to determine a pricing strategy. UPS traded on the information she provided. We later found that the information supplied by Ms. Wood was inaccurate, causing UPS a significant loss. In particular, she had given us inaccurate historical information and then inflated market indicator numbers, causing us to overpay. The details of this transaction are contained in draft correspondence that I prepared but did not send to both Susan Wood and Sempra in early 2002. True and correct copies of these drafts are attached to

SAN/120028.1

this affidavit. I prepared this correspondence after Susan Wood failed to respond to my calls about the matter. I ended up dropping the matter and did not send either letter on the advice of UPS management. I have discontinued business with Sempra as a result of this transaction.

5. I am of the belief, based on my research into the matter and an independent review of trades done during this period, that Susan Wood intentionally misreported to me market indicators which are based on publicly available objective data. I believe that this was intentionally done to mislead UPS as to where the market was trading, and deliberately set to match up with the inaccurate historical data previously provided. I uncovered this information only after it became apparent we had overpaid in the transaction and I attempted to independently verify the market indicators Ms. Wood gave me. Another outside source told me that relevant market indicators were actually $2.00 lower than stated by Ms. Wood.

6. I have read Ms. Wood's trial testimony on pages 144-151 of the transcript which are attached. I believe that she withheld information in her testimony and I disagree that no one pointed out any mistakes to her as stated on page 144. I also disagree that Ms. Wood had no responsibility for UPS trading on bad information as suggested in her testimony. We believed Susan Wood was sufficiently experienced that we relied on her to provide us with accurate historical and forecast data in order to transact business. The historical data was in error and she never advised us of that fact. Moreover, as indicated above, I believe she then intentionally provided false market indicators. Only weeks after we closed the deal did we realize, during a routine monthly audit, that we had dramatically overpaid in the transaction based on Ms. Wood's information.

SAN/120021.1

-2-

7. If called, I am prepared to testify to the above facts via videoconference on August 30, 2005, from Atlanta, Georgia.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

*Mike Casteel* (signature)
Michael Casteel

*Sempra Energy Trading Manager*                                February 19, 2002

As one of the world's largest transportation companies, United Parcel Service purchases approximately 1 billion gallons of fuel each year. In 2001, we decided to broaden the scope of our fuel-hedging program to include basis risk management. In our efforts to better understand our options regarding basis risk management, we turned to Sempra and Susan Wood as one of our key suppliers of information and advice. Our Treasury department had worked with Susan and Sempra in the past so there was a comfort level between our companies. In addition, our research on the Sempra Energy Trading website indicated that Sempra has the experience and the knowledge to help us manage basis risk in a wide variety of markets where we are potentially exposed to fluctuating costs. In September of 2001, we began discussions with Sempra Trading to begin building a basis risk management program. As a result of entering into these discussions with Susan Wood and subsequent trades that have been executed, we are now potentially exposed to unexpected and we believe unnecessary financial loss. Sempra provided false or inaccurate information on more than one occasion that directly created the issues we are currently faced with.

The inaccurate information was provided in two areas; one being inaccurate historical information that was subsequently used for our analysis, and the other being inaccurate or false forward pricing indicators. In November of 2001, UPS requested historical information on New York, Rotterdam and Singapore jet fuel markets. Specifically, we asked for crack spread history on these Platts markets to WTI crude. We began using this historical information as part of our analysis to decide on a strategy for basis risk management in these markets. Our intention is to use spread swaps to lock the crack spread at acceptable levels between certain markets and the price of WTI crude. We have since learned that the Sempra historical information on the New York and Singapore markets is accurate, but the Rotterdam information is wrong. Still, the inaccurate historical information would not have been a critical issue if subsequent events had happened differently.

In December, Susan provided market indicators on the Singapore, New York and Rotterdam markets. In comparing these forward indicators to the market historicals, we saw that the Singapore and New York indicators were not attractive compared to the historicals. However, the forward indicators Susan provided for Rotterdam were favorable compared to the historicals (which we didn't know at the time were wrong). We continued to receive indicators from Susan until January 3, when we decided to act on the information. Believing that the market was providing the opportunity to lock our basis risk at acceptable levels, we asked Susan on January 4, to execute the trades at the market levels she had quoted (see Item 1 below). At this time, we did not solicit quotes from other trading sources. We believed the market was trading where Susan said it was and the only reason for soliciting other quotes would be to possibly save a fractional amount on the margins. Since Susan had done all of the background work for us on these markets, we believed Sempra deserved the opportunity to participate in the trade. We have learned since that the forward indicators provided by Susan on the New York and Singapore markets were accurate, but again, the Rotterdam was not. In fact, the Rotterdam numbers were more than $2 per bbl higher than the market was currently trading on the Rotterdam to WTI forward pricing. As a result, UPS entered into a trade with Sempra that immediately placed us in a negative position for a total of approximately $1.2 million over the life of three contracts.

1

We did not learn of our problem until we asked for mark to market information at the beginning of February 2002. We have obtained accurate historical information on the Rotterdam market and have also obtained from other trading sources, accurate market indicators that were in place on January 4, 2002 when the Sempra trade was executed (see Item 2 below). What we do not know is how or why this happened.

It is our belief that Sempra is fully capable of providing accurate market information such as was requested above. However, inaccurate historical information could be attributed to many kinds of errors and is not our primary concern. Misleading forward indications are our main concern. It is our hope that Sempra wishes as much as UPS to find out how such damaging errors can have been made, placing a client in this type of position. We would like answers to these questions:

1. How was the inaccurate Rotterdam historical information created and what is the source?
2. In December and January, why were we given inaccurate forward market indicators on the Rotterdam to WTI crack? Accurate market indicators at this point would have provided obvious clues that our historicals were wrong.

We continue to pursue basis risk management at UPS. Furthermore, it is still our belief that Sempra has much to offer in the way of expertise and market presence in this area. It would be unfortunate for one series of events at this stage in our relationship to prevent us from creating a mutually beneficial program to address our specific needs in the coming years. We feel there must be a logical and reasonable explanation for the events that took place in January, mainly because these circumstances simply do not add up to the type of long-term and mutually beneficial relationship that Sempra and UPS both need to be successful. We have made an attempt to learn the answers from Susan Wood without success. We look forward to your response.

Sincerely,


Mike Casteel

UNITED PARCEL SERVICE
55 Glenlake Pkwy NE
Atlanta GA 30328
Fuel Basis Risk Management
(404) 828-7059
mcasteel@ups.com


**Item 1 -**
Sempra Contract Numbers: 58937, 58944, 58945

**Item 2 –**
January 4, 2002 Market Forward Indicators for Rotterdam Barge jet to WTI crude crack spread:
Prices $ per bbl – Rotterdam conversion factor 7.88 - tons to bbl.

|         | BBL     | Sempra Deal | BP Trading | J Aron | Bank of Amer. |
|---------|---------|-------------|------------|--------|---------------|
| Q2 2002 | 225,000 | 6.1         | 4.02       | 4.13   | 3.99          |
| Q3 2002 | 225,000 | 6.7         | 4.82       | 4.83   | 4.81          |
| Q4 2002 | 225,000 | 7.2         | 5.52       | 5.31   | 5.54          |



**Casteel Michael J. (pur1jmc)**

**Subject:**           Rotterdam trade

I don't want to close this chapter without understanding what happened in January when we purchased the Rotterdam swap. I'm going to try to explain my perspective of events and hopefully convey why I am so disturbed about what happened.

In November, you provided historical crack information on the Rotterdam, New York and Singapore markets. I compared the NY numbers to my own and they agreed. At the time, I did not have Sing or Rott crack historicals from our own database to compare with Sempra's figures. I assumed they were correct. Having since checked those numbers, the Sing is correct and the Rotterdam is not. Still, this problem would not have been an issue if subsequent events had occurred differently.

In late Dec you began relaying forward indicators on Sing, Rotterdam and NY. The term "forward indicators" is important because the definition of that term (or my understanding of it) does much to explain my behavior. After recreating events and researching historical forward indicators from other sources it is clear that the forward indicators you provided for the Singapore and the NY Jet markets were in line with actual market conditions. The Rotterdam indicators were not in line with actual market conditions but were inflated, with the swaps quoted at about $2 per bbl above the market. This is information which you can easily confirm.

It did not occur to me at this point to get a competitive quote on your numbers mainly because the numbers you were quoting were represented as market indicators. Market indicators are recognized as factual reports of the trades currently taking place in the market - or a snapshot of where others are currently trading. Sempra is fully capable of reporting market conditions so I saw no reason to confirm where the market was trading. The only reason for me to have solicited a competitive quote at this point would have been to try saving a small fraction of money on the margin. I felt that Sempra deserved to participate in the trade because you had done all of the background work that led us to that point. I also assumed a certain level of price protection because of the existing and long-term relationship between UPS and Sempra. With this in mind, I asked you to execute the trade believing that the market conditions were under the historical averages I had been using for setting targets. Unknown to me at this time was the fact that when this trade was executed, the historical averages I had been using were inaccurate and the market was not actually trading at the levels quoted but instead was well below the levels at which we executed. When the trade was executed UPS took a position approximately $1.2 million out of the money.
*If anything that I've said to this point is inaccurate in your opinion, please comment.*

Assuming my version of history is basically accurate, we're left with what happens next.
I have a long history with UPS in procurement management, mainly in automotive related products. Over the years I have relied on a partnership philosophy with a few key suppliers that ensures long-term, sustainable and mutually beneficial relationships. Trust is essential because it is not always possible (and is rarely efficient) to double check all of the transactions taking place between us.  Gary Barth is of the opinion that no one at Sempra, especially you, would have intentionally put your client in such a position as described here, or knowingly allowed your client to be in this position. Still, a mistake was made. I recognize that commodity trading is different than buying manufactured goods and there may be a different mindset regarding the level of trust allotted to any trading relationship. But, Gary seems to apply the same basic philosophy toward his long-term trading partners as I did to the key automotive suppliers in that he believes in an overall mutually beneficial relationship. Situations similar to this have occurred over the years with product purchases where goods were over billed or under-spec'ed. We at UPS have found ourselves on both the positive and negative sides of these issues. But when the issues are clear, whether they are administrative, carelessness or just inadvertently inaccurate, arrangements are always made to correct the situation in a way that reflects the true market. It is my hope that such arrangements can be discussed between UPS and Sempra. It should be possible to restructure the contract to reflect the true market conditions or a close approximation on the day of the trade. Please consider the idea. And also, please comment on my interpretation of our on-going dialog during the last three months. I can accept a change in the market that causes financial loss to UPS. That is an expected and understood risk. This trade is something else altogether. I would sincerely appreciate your evaluation of the events that brought us to this point.

Sorry for the length of the message. I didn't want to lose clarity in the interest of time - it's too important to me. Attached is a spreadsheet showing the value of the trade on Jan 4, and also on Feb 7. This is the spreadsheet used to report mark to market info to our Financial reporting group. Thanks, Mike

1

```
                                                                    1
 1                    STATES DISTRICT COURT.

 2                      DISTRICT OF CONNECTICUT

 3     _____
       SUSAN WOOD                    )              COPY
 4                                   )
                        Plaintiff    ) NO: 3:03CV986(JCH)
 5     vs.                           )
                                     )
 6     SEMPRA ENERGY TRADING         )
       CORPORATION,                  )
 7                      Defendant    )
       _____)
 8

 9                                     July 25, 2005
                                       915 Lafayette Boulevard
10                                     Bridgeport Connecticut
                                       9:00 A.M.
11

12                       FIRST DAY OF BENCH TRIAL

13                          B E F O R E:

14                   THE HONORABLE JANET C. HALL
                     UNITED STATES DISTRICT JUDGE
15

16     A P P E A R A N C E S:

17     For the Plaintiffs   :         BRENDAN JOHN O'ROURKE
                                      JEFFREY M. McCORMICK
18                                    MARIANNE MURRAY
                                      O'Rourke & Associates
19                                    27 Pine Street
                                      New Canaan, CT  06840
20
       For the Defendant    :         MARY C. DOLLARHIDE
21                                    RAYMOND W. BERTRAND
                                      Paul, Hastings, Janofsky
22                                    & Walker
                                      1055 Washington Boulevard
23                                    Stamford, CT  06901

24     Court Reporter       :         Terri Fidanza, LSR

25     Proceedings recorded by mechanical stenography, transcript
       produced by computer.
```

1  A   I believe he was working with me in mentoring me
2  and trying to tell me, yes, if I can bring in more
3  customers and do more profit on the customers I had, I
4  could make more money or the desk and therefore a bigger
5  bonus, yes.
6  Q   He told you you needed to improve your
7  relationship with some people, correct.
8  A   Not that I can recall.
9  Q   He was leaving to take on a new role in Canada
10 soon?
11 A   That was our understanding, yes.
12 Q   Did he tell you that you were doing and saying
13 things that were alienating others, particularly, your
14 co-workers who didn't want you to cover their desks?
15 A   No.
16 Q   You made blunders on the desk, right?
17 A   Not that I was aware of.
18 Q   You made mistakes?
19 A   I'm sure everybody makes mistakes during the
20 course of business. Nothing had been pointed out to me.
21 Q   Ms. Wood, I would like to ask you questions
22 about the deal that you did with UPS in early January
23 2002. Do you have that matter in mind?
24 A   Yes.
25 Q   Did Sempra derive any profits from that deal?

1    A    Yes. I believe over a million dollars.

2    Q    And this was just a couple of months before your
3 termination, right?

4    A    That's correct.

5    Q    Now this was an unusual transaction. It was
6 complicated, right?

7    A    It was an esoteric product.

8    Q    And UPS asked you the marketer for some
9 historical pricing data in connection with that deal,
10 correct?

11    A    I believe I provided them some data on many
12 things.

13    Q    And as the marketer interfacing with UPS, you
14 were responsible for supplying them with that historical
15 data?

16    A    If they requested information from me and data
17 from me, I would go to our main terminal system and pull
18 the data off. Publicly available data and send them over
19 to them. It was a resource that Sempra provided.

20    Q    And you would send the data on to them?

21    A    That was a correct.

22    Q    There was a mistake in the numbers that you gave
23 them, right?

24    A    Not that I was aware.

25    Q    Not that you were aware of at the time,

1  correct?

2  A    I sent them over information on various
3  products, various data pulled off of the system.  It was
4  their data to do with what they will.

5  Q    You knew they had made a miscalculation based on
6  that data, correct?

7  A    I did not know that.

8  Q    You actually spotted that problem before the
9  deal goes, didn't you?

10 A    I spotted they were trying to trade off market
11 but they were a very sophisticated customer.

12 Q    Ms. Wood, do you recall your deposition being
13 taken in the case?

14 A    Yes.

15 Q    Could I have the original deposition transcript
16 for Ms. Wood.  I need a copy for the court as well.

17            MS. DOLLARHIDE:  May I approach, your
18 Honor?

19            THE COURT:  Yes.

20            MS. DOLLARHIDE:  A copy for the court.  For
21 the witness.

22 Q    Ms. Wood, I would like to direct your attention
23 to deposition page 233, line 22 to 234.2.  Do you recall
24 being asked the following question and providing the
25 following answer.

1    Question. I'm actually on line 18 here.

2    "Who was the -- was there are more than one

3    trader other than you.

4    Answer. There was a trader in the Geneva office.

5    I don't remember his name. And as the deal was closing, I

6    checked with Brian Cummings, my supervisor at the time and

7    I informed him that I believed that UPS had made an error

8    in their calculation and in the number that they wanted to

9    transact at, and should we go ahead with the deal. It

10   could potentially be an issue down the road. And Brian

11   made the decision that he felt this was a business risk

12   that companies take and we should go ahead with the deal

13   and he gave me the okay on it.

14   Question. And so you went ahead with the deal at the

15   number that UPS has quoted.

16   Answer. That's correct."

17   Do you remember that testimony?

18   A    Yes, I do.

19   Q    During your conversation with Mr. Cummings you

20   told him that you actually made a mistake yourself,

21   right?

22   A    No. I told him that they were trading on a

23   number that was higher than the market.

24   Q    You UPS discovered this issue about six weeks

25   later; is that right?

148

1  A    That's correct.

2  Q    Your friend Barry Barth at UPS called and told
3  you that UPS had dealt on inaccurate historical data that
4  you had provided?

5  A    No. He told me that there was the market, their
6  trader was inexperienced and he made a mistake and that
7  the numbers were significantly off and that there's a
8  problem with the deal and he would like it looked at and
9  rectified.

10 Q    You told Mr. Barth that you must have made an
11 error in the calculation that you had done, correct?

12 A    I did not.

13 Q    You told him that you didn't understand basis
14 trading?

15 A    I did not.

16 Q    You told him that you didn't understand this
17 particular market, correct?

18 A    I told him it was an esoteric market that
19 doesn't trade very much.

20 Q    Gary Barth asked you to undo the transaction?

21 A    He asked for Sempra to make restitution.

22 Q    During this conversation you did not tell Mr.
23 Barth that you had known all along that UPS had paid too
24 much, did you?

25 A    I did not.

1  Q    But in your deposition which we just reviewed,
2  you did report the problem to Mr. Cummings before the deal
3  ever closed and he approved it, correct?
4  A    He did.
5  Q    The deal went through with you knowing you
6  overpriced the product?
7  A    The deal went through with me knowing that UPS
8  had requested to do the deal off market whether there was
9  a signature margin.
10 Q    You lied to Gary Barth when you told him you
11 were unaware of the issue until six weeks after the
12 fact?
13 A    I tried to manage the fact that they had been
14 taken on a deal and they had made an incorrect trade and
15 they lost a lot of money.  I don't know if that
16 necessarily lied to him.
17 Q    In response to Mr. Barth's request to end the
18 deal, you contacted Mr. Cummings and told him if he
19 doesn't fix this, UPS is gone as a client, right?
20 A    Not that I can recall.
21 Q    They are gone as a client, aren't they?
22 A    They were a customer line that I brought with me
23 to Sempra.  I assume when I left Sempra, they would also
24 follow me wherever I went.
25 Q    At your termination meeting, you pointed out

1  that you had made a million dollars from UPS in just the
2  first two months of 2002, right?
3      A    I said were you aware I had made over a million
4  dollars for the desk income for the first half of 2002.
5      Q    And as you previously testified, most of that
6  money was attributable to the UPS deal, correct?
7      A    I had knowledge that that was, yes.
8      Q    How much was the profit that was associated with
9  that UPS deal that you transacted?
10     A    I had estimated it at over a million dollars. I
11 don't remember the exact number.
12     Q    Over a million dollars. You had to split to
13 that profit in this instance with the Geneva office,
14 correct.
15     A    The trader in the Geneva office was trying to
16 get a significant portion of the deal for his desk.
17     Q    The value of the profit to Sempra was $770,000,
18 correct?
19     A    No. As I stated, it was over a million dollars
20 of profit to Sempra. The Geneva office is part of
21 Sempra.
22     Q    Your profit on that deal was supposedly $335,
23 right?
24     A    Excuse me.
25     Q    The profit on that deal was $335,000 to your

1  desk, isn't that correct?

2  A   Not that I'm aware.

3  Q   It was based on a mistake, right?

4  A   Not that I'm aware of.  It was based on them

5  trading off market.

6  Q   Do you have any facts to dispute that other

7  marketers in the Petroleum Derivative Group including

8  Alberto Vogel and Jamie Evans specifically and separately

9  requested of Brian Cummings that he cover their desk when

10 they were out because they did not trust you?

11 A   I never heard anything to that effect.

12 Q   Could you please take a look at 563.  That's the

13 wrong document.  Is that what you have as 563?

14 A   Yes.

15 Q   You mentioned a barbecue that you attended at

16 Frank Gallipoli's house in 2001, correct?

17 A   Yes.

18 Q   Mr. Gallipoli is one of the senior most

19 executives at Sempra Energy Trading Corp. is that right?

20 A   That's my understanding, yes.

21 Q   You heard about the party and asked if you could

22 come, right?

23 A   I believe I was invited.

24 Q   After you heard about the party and asked if you

25 could come, right?