UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SUSAN E. WOOD,<br><br>                    Plaintiff,<br><br>v.<br><br>SEMPRA ENERGY TRADING<br>CORPORATION,<br><br>                    Defendant. | CIVIL ACTION NO.<br>3:03-CV-986 (JCH)<br><br><br><br>October 3, 2005 |

## SUR-REPLY IN RESPONSE TO PLAINTIFF'S MOTION IN LIMINE

### I.   INTRODUCTION

More than a year after discovery in this matter closed and on the eve of trial, Plaintiff brought her Motion in Limine concerning Sempra's responses to her discovery requests. After an exhaustive inquiry into this matter, Plaintiff has identified a single category of documents that she now claims is responsive. Specifically, Plaintiff claims Sempra should have produced to her the spreadsheets some individual marketers used to track their trades ("Spreadsheets"). As demonstrated below, Sempra produced all documents responsive to Plaintiff's discovery requests and her Motion in Limine should be denied.

II.   **RELEVANT FACTUAL BACKGROUND**

  A.   **Plaintiff's Discovery Requests**

In November, 2003, Plaintiff served on Sempra her Requests for Production of Documents. Request for Production Number 4 ("Request No. 4") sought "documents which relate to the calculation and payment of bonuses paid to employees of Defendant in Stamford, Connecticut from 1999 through the present for employees at the Assistant Vice President and Vice President level."

Sempra objected to Request No. 4 on multiple grounds. One basis for Sempra's objection was that evidence concerning how Sempra calculated bonuses for other employees was irrelevant to Plaintiff's claims that Sempra failed to pay her a bonus at the time of her termination on the profit she had generated off the now infamous UPS trade. See Counts Seven, Eight, Nine (breach of an implied contract, promissory estoppel and unjust enrichment); Count Ten (breach of an implied covenant of good faith and fair dealing); Count Twelve (claim for unpaid wages). This evidence was irrelevant because Plaintiff's employment agreement provided that Sempra would pay her a bonus on a discretionary basis. Indeed, the Court acknowledged this fact when it dismissed the Plaintiff's contract claims outright at the summary judgment stage.

Sempra also objected to this request on the relevance grounds since Sarathi Roy, the decision maker in this matter, did not consider the bonuses individuals received in terminating Plaintiff's employment. Ultimately, the scope of request was narrowed to the Petroleum Derivatives Department ("PDD") and the Natural Gas Department.

### B. Sempra Did Not Rely On The Spreadsheets To "Calculate" Bonuses During The Relevant Time-Period

For the majority of her employment and up through her termination, Plaintiff worked in the Petroleum Derivatives Department ("PDD"). For each of the years Plaintiff worked in the PDD, and the years prior to her arrival, the PDD, as a whole, lost money as a result of the way the traders managed the PDD's oil and petroleum assets. August 30th, Tr. 195:3-17. These losses are reflected in Sempra's Quarterly Profit and Loss Reports (see discussion below), which break down the earnings and expenses for the department.

Brian Cumming explained the interrelation between a department's profitability and an individual employee's bonus. Briefly summarized, at the end of Sempra's fiscal year, each department head was allocated a sum of money to be used to pay bonuses to employees within the department. The amount allocated to each department typically was a percentage of the profits generated by the department as a whole. However, in the case of the PDD, the department did not generate a profit. Nevertheless, since Sempra had not made the decision to dissolve the PDD, the Company paid employees bonuses to keep them in the Company's employ. Mr. Cumming testified how he awarded bonuses in the PDD, given the fact that the department as a whole had lost money.

> Q   Did you have a role in awarding bonuses to the Petroleum Derivative Department in 2001?
> A   Yes.
> Q   What was your role?
> A   I determined the amounts and told each individual what their bonus was.
> Q   And did you have a specified amount that you could award in bonuses?
> A   The group was deeply negative, that I had no

>money to give. I had to go to Davis Messer and get him to give me the money that year to pay bonuses. So I recommended amounts for each person. I got them approved.
>
>Q How did you decide how much to pay in bonuses for 2001 to marketers?
>
>A Because there was no P&L left after the trade losses, on my part, I tried to take out the trading losses. What their contribution had been. That year in particular it was a very strange year. It was almost like a replacement cost on the individual. That's why we were paying bonuses. Technically no one should have been paid. Anything if you do that, you run the risk of the entire group leaving. It came down to how much do I need to pay this person to keep them in their seat and what would the market replacement cost be for that individual.
>
>Q In determining their contribution to the department, did you rely on your observations of their performance during the year?
>
>A But again because there was no money left, it was very rough.
>
>Q You didn't rely on any documentation?
>
>A I don't think so.

July 26th Tr., 107:8-108:14.

For a brief period of time, Plaintiff also worked in Sempra's Natural Gas Department. Sempra's Natural Gas Department historically has been profitable and employees in the department are typically paid a bonus. However, as Jacqueline Mitchell testified, the process by which each individual's bonus is computed has evolved over time. Prior to 2002, "there was always a lot of guess work put in to determining how much money [individual

marketers and traders] really made." August 30th Tr., 165:18-166:4. Significantly, this is the period of time that Plaintiff work for Ms. Mitchell's group.[1]

To eliminate some of this guess work, Ms. Mitchell required that traders track the prices they gave to the marketers so that the traders and marketers could reconcile how much "profit" the marketer brought into the trader's book in connection with each transaction. Id. Based on this information, Ms. Mitchell's group would compile a department spreadsheet that measured each individual's profitability against his or her desk cost. A copy of the 2002 Natural Gas Department's Profit and Loss Statement was produced to Plaintiff and is bates marked D00697-98.

C.    **Sempra's Production In Response To Request No. 4**

As part of its initial production, Sempra produced Company policies and documents particular to Plaintiff, including her employment agreement. These documents provided that bonuses would be paid on a discretionary basis. Following the hearing on Plaintiff's Motion to Compel, Sempra produced the employment agreements of seven of its employees to Plaintiff. These employment agreements were unique because they provided that Sempra would pay the employee a bonus based on a percentage of the profits she generated, instead of on a discretionary basis. In other words, these were the only documents that specified a method to calculate a bonus. Sempra produced the seven employment agreements to Plaintiff under a cover letter that specifically identified them as being responsive to Request No. 4. See P. Schultz ltr. to B. O'Rourke dtd. Apr. 12, 2004 (attached hereto as Exhibit 1).

---

[1] Ms. Mitchell testified that she did not compile profit and loss statements when Ms. Wood was in her group. (Q: When Ms. Wood was in your group, did you have profit and loss statements that you compiled for marketers? A: No."). See August 30th Tr., 165:8-11.

On April 2, 2004, Attorney O'Rourke also requested that Sempra produce "Profit and Loss" statements that Messrs. Howley, Prince and Goldstein testified about during their depositions. The documents to which Attorney O'Rourke was referring were described by Mr. Prince during his deposition:

> Q   On what about Ms. Wood's employment performance did you base that assessment of Ms. Wood?
> A   Lack of revenue production.
> Q   And did you see any written reports on that lack of revenue production?
> A   There are profit center reports that are issued, and she was in one of those profit centers, the internal reports on profit production.
> Q   Are you telling me that that internal report gives you the ability to assess Susan Wood's performance?
> A   A profitability report on her area assesses her profitability, yes.
> Q   Is there more than one person in her area?
> A   Yes.
> Q   Explain to me how you can assess an individual's performance by a profitability report that involves other individuals.
> A   Because there were certain discussions around what customers she was working on and what revenue was being produced by them.
> Q   So, as I understand your testimony, there are reports that Sempra produces that do give you an ability to objectively measure Susan

>               Wood's performance?
>                    MS. DOLLARHIDE: Objection; overbroad.
>               You can respond.
>           A    There were reports that would portray
>      the group, and there were discussions about the
>      customers or people within that group and what
>      revenue they were producing.

Prince Depo. Tr. 34:2-35:11. In response to Attorney O'Rourke's request and pursuant to Request No. 4, Sempra produce documents D00697 through D00716 on April 13, 2004. See P. Schultz ltr. to B. O'Rourke dtd. April 13, 2004 (attached hereto as Exhibit 2). These records included the year end Quarterly Profit and Loss Reports for various Sempra businesses, including the PDD and Natural Gas departments, and the 2002 Natural Gas Department Profit and Loss Statement. ***No further profit and loss statements were ever requested, nor was there any further motion to compel.***

Notably, in response to another one of Plaintiff's discovery requests, Sempra produced a copy of Steven Soule's Spreadsheet. Plaintiff also testified that she was familiar with documents similar to the one Steven Soule had prepared.

## III.    ARGUMENT

### A.    Plaintiff's Rationale For Not Requesting The Spreadsheets

It is undisputed that not one of Plaintiff's discovery demands specifically requests Sempra produce the Spreadsheets, notwithstanding the fact that Plaintiff was aware of the existence of these records.[2] The rationale for Plaintiff's action is simple. Plaintiff did not

---

[2] Plaintiff testified that she maintained such a Spreadsheet and Sempra produced Steven Soule's Spreadsheet.

request the Spreadsheets because she knew they would reflect what the 2001 bonus numbers tell us: Plaintiff was one of the poorest performing marketers (if not the poorest) in the entire Company, and certainly the least productive marketer in the Petroleum Derivatives Department.[3] Indeed, as was brought out on Plaintiff's cross examination, Sempra expected its marketers to generate three times their desk cost in profits.[4] Plaintiff's desk cost was approximately $750 thousand dollars and she only produced $1.1 million dollars in 2001; more than a million dollars less than was expected of her and far less than her colleagues.[5] Plaintiff's decision not to request documents she knew existed was a strategic decision and the Court should not expand the scope of Plaintiff's discovery requests beyond their intended meaning.

### B.    The Spreadsheets Are Not Responsive To Request No. 4

Noticeably absent from Plaintiff's memorandum is any reference to the trial testimony. Neither Brian Cumming, Sarathi Roy nor David Messer testified that they relied on the Spreadsheets to calculate bonuses paid to employees in the Petroleum Derivatives Department. To the contrary, Brian Cumming testified that the Petroleum Derivatives Department lost money in 2001 (and each of the prior years) and the bonuses awarded were

---

[3] Plaintiff received a $50,000 bonus for 2001. Every single marketer and trader who received a bonus for 2001 received more than Plaintiff, and in most instances, more than double what Plaintiff received. Brian Cumming decided how much each marketer would receive in bonus and there has been no suggestion that his decision to award Plaintiff the least amount in bonus was discriminatory or retaliatory.

[4] On cross examination, Plaintiff testified **"Q: The benchmark at Sempra is that a person not just cover their desk because that's just a wash, but earn three times desk cost, correct? A: I would say that's a fair benchmark."** July 25th, Tr. 115:14-17. This admission by Plaintiff refutes her counsel's argument that Plaintiff was in any way prejudiced by the fact that Sempra did not specifically identify an exact multiple as a "benchmark" in its response to Interrogatory No. 7.

[5] For example, Alberto Vogel testified that he generated approximately $2.5 million dollars during that same year.

based on how much he thought Sempra would have to pay each employee to prevent him or her from leaving the company. Accordingly, the Spreadsheets do not in any way "relate to how bonuses were calculated" in the PDD and are therefore unresponsive to Request No. 4.

As for the Natural Gas Department, Ms Mitchell testified that prior to 2002, bonuses were not determined using any precise method. Then, beginning in 2002, Ms. Mitchell required that traders keep track of the prices they gave to the marketers so that the traders and marketers could reconcile how much "profit" the marketer brought into the trader's book in connection with each transaction. Based on this information, Ms. Mitchell's group compiled a department spreadsheet that measured each individual's profitability against his or her desk cost. Ms. Mitchell testified that she relied on this document to calculate bonuses for employees in her department beginning in 2002. Sempra produced this document to Plaintiff during discovery. See D00697-98.

### C. Plaintiff Cannot Show Prejudice

Even assuming, arguendo, that Sempra was required to produce the Spreadsheets and did not do so, Plaintiff was no worse off. The only information that can be derived from the Spreadsheets that is of any significance to this litigation is the bottom line: how much profit did the marketer generate for the year. This information can be (roughly) derived from the bonus information Sempra produced to Plaintiff.

Plaintiff has maintained throughout the course of this litigation that Sempra's marketers and traders were paid bonuses anywhere from 10 to 12 percent on the profits they generated. Accepting this fact as true, the Court can make a rough determination of the profitability of Sempra's marketers and traders by examining the bonus information that was produced. While the bonus numbers do not tell precisely how much profit an individual

marketer earned, it is sufficient for the purposes in this case in light of the fact that Plaintiff's 2000 and 2001 bonuses paled in comparison to her colleagues. It is also worth noting that Plaintiff's counsel had an opportunity to cross examine numerous witnesses (many of whom are former employees) about the profits they generated for Sempra, yet chose not to ask a single question along these lines. Plaintiff's counsel made this tactical decision because he knew what Plaintiff herself testified to: that $1.1 million dollars in revenue did not meet Sempra's performance expectations.

Additionally, the Spreadsheets have marginal, if any, relevance to this litigation. As an initial matter, Sarathi Roy testified that he did not review or consider the Spreadsheets (or the bonuses individuals' received) when making his decision to terminate Plaintiff's employment. He based his assessment of Plaintiff's productivity on his more than a decade of experience doing similar work. Further, the Spreadsheets are inherently unreliable and would have added little to this litigation. Both Brian Cumming and Christine Cantor explained the self serving nature of these documents and how they fail to accurately reflect the true profit (or loss) generated in connection with a transaction.

Lastly, Sempra respectfully submits that the evidence presented at trial demonstrated – overwhelming – that Ms. Wood was terminated for legitimate, non-discriminatory and non-retaliatory reasons. Therefore, any adverse inference that might be drawn against the Company would not be sufficient to warrant a different finding on the issue of liability, since Sempra's purported failure to produce the Spreadsheets has no effect on these material and essential undisputed facts:

**Point 1**: Plaintiff and Mr. Roy enjoyed a personal friendship prior to her termination.

**Point 2**: Mr. Roy mentored Plaintiff prior to her termination.

**Point 3**: Plaintiff specialized in a sector of the market that was devastated by the events of 9/11 and her clients' (airlines) poor credit ratings prevented Sempra from doing business with them.

**Point 4**: Plaintiff was terminated shortly after Mr. Roy learned of the UPS error.

**Point 5**: Plaintiff's co-workers did not trust her to cover their desks during their absences.

**Point 6**: Plaintiff received the smallest bonus of any marketer in the Petroleum Derivatives Department for 2001.

**Point 7**: Sempra terminated other male employees in the Petroleum Derivatives Department prior to the dissolution of the department.

**Point 8**: Mr. Roy recommended other male employees in the Petroleum Derivatives Department be fired.

**Point 9**: Mr. Roy recommended the hire of a female trader.

**Point 10**: Mr. Howley did not participate in the decision to terminate Plaintiff's employment.

   D.   **Sempra Acted In Good Faith In Attempting To Meet Its Discovery Obligations And Plaintiff's "Lie-in-Wait" Litigation Tactic Should Not Be Rewarded**

As noted above, Sempra contends that Plaintiff's Request No. 4 did not encompass the Spreadsheets. However, even if the Court reaches a contrary conclusion, this determination should have no effect on this litigation. At the pre-trial conference, the Court indicated that it was unsure as to what action it would take if it determined Sempra did not fully comply in some manner with its discovery obligations in light of Plaintiff having failed to raise these discovery issues prior to the close of discovery or in the following year. Certainly the

precedent the Court does not want to create is that litigants are better off lying-in-wait and raising their discovery objections in the manner Plaintiff has done. Here, Sempra has demonstrated that it acted in good faith in attempting to meet its discovery obligations and the marginal (if any) value of the Spreadsheets. Therefore, no adverse action should be taken against the Company.

    E.    **Plaintiff Failed To Comply With Her Discovery Obligations And The Doctrine Of "Unclean Hands" Bars Her From The Relieve She Seeks.**

As set forth in Sempra's Statement In Support Of Additional Affidavit Regarding Good Faith Discovery, Plaintiff cannot complain about Defendant's actions with respect to discovery where her own conduct evidences bad faith and false information provided under oath. For this reason alone, Plaintiff's Motion in Limine should be denied. To the extent this Court is willing to entertain Plaintiff's belated motion concerning Sempra's discovery actions, Sempra moves this Court for an order awarding sanctions against Plaintiff in the form of an adverse inference such that Susan Wood's trial testimony be discredited on those matters requiring credibility determinations by this Court.

## IV. CONCLUSION

For all the foregoing reasons, Sempra respectfully requests that the Court deny Plaintiff's Motion in Limine.

Dated: Stamford, Connecticut
       October 3, 2005

                                        Respectfully Submitted,

                                        By: /s/ Ray W. B.
                                        Mary C. Dollarhide (ct12251)
                                        Raymond W. Bertrand
                                        Paul, Hastings, Janofsky & Walker, LLP
                                        1055 Washington Boulevard
                                        Stamford, CT  06901
                                        Telephone:  (203) 961-7400
                                        Facsimile:  (203) 359-3031
                                        raymondbertrand@paulhastings.com
                                        ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing Defendant's Sur-Reply in Response to Plaintiff's Motion in Limine was served on the following counsel of record via hand delivery on this 3rd day of October 2005:

>Brendan J. O'Rourke
>O'Rourke & Associates, LLC
>27 Pine Street
>New Canaan, CT 06840

>_____
>Raymond W. Bertrand

LEGAL_US_E # 70076969.4

**EXHIBIT 1**

**Paul, Hastings, Janofsky & Walker LLP**
1055 Washington Boulevard, Stamford, CT 06901-2216
telephone 203-961-7400 / facsimile 203-359-3031 / internet www.paulhastings.com

# PaulHastings

Atlanta
Beijing
Hong Kong
London
Los Angeles
New York
Orange County
San Francisco
Stamford
Tokyo
Washington, D.C.

(203) 961-7495
peterschultz@paulhastings.com

April 12, 2004

28309.00004

VIA UPS

Brendan J. O'Rourke
O'Rourke & Associates, LLC
27 Pine Street
New Canaan, CT 06840

Re:   *Susan E. Wood v. Sempra Energy Trading Corporation*
      Docket No. 3:03-CV-986 (JCH)

Dear Brendan:

Enclosed are the Bates-stamp numbered copies of seven employment agreements which supplement Sempra's response to Document Request No. 4 in Plaintiff's First Set of Document Requests. You will note that the documents are stamped "Confidential." Pursuant to our January 2004 telephone conference with Judge Hall, certain pages are also stamped "Redacted" to reflect deletions of financial information (e.g., salary, relocation payments) unrelated to the calculation of bonuses and, except for the numbering, in all other aspects, are identical to the unnumbered set sent to you on April 9, 2004.

Very truly yours,

*Peter Schultz*, GAC

Peter M. Schultz
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

Enclosures
Signed, not read

STM/272197.1

**EXHIBIT 2**

# Paul Hastings

Paul, Hastings, Janofsky & Walker LLP
1055 Washington Boulevard, Stamford, CT 06901-2216
telephone 203-961-7400 / facsimile 203-359-3031 / internet www.paulhastings.com

Atlanta
Beijing
Hong Kong
London
Los Angeles
New York
Orange County
San Francisco
Stamford
Tokyo
Washington, D.C.

(203) 961-7495
peterschultz@paulhastings.com

April 13, 2004

28309.00004

**VIA UPS**

Brendan J. O'Rourke
O'Rourke & Associates, LLC
27 Pine Street
New Canaan, CT 06840

Re:   *Susan E. Wood v. Sempra Energy Trading Corporation*
      Docket No. 3:03-CV-986 (JCH)

Dear Brendan:

Enclosed are the Bates-stamp numbered copies (D00697 through D00716) of Quarterly Income Statements which were given to you at the Jackie Mitchell deposition without numbers. You will note that the documents are stamped "Confidential." Document Number D00698 was produced to you on legal size paper. For purposes of numbering, this document was reduced to letter size format. Except for the numbering and the one instance of paper size change, in all other aspects, these documents are identical to the unnumbered set you received on April 13, 2004.

Very truly yours,

*Peter Schultz* GAC

Peter M. Schultz
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

Enclosures
Signed, not read

STM/272296.1