UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SUSAN E. WOOD, | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:03-cv-986 (JCH) |
| | : | |
| SEMPRA ENERGY TRADING | : | |
| CORPORATION, | : | |
| Defendant. | : | DECEMBER 9, 2005 |

**RULING RE:  MOTION IN LIMINE [DKT. NO. 91]**

This action involves claims brought by the plaintiff, Susan E. Wood ("Wood"),

against her former employer, Sempra Energy Trading Corporation ("Sempra").  The

court assumes the reader of this Ruling has familiarity with a Bench Ruling on the

plaintiff's claims issued today.  The court issues this separate Ruling in order to address

a Motion in Limine which has been pending since the final pretrial stage of this case.  In

this particular Motion in Limine, Wood sought a ruling to preclude certain evidence or

for the granting of an adverse inference against Sempra, as a matter of law, or both.

The court determined to admit evidence conditionally and, if the court granted the

Motion, to strike the evidence after the close of trial when it ruled on the Motion.  For

the reasons stated below, Wood's Motion in Limine is denied.

I.    BACKGROUND

This case has been pending since June 4, 2003.  The original scheduling order

called for the cutoff of discovery on December 4, 2003.  The parties had disputes over

discovery, which eventually led to a telephone status conference on January 6, 2004

[Dkt. No. 30].  At that time, the court took up the plaintiff's Motion for Adjudication of

- 1 -

Objections to her First Set of Interrogatories and Requests for Production. [Dkt. No. 23]. The court ruled on a number of objections during that conference and ordered further production by the defendants.

Subsequent to that conference, motions were made to extend the time for discovery and dispositive motions. By Order dated January 26, 2004, the court extended discovery to March 19, 2004 and dispositive motions to April 19, 2004. The court held yet another telephone discovery conference on February 26, 2004. [Dkt. No. 31]. Subsequent to that conference, a further Motion to Extend the scheduling order was made. The court once again extended discovery to May 3, 2004, and allowed the filing of dispositive motions by May 14, 2004. [Dkt. Nos. 34 & 36].

On that latter date, the defendant filed a Motion for Partial Summary Judgment. The court heard oral argument on that motion once it was joined, on February 16, 2005, and issued a Ruling, granting in part and denying in part the Motion for Partial Summary Judgment [Dkt. No. 68], on February 22, 2005. After consideration and denial of the Motion for Reconsideration, the court set the matter down for trial on July 25, 2005.

In connection with the pretrial conference, there were numerous motions in limine by both sides as well as disputes about the admissibility of evidence. One of the motions in limine filed by Wood was a motion requesting the court to enter certain orders against defendant in connection with the evidence to be entered at trial [Dkt. No. 91]. In that motion, Wood sought to preclude the introduction of certain evidence or the drawing of an adverse inference by the court or both. The court took up this Motion in Limine at the pretrial conference, along with many of the others. It took the pending Motion in Limine under advisement at the close of the pretrial conference, however.

Numerous pleadings have been filed addressed to this pending Motion in Limine. [See Dkt. Nos. 96, 129, 143, 145, 155, 158]. In support of its opposition to the Motion, the defendant produced various affidavits and documents to the court *ex parte.* [Dkt. Nos. 96 and 145]. The plaintiff objected to the filing of these affidavits and documents *ex parte*. While the court did read the documents when they were first submitted in August, it has not reviewed or referred to them since that time. Having had an opportunity to go back to the original Motion and Memorandum in support and to review all other memorandum and attachments that were filed which are not *ex parte*, the court has determined that it need not rely on the *ex parte* filings. It expressly states that it is not relying on the ex parte submissions in connection with its decision contained in this Ruling.

It bears noting that discovery in this case ended by court Order on May 3, 2004. At no time between that date and June 21, 2005, did the plaintiff bring to the court's attention any deficiencies in the defendant's response to discovery. Indeed, the court does not recall that the plaintiff made any mention of any such deficiencies in connection with her opposition to the defendant's Motion for Partial Summary Judgment. But even if such complaint was made therein, the court was not asked, after early 2004, to compel the defendant to comply with the discovery request.

In plaintiff's original Motion, filed in June 2005, Wood cited Sempra's failure to search for and produce "relevant emails and other documents relating to Wood." In addition, she complained of Sempra's failure to produce a notebook referred to by Sarathi Roy in connection with a filing at the Connecticut Commission on Human Rights and Opportunity ("CCHRO"). Finally, she complained of the failure by Sempra to

- 3 -

deliver, in a timely fashion, financial statements, which Wood claims are relevant to her liability case as well as her damages proof.

## II.    LAW

Perhaps the only issue about which the parties agree is the law applicable to this Motion in Limine.  They both cite to, and rely upon, a decision from the Southern District of New York by Judge Scheindlin, Zubulake v. UBS Warburg, LLC, 229 F.R.D. 422 (S.D.N.Y. 2004) ("Zubulake").  That opinion deals with the failure of a party to make appropriate discovery.  Zubulake relies upon a Second Circuit opinion which is often cited in connection with adverse inferences, Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99, 106 (2d Cir. 2002).

> Where . . . the nature of the alleged breach of a discovery obligation is the non-production of evidence, a district court has broad discretion in fashioning an appropriate sanction, including the discretion to delay the start of trial, (at the expense of the party that breached the obligation), to declare a mistrial if the trial has already commenced, or to proceed with the trial and give an adverse inference instruction.

Id. at 107 (citing Riley v. Natwest Markets Group, Inc., 181 F.3d 253, 267 (2d Cir. 1999)).  In her Motion, Wood requests an exclusion of evidence.  However, she does not specifically identify what evidence she wants excluded, vaguely referring to some emails upon which the defendant intends to rely as evidence at trial and which were not produced.  By the last round of briefing on this Motion in Limine, that argument appears to have been dropped.  Therefore, the court will address the non-production of emails, which either were or were not offered by the defendant as evidence exhibits, in connection with the consideration of the adverse inference.

The plaintiff asks the court to infer that documents not produced by the defendant would have provided evidence against the defendant's interest. A party seeking an adverse inference instruction based upon evidence not being produced in time for use at trial must establish:

> (1) That the party having control of the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had a "culpable state of mind"; and (3) that the destroyed evidence is "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

Residential Funding Corp., 306 F.3d at 107. As to the second element, "a culpable state of mind," the Circuit has held that such factor "is satisfied by a showing that the evidence was [not produced] knowingly, even without intent to breach a duty to [produce] it, or negligently." Id. at 108 (citing Byrnie v. Town of Cromwell, 243 F.3d 93, 109 (2d Cir. 2001) (internal quotation marks and emphasis omitted).

With respect to the third element of the Residential Funding Corp. test, this court understands that Wood is not to be subjected to "too strict a standard of proof" because doing so "would subvert the purposes of the adverse inference, and would allow parties who have destroyed [or failed to produce] evidence to profit from that destruction [or failure]." Id. at 109 (citing Kronisch, 150 F.3d at 127; Byrnie, 243 F.3d at 110) (internal quotations omitted). Further, the court is aware that the Residential Funding court held that, where there is a finding of bad faith or gross negligence, that same evidence "will frequently also be sufficient" to permit the court to conclude that the missing evidence is favorable to the party." Id.

This Circuit has identified several reasons for permitting an adverse inference to be drawn from the non-production or destruction of documents. First, the Circuit has

- 5 -

said such a rule of an adverse inference will deter parties from destroying or hiding evidence. <u>Byrnie</u>, 243 F.3d at 107.  Further, it places the risk of non-production on the person who failed to produce it. <u>Id</u>.  Finally, it places the party harmed by the non-disclosure in a position it would have been in the absence of the non-disclosure.  <u>Id</u>.

### III.    DISCUSSION

#### 1.    Timing of Wood's Motion

The timing of Wood's Motion is sufficient reason for this court to decline to exercise its discretion in granting the Motion and the relief she seeks.  Wood rests her arguments in support of the relief she seeks upon document production and deposition testimony which all took place in the first four months of 2004.  Yet her Motion was not filed until late in June of 2005, on the eve of the final pretrial conference.  The thrust of Wood's Motion is that Sempra failed to comply with discovery in the first part of 2004.  The court, of course, does not condone any failure to produce documents called for by document requests or court Order.  However, the court also does not wish to condone the practice of waiting until the eve of trial to bring discovery problems to the court's attention.

On the basis of timing alone, the court denies Wood's Motion for an Adverse Inference.  While a motion for an adverse inference can be filed just in advance of the trial itself, it should be preceded by efforts to compel compliance with discovery requests, and even motions for contempt.  Here, there were motions to compel, which were granted in part, but no follow-up motions were filed by plaintiff.  Even if the plaintiff's motion had been timely, however, the court would still decline to grant an

adverse inference.

### 2.    The Alleged Non-Production

**A.    Emails**.  Wood claims that she made several requests for production of documents that related to her termination of employment and communication among fellow colleagues about her, which document she claims she did not receive.  She cites to testimony of defendant witnesses at depositions taken by her counsel as support for her conclusion that defendant's search of its files was inadequate.  The court will address in turn each of Wood's grounds for her argument that the search by Sempra was inadequate, and emails and other documents which she claims exists have failed to be produced.

Wood first cites to a deposition by Denise Freda, who is a Vice President and Human Resources Manager at Sempra.  Freda was asked if she had made a search of her computer files for documents responsive to Wood's discovery requests, to which she replied that she only looked for emails between herself and Wood.  Freda participated in Wood's termination.  What Wood's counsel fails to cite in Freda's deposition testimony, however, is her unqualified statement that, "I did not have any email communication with anyone about Susan Wood's termination."  Freda Dep. Ex. 8 to Def.'s Opp. to Plf.'s Mot. in Limine at 61 ["Def.'s Opp."] [Dkt. No. 96].

Next, Wood cites the deposition testimony of Steven J. Prince that he had "written reports" that existed to assess Wood's profitability.  Wood complains that the reports referenced by Prince at his deposition were not produced by Sempra until after Mr. Roy's deposition, and what was produced were only partial reports which did not

identify Wood.  Sempra responds that it did in fact produce records that documented the profitability of the various profit centers, such as the Petroleum Derivatives Department where Wood worked.  See Letter from P. Schultz to B. O'Rourke, April 13, 2004, Ex. 5 to Def.'s Opp. [Dkt. No. 96].  While the production by Sempra may have been untimely, it was received before the re-noticed deposition of Mr. Prince, as well as before the depositions of Messrs. Cummings and Mitchell, all of whom are senior Sempra executives.  Wood's counsel did not request, based on the late production of the documents, to retake Roy's deposition concerning these documents, which he could have done, as well as requesting costs from the court for the second deposition. To the extent the late production of the documents harmed Wood, it was a harm that could have been avoided, or at least addressed at the time the problem arose and not on the eve of trial.

Next, Wood points to a deposition of Brian Cumming ("Cumming"), who was Wood's supervisor for much of the time she worked at Sempra.  At his deposition, Cumming admitted he did not search his records for documentation concerning Sempra's defense against Wood's claim.  Plt.'s Mem. Ex. D at 4-5.  In arguing that this statement proves a failure in production, Wood's counsel relies on the fact that Cumming indicated he had conversations with Wood and then infers that "it can be reasonably concluded that he had possession of documents relating" to Wood.  Plf.'s Mem. Supp. Mot. in Limine at 11 ["Plf.'s Mem."] [Dkt. No. 91].

This is only one of many instances in which Wood's counsel seeks to draw inferences that are not well founded and which this court will not draw.  First, Cumming specifically testified at that same deposition that he did not take any notes in connection

- 8 -

with conversations he had that involved or affected Wood.  Dep. of Cumming at 6, Ex. 7 to Def.'s Mem. [Dkt. No. 96].  Further, it bears noting that Wood's counsel did not ask Cumming if he ever had any documents that related to Wood or her claims.  Thus, the inference he asks the court  to draw is unfounded.

Next, Wood cites to the deposition of Joseph Howley ("Howley"), which deposition Wood claims evidences that Howley made "little effort to retrieve emails" that might have been related to Wood.  Plf.'s Mem. at 11 [Dkt. No. 91].  Howley was involved in an incident with Wood in connection with which Wood filed a complaint against Howley.  Again, Wood states without support that, "It can be reasonably concluded that [Howley] had responsive emails, which have not been produced by Sempra."  Id.

However, Wood fails to cite to another portion of Howley's deposition in which he states that he did not communicate with anyone via email about the incident with Wood. Howley Dep. at 14, Ex. E, Plf.'s Mem. [Dkt. No. 91].  Further, Howley testified that he did make a search for documents concerning Wood.  Id. at 10-12.  The only thing he did not do was to search historic emails, to which he had no access.

While the court will not rely on the affidavits filed *ex parte*, it will rely upon Sempra's counsel's representation in its supplemental memorandum filed with the *ex parte* affidavits.  Counsel represents that a freeze was put on document destruction when Sempra became aware of Wood's CCHRO complaint, and that historic backup tapes were searched in connection with the discovery requests.

Wood also seeks to rely upon testimony given by Jacqueline Mitchell ("Mitchell"), Wood's supervisor when she first went to work at Sempra.  In her testimony, Mitchell

refers to "P&Ls" which show how profitable business is; Mitchell indicated that she used these reports to determine the profitability of each marketer.  Mitchell Dep. at 23-27, Ex. F., Plf.'s Mem. [Dkt. No. 91].  The court will discuss this in connection with the discussion below concerning spreadsheets.  However, it bears noting that Wood worked under Mitchell for the first few months of her employment, and then transferred to the Petroleum Derivatives Department where she worked for more than a year before her termination.  Further, the court finds that the bonus paid to Wood for the few months she worked at Sempra in the year 2000 under Mitchell's direction was "nominal" and not in any way based upon her profitability.

Lastly, Wood cites to Sarathi Roy's deposition in which he stated that he maintained notebooks in which he kept notes.  Roy Dep. at 41, Ex. G, Plf.'s Mem. However, a closer examination of Roy's testimony at his deposition makes it clear that, while he did look through the notebook in responding to Woods discovery request, he did not find anything relevant.  Roy Dep. at 51, Ex. 6, Def.'s Opp. [Dkt. No. 96].  Further, he stated that he did not make handwritten notations in his notebooks about the performance of people in his department.  Id. at 50.

Taking the record before this court as a whole, it appears that the defendant did not fail to do an appropriate search in order to comply with the discovery requests of Wood, as modified and ordered by the court.  The court does note that the compliance was not exactly prompt.  There is no question that a delay occurred in producing some documents that should have been produced sooner.  However, the court cannot find either that Sempra failed to do a thorough search for documents responsive to Wood's request, nor can it find that there are documents that exist which Sempra has

purposefully withheld.

On the subject of "missing emails" and other documents, putting aside the deposition testimony cited by Wood and discussed above as adequately responded to by Sempra, Wood does not point to any particular documents or even categories of documents that exist and that have not been produced.  The Motion in this respect rests upon the claim of a failure to do a thorough search, which the court finds to be unsupported.  The other basis for Wood's Motion in this respect is that she wrote a lot of emails, and therefore other people must have written many emails as well, and these emails have not been produced.  While the court recognizes under the Second Circuit precedent that the burden of demonstrating what is missing cannot be too heavy a burden on the plaintiff, Residential Funding Corp., 306 F.3d at 109, the relevance prong of the sanctions test does place some burden upon the plaintiff in this regard.  The plaintiff's Motion merely speculates with regard to "missing" emails.  Sempra has explained that, given the nature of its business and the location of employees in close proximity on a trading floor, much work is done orally, and email traffic is limited.  Further, the fact that Wood wrote a lot of emails does not necessarily mean that other people at Sempra did as well.  It must be remembered that she was a recent hire of Sempra, that she came from Enron and before that other corporate settings where memorializing matters in emails or using emails as a means of communication may very well have been a common practice.  However, that does not mean that the people who worked at Sempra had the same email communication habits as Wood. Therefore, the court concludes that Wood has failed to create a record upon which this

court would exercise its discretion to draw an adverse inference.[1]

### 3.    Spreadsheets

The second category of document production about which Wood complains relates to financial statements and materials that Wood sought in order to demonstrate her profitability as well as her damages (hereinafter referred to as "spreadsheets"). Wood cites to Prince's deposition testimony that he had seen written reports that were used to assess Wood's profitability.  Prince Dep. at 34-36, Ex. C, Plf.'s Mem.  She also cites to Mitchell's deposition, in which Mitchell refers to "P&Ls" which she used to determine the profitability of a marketer.  Mitchell Dep. at 27, Ex. F, Plf.'s Mem.

The production of these spreadsheets flowed from certain document requests by Wood, which became the subject of a discovery status conference with the court on January 6, 2004.  Interrogatories 7 and 8 and Request for Production 4 related to obtaining discovery from Sempra concerning bonuses paid in various departments. The court ordered Sempra to answer Interrogatory 7 as modified.  With respect to any criteria referenced by Sempra in connection with "their evaluation of employee performance from January 2000 to December 2002, Sempra was to state Susan Woods' performance with respect to that criteria."  Telephonic Discovery Conf. Tr. at 23, Jan. 6, 2004 [Dkt. No. 152].  The court made the same order with respect to

---

[1]  Wood also seeks to preclude certain evidence based upon Sempra's failure to properly comply with discovery.  However, Wood does not identify the particular exhibits she seeks to preclude, either in her Motion or Memorandum in Support of a Motion in Limine or by indicating an objection on that basis to the introduction of a defendant's exhibit on the defendant's proposed exhibit (which was a part of the pretrial compliance).  Joint Pretrial Mem. (Revised) [Dkt. No. 97]; see Final Pretrial Order [Dkt. No. 80].  In the absence of any identification of particular exhibits, this aspect of the Motion is denied with respect to the alleged failure to produce emails and other documents.

Interrogatory 8 as it related to other persons in the Gas and Petroleum Derivatives Departments (at the Assistant Vice President and Vice President level).  Id. at 29.  With respect to Request for Production No. 4, the court ordered that any documents with respect to the payment of bonuses in the time period, and for the people covered by Interrogatories 7 and 8 as modified, must be produced.  Sempra provided supplemental response to those and other interrogatories that were the subject of that telephone conference.

Wood was employed at Sempra for a period which covered the end of two calendar years, December 2000 and December 2001, at which times bonuses were calculated.  With respect to the latter time, she was employed in the Petroleum Derivatives Department and worked for Brian Cumming.  Cumming testified that the Petroleum Derivatives Department lost a lot of money in 2001, and that he, in effect, had to go to his boss to "get him to give me money that year to pay bonuses."  Trial Tr., vol.2, 107, July 26, 2005 [Dkt. No. 126].  Cumming testified credibly that he did not rely on any documentation, spreadsheets or otherwise, in determining what bonuses to pay. Id. at 108.  He said he was basically trying to determine what "their contribution had been. . . .  It was almost like a replacement cost on the individual."  Id. at 108.

With respect to the first time period, December 2000, Wood worked in the Natural Gas Department under Jacqueline Mitchell.  Mitchell described the determination of bonuses at that time period to be "a lot of guess work" in trying to determine what marketers were responsible for what profit.  Trial Tr., vol.4, 165, Aug. 30, 2005 [Dkt. No. 153].  Mitchell credibly stated that she did not have profit and loss statements that she compiled for the marketers at the time that Wood worked in her

group. Id. at 165.  Subsequent to Wood's transfer out of the Natural Gas Department,

Mitchell began in 2002 to require traders to track their "profit."  Id.

　　　For her last period of employment at Sempra, Wood worked under Roy.

However, no bonuses were awarded during that period of time, and her employment did

not encompass a year-end.

　　　Sempra did produce certain spreadsheets.  Among them were year-end/

quarterly profit and loss reports for various departments or segments of Sempra's

businesses, including the Petroleum Derivatives Department and the Natural Gas

Departments, as well as the 2002 Natural Gas Department profit and loss statement.

Further, they produced a document concerning profit prepared by another marketer,

Steven Soule, who transferred into the Petroleum Derivatives Department after Wood

left.  Sempra argues that Wood never specifically requested any spreadsheets, despite

the fact that Wood was aware of the existence of such records.  While Sempra is

correct that these documents were not called for specifically, they were called for if they

related to a calculation of a bonus paid to persons in the Natural Gas or the Petroleum

Derivative Departments between 2000 and 2002.  However, the only document which

appears to fall into this category is the 2002 spreadsheets produced for the Natural Gas

Department.  Clearly, Cumming's testimony (which the court credits) establishes

unequivocally that he did not look at any profit statements because there was no profit

in the Petroleum Derivatives Group for the year 2000.  Thus, he did not rely on a profit

statement or a spreadsheet of any kind in determining bonuses.  Mitchell's testimony is

relatively clear and credible that she evolved the process of determining bonuses by

relying on profit sheets created either by Sempra or by the persons who reported to her

at her direction.  Her testimony suggests that this did not evolve into a formal process until 2002.  Thus, it appears that any documents that are arguably responsive to this request were, in fact, produced.

What causes this court to have some pause on this issue, however, is the late production of those few documents, as well as the failure to produce "profit" spreadsheets that were maintained informally by marketers.  As Sempra points out, they did produce profit sheets of Steven Soule, one of the marketers.  However, another marketer, Albert Vogel, testified that he maintained his own profit sheet in an Excel program on a company computer, and the court is unaware of the production of that document.  See A. Vogel Tr. Dep., Sep. 6, 2005, Ex. 673A & B, at 41-42.  Given the court's Order that "related to" with respect to the subject matter of Request for Production No. 4 should be broadly applied, it is arguable that the individual marketer's own spreadsheets showing the deals they worked on (and thus their "profitability") should have been produced by Sempra.

However, the court cannot say that failure to produce them is a failure to comply with discovery.  Sempra's position is that they did not rely on the "profit" sheets prepared by the marketers in determining bonuses paid in these two departments in the three-year period covered by the Request, as modified by the court's Order.  The record supports that position with the possible exception of Mitchell's group in the year 2002.  However, given that Wood was not in that Department for that year, and that her 2000 bonus in that Department was not determined based on "profit" or any profit sheets, the court does not find this possible failure sufficient to support an adverse inference.  To the extent it failed to produce individual marketers "profit sheets" for 2002 in the Natural

Gas Department, the court finds these profit sheets are not "relevant," because the court cannot infer that they would support Wood's claim, and it is not clear Sempra had an obligation to produce them.  See <u>Residential Funding</u>, <u>supra</u>, 306 F.3d at 107.

## IV.    CONCLUSION

Based on review of the materials and memorandum before this court in connection with this Motion in Limine, the court concludes that Sempra did not destroy any documents.  Indeed, it timely froze any destruction that might have taken place in the ordinary course.  While its production was tardy in some respects, it eventually produced all documents which reasonably could be said to be responsive to the document requests as modified by the court.

For the foregoing reasons, the court denies the plaintiff's Motion in Limine to Preclude or for an Adverse Inference [Dkt. No. 91].

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 9th day of December, 2005.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge