UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SUSAN E. WOOD, : | |
|     Plaintiff, : | |
| : | CIVIL ACTION NO. |
| v. : | 3:03-cv-986 (JCH) |
| : | |
| SEMPRA ENERGY TRADING : | |
| CORPORATION, : | |
|     Defendant. : | DECEMBER 9, 2005 |

**BENCH TRIAL RULING**

The plaintiff, Susan Wood ("Wood"), commenced this action in June 2003 against her former employer, Sempra Energy Trading Corporation ("Sempra"). In her Complaint, Wood asserted 14 claims. After the court ruled on Sempra's Motion for Summary Judgment, denying in part and granting in part that Motion, there were remaining for trial Counts 1 and 2, which asserted discrimination on the basis of Wood's gender pursuant to federal and state law; Count 3 which alleged discrimination on the basis of sexual orientation pursuant to state law; and Counts 4 and 5 which alleged retaliatory discharge in violation of federal and state law.[1] These remaining claims of discrimination and retaliation were tried before the court on July 25, 26 and 27, and August 30, 2005.

**I.   FINDINGS OF FACT**

Wood commenced her employment at Sempra as an Assistant Vice President in the fall of 2000. Prior to joining Sempra, Wood had worked at Enron in Houston, Texas

---

[1] Sempra did not move for summary judgment on Count 11, which sought payment of certain business expenses. However, that Count was settled between the parties prior to trial and was then withdrawn by Wood.

for approximately a year and a half.  For approximately one year of that time, she was involved as a marketer in oil and natural gas areas.  As a marketer, she worked with traders in an attempt to bring in deals with customers who were typically large utilities.  The deals were done either as derivatives or hedged.

Sempra is an energy commodities trading company, with approximately 500 employees.  Wood was employed in the Stamford office of Sempra.  The business of Sempra is to market and trade physical and financial energy products and other commodities, such as crude oil and refined products, natural gas and natural gas liquids, power, coal, and emissions.  When Wood joined Sempra in the fall of 2000, she was hired to provide backup support to Elizabeth Dwyer ("Dwyer"), a senior marketer in the Natural Gas Marketing Department.  In addition, she was responsible for selling gas derivatives to Sempra's customers.  Her supervisor at the time was Jackie Mitchell ("Mitchell").  After several months of working with Wood, Dwyer concluded that she could not rely upon Wood to perform the responsibilities of providing backup support.  Dwyer attributed a problem on a deal with a customer, Crosstex, to Wood's inability to adequately provide correct information to the customer in connection with the prospective deal in Dwyer's absence.

At year end 2000, Mitchell gave Wood an evaluation.  On a scale of 1 to 5, the ratings are 3s, and the verbal comments reflect that Mitchell had not worked with Wood long enough to be able to evaluate her fully.  [Plf. Ex. 6].  In addition, at year end, and keeping with company practice, fellow employees evaluated Wood.  [Plf. Ex. 4]  These evaluations, while varied, were generally mediocre.

In early 2001, Wood transferred to a marketing position in the Petroleum Derivatives Department, a group at Sempra managed by Brian Cumming ("Cumming").[2] She remained in that department until her termination in March of 2002.

As a derivatives marketer, Wood was tasked with servicing existing customers and identifying new customers. As with all derivative marketers, she sought to generate transactions with customers who typically were users of petroleum derivative products. Derivative marketers worked with traders in the Petroleum Derivatives Department, who actually effectuated the trades upon which the transactions were based.

As Wood's supervisor, Cumming had the opportunity to observe her. He came to the view that Wood was less experienced and knowledgeable about the petroleum derivatives market then he had originally thought. Having come to this realization, Cumming sought to mentor Wood by suggesting reading she could do to add to her knowledge. In addition, Cumming determined that, in her customer meetings, Wood should be accompanied by a more experienced marketer. Wood made at least two trips with other marketers, and, after those trips, the marketer who accompanied Wood told Cumming that Wood did not understand the market and was not qualified to interact with customers on her own. Alberto Vogel, for example, felt that she lacked basic knowledge that was fundamental to understanding the market. While in his view the customer trip on which he accompanied her went well, Vogel felt that Wood needed to learn more about the market. Sarathi Roy and J.B. Evans, two fellow marketers at the time, told Cumming the same. In addition to Dwyer, Evans and Brian Rickers both

---

[2] While the parties dispute the circumstances under which this transfer came about, that dispute is not material to this decision.

testified that, when they attempted to speak with Wood in order to add to her knowledge about the market, she would defensively react with assurances that she understood or already knew the information they were giving her, when in their view she clearly did not.  As a result of their observations, none of the other marketers in the Petroleum Derivative Department wished to have Wood cover their desks while they were out of the office.  They were concerned that her lack of knowledge would create problems in conversations she might have with their customers in their absence.

It appears undisputed that Wood was responsible for slightly more than $1.1 million in income generated in 2001 through deals she was involved in under Cumming' supervision.  At year-end 2001, she received a $50,000 bonus.  While Wood claimed that this was 10% of her "profit" ($1.1 million less $700,000 for the cost of her desk),[3] Cumming, who determined her bonus and whom the court credits, stated that the entire department lost money that year and that bonuses were awarded solely on the basis of what it would cost to replace a person, in other words a payment made to avoid an expense of having people leave who might do so if no bonuses were paid.  When he determined Wood's bonus for the year 2001, Cumming did not have specific information about the deals for which Wood was responsible or about her "profit."  Cumming did not determine Wood's 2001 bonus based on her "profit" or her deal

---

[3]  When she was hired, the letter written to Wood stated that she could earn bonuses based upon her performance and that of the company.  [Plf. Ex. 3].  A marketer's performance was measured by the "profit" realized on deals attributable to that marketer in excess of the cost of the marketer's "desk," that is, the cost of supporting and maintaining, and paying the salary of, the marketer.  The "rule of thumb" was that a marketer was expected on average to bring in three times his desk cost in order to be profitable.  Bonuses were paid based upon that "profit."

income.

In June 2001, Wood was involved in negotiating a transaction with a customer. At approximately 2:20 p.m. on June 20, 2001, Wood agreed to the transaction with the customer at a price Wood quoted to the customer that was the same as the price that a derivative trader, Joseph Howley, had given Wood for the deal.  Because the price was the same to the customer as it was quoted to her by the trader, Wood would not be credited for any "profit" on the transaction.  Shortly after doing the deal, Wood approached Howley to request that he share some of his profit on the deal with her. Howley would not agree to Wood's proposition to share the profit and asked her to leave, saying that they could talk about it after the trading day ended.  Wood uttered an obscenity at him and walked away.  Shortly thereafter, Wood again approached Howley at his desk, where he was seated monitoring the New York Mercantile Exchange ("NYMEX") market on his computer screen.  At that time, Howley held a large position in that market and had only a few minutes left that day in which to trade.  Wood leaned over Howley's desk, placed both of her hands on the desk in front of his computer screen, and insisted that Howley discuss her deal with her.  Despite Howley's insistence that he would discuss it later, Wood continued to block his view of the computer screen on which he was monitoring the NYMEX market.  Howley told Wood to leave, and, when Wood did not move, Howley took her by the wrist and moved her arms out of the way.  Wood immediately complained about this assault to Mitchell, and, on Mitchell's advice, Wood and Mitchell phoned Wood's supervisor, Brian Cumming, who was in Canada at the time.  Cumming asked Mitchell to assist, and the matter was reported to Sempra's general counsel, Michael Goldstein, who investigated the matter.  Howley

apologized to Wood that day. Eventually, Goldstein completed his investigation. Howley was reprimanded for his conduct and advised that his physical contact with Wood was inappropriate. Wood was also counseled for her actions on the trading floor that afternoon and for having threatened Sempra's financial position by physically interfering with Howley's time-sensitive work.

The entire time that Wood was employed by Sempra in the Petroleum Derivatives Department, that Department suffered severe financial losses. The period from January 2001 through a time after Wood's termination but the date upon which the Department was closed, December 2002, Sempra's Petroleum Derivatives Department lost in excess of $12,000,000. There were a number of obvious reasons for the losses. First, banks and other financial institutions were presenting increasing competition, particularly because of the advantage they had in their ability to provide more favorable credit ratings. Second, the Enron, Arthur Anderson, and like scandals were affecting the markets. Last, and perhaps most significant for Wood, who focused her marketing in part on airlines, the tragic events of September 11, 2001 generally had had a recessionary effect upon the U.S. economy and struck certain parts of the economy, airlines in particular, hard. These losses led to personnel changes even before Wood's termination. In 2001, Cumming terminated a derivatives trader, James Rohan. Also in 2001, a Petroleum Derivatives marketer resigned. Further, Cumming asked in late 2001 if he could surrender his position as manager of the Petroleum Derivatives Department and instead focus on more profitable departments.

As a result of Cumming's resignation in late 2001, Sempra appointed Sarathi Roy to head up the marketing function of the Petroleum Derivatives Department in

February 2002. At this point, Roy became Wood's direct supervisor. Previously, he had been an experienced marketer in the Petroleum Derivatives Department with Wood. Roy was aware that two other marketers in the department, Vogel and Evans, did not want Wood to cover their desks and take their customers' phone calls when they were out of the office because they felt Wood did not understand the limitation of risk management services that the department offered and was not able to communicate those limitations to their customers. Based on his own experience as a marketer working with Wood, he also did not wish Wood to cover his desk and take his customer calls because he believed that Wood lacked the understanding of certain, important aspects of their business.

In addition, Roy learned about a deal that Wood had closed in January 2002 with UPS. That was a deal worth more than $1,000,000 to the company. Roy learned that UPS had received incorrect historic data, which lead to a miscalculation such that it paid far more on the deal then the market would have called for. Roy concluded, based on the information he received, that Wood had been the source of the miscalculated information.

When Roy took over the Petroleum Derivatives Department in early 2002, he was charged by management with "returning the department to profitability." In that regard, Roy eventually determined that he would focus the efforts of the Department on a specific customer base, the hedge fund industry. Based on his experience with customers in that industry, he understood that they had no tolerance for errors. Roy concluded that Wood could not perform in the refocused Petroleum Derivative Department because she lacked the skills and experience necessary to work with these

sophisticated clients. He finally reached this decision in early March of 2002. When he did, he made inquiries as to whether there was a position for Wood elsewhere in the company. However, he did not locate one, and he terminated Wood on March 8, 2002.

During her employment at Sempra, Wood enjoyed friendly relationships with her fellow workers, with the possible exception of the Howley incident. She was particularly friendly with Roy and had even invited him and his wife to her Super Bowl party.

Wood on the one hand, and her fellow marketers on the other, claim that each made inappropriate remarks. Roy and Evans both testified about comments Wood made which they felt were inappropriate in a work setting. Roy testified about what he viewed as inappropriate conduct. The court finds that, while there may have been things said or done that did not meet a level of what might be considered proper office decorum, nothing was said or done by Wood or others that had any impact upon the decision to terminate Wood.

Sempra maintains a written anti-harassment policy that has been in place since well before Wood's employment began. This policy prohibits, *inter alia*, discrimination or harassment on the basis of gender or sexual orientation. The policy provides for a procedure to report complaints about such inappropriate behavior. Wood received and read a copy of this policy before she commenced her employment at Sempra. Wood never made a complaint, pursuant to this procedure, that she was subject to harassment based on her sexual orientation or gender.

## II. CONCLUSIONS OF LAW

### A. Sexual Discrimination and Sexual Orientation Discrimination Claims

In Count I of her Complaint, Wood alleges that she was discriminated against in that the termination of her employment in March 2002 was motivated by her gender, in violation of Title VII of the U.S. Civil Rights Act of 1964, as amended ("Title VII"). See 42 U.S.C. § 2000e-2(a). She makes a similar claim in Count 2 based upon the Connecticut Fair Employment Practices Act ("CFEPA"). See Conn.Gen.Stat. §46a-81(c). In Count III, she alleges discrimination on the basis of sexual orientation in violation of CFEPA.

Since 1964, Title VII has made it "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual . . . , because of such individual's . . . sex, . . . .'" Desert Palace, Inc. v. Koster, 539 U.S. 90, 93 (2003) (citing 42 U.S.C. §200e-2(a)(1). CFEPA likewise bars discrimination on the basis of sex. Conn. Gen. Stat. § 46a-60(a)(1). It also, however, bars discrimination based on sexual orientation, as follows:

> "It shall be a discriminatory practice in violation of this section: (1) For an employer, by himself or his agent, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against him in compensation or in terms, conditions or privileges of employment because of the individual's sexual orientation, . . . ."

Conn. Gen. Stat. §46a-81c.

Following the 1991 amendment of Title VII, an unlawful employment practice is proven when "the complaining party demonstrates that . . . sex [or, in the case of the CFEPA, sexual orientation], . . . was a motivating factor for any employment practice,

even though other factors also motivated the practice." 42 U.S.C. §2000e-2(m); see Desert Palace, Inc. v. Koster, 539 U.S. 90 (2003) (discussing "mixed-motive" cases). A plaintiff can establish a claim of disparate treatment under Title VII or the CFEPA,[4] "either (1) by showing that (s)he has suffered an adverse job action under circumstances giving rise to an inference of discrimination . . . (on a protected ground), or (2) by demonstrating that harassment on one or more of these bases amounted to a hostile work environment." Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004) (internal citation omitted)[5].

It is undisputed in this case that Wood has suffered an adverse employment action: she was terminated from her employment. The question then to be addressed is whether that adverse employment action was motivated in part, or in whole, by her gender or sexual orientation.[6]

---

[4] As both parties agree, the case law interpreting Title VII also guides the interpretation of CFEPA. Brittell v. Dep't of Correction, 717 A.2d 1254, 1264 (Conn. 1998).

[5] The plaintiff asserts a claim of type (1).

[6] It should be noted that Title VII suits fall into two basic categories: "single issue motivation" and "dual issue motivation" cases. In single issue motivation cases, "the single issue [is] whether an impermissible reason motivated the adverse action," which courts analyze under the framework first set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In dual issue motivation cases, the determination involves "both the issue of whether the plaintiff has proved that an impermissible reason motivated the adverse action and the additional issue of whether the defendant has proved that it would have taken the same action for a permissible reason, which is analyzed under the framework set forth in Price Waterhouse v. Hopkins, 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion) [and, more recently, Desert Palace." Bickerstaff v. Vassar College, 196 F.3d 435 (2d Cir. 1999). Wood presents her claim as one of single issue motivation, and Sempra defends in a similar manner. Moreover, the court does not find that Wood's termination was motivated by any impermissible factors at all. Therefore, the court does not find it necessary to undertake a "dual issue motivation" analysis. The court further notes that the Second Circuit has held that "[t]he 'ultimate issue' in an employment discrimination case is whether the plaintiff has met her burden of proving that the adverse

A Title VII plaintiff can prove her case by direct proof or circumstantial evidence of discrimination. See Desert Palace, Inc. v. Koster, 539 U.S. 90 (2003) (holding that direct evidence of discrimination is not required for mixed-motive cases under 42 U.S.C. § 2000e-2(m)); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 526 (1993). Where, as here, a Title VII case relies on circumstantial evidence of discrimination, the court follows the burden-shifting analysis first announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).[7] Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005); Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-149 (2000); Hicks, 509 U.S. at 506-511; Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248,

---

employment decision was motivated at least in part by an 'impermissible reason,' i.e., a discriminatory reason," regardless of whether the case is presented as one of single or dual motive. Stratton v. Dep't for the Aging for New York, 132 F.3d 869, 878 (2d Cir. 1997).

[7]Some courts have declined to continue to apply the McDonald Douglas-Burdine-Hicks burden-shifting analysis to Title VII claims following the Supreme Court's Desert Palace decision, e.g., Dare v. Wal-Mart Stores, Inc., 267 F.Supp.2d 987(D.Minn.2003). However, the Second Circuit continues to apply the burden-shifting analysis. See, e.g., Feingold v. New York, 366 F.3d 138 (2d Cir. 2004) (applying McDonnell Douglas in a summary judgment context); Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005) (same). While the Second Circuit has indicated that the McDonnell Douglas framework is not to be used in a jury charge, Gordon v. New York City Bd. of Educ., 232 F.3d 111, 118 (2d Cir. 2000), and the Supreme Court has held that a bench ruling should not employ the McDonnell Douglas analysis where it obscures the ultimate issue of whether the plaintiff has carried his or her burden, United States Postal Service Bd. of Governors v. Aikens, 460 U.S. 711 (1983), the Second Circuit still appears to consider this framework to be a helpful and appropriate guide for a bench trial ruling. See generally Fisher v. Vassar College, 70 F.3d 1420, 1432 (2d Cir. 1995) (post-Aikens review of bench trial ruling, using the burden-shifting analysis); Sweeney v. Research Found. of the State Univ. of New York, 711 F.2d 1179, 1184-85 (2d Cir. 1983) ("Although under Aikens, we need not linger long over the question of whether Sweeney in fact established a prima facie case before we turn our attention to 'the ultimate question of discrimination vel non,' . . . we note, that the district court properly found that Sweeney had established a prima facie case."); see also Maietta v. Potter, 70 Fed. Appx. 28 (2d Cir. 2003) (affirming bench ruling that applied McDonnell Douglas framework, examining only the manner in which the trial judgment applied the framework, not the use of the framework); Sank v. C.U.N.Y., 2003 WL 21403682 (S.D.N.Y. June 19, 2003) (Sweet, J.) (applying McDonnell Douglas in a Title VII bench ruling and citing Gordon for the elements of the McDonnell Douglas framework).

253-256 (1981). The plaintiff bears the initial burden of establishing a prima facie case of discrimination. Id. She may make out a prima facie case by showing that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she experienced an adverse employment action; and (4) the adverse action occurred under circumstances that give rise to an inference of discriminatory intent. E.g., Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004). Once a plaintiff has established a prima facie case, a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to offer a legitimate, non-discriminatory "business rationale" for its actions.[8] Id. If a defendant offers a legitimate, non-discriminatory reason for its actions, the burden shifts back to the plaintiff to fulfill her ultimate burden of proving that the defendant intentionally discriminated against her in the employment action. Reeves, 530 U.S. at 143. In order to satisfy this burden, the plaintiff may attempt to prove that the legitimate, non-discriminatory reason offered by the defendant was not the employer's true reason, but was a pretext for discrimination. Reeves, 530 U.S. at 143. Ultimately, a finder of fact may consider the strength of the prima facie case, the probative value of the proof that the defendant's reason is pretextual, and any other evidence presented in the case when determining if the plaintiff has sustained her burden. Zimmermann v. Assoc. First Capital Corp., 251 F.3d 376, 381-82 (2d Cir. 2001).

The first and third elements of the prima facie case are undisputed. Wood is a

---

[8] The 1991 amendment also established an affirmative defense for an employer who can "'demonstrat[e] that [it] would have taken the same action in the absence of the impermissible motivating factor." Desert Palace, 539 U.S. at 95 (quoting § 2000e-5(g)(2)(B)).

member of a protected class, because she is female and, as relevant to the CFEPA claim, lesbian. She suffered an adverse employment action when the defendant discharged her from its employment. The defendant argues, however, that the plaintiff has not proven the fourth element, that termination occurred under circumstances giving rise to an inference of discriminatory intent. The court agrees with the defendant. The court finds that none of the comments Wood has attributed to her former co-workers, even if made, support an inference that her gender or sexual orientation was a factor in her termination. The record, taken as a whole, lacks evidence suggesting an improper motivation for her termination. Thus, the court finds that the circumstances under which Wood's termination occurred do not give rise to an inference of discriminatory intent, even considering the minimal nature of the prima facie case.

Moreover, even if Wood had made out a prima facie case, Sempra has proven a legitimate, non-discriminatory business rationale for her termination. The court credits the evidence offered by Sempra that Wood was not profitable enough, in relation to the cost of her position, and she lacked sufficient knowledge about the market and business in order to be maintained in a refocused Petroleum Derivatives Department. For example, Bill Cumming, her supervisor in that Department for most of her employment there, testified that he observed that Wood "had very little experience and very little understanding" of either the commodities or the financial instruments that the group traded, and that for this reason he refused to let her meet with customers without another marketer present. Trial Tr., vol. 2, 94-97, July 26, 2005 [Dkt. No. 126]. The court credits this testimony as well as that of several other witnesses, discussed in greater detail above, that other marketers in the Petroleum Derivatives Department

were concerned about Wood's lack of knowledge of the commodities the group traded.

Most significantly, this court also credits the testimony of Roy, who fired Wood, with regard to his reasons for terminating her. Roy testified that, during her time with the Petroleum Derivative Department, Wood insisted on pursuing high-risk airline clients, even though Roy discouraged this tactic. When Roy assumed management of the Petroleum Derivative Department, following a year in which that Department lost money, he decided that the Department should abandon the types of clients that made up much of Wood's customer list. He also decided the Department should focus more on hedge funds, an area in which Wood did not appear to have had experience. In addition to the mismatch between Wood's area of expertise and the Department's re-focus, Roy testified based on his experience working with her that Wood was not profitable, had less experience than the other marketers in the Department, was unreliable, and was not willing to learn. The court finds that the decision to terminate Wood was a business decision made without any motivation based upon her gender or her sexual orientation. It finds that Sempra did not have any discriminatory motivation for the termination. Further, the court finds no evidence that would allow Wood to rebut Sempra's proffered reason for her termination. The court finds that Wood has failed in her ultimate burden of proof of establishing, by a preponderance of the evidence that gender or sexual orientation was a motivating factor in her termination.

### B.    Retaliation Claim

Wood also claims that she was discharged by Sempra in retaliation for filing a complaint with respect to the Howley incident, which retaliatory discharge is in violation

of both Title VII and CFEPA.[9]  Title VII provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). "A retaliation claim follows the familiar burden shifting framework developed to evaluate allegations of disparate treatment." Juke v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005).  In order for Wood to prove her claim of retaliatory discharge, she must show:

1) that she was engaged in protected activity by opposing a practice made unlawful by Title VII;

2) that the employer was aware of that activity;

3) that she suffered adverse employment action; and

4) that there was a causal connection between the protected activity and the adverse action.

Galdieri/Ambrosini v. Nat'l. Realty & Dev. Corp., 136 F3d 276, 292 (2d Cir. 1998), see Jute, 420 F.3d at 173.  Once a plaintiff has made out a prima facie case of retaliation, the burden shifts to the defendant to show a legitimate, non-retaliatory, reason for the termination.  Jute, 420 F.3d at 173.  It then shifts back to the plaintiff to show that retaliation "was a substantial reason for the adverse employment action." Id.  As discussed above, it is undisputed that Wood has suffered an adverse employment action by her termination in March of 2002.  She claims that her complaint about the

---

[9] The elements of proof under both Title VII and CFEPA are essentially the same.  See Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 171 n.4 (2d Cir. 2005); Brittell, 717 A.2d at 1264.

Howley incident was a protected activity in that she was opposing conduct by Howley made unlawful by Title VII.

The court concludes that Wood has failed in her burden of proof that she was engaged in protected activity. Although Wood did complain to her superiors about the incident with Howley, she admitted at trial that she made no mention of either her gender or her sexual orientation as part of her initial call with Mitchell and Cumming. Trial Tr., vol. 1, 158, July 25, 2005 [Dkt. No. 125]. She testified that she told Goldstein that she felt that Howley's action in grabbing her arm was a violation of company policy, Id. at 163-64, she did not know which policy it violated, and she did not allege in her complaint that Howley's action was motivated in any way by Wood's sex or sexual orientation. Goldstein testified credibly that Wood had never told him that her complaint involved harassment. Trial Tr., vol. 3, 43-44, 61, July 27, 2005 [Dkt. No. 132]. He also testified credibly and reasonably that he did not understand the physical contact between Howley and Wood to be "sexually related," nor "in any way based on gender." Id. at 61. Nor does the incident report that Goldstein prepared after his investigation contain any allegations of discriminatory behavior based on Wood's sex or sexual orientation. Indeed, even when Wood had an opportunity to comment on this report, she added no accusation that the incident related in any way to her gender or sexual orientation. See Incident Report, unsigned, with handwritten notes by Susan Wood, Ex. 588; Trial Tr., vol. 3, 69-71, July 27, 2005 [Dkt. No. 132]. Wood has not established that she engaged in a protected activity. Thus, she fails to make out a prima facie case of retaliation. The court finds that the incident between Wood and Howley, while completely regretable, was a business dispute. There is nothing about her gender that

was involved in that dispute.  Howley's grabbing of her arm and moving her out of the way of his computer was not based on Wood's sex.  There is absolutely no evidence in that regard.  It was based upon poor judgment driven by stress in the face of a closing market and likely loss of a substantial amount of money by Howley.  Nothing Howley said or did suggests in any way that he said or did it because of Wood's gender or sexual orientation.

In addition, the court also concludes that Wood's claims of retaliation in Counts 4 and 5 have failed for want of proof with respect to the fourth element of that claim, a causal connection between protected activity and the adverse action.  The court finds no evidence that Wood's complaints about the Howley incident, which occurred in late June 2000, had any causal relationship to Wood's termination on March 8, 2001.  The evidence shows merely that Sempra terminated Wood roughly eight months after the Howley incident and subsequent complaint.  Although a causal connection may sometimes be inferred when an adverse employment action closely follows a protected activity, periods shorter than eight months have been found to be insufficient to create proof of causal connection.  See generally, Clark City School Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (temporal proximity must be "very close" to constitute evidence of causality, citing cases holding periods of three to four months as too distant to support causal link); see also Connor v. Schnuck Markets, Inc., 121 F.3d 1390, 1395 (10th Cir. 1997) (four-month lag will not support an inference of causation.  Further, the court finds no evidence that would tend to suggest a pattern of retaliatory conduct between the time of the Howley incident complaint and Wood's termination.  See, e.g. Marks v. Schnuck Markets, Inc., 76 F.3d 324, 329 (10th Cir. 1996) (holding, in the context of a

Fair Labor Standards Act retaliation claim, that a court might overlook a significant time gap between protected conduct and termination when "the pattern of retaliatory conduct begins soon after the filing of the [ ] complaint and only culminates later in actual discharge") (citing Jackson v. RKO Bottlers of Toledo, Inc., 743 F.2d 370, 377 n. 4 (6th Cir.1984) (Title VII case)).

In connection with her opposition to the Motion for Summary Judgment, Wood relied on an Affidavit in which she attested that Howley was a close friend of Roy, and that the delay was explained by the fact that Roy only became her supervisor in February 2001 and then retaliated shortly thereafter.  Wood argued, and the court accepted for purposes of summary judgment, that this might explain the delay and, therefore, support a causality inference.  However, the court has found that, while Howley and Roy were collegial in the work environment, they were not close friends outside of the work environment.  In this respect the court has credited Howley and Roy's testimony.

There is nothing in the record to connect the Howley incident with Wood's firing. Thus, Wood is left with an eight-month, uneventful period between the alleged protected activity and the adverse employment action.  The court finds that Wood has failed to prove the required causality between any protected activity and her termination.[10]  Wood has failed to prove a prima facie case of Title VII or CFEPA

---

[10] Additionally, Roy testified credibly that he was unaware of any complaint of discrimination or harassment, based on Wood's gender or sexual orientation, regarding the incident between Howley and Wood.  See Gordon v. New York City Bd. of Ed., 232 F.3d 111, 117 (2d Cir. 2000) ("the lack of knowledge on the part of particular individual agents is admissible as some evidence of a lack of causal connection, countering plaintiff's circumstantial evidence or proximity or disparate treatment.

retaliation, and the court does not find it necessary to reach the remaining steps in the burden-shifting analysis.

## IV.	CONCLUSION

Based on the preceding findings of fact and conclusions of law, this court orders that judgment enter in favor of the defendant, Sempra Energy Trading, Inc., on Counts 1, 2, 3, 4 and 5 of the plaintiff's Complaint. The clerk is hereby directed to close the case.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 9th day of December, 2005.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge